1  MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO, P.C.
2  Andrew D. Skale (211096)
   ADSkale@mintz.com
3  Laura Franco (186765)
   LFranco@mintz.com
4  Anthony J. Viola (*pro hac vice forthcoming*)
   AJViola@mintz.com
5  Kara M. Cormier (*pro hac vice forthcoming*)
   KMCormier@mintz.com
6  44 Montgomery Street, 36th Floor
   San Francisco, CA 94104
7  Telephone: 415.432.6000

8  LWD ADVISORS, INC.
   Jeff Hyman (171896)
9  jeff@lwdadvisors.com
   700 El Camino Real Suite 120 #1310
10 Menlo Park CA 94025
   Telephone: 650.219.4229
11
   Attorneys for Plaintiff
12 IYO, INC.

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15

16 IYO, INC.                          Case No. 3:25-cv-4861

17              Plaintiff,            **PLAINTIFF IYO, INC.'S MEMO OF
                                      POINTS AND AUTHORITIES IN
18       v.                           SUPPORT OF ITS MOTION FOR A
                                      TEMPORARY RESTRAINING ORDER
19 IO PRODUCTS, INC., OPENAI, INC.,   AND PRELIMINARY INJUNCTION**
   OPENAI, LLC, SAM ALTMAN, and SIR
20 JONATHAN PAUL IVE,                 Complaint Filed: June 9, 2025
                                      Hearing Date:      TBD
21              Defendants.           Place:             TBD

22

23

24

25

26

27

28

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law
San Diego

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................ 1

II.  FACTS ...................................................................................................... 3

    A.   IYO'S Trademarks ........................................................................ 3

    B.   IYO'S Products ............................................................................. 4

    C.   OpenAI's Commanding Market Presence .................................... 5

    D.   Defendants' Prior Knowledge of IYO Leading Up to Their Infringement........... 5

    E.   The May 21, 2025 Announcement ................................................ 8

    F.   The Announcement Immediately Begins to Irreparably Harm IYO.................. 9

    G.   Plaintiff's Attempts to Stop Defendants' Infringing Conduct .................... 9

    H.   Ongoing Injury to IYO .................................................................. 10

III. LEGAL STANDARDS ............................................................................. 12

IV.  ARGUMENT ............................................................................................ 13

    A.   Plaintiff is Likely to Succeed on the Merits of Trademark Infringement .......... 13

        1.   Plaintiff Has a Valid and Protectable Trademark. .................... 14

        2.   There is a Likelihood of Confusion .......................................... 15

            a.   Defendants' Commercial Strength Will Overwhelm Plaintiff.......... 16

            b.   The Parties Goods are Related. .................................. 17

            c.   The Marks are Nearly Identical. ................................. 17

            d.   There is Already Evidence of Actual Confusion. ............. 18

            e.   The Parties' Marketing Channels Overlap. .................... 19

            f.   The Consumer Care Factor Makes Confusion Likely. ...... 19

            g.   Defendants Intended to Infringe.................................. 19

            h.   Likelihood of Expansion is Irrelevant......................... 20

    B.   Plaintiff Will Suffer Irreparable Injury Without Injunctive Relief ........... 21

        1.   Irreparable Harm is Presumed.................................................. 21

        2.   Plaintiff is Suffering Irreparable Harm .................................... 21

        3.   This Dispute is Ripe and an Injunction is Urgently Needed.......... 22

    C.   The Balance of Equities Tips in Plaintiff's Favor.......................... 23

    D.   An Injunction is in the Public Interest .......................................... 24

    E.   No Bond Should Be Required........................................................ 25

V.   CONCLUSION .......................................................................................... 25

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law
San Diego

i

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

**TABLE OF AUTHORITIES**

*AARP v. 200 Kelsey Assocs., LLC*,
    2009 WL 47499 (S.D.N.Y. Jan. 6, 2009) ............................................................ 23

*AMF, Inc. v. Sleekcraft Boats*,
    174 F.3d (9th Cir. 1979)..................................................................*passim*

*Aurora World v. Ty, Inc.*,
    719 F. Supp. 2d 1115 (C.D. Cal. 2009)............................................................ 15

*Berg v. Cnty. of Los Angeles*,
    2021 WL 4691154 (C.D. Cal. May 28, 2021) .................................................. 13

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,
    2020 WL 5199434 (N.D. Cal. Aug. 17, 2020)........................................ 12, 13, 21

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998)........................................................................ 14

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992)........................................................................ 15

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    618 F.3d 1025 (9th Cir. 2010)........................................................................ 17

*Friends of the Wild Swan v. Weber*,
    767 F.3d 936 (9th Cir. 2014).................................................................... 13, 21

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
    826 F.2d 837 (9th Cir. 1987).......................................................................... 14

*Gucci Am., Inc. v. Los Altos Boots, Inc.*,
    2014 WL 12561613 (C.D. Cal. Aug. 27, 2014)................................................ 23

*Idaho v. Coeur d'Alene Tribe*,
    794 F.3d 1039 (9th Cir. 2015)........................................................................ 13

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
    2 F.4th 1150 (9th Cir. 2021)....................................................................*passim*

*JGX, Inc. v. Handlery*,
    2018 U.S. Dist. LEXIS 27079 (N.D. Cal. 2018)..........................................22-23

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003).......................................................................... 25

*Kahala Franchising, LLC v. Real Faith, LLC*,
    2022 WL 1605377 (C.D. Cal. May 20, 2022) .................................................. 21

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

*Kreation Juicery, Inc. v. Shekarchi*,
    2014 WL 7564679 (C.D. Cal. Sept. 17, 2014)........................................................ 24

*OpenAI, Inc. v. Open A.I., Inc.*,
    2024 WL 4763687 (9th Cir. Nov. 13, 2024)........................................................... 3

*Phillip Morris USA Inc. v. Shalabi*,
    352 F. Supp. 2d 1067 (C.D. Cal. 2004).................................................................. 24

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
    692 F.2d 1272 (9th Cir. 1982)................................................................................ 24

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    354 F.3d 1020 (9th Cir. 2004)................................................................................ 19

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014)................................................................... 14, 16, 19

*Rockport Admin. Servs., LLC v. Integrated Health Sys., LLC*,
    2023 WL 5667867 (C.D. Cal. June 26, 2023) ....................................................... 13

*Tari Labs, LLC v. Lightning Labs, Inc.*,
    2023 WL 2480739 (N.D. Cal. Mar. 13, 2023) ....................................................... 25

*THEIA Techs. LLC v. THEIA Grp., Inc.*,
    2021 WL 291313 (E.D. Pa. Jan. 27, 2021) ............................................................ 23

*U.S. Olympic Comm. v. Xclusive Leisure & Hosp. Ltd.*,
    2008 WL 3971120 (N.D. Cal. Aug. 25, 2008)....................................................... 24

*Winter v. Natural Res. Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 12, 20, 23

*Zobmondo Ent., LLC v. Falls Media, LLC*,
    602 F.3d 1108 (9th Cir. 2010)................................................................................ 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

- iii -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff IYO, Inc. ("IYO" or "Plaintiff") respectfully submits this Memorandum of Points & Authorities in support of its Motion for Temporary Restraining Order and Preliminary Injunction pursuant to Fed. Rule of Civil Pro. 65, Local Rule 65-1, and the Court's inherent equitable powers.

## I.    INTRODUCTION

This case arises from defendants IO Products Inc.'s, OpenAI, Inc.'s, OpenAI LLC's, Sam Altman's, and Sir Jonathan Paul Ive's ("Jony Ive") ("Defendants") brazen and willful infringement of IYO's trademark rights. This is a textbook reverse confusion case: a powerful and well-known junior user is attempting to overwrite the identity and goodwill of a smaller senior user by flooding the market with publicity and capital under a phonetically identical mark.

IYO (pronounced "EYE-OH") spent seven years and over $60 million dollars developing innovative hardware and software that enables users to interact with smartphones, computers, artificial intelligence ("AI"), and the internet without the use of screens, keyboards, mice or other traditional physical interfaces. The company is currently finalizing manufacturing arrangements and has established a dedicated manufacturing line to launch 20,000 units of its latest product, the IYO ONE, beginning in September or October 2025. In parallel, IYO is actively raising capital to support this rollout and to fund paid advertising campaigns for its products.

Defendants have been well aware of IYO and its technology for years. They met with IYO in **2022**, gaining insight into its vision and technology. They also surreptitiously purchased one of IYO's earlier products and placed two pre-orders for the IYO ONE. In 2025, under the pretense of exploring a potential investment in or acquisition of IYO, Defendants had further meetings with IYO at which IYO shared extensive information about the IYO ONE. Notably, seven of Defendants' employees were fitted with custom IYO ONE devices (which sit in the ear) and experienced the product firsthand.

In reality, Defendants were planning all along to release their own competing hardware line. IO Products, Inc. ("IO") was named and formed **after** Defendants met with IYO and learned of its technology, vision, and brand. As Defendants announced on May 21, 2025, IO intends to directly compete with Plaintiff in offering technology and devices that allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice or other

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW
SAN DIEGO

1

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1   traditional interfaces.

2        After gaining detailed knowledge of IYO's products and its plans for mass marketing,

3   Defendants rushed to announce to the world their own collaboration – which they dubbed "IO" –

4   without any regard for the fact that "IO" and "IYO" are pronounced the same and without regard

5   for Plaintiff's senior trademark rights. Put bluntly, Defendants stole Plaintiff's trademark and the

6   goodwill associated with it to preempt the competitive threat posed by IYO's product.

7        Defendants are industry giants – both generally and in the tech industry specifically.

8   OpenAI, Inc. ("OpenAI") recently raised $40 billion giving it an imputed value of ***$300 billion***. It

9   acquired IO for ***$6.5 billion***. IO was founded by Jony Ive, the renowned designer behind LoveFrom

10  Inc. and many of Apple's iconic products. Other founders include Evans Hankey, Apple's former

11  Chief of Industrial Design, Tang Yew Tan, Apple's former Vice President of Product Design, and

12  investor Scott Cannon. OpenAI, led by Sam Altman, is the force behind ChatGPT, the fastest

13  growing app in history.

14       The Defendants are fully aware that their announcement of a product line—designed for the

15  same purpose, function, target audience, and consumer base as Plaintiff IYO's device—using a

16  strikingly similar and phonetically identical name, is likely to overwhelm Plaintiff in the

17  marketplace. This deliberate move is expected to cause and has already caused significant consumer

18  confusion and imminent harm, undermining IYO's marketing strategy, manufacturing timeline,

19  and ongoing capital raise. But Defendants knew this. When Sam Altman finally told IYO's CEO

20  what was happening, he told him that Defendants were making a "competitive" product. Mr.

21  Altman, apparently expressing regret, added, in parenthesis, that the product is "(called io …)"

22  (with the ellipsis), indicative that he knew how harmful his decision was going to be to IYO.  Mr.

23  Altman then followed up stating that "jony ive" is "the one driving this."

24       Defendants have virtually limitless resources and their intent to overwhelm IYO was made

25  clear during a May 30, 2025, call between Sam Altman and IYO's founder. During that call, Mr.

26  Altman not only refused to discontinue use of the name "IO," he also pondered suit against IYO to

27  force IYO to abandon its own name, despite the fact that IYO has a federally registered trademark

28  and is the senior user. IYO's resources are modest by comparison, and it is suffering irreparable

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 2 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

harm each day that Defendants continue to promote IO.

Defendants appear to believe that they can take IYO's trademark and goodwill simply because they can afford to overwhelm IYO in the marketplace. But they know better. OpenAI recently stood in IYO's shoes, successfully seeking and obtaining a preliminary injunction under near-identical circumstances. *See OpenAI, Inc. v. Open A.I., Inc.*, 2024 WL 4763687 (9th Cir. Nov. 13, 2024) (affirming this Court's grant of preliminary injunction to OpenAI against Open A.I., Inc., which was using the name "Open AI" in connection with technology similar to that offered by OpenAI). Its role reversal here—defending conduct it so recently decried—makes the equities and legal standards especially clear. Now, with the shoe on the other foot, OpenAI should be bound by the very same law and result it obtained just about a year ago, to address and prevent the same type of harm it complained was being caused by the willful infringement of its own mark.  *Id.*

IYO respectfully requests that this Court stop Defendants from stealing IYO's trademark and goodwill; exactly the same type of relief OpenAI recently obtained from this Court.

## II.    FACTS

### A.    IYO'S Trademarks

IYO was founded in 2021. Verified Complaint ("VC") at ¶ 46. Since then, it has invested substantial time and resources, including more than $60 million on developing a cutting edge, audio computing technology, launching products under the IYO brand. *Id.* IYO has used the IYO mark continuously in commerce in the United States since at least as early as February 2, 2024, in connection with its audio-centric hardware and software. *Id.* ¶ 47. IYO's first product, the VAD PRO and the soon-to-launch IYO ONE both bear the IYO mark. *Id.* Through this use, IYO has established strong common law rights in the IYO Marks for, among other things, wearable devices and related software for interacting with smartphones, computers, artificial intelligence, and the internet, without the use of screens, keyboards, mice, or other similar physical interfaces. *Id.* ¶ 48. In addition, IYO owns federal trademark Registration No. 7,409,119 issued by the United States Patent and Trademark Office ("USPTO") for its IYO mark covering the following goods:

> Audio headphones; Earphones; Computers; Micro-computers; Computer hardware and recorded and downloadable software sold as a unit for the integration of data and information into an interactive audio delivery mechanism for multimedia

applications; Downloadable operating system programs; Downloadable mobile operating system software; Computer hardware in the form of an earpiece and audio/visual display with preinstalled operating system software; Computer hardware and recorded and downloadable software system containing an auditory user interface in the form of a molded earpiece for use in listening to, accessing, transmitting and sharing information, applications and data in an audio format, amplifying and reducing sounds and noise, natural language processing, and allowing communication between users, electronic devices and wireless devices

in Class 9. *Id.* ¶ 49. The application that matured into Registration No. 7,409,119 was filed on September 17, 2021, and registered on June 4, 2024. *Id.* ¶ 50. IYO's registration is valid, subsisting, and in full effect.[1]

IYO promotes the IYO Mark and its products through a number of channels. *Id.* ¶ 55. For example, IYO has an active presence on LinkedIn, Instagram, and X (formerly Twitter) platforms, all of which prominently display and promote the IYO Marks. *Id.* Additionally, IYO operates a robust website at www.iyo.audio that also prominently displays the IYO Marks and where the public has access to, and views, the content, videos, and product specifications (among other things) of IYO's products. *Id.* In April 2024, IYO's founder gave a TED talk about the IYO ONE and demonstrated some of its features. A clip of that TED talk garnered approximately 25 million views on Instagram, an additional 5 million views on TikTok, nearly 200,000 views on YouTube, and nearly 700,000 views on TED's website. *Id.* ¶ 54.

## B. IYO'S Products

IYO's most recent product – the IYO ONE – allows users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces. *Id.* ¶ 34. The IYO product is designed to be an ear-worn device (though other embodiments have also been contemplated – e.g. one worn as a pendant). *Id.* ¶ 36. The device uses 16 beamforming microphones to create an "audio display," or an immersive audio environment for both speaking and listening. *Id.* Eight (8) external microphones on each earpiece arranged in a circular array pattern perform a spatial capture of the surrounding environment, enabling the IYO ONE to pass sound through to the ears in a way that feels immersive and natural, as if the user were

---

[1] IYO also owns pending U.S. Trademark Application Serial No. 98/088,268 for the mark IYO, for which the USPTO has issued a Notice of Allowance.

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

not wearing any device. *Id*. ¶ 37. Layering in an audio computing interface in "virtual auditory space" yields a form of mixed audio reality, where the user can hear what is happening around him/her and also engage effortlessly with audio apps. *Id*. ¶ 38. The IYO ONE achieves this through the use of natural language; the user does not have to learn, know, or memorize special commands, words, or gestures to cause the device to do what is asked of it. *Id*. Instead, all the user needs to do is speak to the device naturally, as though the user were conversing with a person. *Id*. In short, the IYO ONE is a revolutionary new kind of wearable, screenless, "audio computer." *Id*. ¶ 39. It can run apps just like a smartphone, with the user simply speaking to them in natural language. *Id*. The apps also talk back to the user in natural language, through the world's best audio display. *Id*.

IYO ONE is marketed for sale through IYO's website iyo.audio, and is available for pre-sale to the general public, with shipping expected in September or October 2025. *Id*. ¶ 44. The pricing for the IYO ONE is $999 for the WiFi version, $1,199 for the WiFi + LTE version, which is in the range of pricing for other mass market electronics such as smartphones and tablets. *Id*. IYO is in the process of manufacturing an initial 20,000 units for 2025. *Id*.

### C.    OpenAI's Commanding Market Presence

Defendant OpenAI is an AI organization founded in December 2015, which among other things, aims to develop artificial general intelligence ("AGI"). *Id*. ¶ 57. OpenAI is known for the GPT family of large language models, the DALL-E series of text-to-image models, and a text-to-video model named Sora. *Id*. ¶ 59. OpenAI's release of ChatGPT in November 2022 has been credited with catalyzing widespread interest in generative AI and igniting the AI boom. *Id*. ¶ 60. Indeed, by January 2023, ChatGPT became the then fastest-growing consumer software application in history, gaining over 100 million users in two months. *Id*. In June 2024, OpenAI joined forces with Apple Inc. to integrate ChatGPT features into Apple Intelligence and the iPhone. *Id*. ¶ 61.  In October 2024, OpenAI secured $6.6 billion in funding—valuing it at $157 billion—with major investors including Microsoft, Nvidia, and SoftBank. *Id*. ¶ 62. In April 2025, OpenAI then raised $40 billion at a $300 billion post-money valuation, making it the largest private technology deal on record, and making it one of the world's most valuable private companies. *Id*. ¶ 65.

### D.    Defendants' Prior Knowledge of IYO Leading Up to Their Infringement

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attorneys at Law

Unbeknownst to IYO, IO Products, Inc. was formed as a Delaware corporation on September 21, 2023. *Id.* ¶ 66. It did not register to do business in California until April 4, 2024, after which it continued to operate largely in secret. *Id.* ¶ 67. Indeed, the May 21, 2025, press release is titled "Sam & Jony Introduce io." *Id.* ¶ 68. Until very recently, IYO had no idea that Ives, Altman, and OpenAI had formed a company and were working together on hardware products intended to allow users to interact with smartphones, computers, artificial intelligence, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces. *Id.* ¶ 69.

But the Defendants knew all about IYO and its technology and brand prior to adopting the IO name. *Id.* ¶ 70. In February 2022, IYO attempted to recruit Evans Hankey, one of Defendant IO's co-founders, to work as Head of Design at IYO. *Id.* ¶ 71. IYO shared with Ms. Hankey its story, vision, current technology, and plans for future development, but she declined to join IYO. *Id.* In March 2022, representatives from Sam Altman's personal investment fund, Apollo Projects, met with IYO, obtained technical information from IYO, and discussed IYO's vision for the future of human/computer interaction and the use of natural language. *Id.* ¶ 72. A month later, Ryan Cohen – a representative of Apollo Projects – visited IYO's headquarters where IYO shared its vision and story with him and provided him demonstrations of its technology. *Id.* ¶ 73. Mr. Cohen later informed IYO that it had decided not to invest in IYO. *Id.* ¶ 74; Declaration of Jason Rugolo dated June 9, 2025 ("Rugolo Decl."), ¶ 5, Ex. A.

Separately, in April 2022, IYO was introduced to Jony Ive's company LoveFrom and met with Evan Sharp (the former co-founder of Pinterest) to share IYO's vision and see if LoveFrom would collaborate with it on natural language screenless computers. VC at ¶ 75. After their meeting, LoveFrom told IYO it did not want to pursue a collaboration with IYO at this time. *Id.* ¶ 76; Rugolo Decl., ¶ 7, Ex. B.

On March 4, 2025, IYO reached out to Mr. Altman again to request a meeting to pitch its latest strategic financing round. *Id.* ¶ 77. Mr. Altman responded the same day, stating "thanks but im working on something competitive so will respectfully pass!" *Id.* ¶ 78, Rugolo Decl., ¶ 9, Ex. C. He then added "(called io…)." *Id.* (ellipsis in original) (shown below):

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

> On Tue, Mar 4, 2025 at 5:29 PM Sam Altman <sam.hg.altman@gmail.com> wrote:
> thanks but im working on something competitive so will respectufly pass!
>
> (called io...)

2

3    Mr. Altman, in a follow-up email, then quickly pointed the finger by stating that "jony ive" is "the

4    one driving this." *Id.* At the time, IYO did not appreciate that Defendants were actually working to

5    brand a company and competing products with an infringing name. It was too inconceivable to

6    believe. VC at ¶ 79.

7          On March 17, 2025, a product design engineer named Marwan Rammah, who –

8    unbeknownst to IYO – worked for IO, purchased IYO's VAD PRO product and pre-ordered an

9    IYO ONE device. *Id.* ¶ 80; Rugolo Decl., ¶ 11, Ex. D. When placing those orders, Marwan Rammah

10   used an email address at "presidiotech.com," apparently to hide his association with Defendants.

11   VC at ¶ 81. Tang Yew Tan, the co-founder of IO, also preordered the IYO ONE. *Id.* ¶ 80. When

12   Mr. Rammah was fitted for his VAD PRO on March 19, 2025, he asked IYO's fit specialist

13   questions for over an hour about the IYO device and its specifications.  Mr. Rammah even asked

14   for IYO's design files. *Id.* ¶ 82.

15         On March 26, 2025, IYO discussed with Mr. Altman the possibility of OpenAI acquiring

16   IYO and launching IYO ONE as a developer kit for a new kind of computer based on natural

17   language interaction. *Id.*  ¶ 84. Mr. Altman stated that an acquisition would come down to whether

18   his team agreed, and introduced IYO to Peter Welinder, OpenAI's Vice President of Product. *Id.*

19   On March 30, 2025, Mr. Altman introduced Mr. Welinder to IYO via email and stated that we

20   "should talk and see if it makes sense to team up!" *Id.*  ¶ 85; Rugolo Decl., ¶ 13, Ex. E. On April 4,

21   2025, representatives of IYO met with Peter Welinder to discuss IYO's vision for screenless natural

22   language human-computer interaction. VC at ¶ 86. There was another such meeting the next week,

23   at which Peter Welinder stated that IYO should meet with Tang Yew Tan (one of the founders of

24   IO) who at the time was working on one of Mr. Ive's projects. *Id.* ¶ 87.

25         On April 17, 2025, Mr. Tan requested that IYO fit members of his team for the IYO device.

26   IYO ended up fitting seven of Defendants' representatives to demo IYO ONE devices. *Id.* ¶ 89;

27   Rugolo Decl., ¶¶ 16-19, Exs. F-H. On May 1, 2025, IYO met with several of Defendants'

28   representatives, including Mr. Welinder, Mr. Tan, Ms. Hankey, and Mr. Rammah. VC at ¶ 90. IYO

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

1    presented its products and visions for the future of human interaction. *Id.* On May 5, 2025, Mr. Tan

2    indicated to IYO that its product had potential. Indeed, after meeting with IYO and experiencing

3    the IYO ONE in person, the Defendants were sufficiently interested to request that they be allowed

4    an opportunity to review IYO's intellectual property portfolio. *Id.* ¶ 91. Indeed, on May 15, 2025

5    (six days before Defendants' announcement), Mr. Tan emailed IYO requesting to review IYO's

6    intellectual property through an "IP air curtain" because "it could be interesting."  Mr. Tan added:

7    "ps. is it possible to get our ear plugs?" *Id.* ¶ 92; Rugolo Decl., ¶ 23, Ex. I.

8        **E.    The May 21, 2025 Announcement**

9        On May 21, 2025, Sam Altman and Apple designer Jony Ives (LoveFrom) announced the

10   existence of IO, its $6.5 billion acquisition of IO by OpenAI, and its decision to make this new

11   category of computer devices that allow users to interact with their smartphones, computers, AI,

12   and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

13   VC at ¶ 93; Rugolo Decl., ¶ 24, Ex. J.  An image from that announcement is shown below:



23   The deal was reported to be OpenAI's largest acquisition to date. VC at ¶ 94. According to

24   Defendants' press statement, the two companies would merge to "work more intimately with the

25   research, engineering, and product teams in San Francisco," and "Jony will assume deep design

26   and creative responsibilities across OpenAI" as the company develops new hardware products

27   powered by AI technology. *Id.* ¶ 95. The announcement, on OpenAI's website, further states

28   (among other things) that: "This is an extraordinary moment. Computers are now seeing, thinking

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

- 8 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

and understanding. Despite this unprecedented capability, our experience remains shaped by traditional products and interfaces. . . . . It became clear that our ambition [was] to develop, engineer and manufacture a new family of products." *Id.* ¶ 96.

In a video accompanying the press release, Sam Altman (CEO of OpenAI) opens by stating that IO "has the opportunity to completely re-imagine what it means to use a computer." *Id.* ¶ 97. The video also makes clear that IO is formed around a nucleus of employees from the LoveFrom design collective, and that IO and OpenAI are merging for the "mission" of developing a new class of products for the way people use computers and AI. *Id.* ¶ 98. The video mentions that the existing devices people use to access technology are "decades old," and that it is "common sense" to move beyond them. *Id.* ¶ 99. In the video, Altman specifically described the current method of accessing the internet or ChatGPT through the process of opening a computer and physically interacting with it through keyboard and screen as obsolete, as they are "at the limit of what that tool can do." *Id.* ¶ 100.  These are the same talking points that IYO had pitched to Altman not long before.  *Id.*

The press release and video make clear that the purpose of IO is precisely the purpose that IYO made public years earlier: to develop a family of products which will allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces. *Id.* ¶ 101. The video also makes clear that there is a prototype of such a device. *Id.* ¶ 102. In addition, Defendants acquired the domain name "io.com" – further evidencing Defendants' resolve to use the IO brand name.

**F.    The Announcement Immediately Begins to Irreparably Harm IYO**

Almost immediately after the May 21, 2025 announcement, IYO's founder began to receive an avalanche of communications to the point that IYO's founder's phone was so swamped with messages that IYO's founder reported to Defendants that "it's been a while since [I]'ve been blown up this hard by pretty much everyone, iyO investors, professional network, etc." *Id.* ¶ 103.

**G.    Plaintiff's Attempts to Stop Defendants' Infringing Conduct**

Defendants are not associated or affiliated with IYO and have never been authorized or otherwise licensed to use the IYO Mark in connection with any products or services. *Id.* ¶ 106. As such, following the May 21, 2025 announcement, IYO made repeated attempts to get Defendants

1    to reverse course. *Id.* ¶ 106. They refused. *Id.*

2          On May 23, 2025, two days after the May 21 announcement, IYO's founder emailed Mr.

3    Altman to express concern that investors had contacted him about confusion between the parties'

4    company names. *Id.* ¶ 111. On May 29, 2025, IYO's founder again told Defendants that the

5    announcement of IO and the resulting confusion was causing problems for IYO and its investors,

6    network, and fund-raising efforts. *Id.* ¶ 112. IYO's founder asked that Defendants cease using the

7    IO name to stop the confusion, stating that the situation was "urgent." *Id.*; Rugolo Decl., Ex. I. On

8    May 30, 2025, Mr. Altman responded and asked IYO's founder to call him, which he did that same

9    day. VC at ¶ 113; Rugolo Decl., Ex. I. On the call, IYO's founder reiterated the confusion IO was

10   causing and expressed the concern that IO had "stolen" IYO's name. *Id.* He also asked Mr. Altman

11   whether Defendants would agree to stop using IO. *Id.* Mr. Altman not only refused, he incredibly

12   (i) falsely stated that OpenAI had superior trademark rights; and (ii) pondered IO suing IYO to

13   force IYO to stop using its own name. *Id.*; Rugolo Decl., ¶ 29.

14         On June 2, 2025, IYO's general counsel sent an email to Defendants outlining IYO's

15   trademark rights and the damage their announcement was causing, again asking them to cease using

16   the IO name. *Id.* ¶ 114. On June 3, 2025, IYO's general counsel had a phone call with OpenAI's

17   Deputy General Counsel, Renny Hwang. *Id.* ¶ 115. IYO's general counsel reiterated the history of

18   the parties' relationship and stressed that the announcement of IO was already causing confusing

19   and harm to IYO. *Id.* Mr. Hwang responded that he would investigate, but he has not made any

20   further communication as of the date of this filing. *Id.* ¶ 116. On June 6, 2025, IYO's general

21   counsel then had a phone call with OpenAI's outside trademark counsel, Margaret Caruso. *Id.* ¶

22   117. She confirmed that OpenAI would not cease using the IO name and took the implausible

23   position – despite the evidence to the contrary and its highly publicized marketing – that OpenAI

24   was not using the infringing mark in commerce. *Id.*

25         **H.    Ongoing Injury to IYO**

26         Defendants' infringement has caused and is likely to continue causing confusion in the

27   marketplace that is so significant that it is impacting IYO's ability to raise funds.  Rugolo Decl., ¶¶

28   30-32.  IYO is in the midst of raising funds for the manufacture of its next generation of products

1    and to support the advertising that is needed to support that release. *Id.* This funding is critical to

2    IYO's survival. *Id.* Before OpenAI made the May 21, 2025, announcement, IYO's capital raise had

3    been going well. *Id.* But since then, IYO has not been able to secure any additional funding or

4    pledges for funding due to investors' expressed concerns over the infringement. *Id.* If IYO cannot

5    raise the necessary funding and if it cannot reverse the confusion that is already happening in the

6    marketplace, its sales will be so severely impacted that it will risk a substantial loss in market share

7    and a loss of existing and potential investors. *Id.*

8        One of IYO's investors, David Rangel, a general partner of Merus Capital IV, L.P., "became

9    incredibly concerned" after "reviewing OpenAI's announcement about IO" because he felt "the

10   names are so confusing" and "this will significantly impair IYO's ability to raise capital."

11   Declaration of David Rangel, dated June 9, 2025 ("Rangel Decl."), ¶ 4. In his view, OpenAI formed

12   a similarly named company to "sell products that are extremely similar to IYO's products under

13   the brand name IO." *Id.* ¶ 3. Mr. Rangel was "shocked that OpenAI would choose that name"

14   because he knew that it had a history with IYO and knew of its brand, "its business and technology."

15   *Id.* ¶ 6. Mr. Rangel believes that OpenAI's announcement "is awful for IYO," will create "a huge

16   distraction" for IYO, and will cause "significant confusion in the marketplace." *Id.* ¶ 7. Mr.

17   Rangel's view, as an investor, is that Defendants' conduct will "have a profoundly negative effect

18   on IYO's fundraising opportunities." *Id.* ¶ 8. In his view, Defendants' use of "a name that is nearly

19   identical to the one" IYO is using effectively prevents IYO from "going to market." *Id.* Mr. Rangel

20   also indicated that several of his own contacts have already inquired whether "IYO had anything

21   to do with OpenAI's announcement of IO" and he believes this was because the confusion that

22   Defendants are causing in the marketplace. *Id.* ¶ 10. Mr. Rangel is concerned that the confusion

23   Defendants are causing may be "fatal[] to IYO," *id.* ¶ 12, and that "it would be suicide for IYO to

24   continue to market under the IYO name," *id.* ¶ 13. Finally, Mr. Rangel also stated that IYO will

25   now have difficulty recruiting employees because top "talent [are] not going to want to join a

26   company whose name and brand have been hijacked." *Id.* ¶ 14.

27       Ed Catmull, a legend in the technology business, and also a shareholder in IYO and member

28   of its board of directors, expressed similar concern. After working for several years at Lucasfilm

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 11 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Ltd., the production company founded by George Lucas, he co-founded Pixar Animation Studios, where he was the President from 1986 to 2019. Declaration of Ed Catmull, dated June 9, 2025 ("Catmull Decl."), ¶ 2. In 2006, when Disney acquired Pixar, he was separately named as President of Disney Animation, a title he held until 2019. *Id.* ¶ 3. He has achieved national recognition in the field of digital imagery, *id.* ¶ 4, and has won four Academy Awards, *id.* ¶ 5. When Mr. Catmull first saw Defendants' May 21, 2025 announcement, his immediate reaction was: "That's terrible. IO is pronounced the same as IYO." *Id.* ¶ 8. Mr. Catmull also believes that Defendants' conduct has caused and will continue to cause confusion in the marketplace. *Id.* ¶ 9. "OpenAI is famous, especially compared to IYO," and so "investors and customers are going to think, erroneously, that IYO copied OpenAI and not the other way around." *Id.* "This false perception significantly hurts a company trying to create new and innovative products," *id.*, and "[a]ll the time and effort IYO put into building its brand equity is now gone." *Id.* ¶ 10.

When Mr. Catmull saw the announcement, he was "very surprised" because he knew that Defendants knew of IYO and the products it was offering. *Id.* ¶¶ 11-12. In his view, Defendants' position is basically: "screw the little guy because they don't matter." *Id.* He went so far as to opine that their conduct was "not only unethical," but also "immoral." *Id.* Indeed, an "ethical" company would have run a trademark clearance search to verify the availability of the mark. *Id.* That is what Mr. Catmull did when he was at Disney. *Id.*

Like Mr. Rangel, Mr. Catmull stated that "the false perception that IYO is trading off the goodwill of the IO name will [] make it more difficult for IYO to raise capital. Investors are going to be less inclined to invest in a company that they perceive to have stolen a well-known company's name. Even if investors do not jump to the erroneous conclusion that IYO stole IO's name, they will still know that there are two companies with identical-sounding names, offering similar products, and will be disinclined to invest in IYO given the inevitable market confusion." *Id.* ¶ 13.

## III.   LEGAL STANDARDS

The standard for issuing a temporary restraining order is the same as that for granting a preliminary injunction. *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, 2020 WL 5199434, at *6 (N.D. Cal. Aug. 17, 2020) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d

- 12 -

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

832, 839 n.7 (9th Cir. 2001)). Specifically, the moving party must establish that: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (internal quotation marks omitted); *see also Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

Even in the absence of a showing of success on the merits, if a plaintiff shows "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits," "a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (cleaned up and emphasis removed).

Preliminary injunctions are "routinely granted" in trademark infringement cases due to the "well-settled" and "universally recognized" principle that "trademark infringement causes irreparable injury and necessitates immediate injunctive relief." *Cisco Sys.*, 2020 WL 5199434, at *6.1. That principle was effectively codified in the Trademark Modernization Act, which applies a presumption of irreparable harm upon a showing of likely confusion. 15 U.S.C. § 1116(a). The same is true for TROs where time is of the essence. *Rockport Admin. Servs., LLC v. Integrated Health Sys., LLC*, 2023 WL 5667867, at *2 (C.D. Cal. June 26, 2023).

Plaintiffs may provide a broad range of evidence to support an injunction and courts may even give "inadmissible evidence some weight, when to do so serves [the] purpose of preventing irreparable harm before trial." *Berg v. Cnty. of Los Angeles*, 2021 WL 4691154, at *2 n.3 (C.D. Cal. May 28, 2021) (citation omitted).

Plaintiff easily meets these standards.

## IV.    ARGUMENT

### A.    Plaintiff is Likely to Succeed on the Merits of Trademark Infringement[2]

To prevail on its claim for trademark infringement claim, IYO must establish that (1) it has a valid, protectable trademark; and (2) Defendants' use of the same or a similar mark causes a

---

[2] Plaintiff is also likely to succeed on its other claims alleged in the Verified Complaint. But to simplify the issues and expedited relief, this Application is limited to trademark infringement.

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 13 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  likelihood of confusion in the minds of the relevant consuming public. *Fuddruckers, Inc. v. Doc's*

2  *B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987).

3      Trademark confusion can be forward or reverse and the Verified Complaint alleges both.

4  However, for purposes of simplicity, only reverse confusion is addressed here. "[R]everse

5  confusion occurs when a person who knows only of the well-known junior user [here, Defendants]

6  comes into contact with the lesser-known senior user [here, Plaintiff] and because of the similarity

7  of the marks, mistakenly thinks that the senior user [Plaintiff] is the same as or is affiliated with the

8  junior user [Defendants]." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir.

9  2021) (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998). This

10  typically occurs because "the junior user's advertising and promotion so swamps the senior user's

11  reputation in the market that customers are likely to be confused." 4 McCarthy on Trademarks and

12  Unfair Competition § 23:10 (5th ed. 2020) (citations and footnotes omitted); *see also Dreamwerks*,

13  142 F.3d at 1130 n.5.

14      As the Ninth Circuit has explained, "[a]ffiliation with a popular well-known brand may seem

15  beneficial, but reverse confusion carries" significant adverse "consequences" for the senior user

16  because it places "the senior company's goodwill in the hands of the junior user" and can "foreclose

17  the senior user from expanding into related fields." *Ironhawk*, 2 F.4th at 1160. "[T]he result of

18  reverse confusion is that the senior user loses the value of [its] trademark—its product identity,

19  corporate identity, [and] control over its goodwill and reputation." *Id.*

20      "[T]he doctrine of reverse confusion is designed to prevent the calamitous situation where a

21  larger, more powerful company usurps the business identity of a smaller senior user." *Id.* (cleaned

22  up, citation omitted). That "calamitous situation" is precisely what is happening here.

### 1.      Plaintiff Has a Valid and Protectable Trademark.

24      Plaintiff owns a federal registration for its IYO trademark (Reg. No. 7,409,119), a copy of

25  which is annexed as Exhibit A to the Verified Complaint. "Registration of a mark is prima facie

26  evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's

27  exclusive right to use the mark in connection with the goods specified in the registration." *Pom*

28  *Wonderful LLC* v. *Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)). Where

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

- 14 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  the proof of registration for the federally registered trademark is uncontested, the element requiring

2  proof of a valid, protectable trademark is met. *Id.*

3      Plaintiff's registration covers, among other things, "Audio headphones; Earphones;

4  Computers; Micro-computers; Computer hardware and . . . software system containing an auditory

5  user interface in the form of a molded earpiece for use in listening to, accessing, transmitting and

6  sharing information, applications and data in an audio format, amplifying and reducing sounds and

7  noise, natural language processing, and allowing communication between users, electronic devices

8  and wireless devices" in Class 9.

9      Plaintiff filed the application for its IYO Mark on September 17, 2021, years before IO

10  Products, Inc. was even formed. Plaintiff began using that mark in commerce at least as early as

11  February 2, 2024, and its mark registered on June 4, 2024, nearly a year before Defendants even

12  announced their collaboration. Accordingly, Plaintiff is the senior mark holder and user.

13                          **2.      There is a Likelihood of Confusion**

14      The Ninth Circuit weighs eight factors in evaluating whether an allegedly infringing mark

15  is likely to cause confusion in the marketplace: (a) strength of the mark; (b) similarity of the marks;

16  (c) proximity or relatedness of the goods; (d) evidence of actual confusion; (e) marketing channels

17  used; (f) types of goods and degree of care likely to be exercised by the consumer; (g) defendant's

18  intent to select the mark; and (h) likelihood of expansion of product lines. *AMF, Inc. v. Sleekcraft*

19  *Boats*, 174 F.3d at 1052 n.15 (9th Cir. 1979). The same factors apply in a reverse confusion case

20  (with certain modifications addressed below). *See Ironhawk*, 2 F.4th at 1161-1168 (9th Cir. 2021).

21      The Court need not address all of the factors at the preliminary injunction stage, nor does

22  Plaintiff need to prevail on every one. *See Aurora World v. Ty, Inc.*, 719 F. Supp. 2d 1115, 1156

23  (C.D. Cal. 2009). The list of factors is "neither exhaustive nor exclusive." *E. & J. Gallo Winery v.*

24  *Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) (citation omitted). "[T]he factors are intended

25  to guide the court in assessing the basic question of likelihood of confusion." *Id.* (citing *Eclipse*

26  *Assoc., Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)). The factors should be

27  considered together to determine, under the totality of the circumstances, whether a likelihood of

28  confusion exists, and the weight given to each can vary depending on the facts of the case. *Pom*

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 15 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  *Wonderful*, 775 F.3d at 1125.

2         Here, however, all of the factors weigh strongly in favor of a likelihood of confusion.

3                    **a.      Defendants' Commercial Strength Will Overwhelm Plaintiff.**

4         In reverse confusion cases, courts evaluate the conceptual strength of Plaintiff's mark and

5  compare it to the commercial strength of Defendants' mark. *Ironhawk*, 2 F.4th at 1162.

6         <u>Conceptual Strength of Plaintiff's Mark</u>: Marks are "classified into one of five categories

7  of increasing distinctiveness" that warrant increasing protection: (1) generic, (2) descriptive, (3)

8  suggestive, (4) arbitrary, and (5) fanciful. *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108,

9  1113 (9th Cir. 2010). Suggestive, arbitrary, and fanciful marks are considered "inherently

10 distinctive" and are automatically entitled to federal trademark. *Id.* Where, as here, the USPTO

11 issued a registration without requiring proof of secondary meaning, the federal registration provides

12 *prima facie* evidence that Plaintiff's registered mark is inherently distinctive. *Id.* at 1111-14.

13        <u>Commercial Strength of Defendants' Mark</u>: The key question in a reverse confusion case is

14 "whether the junior mark is so commercially strong as to overtake the senior mark." *Ironhawk*, 994

15 F.3d at 1119. Accordingly, this Court must assess the commercial strength of Defendants' mark

16 and ask "whether it is able to swamp the reputation" of Plaintiff's IYO Mark "with a much larger

17 advertising campaign." *Id.* That is unquestionably true here.

18        Defendants' celebrity and public recognition are dwarfed only by their near limitless

19 resources. Defendants' IO mark is already so commercially strong that it has overtaken Plaintiff's

20 senior mark and caused actual confusion among investors. *See, e.g.,* VC at ¶ 13 & n.1 (listing

21 prominent publications picking up the story). This is not surprising given that Defendants began

22 their pursuits with a ***$6.5 billion*** acquisition of IO. Moreover, as discussed above, Defendants'

23 announcement of its new IO brand garnered widespread nationwide press in almost every major

24 publication.

25        <u>Comparison</u>: Defendants' mark and reputation plainly has the capability to dwarf Plaintiff

26 in the market. As already discussed above, it appears that swamping Plaintiff in the market and

27 usurping its goodwill is exactly what Defendants intended and exactly the effect they have already

28 had. As such, this factor weighs in favor of Plaintiff. *See Ironhawk*, at 1163.

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 16 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### b.      The Parties Goods are Related.

Goods are related when they are complementary, sold to the same class of purchasers, or similar in use and function. *Sleekcraft*, 599 F.2d at 350. Plaintiff "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor." *Ironhawk*, at 1163. Instead, "[r]elated goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Id.* (quoting *Sleekcraft*, 599 F.2d at 348 n.10).

Here, Defendants admitted they intend to sell "competitive" products. VC at ¶70. Regardless, there is no dispute to this issue. Both companies have identified "legacy" methods of using computers, the internet, and AI as obsolete and both develop hardware (and related software) that allows users to interact with their smartphones, computers, artificial intelligence, and the internet without legacy hardware. That is why Defendants refused to sign an NDA with IYO, stating they were working on something "competitive" to IYO.  Rugolo Decl. ¶ 18, Ex. E.

In short, Plaintiff's and Defendants' products are intended for the same purpose, are similar in use and function, and to be sold to the same class of purchasers, namely the general public. As Defendants said, the products are competitive.  Thus, this factor weighs heavily for Plaintiff.

### c.      The Marks are Nearly Identical.

Assessing similarity of the marks turns on three general principles. "First, '[s]imilarity is best adjudged by appearance, sound, and meaning.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (quoting *Entrepreneur Media*, 279 F.3d at 1144). "Second, the 'marks must be considered in their entirety and as they appear in the marketplace.'" *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000)). "Third, 'similarities are weighed more heavily than differences.'" *Id.* (citation omitted).

The marks IO and IYO are virtually indistinguishable in appearance, sound, and meaning. They start and end with the same letter and (tellingly) are pronounced exactly the same ("EYE-OH"). Although IYO has a Y in the middle, the Y is silent, such that the marks, as spoken, are indistinguishable.

In short, the similarities between the parties' marks far outweigh the one insignificant

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  difference. Moreover, the marks convey identical commercial impressions.

2          As OpenAI argued in its brief in support of a preliminary injunction against Open Artificial

3  Intelligence, "[t]he use of similar marks to offer similar products [] weighs heavily in favor of

4  likelihood of confusion,' as does 'the fact that the two companies compete for the patronage of an

5  overlapping audience.'" *OpenAI, Inc. v. Open A.I., Inc.*, Case No. 4:23-cv-03918-YGR, Plaintiff's

6  Brief, ECF 21 at 12. The same is true here.

7                  **d.      There is Already Evidence of Actual Confusion.**

8          Evidence of actual confusion can be an important factor. However, "[b]ecause of the

9  difficulty in garnering such evidence, the failure to prove instances of actual confusion is not

10 dispositive." *Sleekcraft*, 599 F.2d at 353. Therefore, "this factor is weighed heavily only when there

11 is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence

12 should have been available." *Id.*

13         Here, even though Defendants have only just "introduced" IO to the world (per their May

14 21, 2025 press release), actual confusion is already occurring. As OpenAI wrote in its motion for a

15 preliminary injunction against Open Artificial Intelligence, "[e]vidence of actual confusion is

16 strong evidence that future confusion is likely." *OpenAI, Inc. v. Open A.I., Inc.*, Case No. 4:23-cv-

17 03918-YGR, Plaintiff's Brief, ECF 21 at 15.

18         Here, the immediate reaction of Plaintiff's investors and professional network, upon

19 learning of the May 21 "introduction" of IO, was that Plaintiff would be swamped by Defendants

20 and that Defendants had stolen Plaintiff's name. *See* Section II.H above. Moreover, as one investor,

21 Mr. Rangel, indicated, several of his contacts have already asked him whether "IYO had anything

22 to do with OpenAI's announcement of IO" and he believes this was because the confusion that

23 Defendants are causing in the marketplace. Rangel Decl., ¶ 10. Mr. Rangel believes that this

24 confusion may be "fatal[] to IYO." *Id.* ¶¶ 12-13.  Mr. Catmull agreed. Catmull Decl., ¶¶ 9-13.

25         As such, this factor weighs in Plaintiff's favor.

26

27

28

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1                        **e.      The Parties' Marketing Channels Overlap.**

2          "In assessing marketing channel convergence, courts consider whether the parties' customer

3   bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d

4   at 1130. Here, both parties have the general public as their customer base. Both parties also

5   advertise their products via the internet. As such, this factor too weighs in favor of Plaintiff.

6                        **f.      The Consumer Care Factor Makes Confusion Likely.**

7          The consumer care factor considers whether a typical consumer exercising ordinary care is

8   likely to be confused. *Sleekcraft*, 599 F.2d at 353. "Low consumer care ... increases the likelihood

9   of confusion." See *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th

10  Cir. 2004). Here, the intended buyers are members of the general public. Both parties' devices are

11  intended to lessen the reliance of their users on computer literacy. Indeed, a selling point of both

12  parties' products is that their devices will respond to natural language, such that no special jargon

13  or training is needed. The user simply speaks to the device as though it were speaking to another

14  person and the device understands what is being asked of it.

15         Both products are intended for mass sale to the general public. Plaintiff's pricing for the

16  IYO ONE is $999 for the WiFi version, $1,199 for the WiFi + LTE version, which is in the range

17  of pricing for other mass market electronics such as smartphones and tablets. Defendants have also

18  suggested its product is intended for sale to the general public, given its widely publicized

19  announcement.

20         Accordingly, neither the nature of the consumer nor the price point operates to lessen the

21  likelihood of consumer confusion created by Defendants' conduct.

22                       **g.      Defendants Intended to Infringe.**

23         This factor "favors the plaintiff 'where the alleged infringer adopted his mark with

24  knowledge, actual or constructive, that it was another's trademark.'" *Ironhawk*, 2 F.4th at 1167-68

25  (9th Cir. 2021) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1059

26  (9th Cir. 1999)). In the reverse confusion context, the Court asks "whether there is some evidence

27  that the junior user, when it knew of the senior user, was at fault for not adequately respecting the

28  rights of the senior user." 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

- 19 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

2020). Intent can be shown through evidence that the junior user deliberately intended to push the senior user out of the market by flooding the market with advertising to create reverse confusion, or "by evidence that, for example, the [junior user] knew of the mark, should have known of the mark, intended to copy the [senior user], failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Ironhawk*, 2 F.4th at 1167-68 (9th Cir. 2021) (quoting *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934-35 (9th Cir. 2017) (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005)).

This is not a case of innocent infringement. At the time of their announcement of IO, Defendants were aware of the existence of IYO, and had deep visibility into its brand, technology, and marketing strategy. They then copied IYO's identity wholesale. Defendants had most of this information in 2022, which long predates the corporate formation of Defendant IO and Defendants' usurpation of the IYO Mark. Further, one of the founders of Defendant IO, and a design engineer, both ordered IYO's products. And, in 2025, there was a series of meetings between representatives of IYO and IO and OpenAI during which at least seven of defendants' employees were fitted with IYO ONE devices and given demonstrations of the product. Mr. Altman's reticent disclosure to IYO's CEO that he was naming a competing product "io," shows that Mr. Altman knew how destructive his actions would be to IYO.

Moreover, the IYO Mark was also federally registered prior to Defendants' May 21, 2025 "introduction" of IO to the world, meaning that Defendants should have known of the IYO Mark, and are charged with constructive knowledge of it. If Defendants had any question as to whether IYO had senior rights, a basic trademark search would have shown that IYO had rights predating Defendants' entry. Defendants either failed to run a search, or ran the search and willfully ignored IYO's rights. In either case, the facts support intent. *Ironhawk*, 2 F.4th at 1167-68.

This factor thus weighs heavily in Plaintiff's favor.

### h.    Likelihood of Expansion is Irrelevant.

The final *Sleekcraft* factor assesses the likelihood of expansion of product lines. However, when goods "are already related" or the parties offer similar products, likelihood of expansion is unnecessary. *See Playboy*, 354 F.3d at 1029. As discussed above, the parties are already offering

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 20 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1    or developing similar products.

2                             *        *        *

3         Thus, all factors point to a strong likelihood of success on the merits. At minimum, Plaintiff

4    has raised "'serious questions' on the merits." Since the balance of equities also tips strongly in

5    Plaintiff's favor and the other *Winter* elements have been satisfied (as discussed further below), a

6    TRO and preliminary injunction are warranted. *Friends of the Wild Swan*, 767 F.3d at 942.

7    **B.      Plaintiff Will Suffer Irreparable Injury Without Injunctive Relief**

8            **1.      Irreparable Harm is Presumed**

9         Irreparable harm is presumed because Plaintiff has shown a likelihood of success in proving

10   infringement. *Kahala Franchising, LLC v. Real Faith, LLC*, 2022 WL 1605377, at *4 (C.D. Cal.

11   May 20, 2022) ("Given that [Plaintiff] demonstrates a likelihood of success on its trademark

12   infringement claim, [Plaintiff] is statutorily entitled to a presumption of irreparable harm for the

13   purposes of its request for a preliminary injunction") (citing 15 U.S.C. § 1116(a)). Moreover,

14   "[p]reliminary injunctions are routinely granted in cases involving trademark infringement." *Cisco*

15   *Sys.*, 2020 WL 5199434, at *6.

16          **2.      Plaintiff is Suffering Irreparable Harm**

17        In addition to the presumption, Plaintiff is suffering and will continue to suffer irreparable

18   harm if Defendants are permitted to continue their infringement. As soon as Defendants published

19   their announcement of "IO," Plaintiff received numerous inquiries about confusion due to the

20   similarities in name. And Plaintiff's investors began expressing concern over Defendants' theft of

21   Plaintiff's name. *See* Section II.H above. Worse still, Plaintiff's investors have already voiced their

22   concerned over Plaintiff's ability to raise capital and continue to build its brand in light of

23   Defendants' operation of a competing company developing competing products under a nearly

24   identical name. *Id.* Those concerns reflect reality. Prior to Defendants' May 21 announcement,

25   Plaintiff was in the midst of a fundraising campaign that had successfully raised significant funds

26   toward the needed goal. Rugolo Decl. ¶ 30. However, since May 21, no further funds or pledges

27   have been received. *Id.*

28        Without the raise needed, IYO will not be able to fund its manufacturing efforts or pay for

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

- 21 -
PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  the advertising that will be needed to market its products. *Id.* ¶ 31. This in turn will impact IYO's

2  anticipated sales so severely that IYO is not only at risk of losing significant market share, but also

3  at risk of losing investors, with no ability to replace them. *Id.*

4              **3.        This Dispute is Ripe and an Injunction is Urgently Needed**

5              Defendants' outside trademark counsel has suggested that this dispute is not ripe because

6  IO has yet to offer products to the masses. But that is not how the law works. "[I]njunctive relief

7  may be obtained even before defendant actually opens for business. A trademark owner does not

8  have to await the impact of the threatened infringement to obtain preventive relief. It is a mainstay

9  of equity jurisprudence that one need not wait for the actual violation to occur if it is imminent and

10  impending. Trademark infringement by its nature is a commercial tort created by the probability of

11  confusion. What triggers a case of trademark infringement is not actual confusion, but the

12  likelihood or probability of confusion." 4 McCarthy on Trademarks and Unfair Competition § 30:10

13  (5th ed. 2020) (hereafter, "*McCarthy*") (citations and footnotes omitted).

14              Here, actual confusion already exists, meaning that there is a strong likelihood of future

15  confusion when IO does flood the market with products. Plaintiff has already started feeling the

16  deleterious effect of Defendants' viral announcement in that it has rendered it exceedingly difficult

17  for Plaintiff to continue with its ongoing capital raise.  Indeed, as discussed above, Plaintiff has not

18  been able to secure a single new investor since Defendants' May 21 announcement and its existing

19  investors have already expressed concern about IYO's ongoing viability.

20              Moreover, as McCarthy (the leading trademark treatise) explains the "Lanham Act" only

21  "requires that the accused use be 'in connection with the sale, offering for sale, distribution or

22  advertising of any goods or services' in a context that is likely to cause confusion, mistake or

23  deception." *McCarthy* at § 30:10.  As such, "pre-sales advertising or promotion triggers a case for

24  infringement of a registered mark. In addition, pre-sales preparatory activities constitutes use 'in

25  connection with' the impending goods or services. Pursuant to the analysis above, injunctive relief

26  may be obtained even before defendant has sold goods or services in connection with the accused

27  mark. ***Pre-sales preparations such as advertising, seeking investors, registering a domain name***

28  ***and other preparatory activities are often sufficient*****.**" *Id.* (emphasis added).

Mintz, Levin, Cohn,
Ferris, Glovsky and
Popeo, P.C.
Attorneys at Law

This Court reached the same conclusion in analogous circumstances in *JGX, Inc. v. Handlery*, 2018 U.S. Dist. LEXIS 27079 (N.D. Cal. 2018) (Lanham Act claims ripe where defendant put up a sign with restaurant's name using Plaintiff's mark outside restaurant's boarded-up and vacant future location, leading to loss of opportunities for Plaintiff). As this Court held in *JGX*, "[i]t is reasonable to infer from Plaintiff's allegations that the market deemed Defendants' use of [the mark] to be imminent, and refused to collaborate with Plaintiffs as a result." *Id.* at *11. The same is true here. And courts across the country have agreed with McCarthy and *JGX*.

For example, the Southern District of New York concluded that when "a party has produced prototypes or samples of the allegedly infringing products, begun soliciting -- and advertising to -- potential customers, or otherwise invested significant sums of money in preparation for producing the goods, the case or controversy requirement is likely to be satisfied." *AARP v. 200 Kelsey Assocs., LLC*, 2009 WL 47499, at *9 (S.D.N.Y. Jan. 6, 2009). Likewise, in *THEIA Techs. LLC v. THEIA Grp., Inc.*, the Eastern District of Pennsylvania granted a preliminary injunction and rejected the argument that a reverse confusion claim was not ripe where the alleged infringer used the marks on its website to promote satellites to investors even though the satellites were "yet to be manufactured" and were in fact years away. 2021 WL 291313, at *7 (E.D. Pa. Jan. 27, 2021) (finding advertising sufficient to trigger Lanham Act).

Here again, Defendants announced IO to the world. They have sought (and obtained) investors (OpenAI acquired IO for $6.5 billion) and they have a prototype, as admitted in the video announcement. They also own the domain name, "io.com." Consequently, their infringement is sufficiently impending to support injunctive relief.

It is immaterial whether Defendants' product is for sale; all of Defendants' harmful actions are more than enough. And the harm Plaintiff has suffered and continues to suffer is irreparable.

**C.    The Balance of Equities Tips in Plaintiff's Favor**

"[C]ourts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief." *Winter*, 555 U.S. at 29. Here, the balance weighs sharply in Plaintiff's favor.

As an initial matter, Defendants are unlikely to suffer any unfair harm or hardship. "[W]here

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Gucci Am., Inc. v. Los Altos Boots, Inc.*, 2014 WL 12561613, at *7 (C.D. Cal. Aug. 27, 2014) (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1574 (S.D. Cal. 1996) *aff'd*, 109 F.3d 1394 (9th Cir. 1997)). Plainly, "any injury that Defendants may suffer as a result of the preliminary injunction may be discounted by the fact that Defendants brought the injury upon themselves by intentionally adopting a deceptively similar trademark to Plaintiff's." *Kreation Juicery, Inc. v. Shekarchi*, 2014 WL 7564679, at *12 (C.D. Cal. Sept. 17, 2014) (cites omitted).

Indeed, as Defendants have no legitimate interest in the IO mark, any "harm" resulting to them from a TRO or injunction, including economic harm, should be discounted. *See e.g., U.S. Olympic Comm. v. Xclusive Leisure & Hosp. Ltd.*, 2008 WL 3971120, at *10 (N.D. Cal. Aug. 25, 2008) ("Where the intent to infringe is clear, even if the defendant's entire business was built upon the infringing mark, the balance of hardships weighs in favor of the plaintiff.").

Further, the injunction requested here would cause no actual harm to Defendants because Plaintiff only seeks an order enjoining Defendants' use of the name "IO" in connection with their new company/products, not to prevent Defendants from pursuit of a competitive product under a different name. As the Defendants' product is not even available for sale, Defendants could easily alter their brand and company name to comply with an injunction or a restraining order to eliminate infringement and confusion. Doing so would not cause Defendants any harm.

In contrast, as discussed above, Plaintiff's entire commercial viability is at risk.

**D.    An Injunction is in the Public Interest**

Public policy favors an injunction when there is a likelihood of confusion, as there is here. *See Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial response to trademark infringement."). The Ninth Circuit has determined that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Id.* Additionally, the public has an interest in "not being confus[ed] by [] infringing products." *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067,

1075 (C.D. Cal. 2004). "Preliminary injunctive relief is appropriate here . . . to promote the public interest in protecting trademarks generally as well." *Brookfield*, 174 F.3d at 1066.

Here, an injunction promotes the public interest by minimizing the risk of consumer confusion and preserving Plaintiff's goodwill. It would be contrary to the public interest to allow Defendants to continue using a homophone of Plaintiff's IYO Mark in connection with a competing product where, as here, they were long-aware of Plaintiff, its IYO Mark, and its technology.

### E.    No Bond Should Be Required

Under Fed. R. Civ. P. 65(c), a preliminary injunction must be accompanied by a bond "in such a sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." But Rule 65(c) "invests the district court with discretion as to the amount of security required, if any." *Tari Labs, LLC v. Lightning Labs, Inc.*, 2023 WL 2480739, at \*12 (N.D. Cal. Mar. 13, 2023) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)). Moreover, the Court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [its] conduct." *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, where the evidence of infringement is so compelling, the Plaintiff's presence in the market is vastly outweighed by the Defendants' presence, the issuance of an injunction would cause no legally cognizable harm to the Defendants (or, at most, only speculative harm), and where the injunction would prevent further irreparable harm to the Plaintiff and serve the public interest—the Court should not require the posting of a bond.

## V.    CONCLUSION

For the foregoing reasons, IYO respectfully requests that the Court grant its motion for a temporary restraining order and, upon its expiration, a preliminary injunction prohibiting Defendants, their employees, agents, representatives, subsidiaries, affiliates, related entities, and all persons and entities in active concert or participation with any of from using by any means whatsoever, directly or indirectly, Plaintiff's IYO mark, and any mark confusingly similar thereto, including without limitation "IO."

MINTZ, LEVIN, COHN,
FERRIS, GLOVSKY AND
POPEO, P.C.
ATTORNEYS AT LAW

- 25 -

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated:  June 9, 2025

Respectfully submitted,

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: */s/ Andrew D. Skale*_____
Andrew D. Skale (211096)
Laura Franco (186765)
Anthony J. Viola (*pro hac vice forthcoming*)
Kara M. Cormier (*pro hac vice forthcoming*)

LWD ADVISORS, INC.
Jeff Hyman (171896)

Attorneys for Plaintiff IYO, Inc.

PLAINTIFF'S MEMO ISO MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION