1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2  Margret M. Caruso (Bar No. 243473)
   margretcaruso@quinnemanuel.com
3  Sara L. Pollock (SBN 281076)
   sarapollock@quinnemanuel.com
4  555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, California 94065
5  Telephone:    (650) 801-5000
   Facsimile:    (650) 801-5100
6
7  *Attorneys for Defendants io Products, Inc., OpenAI,
   Inc., OpenAI, LLC, and Sam Altman*
8
   JONES DAY
9  David Kiernan (Bar No. 215335)
   dkiernan@jonesday.com
10 555 California Street 26th Floor
   San Francisco, California 94104
11 Telephone:    (415) 875-5745
12
   Meredith Wilkes (*pro hac vice forthcoming*)
13 mwilkes@jonesday.com
   901 Lakeside Avenue
14 Cleveland, Ohio 44114
   Telephone    (216) 586-7231
15
16 *Attorneys for Defendant Sir Jonathan Paul Ive*
17
18             **UNITED STATES DISTRICT COURT**
19            **NORTHERN DISTRICT OF CALIFORNIA**
20              **SAN FRANCISCO DIVISION**
21 IYO, INC.,                          | Case No. 3:25-cv-04861

                Plaintiff,             | **DEFENDANTS' OPPOSITION TO**
22                                      | **PLAINTIFF IYO INC.'S MOTION FOR A**
23        vs.                          | **TEMPORARY RESTRAINING ORDER**
                                        | **AND PRELIMINARY INJUNCTION**
24 IO  PRODUCTS,  INC.,  OPENAI,  INC.,
   OPENAI, LLC, SAM ALTMAN, and SIR   | Judge:  Hon. Trina L. Thompson
25 JONATHAN PAUL IVE,                   | Hearing:  June 17, 2025 at 10 am
26
                Defendants.
27
28

1

## <u>TABLE OF CONTENTS</u>

<strong><u>Page</u></strong>

INTRODUCTION...................................................................................................................9

STATEMENT OF FACTS......................................................................................................9

I.     THIS COURT LACKS ARTICLE III JURISDICTION TO GRANT INJUNCTIVE
       RELIEF BECAUSE THE DISPUTE IS NOT RIPE ...................................................15

II.    PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF...........................................17

       A.     Legal Standard........................................................................................17

       B.     Plaintiff Is Not Likely To Succeed On the Merits ...................................18

              1.     There Is No Use Of The io Mark In Commerce ...........................19

              2.     The *Sleekcraft* Factors Demonstrate No Likelihood Of Confusion ...........19

                     a.     The Conceptual Strength of iyO Is Not Likely To
                            Overwhelmed .....................................................................20

                     b.     Plaintiff And Defendants Have No Related Products .....................20

                     c.     The Marks Are Not Similar.............................................................21

                     d.     Plaintiff Cites No Evidence of Consumer Confusion .....................23

                     e.     Plaintiff's Marketing Channel Does Not Make Confusion
                            More Likely .......................................................................23

                     f.     Plaintiff's Consumers Are Likely To Be Careful and Not
                            Confused.............................................................................24

                     g.     Defendants Had No Bad Intent In Adopting The io Name. .............25

                     h.     Plaintiff Admits No Expansion Plans Help Its Position...................25

       C.     No Exigent Circumstances or Threats of Immediate Irreparable Harm to
              Plaintiff Warrant the Extraordinary Relief Plaintiff Seeks ......................26

              1.     There Is No Imminent Harm to Enjoin ........................................27

                     a.     An Injunction Cannot Issue For An Already Completed Act ..........27

                     b.     There is No Imminent Threat of Infringement...............................28

              2.     Plaintiff's Delay Precludes A Finding Of Imminent Harm.........................28

       D.     The Balance Of Hardships And Public Interest Weighs Heavily Against iyO's
              Requested TRO .......................................................................................29

III.   IF THE COURT GRANTS AN INJUNCTION, IT SHOULD REQUIRE A
       SUBSTANTIAL BOND .................................................................................30

IV.     CONCLUSION ...................................................................................................................30

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4
*AARP v. 200 Kelsey Associates, LLC*,
2009 WL 47499 (S.D.N.Y. Jan. 8, 2009)...................................................................... 17

5

6
*Alatus Aerosystems v. Velazquez*,
2019 WL 7166987 (C.D. Cal. Oct. 2, 2019) ............................................................... 29

7
*Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*,
2021 WL 3117239 (C.D. Cal. June 7, 2021), *aff'd*, 2022 WL 3210698 (9th Cir.

8
Aug. 9, 2022)............................................................................................................... 24

9
*Alpha Indus., Inc. v. Alpha Steel Tube & Shape, Inc.*,
616 F.2d 440 (9th Cir. 1980)...................................................................................... 22

10

11
*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979).............................................................................. 20, 21

12
*Apple Inc. v. Samsung Electronics Co.*,
877 F. Supp. 2d 838 (N.D. Cal. 2012) ...................................................................... 31

13

14
*Assurance Wireless USA, L.P. v. Reynolds*,
100 F.4th 1024 (9th Cir. 2024).................................................................................. 26

15

16
*Blackburn v. State Dep't of Soc. & Health Servs.*,
472 Fed.Appx. 569 (9th Cir. 2012) ........................................................................... 27

17
*Boost Beauty, LLC v. Woo Signatures, LLC*,
2022 WL 409957 (C.D. Cal. Feb. 7, 2022)................................................................ 24

18

19
*Bosley Med. Inst., Inc. v. Kremer*,
403 F.3d 672 (9th Cir. 2005).............................................................................. 18, 19

20

21
*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988)..................................................................................... 27

22

23
*Cherokee Inc. v. Wilson Sporting Goods Co.*,
2015 WL 12656935 (C.D. Cal. June 19, 2015).......................................................... 18

24
*Collins v. U.S. Dep't of Veterans Affs.*,
497 F. Supp. 3d 885 (S.D. Cal. 2020) ....................................................................... 21

25

26
*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*,
2014 WL 5361548 (N.D. Cal. Oct. 20, 2014)............................................................ 18

27

28
*Dahl v. Swift Distrib., Inc.*,
2010 WL 1458957 (C.D. Cal. Apr. 1, 2010).............................................................. 29

*DISH Network Corp. v. F.C.C.*,
    653 F.3d 771 (9th Cir. 2011)................................................................................. 26

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th. Cir. 2010)............................................................................... 30

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
    2018 WL 659105 (N.D. Cal. Feb. 1, 2018).................................................... 18, 25

*FW OmniMedia Corp. v. Toyota Motor Sales, U.S.A., Inc.*,
    2004 WL 3203134 (C.D. Cal. Dec. 8, 2004)......................................................... 21

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006) ................................................................. 27

*Georgia-Pac. Consumer Prods. LP v. Lee's Gen. Toys, Inc.*,
    2008 WL 11337935 (S.D. Cal. Apr. 22, 2008) ..................................................... 18

*Groupion, LLC v. Groupon, Inc.*,
    826 F. Supp. 2d 1156 (N.D. Cal. 2011) .......................................................... 18, 23

*Guichard v. Universal City Studios, LLLP*,
    2007 WL 1750216 (N.D. Cal. June 15, 2007), *aff'd*, 261 F. App'x 15 (9th Cir.
    2007)....................................................................................................................... 28

*Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*,
    952 F. Supp. 1084 (D.N.J. 1997) ......................................................................... 21

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013)......................................................................... 26, 28

*Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    2013 WL 489899 (C.D. Cal. Feb. 7, 2013) .......................................................... 16

*Instant Media, Inc. v. Microsoft Corp.*,
    2007 WL 2318948 (N.D. Cal. Aug. 13, 2007)...................................................... 20

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
    645 F. Supp. 3d 185 (S.D.N.Y. 2022) ............................................................ 25, 30

*JGX, Inc. v. Handlery*,
    2018 WL 984856 (N.D. Cal. Feb. 20, 2018)........................................................ 17

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016)............................................................................... 20

*Kelly v. Fashion Nova, LLC*,
    2024 WL 3455256 (C.D. Cal. Mar. 8, 2024) ....................................................... 25

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
    402 F. Supp. 3d 877 (N.D. Cal. 2019) ......................................................................... 18

*Koller v. Brown*,
    224 F. Supp. 3d 871 (N.D. Cal. 2016) ......................................................................... 27

*La Terra Fina USA, LLC v. TerraFina, L.L.C.*,
    2017 WL 4284167 (N.D. Cal. Sept. 27, 2017) ............................................................ 23

*LegalForce RAPC Worldwide, P.C. v. LegalForce, Inc.*,
    2023 WL 6930330 (N.D. Cal. Oct. 19, 2023), *aff'd* 124 F.4th 1122 (9th Cir.
    2024) ...................................................................................................................... 16, 18, 19

*Lindy Pen Co. v. Bic Pen Corp.*,
    725 F.2d 1240 (9th Cir. 1984) ..................................................................................... 21

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ....................................................................................... 23

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................................... 15, 16

*Midgett v. Tri–County Met. Transp. Dist.*,
    254 F.3d 846 (9th Cir. 2001) ....................................................................................... 27

*Move Press, LLC v. Peloton Interactive, Inc.*,
    2019 WL 4570018 (C.D. Cal. Sept. 5, 2019) .............................................................. 21

*Multifab, Inc. v. ArlanaGreen.com*,
    122 F. Supp. 3d 1055 (E.D. Wash. 2015) ................................................................... 21

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    795 F.3d 1124 (9th Cir. 2015) ................................................................................. 15, 19

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1040 (C.D. Cal. 2003) ...................................................................... 28

*Nelsen v. King Cnty.*,
    895 F.2d 1248 (9th Cir. 1990) ..................................................................................... 27

*Nelson-Ricks Cheese Company, Inc v. Lakeview Cheese Company, LLC*,
    331 F.Supp.3d 1131 (D. Idaho 2018), *aff'd,* 775 F.App'x 350 (9th Cir. 2019) ..................... 19

*Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) ......................................................................... 21, 23, 24

*Nossk, Inc. Plaintiff, v. Fitness Anywhere LLC dba TRX, Defendant*,
    2021 WL 5991701 (N.D. Cal. Nov. 22, 2021) ............................................................ 18

*Nossk, Inc. Plaintiff, v. Fitness Anywhere LLC dba TRX, Defendant.*,
    2021 WL 5991701 (N.D. Cal. Nov. 22, 2021) ........................................................................ 29

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ............................................................................................................. 27

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ........................................................................................ 27, 29

*One Industries, LLC v. Jim O'Neal Distributing, Inc.*,
    578 F.3d 1154 (9th Cir. 2009) ........................................................................................ 22, 23

*Pedego, LLC v. Alliance Wholesalers, Inc.*,
    2012 WL 12892900 (C.D. Cal. 2012) .................................................................................. 29

*Pinterest, Inc. v. Pintrips, Inc.*,
    140 F. Supp. 3d 997 (N.D. Cal. 2015) ................................................................................ 20

*Planet Coffee Roasters, Inc. v. Hung Dam*,
    2010 WL 625343 (C.D. Cal. Feb. 18, 2010) .................................................................. 28, 30

*Pom Wonderful LLC v. Pur Beverages LLC*,
    2015 WL 10433693 (C.D. Cal. Aug. 6, 2015) ................................................................ 26, 30

*Quia Corp. v. Mattel, Inc.*,
    2010 WL 2486364 (N.D. Cal. June 15, 2010) ..................................................................... 18

*Roxbury Ent. v. Penthouse Media Grp., Inc.*,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009) .............................................................................. 23

*Signeo USA, LLC v. SOL Republic, Inc.*,
    2012 WL 2050412 (N.D. Cal. June 6, 2012) .................................................................. 18, 22

*Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*,
    240 F.3d 832 (9th Cir. 2001) .............................................................................................. 17

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) .............................................................................................. 24

*Swedlow, Inc. v. Rohm & Haas Co.*,
    455 F.2d 884 (9th Cir. 1972) (per curiam) ......................................................................... 15

*Theia Technologies, LLC v. Theia Group, Inc.*,
    2021 WL 291313 (E.D. Pa. Jan. 28, 2021) .......................................................................... 17

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) ............................................................................ 15

*Twitter, Inc. v. Paxton*,
    56 F. 4th 1170 (9th Cir. 2022) ...................................................................................... 15, 16

*UnifySCC v. Cody*,
  2022 WL 686310 (N.D. Cal. Mar. 8, 2022) ..................................................................... 27, 29

*United Am. Indus., Inc. v. Cumberland Packing Corp.*,
  2007 WL 38279 (D. Ariz. Jan. 5, 2007) ................................................................................ 16

*Where Do We Go Berkeley v. California Dep't of Transportation*,
  32 F.4th 852 (9th Cir. 2022) ................................................................................................ 26

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ..................................................................................................... 18, 26, 30

*Wunderwerks, Inc. v. Dual Beverage Co. LLC*,
  2021 WL 5771138 (N.D. Cal. Dec. 6, 2021) ........................................................................ 18


## <u>Statutes</u>

15 U.S.C. § 1114(1)(a) ................................................................................................................ 18

15 U.S.C. § 1125(a) .................................................................................................................... 18


## <u>Other Authorities</u>

Fed. R. Civ. P. 65(c) ................................................................................................................... 31

Rutter Group Prac. Guide Fed. Civ. Proc. Before Trial (Nat Ed.) Ch. 13-D ............................... 30

Case No. 3:25-cv-04861

DEFENDANTS' OPPOSITION TO MOTION FOR TRO

**INTRODUCTION**

Plaintiff's lawsuit and motion are unfounded, and premature. Trademark infringement claims require that a defendant use a mark that is likely to cause consumer confusion to sell, distribute, or advertise goods or services. Defendants, and in particular io Products, Inc. ("io"), are doing none of those things. io is at least a year away from offering any goods or services, and the first product it intends to offer is not an in-ear device like the one Plaintiff is offering for "presale" (but which is also still at least months away from its claimed release date).

In addition to warranting dismissal for lack of a concrete controversy, the lack of ripeness dooms Plaintiff's showing on the merits. There is no use in commerce in connection with goods or services, and the prematurity of the circumstances makes it impossible fully to analyze the *Sleekcraft* confusion factors. For example, there is no io product or marketplace context to evaluate. Like Plaintiff's long-promised, but release-date-still-to-be-determined iyO ONE LTE headphones, Plaintiff's lawsuit is vapor—claims that something will materialize, but nothing there.

However, what is known about Plaintiff's products and consumers makes reverse confusion with any product io may offer in the future highly ***un***likely. Plaintiff's products are expensive and require each customer to schedule an appointment with an audiologist to make custom molds of the consumer's ears before they receive any product. Any consumer engaging in such a high-engagement purchase is likely to be sufficiently sophisticated to tell the parties' offerings apart. Indeed, as recently as last week, Plaintiff's website specifically identified the sophisticated nature of its target consumers as: "PROFESSIONAL MUSICIANS, AUDIO ENGINEERS, AUDIOPHILES, AUDITORY NEUROSCIENTISTS, PSYCHOACOUSTICIANS."

Not only is Plaintiff unlikely to succeed on the merits of its trademark claims, but its lawsuit should be dismissed because there is no sufficiently concrete controversy to adjudicate. For either reason, its motion should be denied—or at least delayed pending resolution of Defendants' expected motion to dismiss.

**STATEMENT OF FACTS**

**io:** io was born out of excitement about AI developments. *See* Hankey Dec. ¶ 4. It was founded by four acclaimed former Apple employees, Sir Jonathan ("Jony") Paul Ive, Evans Hankey,

1    Tang Yew Tan, and Scott Cannon.  Tan Dec. ¶ 3.

2          Sir Ive served as Apple's Chief Design Officer, responsible for creating many of Apple's

3    most iconic consumer electronics devices, including the iMac, iPod, iPhone, and iPad during his

4    twenty-seven-year tenure.  Caruso Dec. ¶ 9, Ex. I. Ms. Hankey served as Apple's Vice President of

5    Industrial Design responsible for overseeing the development of the look and feel of Apple products

6    ranging from AirPods to Mac computers over the course of the 23 years she worked there.  Hankey

7    Dec. ¶ 2.  Mr. Tan led product design for both the iPhone and the Apple Watch product lines.  Tan

8    Dec. ¶ 2.  He also oversaw accessory design and Apple's Material and Acoustic teams.  *Id.*  The

9    three of them collectively have hundreds of patents or patent applications to their names, and they

10   are some of the most accomplished and well-regarded experts in product design and engineering.

11   Although each left Apple at different times and for different reasons, they ultimately came together,

12   along with Scott Cannon, another former Apple employee, to found io and partner with OpenAI,

13   Inc., an artificial intelligence research and deployment company co-founded by Sam Altman.  Tan

14   Dec. ¶ 3; Altman Dec. ¶ 1-2.  Their shared goal was, and is, to create a family of products that would

15   revolutionize the way people interact with AI technology.  Tan Dec. ¶ 3; Altman Dec. ¶ 2.

16         The "io" name references the new "input/output" paradigms io seeks to create, and the "io"

17   name was chosen, and the io.com domain acquired, back in 2023, long before iyO announced its (as

18   yet to be released) iyO ONE earpieces.  *See* Altman Dec. ¶ 2; Caruso Dec. ¶ 5, Ex. F.

19         **iyO:** iyO, Inc., founded by Jason Rugolo, operates as a developer of wearable audio devices

20   in Redwood City, California.  iyO released its first product, VAD PRO, a wired headset, in early

21   2024 for $2,000.  Caruso Dec., Ex. E; Mot. 3.  Following its VAD PRO launch, in April 2024, iyO

22   announced its as-yet unreleased follow-on product, the iyO ONE, which it advertises as an audio

23   computer that will retail for $999 for the Wi-FI-only model and $1,199 for the LTE model.  *Id.* ¶ 3,

24   Ex. C.  iyO encouraged customers to pre-order the product with a down-payment of $69, claiming

25   it would ship in winter 2024.  *Id.* ¶ 4, Ex. D.  It did not.  Tan Dec. ¶ 5.  Today, iyO's website

26   advertises that the Wi-Fi version of the product will be shipped in August 2025 (even though

27   Plaintiff's motion claims it will be "in September or October"), and the LTE version still has no

28   release date.  Caruso Dec. ¶ 3, Ex. C; Mot. at 1.

1    The iyO ONE is customized to the purchaser and requires an in-person fitting; after ordering

2    a headset, the purchaser must meet with an audiologist to take an impression of the ear.  Rammah

3    Dec. ¶ 5.  As stated on iyO's website as of June 2, 2025, the target audience for iyO's products is

4    sophisticated users of audio devices, such as "PROFESSIONAL MUSICIANS, AUDIO

5    ENGINEERS,    AUDIOPHILES,    AUDITORY    NEUROSCIENTISTS,    AND

6    PSYCHOACOUSTICIANS."  Caruso Dec. ¶ 2, Ex. A.  As Mr. Rugolo confirmed last month, they

7    are not intended to be a general consumer product for the mass market.  Hankey Dec. ¶ 5.

8    While of minimal relevance to any legal issues, Plaintiff spends significant effort developing

9    a factual narrative.  The remaining discussion of facts is provided largely to contextualize that

10   narrative.

11   **io Explores Various Form Factors For Its Product Suite:** io was formed in 2023 with the

12   goal of developing new ways for people to use AI.  Altman Dec. ¶ 2.  At the time, io had not selected

13   a particular product or form factor.  Tan Dec. ¶ 3.  For many months after its founding, io surveyed

14   the existing commercial offerings and engaged in prototyping exercises, as it considered a broad

15   range of form factors, including objects that were desktop-based and mobile, wireless and wired,

16   wearable and portable.  Tan Dec. ¶ 4.  As part of these early efforts, io purchased a wide range of

17   earbuds, hearing aids, and at least 30 different headphone sets from a variety of different companies.

18   *Id.*; Rammah Dec. ¶ 3.  One of those companies was iyO.  *Id.*  In May 2024, Tan placed a pre-order

19   for iyO's ONE LTE earbuds from iyO's website.  Tan Dec. ¶ 5.  He paid the preorder downpayment

20   of $69.  *Id.*  At the time of the purchase, iyO represented that the product would be shipped in

21   "winter 2024."  *Id.*  In January 2025, Tan received an email from iyO stating that the shipping date

22   had been delayed to some indefinite point in the future.  *Id.*  Tan has still not received the iyO ONE

23   earbuds he ordered and paid a deposit on over one year ago.  *Id.*

24   On March 17, 2025, Marwan Rammah, an engineer at io, placed an order from his standard

25   work email address for a VAD PRO headphones set.  Rammah Dec. ¶ 3.  After he placed the VAD

26   PRO order, an employee at the Ear Project emailed him to schedule an ear impression with an

27   audiologist.  *Id.* ¶ 5.  The audiologist came to the io office to take the impressions on March 19,

28   2025, and once he received an email that the VAD PRO headphones were ready to be delivered, he

scheduled delivery via Uber courier to his office.  *Id.*  After receiving the VAD PRO headphones, Rammah asked the employee at the Ear Project whether it was "possible to get the 3D CAD of my ear imprints after they were cut/modified to fit the VAD enclosure and other parts?  Not asking for any VAD parts themselves, just the part that goes into my ear."  *Id.* ¶ 6.  He did not request, or receive, Plaintiff's "design files" for the VAD PRO or any other product—only the scans of his own ear canals.  *Id.*

**iyO Pursues Funding And Assistance From io And OpenAI Employees:**  Since January 2022, iyO has attempted to acquire talent and treasure from the individuals and entities it is now suing.  For example, in January 2022, Steve Zadesky, a good friend of Hankey, asked her to take a call with Rugolo while she was working at Apple.  Hankey Dec. ¶ 3.  As a favor to Zadesky, she agreed.  *Id.*  During that conversation, which lasted less than an hour, Rugolo explained that he was working on augmented audio technology for the ear with a voice input and needed a new head of design.  *Id.*  Rugolo did not tell Hankey the name of his company, and she did not ask.  *Id.*  Hankey said she was not interested in working on a product like that, but referred Rugolo to one of her former colleagues.  *Id.*

On March 4, 2025, Rugolo emailed Sam Altman, CEO of OpenAI, seeking $10 million in funding.  Altman Dec. ¶ 4; Dkt. 6-9 (Rugolo Dec. Ex. C).  Rugolo stated that he would "love to show you what we've built and convince you we are right about the future of human-computer interface."  *Id.*  Altman responded the same day: "thanks but im working on something competitive so will respectfully pass!" and told Rugolo that what he was working on was "called io."  *Id.*

Rugolo was undeterred.  He responded "ruh roh.  /  want to work together?"  *Id*.  Altman replied that he would "chat with jony ive" who was the "one driving this."  *Id.*  Altman subsequently introduced Rugolo to Peter Welinder, the VP of Products at OpenAI.  Dkt. 6-11 (Rugolo Dec. Ex. E).  Welinder then informed Tan that Rugolo had requested to meet him.  Tan Dec. ¶ 6.  By that time, Tan had a poor opinion of iyO's product.  *Id.*  He was disappointed by his experience with his pre-order of the iyO ONE product, and he had spoken to a (now former) iyO engineer, who told him he was seeking a new job because he was frustrated with iyO's slow pace, unscalable product plans, and continued acceptance of preorders without a sellable product.  *Id.*  However, Zadesky, Tan's

1  former mentor from Apple, reached out to Tan and encouraged him to take the meeting. *Id.* ¶ 7. As

2  a courtesy to Zadesky, Tan agreed. *Id.* When he agreed to the meeting with iyO, Tan made clear

3  that he would not sign any NDA with iyO because he did not want io to receive any iyO confidential

4  information. Tan Dec. ¶ 8. Rugolo agreed to proceed without one. *Id.*

5       In late April, 2025, an audiologist from the Ear Project came to io's office to take ear

6  impressions of several people in advance of the demonstration. Tan Dec. ¶ 10. Following the fitting

7  – which lasted about 15 minutes – Tan emailed Rugolo saying that he "[l]earned a lot from the

8  fitting." *Id.* Tan's comment was not referring to iyO's technology or design, which the audiologist

9  did not discuss during her visit, but to the molding process. *Id.*

10       On May 1, 2025, custom earpieces made, Rugolo and an iyO audio engineer met with Tan,

11  Rammah, and other io employees to demonstrate the iyO ONE. Tan Dec. ¶ 12. There were three

12  parts to the iyO ONE demonstration: (1) search, which allowed the user to give voice commands to

13  search the internet (much like Siri on an iPhone with AirPods); (2) "Deej," which allowed the user

14  to listen to music (much like Apple Music on an iPhone with AirPods); and (3) live translation,

15  which was supposed to translate quickly. *Id.* The demonstration did not go as planned, and various

16  parts failed repeatedly. *Id.*

17       Tan was the last person to do the demonstration, so when it was over, he was the only

18  employee left in the room. Tan Dec. ¶ 13. *Id.* Rugolo used that opportunity to explain that he was

19  fundraising for iyO. *Id.* When Tan did not express interest, Rugolo pivoted, saying he would sell

20  the entire iyO company for $200 million. *Id.* When Tan again demurred, Rugolo asked Tan to

21  review iyO's IP portfolio to see if io would be interested in purchasing it. *Id.* Tan responded that

22  he would need to speak to attorneys before undertaking any such review due to IP concerns. *Id.*

23       Four days after the meeting, Rugolo sent an email saying he would "love to find a way to

24  partner up," suggesting a joint "developer kit." Tan Dec. ¶ 14. Over a week later, Tan responded.

25  *Id.* He explained again that iyO's product was "very different" from io's product vision and that io

26  did not believe the designs or hardware would be complementary, therefore it did not see the value

27  in a developer kit. *Id.* In an effort to find some way to help Rugolo and iyO, Tan offered to have

28  io's IP lawyer review the IP portfolio. *Id.*

On May 15, 2025, Rugolo emailed Tan asking that he reconsider the developer kit concept, as well as having "subject matter experts" rather than attorneys review iyO's intellectual property portfolio.  Tan Dec. ¶ 15.  Tan did not want his engineers to look at a third-party's confidential intellectual property, so he did not respond to the email.  *Id.*  On May 25, 2025, following the public announcement that io and OpenAI had formed a collaboration, Rugolo emailed to congratulate Tan on the launch and stating that he was "looking forward to continuing the conversation."  Tan Dec. ¶ 17.  Tan responded the following day, thanking Rugolo for his well wishes, reiterating that it had "a dev platform already so not sure if this will be complimentary" and declining to look at iyO's IP portfolio.  *Id.*  In response, Mr. Rugolo asked for another meeting and raised, for the first time, an issue with the use of the "io" name, asking io to "stop using the name" while "we are continuing our conversations."  *Id.*  As there were no continuing conversations, and Mr. Rugolo had never mentioned any issues with the io name in prior communications over the past several weeks, Tan thought it was clear that Mr. Rugolo was raising the issue of the io name in bad faith to try to force a deal with his company.  *Id.*

**iyO Changes Its Website In Advance Of Filing Its Complaint:** During the week of June 2, 2025, after receiving a demand letter from Plaintiff's counsel, Defendants' counsel viewed Plaintiff's iyo.audio website.  Caruso Dec. ¶ 2.  At the time, the website largely consisted of a black background with yellow-green lettering rendered in a blocky all-cap font that seemed designed to appear like a computer screen from the 1980s or 90s.  *Id.*, Ex. A.  Part of the content of the website included an itemized list of intended users of Plaintiff's products: professional musicians, audio engineers, audiophiles, auditory neuroscientists, and psychoacousticians.  *Id.* ¶ 2.  The next week, Plaintiff initiated this action on June 9, 2025.  Dkt. 1.

As of June 11, 2025, Plaintiff's website is dramatically different.  Caruso Dec. ¶ 2.  The layout became more ordered and balanced, with white text on black or black text on white, rather than yellow green all caps, and the primary website font has changed, yielding a more elegant and "Apple-style" website.  *Id.*, Ex. B.  Information regarding Plaintiff's intended users has since been removed.  *See id.* ¶ 2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**I.    THIS COURT LACKS ARTICLE III JURISDICTION TO GRANT INJUNCTIVE RELIEF BECAUSE THE DISPUTE IS NOT RIPE**

The dispute alleged in Plaintiff's complaint is purely hypothetical and thus insufficiently ripe to confer Article III jurisdiction.  "Along with standing and mootness, ripeness is one of three justiciability requirements."  *Twitter, Inc. v. Paxton*, 56 F. 4th 1170, 1173 (9th Cir. 2022).  "The basic rationale of the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Id.* (internal quotation marks omitted).  "The constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry," which requires "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (cleaned up); *see, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (dispute must "be definite and concrete, touching the legal relations of parties having adverse legal interests" and "real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts") (cleaned up).  A court thus obtains jurisdiction over a dispute only "when it can be decided without considering contingent future events that may or may not occur as anticipated, or indeed may not occur at all."  *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015) (internal citations and quotation marks omitted) (affirming dismissal of trademark claim as unripe); *see, e.g.*, *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc) (reversing judgment and directing dismissal because threatened harm, "though theoretically possible[,] is not reasonable or imminent" and instead was "wholly contingent upon the occurrence of unforeseeable events").

Defendants' announcement that OpenAI and io would be merging and had plans to develop at some indefinite point in the future a new "family of products"—the sole trademark "use" Plaintiff alleges by Defendants—is insufficient to establish a ripeness under Article III.  Mot. 9.  The law is clear that an infringement claim is unripe where "the complaint does not allege 'actual or imminent infringement.'"  *Name.Space*, 795 F.3d at 1133 (quoting *Swedlow, Inc. v. Rohm & Haas Co.*, 455

F.2d 884 (9th Cir. 1972) (per curiam), and distinguishing cases where "defendant clearly intended to violate plaintiff's trademarks in the near future"); *see, e.g.*, *LegalForce RAPC Worldwide, P.C. v. LegalForce, Inc.,* 2023 WL 6930330, *7-8 (N.D. Cal. Oct. 19, 2023), *aff'd* 124 F.4th 1122 (9th Cir. 2024) (dismissing trademark infringement claims as unripe where evidence did not show launch of allegedly infringing product was "imminent").[1]

Here, there is absolutely no allegation, with any degree of specificity, of imminent let alone actual trademark infringement.  Indeed, the complaint is entirely devoid of any of the "factual dimensions … of the dispute" that would render it ripe.  *MedImmune,* 549 U.S. at 128 (case is ripe only where "factual and legal dimensions of the dispute are well defined").  For example, what kind of product will be created?  To whom would it be marketed?  What marketing channels would be used?  How would the io mark be used, if at all?  Would it be imprinted on the product hardware?  Would language or house marks accompany uses of the io mark that further reduces the likelihood of confusion?  These are all important questions as to which there is no non-speculative answer because io has no existing product that uses the io mark and has not sold any products, offered any products for sale or distribution, distributed any products, or advertised any goods or services.  Tan Dec. ¶ 16.  And it has no plans to do so for at least a year.  *Id.*  Without any allegations on these critical issues, Plaintiff simply has not established the existence of a "definite and concrete" dispute that is properly submitted for judicial resolution, *MedImmune*, 549 U.S. at 127, or any "imminent" threat of injury that can be judicially redressed, *Twitter*, 56 F.4th at 1173.  Any judicial determination of infringement or non-infringement thus would necessarily be an impermissible advisory opinion as to "what the law would be upon a hypothetical state of facts."  *MedImmune*, 549 U.S. at 127.

---

[1]  Even express future intent to use a trademark is not enough to establish a ripe dispute.  *See United Am. Indus., Inc. v. Cumberland Packing Corp.*, 2007 WL 38279, *2 (D. Ariz. Jan. 5, 2007) (a "defendant's stated intention to use the [mark in question]" is insufficient for Article III jurisdiction); *Image Online Design, Inc. v. Internet Corp. for Assigned Names & Numbers,* 2013 WL 489899, at *5 (C.D. Cal. Feb. 7, 2013) ("No one has used the mark or has the immediate capability and intent to use the mark. Therefore the issue is not ripe.").

The three decisions on which Plaintiff relies (Mot. 23) confirm that this dispute is not ripe. First, *JGX, Inc. v. Handlery* (the only in-circuit authority Plaintiff cites) involves starkly different facts. 2018 WL 984856 (N.D. Cal. Feb. 20, 2018). The *JGX* defendant had announced that it would be "reopening" the very restaurant the plaintiff used to operate, using the plaintiff's actual "Lefty O'Doul's" signage, memorabilia, and menus, all of which the defendant had obtained an injunction to prevent plaintiff from removing; there was no question about what the goods and services would be or the exact marketplace appearance of the mark, as they consisted of literally the same physically marked uses the plaintiff had once used. *See id.* at *3. Second, the defendant in *Theia Technologies, LLC v. Theia Group, Inc.* was advertising specific product capabilities of specific products to solicit customers (encouraging "'qualified interested parties' to reach out for more information"), and it had solicited customers at trade shows. 2021 WL 291313 *5, 7 (E.D. Pa. Jan. 28, 2021). *Third*, in *AARP v. 200 Kelsey Associates, LLC*, the court assumed that "concrete decisions concerning the proposed content, design, and layout of the magazine" had already occurred, and concluded that "little will remain for defendants to do other than commence production, distribution, and sale." 2009 WL 47499 *9 (S.D.N.Y. Jan. 8, 2009). As *AARP* recognized, the question of whether "because of the early stage of its development, the design [before the court] may not be the design which is ultimately produced and marketed"—as opposed to the question of whether some product will ever be released—provides "a useful framework for determining when a dispute is of sufficient immediacy and reality to constitute a controversy." *Id.* * 6, 8 (alterations in original, citation and quotation marks omitted). Here, with no finalized product, no promoting of detailed specifications, and no solicitation of interested customers, there are simply too many contingent future events to establish a justiciable controversy.

Because this dispute is not ripe, the Court lacks Article III jurisdiction.

## II.     PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF

### A.     Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n.7

1  (9th Cir. 2001).[2]  To obtain either, a plaintiff must establish (1) a likelihood of success on the merits,

2  (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of

3  equities tips in plaintiff's favor, and (4) an injunction is in the public interest.  *Winter v. Natural*

4  *Res. Def. Council*, 555 U.S. 7, 20 (2008).  A preliminary injunction is an "extraordinary remedy that

5  may only be awarded upon a "clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

6      Courts routinely deny these motions in trademark cases where a plaintiff has not met its

7  burden on each of the factors.[3]  Plaintiff has failed to show that any factor favors an injunction, let

8  alone that they all do.

9  **B.**  **Plaintiff Is Not Likely To Succeed On the Merits**

10      Plaintiff's "Application is limited to trademark infringement.  Mot. 13. "[T]o state a claim

11  for trademark infringement under the Lanham Act, the plaintiff must show that (1) the plaintiff has

12  a protectible ownership interest in the mark, or for some claims, a registered mark; (2) the defendant

13  used the mark 'in connection with' goods or services; and (3) that use is likely to cause confusion."

14  *LegalForce*, 124 F.4th at 1125 (quoting and citing 15 U.S.C. §§ 1114(1)(a), 1125(a)); *see also*

15  *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (infringement requires use "in

16  connection with a commercial transaction in which the trademark is being used to confuse potential

17  consumers").  Plaintiff has not provided evidence of either a use of "io" in connection with goods

---

19  [2]  If the Court is not inclined to deny this Motion in its entirety, Defendants respectfully request the
20  opportunity to present an opposition to oppose the request for preliminary injunction on a normal
    briefing schedule.  *See, e.g.*, *Nossk, Inc. Plaintiff, v. Fitness Anywhere LLC dba TRX, Defendant.*,
21  2021 WL 5991701, at *2 (N.D. Cal. Nov. 22, 2021) (denying ex parte TRO and setting briefing
    schedule before hearing on preliminary injunction); *Cherokee Inc. v. Wilson Sporting Goods Co.*,
22  2015 WL 12656935, at *10 (C.D. Cal. June 19, 2015) (granting TRO, ordering Defendants to show
    cause why a preliminary injunction should not issue, then allowing the parties to submit additional
23  briefing); *Georgia-Pac. Consumer Prods. LP v. Lee's Gen. Toys, Inc.*, 2008 WL 11337935, at *2
24  (S.D. Cal. Apr. 22, 2008) (after TRO was denied court received further briefing on the preliminary
    injunction motion, denying PI motion).

25  [3]     *See, e.g., Wunderwerks, Inc. v. Dual Beverage Co. LLC*, 2021 WL 5771138 (N.D. Cal. Dec.
    6, 2021); *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877 (N.D. Cal. 2019);
26  *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, 2018 WL 659105 (N.D. Cal. Feb. 1, 2018);
    *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548 (N.D. Cal. Oct.
27  20, 2014); *Signeo USA, LLC v. SOL Republic, Inc.*, 2012 WL 2050412 (N.D. Cal. June 6, 2012);
    *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156 (N.D. Cal. 2011); *Quia Corp. v. Mattel, Inc.*,
28  2010 WL 2486364 (N.D. Cal. June 15, 2010).

1    or services or a likelihood of confusion.

2                 **1.    There Is No Use Of The io Mark In Commerce**

3        Plaintiff does not offer any evidence that Defendants have used the io mark in commerce in

4    connection with the sale, distribution, or advertising of any actual good or service.  Nor could it, as

5    io has no goods or services to offer, sell, or advertise; its first product is at least a year away.  Tan

6    Dec. ¶ 16.

7        Instead, Plaintiff's allegations are limited to Defendants issuing a press release and

8    publishing a video that discussed the intent of OpenAI and io to merge and develop new products

9    in the future.  Mot. 8-9.  These materials do not offer any product for sale or identify any product to

10   be released.  Instead, they state that io has "gathered together the best hardware and software

11   engineers, the best technologists, physicists, scientists, researchers and experts in product

12   development and manufacturing," and that the team is "focused on developing products that inspire,

13   empower, and enable."  Dkt. 6-16 (Rugolo Decl., Ex. J).  They specifically say io and OpenAI "look

14   forward to sharing [their] work next year."  *See id.* (embedded video).  This is insufficient to

15   establish use in commerce.  *See Bosley Medical Institute*, 403 F.3d at 672 (website that did not offer

16   goods for purchase did not infringe because "trademark infringement law prevents only

17   unauthorized uses of a trademark in connection with a commercial transaction"); *Nelson-Ricks*

18   *Cheese Company, Inc v. Lakeview Cheese Company, LLC*, 331 F.Supp.3d 1131 (D. Idaho 2018),

19   *aff'd*, 775 F.App'x 350 (9th Cir. 2019) ("Courts do not consider there to be infringement under the

20   Lanham Act if a website contains another's trademark if the website does not offer any product for

21   sale or contain any paid advertisements."); *see also LegalForce*, 124 F.4th at 1126 (use of a mark

22   to advertise and sell equity "does not constitute a use of the trademark 'in connection with' goods

23   or services within the meaning of the Lanham Act"); *Name.space*, 795 F.3d at 1128, 1132-33

24   (accepting $185,000 applications for top-level domains allegedly infringing on plaintiff's

25   trademarks was "too remote and unduly speculative" for trademark claim).

26                 **2.    The *Sleekcraft* Factors Demonstrate No Likelihood Of Confusion**

27       Plaintiff's merits position is based entirely on a theory of reverse confusion—*i.e.,* the

28   concern that consumers who encounter Plaintiff's iyO ONE will assume it is related to io.  Mot. 14.

Because Plaintiff's case is premature, the factual and legal contours are too indefinite to conduct the requisite analysis. But even on this unripe record, examination of the *Sleekcraft* factors based on what is discernable, reveals no likely actionable confusion. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

### a.    The Conceptual Strength Of iyO Is Not Likely To Overwhelmed

"[I]in reverse confusion cases, courts consider the conceptual strength of the plaintiff's senior mark as compared to the commercial strength of the defendant's junior mark." *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *12 (N.D. Cal. Aug. 13, 2007).

Conceptually, it is unclear what iyO means. In common usage, it means "In Your Opinion"—a meaning that is inapplicable to Defendants' io mark, which is associated with the term "input/output." *See, e.g*., Altman Dec. ¶ 2; Caruso Dec. ¶ 10, Ex. J. Aside from that meaning, IYO appears to be three random letters. Whether these letters form a conceptually strong mark is unclear from the record. But in any event, the conceptual *differences* between the marks makes confusion less likely. *See e.g., Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1014 (N.D. Cal. 2015) (no likelihood of confusion where two marks had little-to-no shared meaning). This factor does not favor Defendants.

### b.    Plaintiff And Defendants Have No Related Products

Plaintiff bases its relatedness argument on two products that are not actually available for sale. Mot. 17. The only product that Plaintiff has actually sold—i.e., provided to consumers in exchange for payment—are its VAD PRO wired headphones, which Plaintiff does not argue relate to any offering by Defendant. With no specific io product to assess, Plaintiff broadly asserts that "[b]oth companies have identified 'legacy' methods of using computers, the internet, and AI as obsolete and both develop hardware (and related software) that allows users to interact with their smartphones, computers, artificial intelligence, and the internet without legacy hardware." Mot. 17. But Plaintiff's products—actual and promised—rely on legacy hardware: an in-ear device that is functionally similar to other products actually on the market. *See* Tan Dec. ¶ 12; Caruso Dec. ¶ 8,

1    Ex. H.  And it is yet to be seen what io's products are and what they will do.  Simply put, there is

2    no evidence related products exist, or will ever exist.  *See* Tan Dec. ¶¶ 5, 16, Ex. B.

3          Even if Plaintiff were correct that the parties will eventually offer non-legacy methods of

4    using computers, this alone stretches the definition of "related."  "The proximity of goods is

5    measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers;

6    and (3) similar in use and function."  *Network Automation, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d

7    1137, 1150 (9th Cir. 2011).  Plaintiff's promised product is an ear-device; io's first product will not

8    be an in-ear device.  *See* Tan Dec. ¶ 16; Mot. 1.  "The mere fact that two products or services fall

9    within the same general field ... does not mean that the two products or services are sufficiently

10   similar to create a likelihood of confusion."  *Collins v. U.S. Dep't of Veterans Affs.*, 497 F. Supp. 3d

11   885, 898 (S.D. Cal. 2020) (quotations and brackets omitted); *see also, e.g., Move Press, LLC v.*

12   *Peloton Interactive, Inc.*, 2019 WL 4570018, at *10-12 (C.D. Cal. Sept. 5, 2019) (products both in

13   category of cycling not necessarily related); *Harlem Wizards Entm't Basketball, Inc. v. NBA Props.,*

14   *Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. 1997) (WIZARDS professional basketball team and

15   WIZARDS "show basketball" team different).  Where, as here, the parties' products "d[o] not

16   compete to any extent whatsoever, the likelihood of confusion [will] probably be remote."  *Multifab,*

17   *Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1063 (E.D. Wash. 2015) (quotations, brackets

18   omitted).

19                    **c.      <u>The Marks Are Not Similar</u>**

20         "Similarity of the marks … must be considered **_as they are encountered in the_**

21   **_marketplace_**."  *Sleekcraft*, 599 F.2d at 351.  Marks that are similar, and "indeed identical" when

22   viewed in isolation may prove "readily distinguishable in the context in which they were

23   encountered."  *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (finding no

24   confusing similarity based upon dominant company logos on products and packaging, dissimilar

25   product appearance, and distinctive advertising designs).  Here, there is not even any marketplace

26   context for io's goods to be "encountered"; io is not selling, distributing or advertising products,

27   indeed, io does not have any to sell.  *E.g.,* Tan Dec. 16.  There is little to compare other than the

28   marks in a vacuum—the very thing controlling authority prohibits.  *See, e.g.*, *FW OmniMedia Corp.*

*v. Toyota Motor Sales, U.S.A., Inc.*, 2004 WL 3203134, at *11 (C.D. Cal. Dec. 8, 2004) (citing *Alpha Indus., Inc. v. Alpha Steel Tube & Shape, Inc.,* 616 F.2d 440, 444 (9th Cir. 1980)) ("Likelihood of confusion is assessed not by comparing the subject marks in a vacuum, but by comparing them as they are actually used in the marketplace.").

All the elements that go into marketplace context affect consumer perception and whether a consumer may think uses of two different marks are related. Here, there is no marketing of io's products from which to make a comparison. Plaintiff may argue, contrary to precedent, this does not matter, but the importance of marketplace context is readily demonstrated by Plaintiff's recent overhaul of its website. The prelawsuit version with its all-cap, blocky yellow-green fonts against a black screen presented a very different commercial impression than Plaintiff's current website, which switched to a cleaner layout with a more uniform stroke weight and more rounded conventional letters in black and white:

 

Caruso Dec. ¶ 2, Exs. A & B.

Even when viewed in a vacuum rather than in their marketplace context, the marks are dissimilar, due in large part to the difference of the letter Y—one third of Plaintiff's name—particularly given that Plaintiff typically mixes the capitalization of its mark: iyO, whereas io does not used mixed capitalization. *Compare, e.g.*, *id.*, Exs. A, B, G, *with* Dkt. 6-7–6-15 (Rugolo Dec., Exs. A-I). This weighs against confusion. *See e.g.*, *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1163 (finding that two marks—both consisting of a single letter "O" and both placed on motorcycle helmets—were dissimilar because one had a "prominent apostrophe, which the [other] icon noticeably lacks" and the typeface was different); *see also Signeo USA*, 2012 WL 2050412 at *6 ("SOUL" and "SOL" are not similar where "the mark is only vaguely similar when

considered by its appearance on the product"); *Groupion*, 826 F. Supp. 2d at 1163 ("Despite the similarity in the spelling of [GROUPON and GROUPION], the Court finds that the marks, when viewed in their entirety and as they appear in the marketplace, are dissimilar.").

Plaintiff seems to argue that similarity of sound matters most (*see* Mot. 17), but that does not make sense here.  Plaintiff's sole sales channel is its website.  Mot. 19; Caruso Dec. Exs. A-E.  Because "[v]erbally articulating" the mark "is not part of buying a [physical product]," "sight is significantly more important when comparing these marks than sound."  *One Industries*, 578 F.3d at 1162.

### d. Plaintiff Cites No Evidence of Consumer Confusion

"[T]he sine qua non of trademark infringement is consumer confusion."  *Network Automation,* 638 F.3d at 1142.  Plaintiff cites no evidence of any consumer confusion—nor could it: io has no consumers or even any stimulus of marketing of products by which to run a survey.

Instead, Plaintiff offers conclusory lay witness assertions that confusion will occur.  *See* Mot. 18.  But even if investors or potential investors in Plaintiff's company might be confused – another implausible proposition – that is not relevant to trademark infringement, which seeks to protect **consumers** from confusion.  *E.g.*, *Mattel, Inc. v. Walking Mountain Prods.,* 353 F.3d 792, 806 (9th Cir. 2003) ("The limited purpose of trademark protections set forth in the Lanham Trade-Mark Act, is to avoid confusion in the marketplace by allowing a trademark owner to prevent … others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.") (internal quotation marks and citation omitted)*; Roxbury Ent. v. Penthouse Media Grp., Inc.*, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) (similar); *see also La Terra Fina USA, LLC v. TerraFina, L.L.C.,* 2017 WL 4284167, at *4 (N.D. Cal. Sept. 27, 2017) (instance of confusion by non-consumer did not support plaintiff's argument that a consumer might be confused, making this factor neutral).

### e. Plaintiff's Marketing Channel Does Not Make Confusion More Likely

Plaintiff makes the conclusory assertion that both sides "advertise their products via the internet."  Mot. at 19.  But it points to no evidence that any io product has ever been advertised.  Nor

1    could it; none has.  *See* Tan Dec. ¶ 16.  But even if both parties advertised "via the internet" (Mot.

2    at 19) that does not increase the likelihood of confusion.  As the Ninth Circuit recognized more than

3    a decade ago, "it would be the rare commercial retailer that did not advertise online, and the shared

4    use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer

5    confusion." *Network Automation*, 638 F.3d at 1151.

6                        **f.    Plaintiff's Consumers Are Likely To Be Careful and Not**

7                              **Confused**

8           In the reverse confusion context, the relevant consumers are those who "deal[] with the

9    senior mark holder [and] believe that they are doing business with the junior one." *Surfvivor Media,*

10   *Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005).  Plaintiff's consumers—a highly

11   specialized audience—are not likely to be confused here, given the high price of Plaintiff's goods

12   and the unusually high level of engagement their buying experience requires.  *Aliign Activation*

13   *Wear, LLC v. lululemon athletica Canada Inc.*, 2021 WL 3117239, at *9, *12 (C.D. Cal. June 7,

14   2021), *aff'd*, 2022 WL 3210698 (9th Cir. Aug. 9, 2022) ("[W]here the buyer has expertise in the

15   field or when the goods are expensive, the buyer can be expected to exercise greater care in the

16   purchase"; consumers of senior user's products "likely to exercise caution—and therefore ensure

17   they are actually buying [senior user's product], not [the junior user's]"); *Boost Beauty, LLC v. Woo*

18   *Signatures, LLC*, 2022 WL 409957, at *11 (C.D. Cal. Feb. 7, 2022) (even $50 cosmetic goods

19   counsels against confusion).  The "degree of consumer care" factor thus weighs strongly against the

20   likelihood of confusion.

21          Before this case was filed, Plaintiff described its target audience as professional musicians,

22   audio engineers, audiophiles, auditory neuroscientists, psychoacousticians.   Caruso  Dec.  ¶ 2

23   (quoting Plaintiff's website on June 2, 2025); *see also* Hankey Dec. ¶ 5 (iyO CEO explaining in

24   May 2025 that the iyO ONE was "designed for early adopters, researchers, musicians, and audio

25   purists who are accustomed to having customized earpieces").  Plaintiff's highly sophisticated target

26   users are likely to be very careful in buying products that cost nearly $1,000 and require an in-person

27   appointment with an audiologist to create custom ear molds.  Tan Dec. ¶ 5; Rammah Dec. ¶ 4.  This

28   factor strongly favors Defendants.

1

        **g.**     **Defendants Had No Bad Intent In Adopting The io Name**

2
Although "intent plays a less critical role" in reverse confusion cases, *Equinox*, 2018 WL

3
659105, at *9, Defendants had no malicious.

4
Altman and Ive chose the "io" name in mid-2023 and acquired the io.com domain around

5
the same time.  Altman Dec. ¶ 2.  The name "io" was chosen because it was a common phrase for

6
"input/output," and their intent was, and is, to create products that go beyond traditional products

7
and interfaces.  *Id*.  A party's adoption of a mark that describes or reflects its own products or

8
services is not bad faith.  *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 271

9
(S.D.N.Y. 2022) (factor favors Defendants where mark includes word that "is intimately linked to

10
… the precise product").

11
Defendants had no intention of trading on iyO's mark or causing any confusion between

12
iyO's mark and io.  Altman Dec. ¶ 2.  Indeed, when they selected the name and acquired the io.com

13
domain in 2023, Plaintiff was not using iyO in commerce.  It does not claim to have done so before

14
February 2, 2024, and the mark was not registered until June 4, 2024.  Mot. 3-4.  This factor also

15
favors Defendants.  *See e.g.*, *Kelly v. Fashion Nova, LLC*, 2024 WL 3455256, at *19 (C.D. Cal.

16
Mar. 8, 2024) (intent factor weighed against confusion where "Defendant presented unrebutted

17
evidence that it [chose] its product names . . . without knowledge of whether other companies were

18
using those names").

19

        **h.**     **Plaintiff Admits No Expansion Plans Help Its Position**

20
Plaintiff argues the likelihood of expansion of products is irrelevant.  Mot. 21.  Assuming

21
for the sake of argument that is true, this factor is neutral and does not help Plaintiff.

22
                        \*      \*      \*

23
Because Plaintiff cannot establish either any use of the io mark in commerce, or likely

24
confusion under the *Sleekcraft* factors—to the extent they can be analyzed at all given the lack of

25
any product with Defendants' mark—Plaintiff's claim not only lacks merit, it is implausible.

26
Plaintiff is certainly not likely to succeed on the merits.  *See DISH Network Corp. v. F.C.C.*, 653

27
F.3d 771, 776-77 (9th Cir. 2011) (court "need not consider" the remaining three injunction elements

28
where plaintiff failed to demonstrate a likelihood of success).  Nor can it show "serious questions"

on the merits.  A "merely plausible claim" does not rise to the level of "serious question." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (affirming the denial of preliminary injunction because there was no serious question on the merits); *see also Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852, 863 (9th Cir. 2022) (finding the district court erred in entering an injunction "on a merely plausible claim").  Plaintiff fails to show any such serious factual questions here.  Further, as discussed *infra*, as Plaintiff cannot show that the balance of hardship "tips sharply"—or at all—in its favor.

Plaintiff's failure to satisfy the merits prong under either standard dooms Plaintiff's motion. *See DISH*, 653 F.3d at 776-77.

## C.    No Exigent Circumstances or Threats of Immediate Irreparable Harm to Plaintiff Warrant the Extraordinary Relief Plaintiff Seeks

Plaintiff has failed to demonstrate any irreparable harm, let alone "imminent" harm arising from trademark infringement.  *See Pom Wonderful LLC v. Pur Beverages LLC*, 2015 WL 10433693, at *5 (C.D. Cal. Aug. 6, 2015).  While Plaintiff may certainly be facing harm due to its technological challenges, manufacturing difficulties, and funding problems that led it to reach out to Defendants seeking millions of dollars before it ever heard of "io," nothing in its submission connects this harm with trademark injury—*i.e.*, a likelihood of confusion by consumers.  *See*, *e.g.*, Catmull Dec. ¶ 13; Rugolo Dec. ¶¶ 30-31; Rugolo Dec. Ex. I.  In any event, the mere "possibility" of irreparable harm or of a "speculative injury" is not enough to justify injunctive relief.  *See Winter*, 555 U.S. at 22. Rather, irreparable harm must be "likely" in order to obtain a preliminary injunction.  *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).

Temporary restraining orders are proper only in "emergency situations." *See UnifySCC v. Cody*, 2022 WL 686310, at *1 (N.D. Cal. Mar. 8, 2022).  No such emergency exists here.  Not only is the harm for which Plaintiff seeks relief speculative, but it is far from ***imminent***.  And Plaintiff's ***months-long delay*** in seeking relief only further demonstrates the lack of urgency and imminent harm here.  *See Oakland Tribune, Inc. v. Chronicle Publ'g C*o., 762 F.2d 1374, 1377 (9th Cir. 1985). Plaintiff's failure to demonstrate non-speculative, imminent, and irreparable harm is fatal to its TRO Application.  *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see*

1    also *Blackburn v. State Dep't of Soc. & Health Servs.*, 472 Fed. Appx. 569, 570–71 (9th Cir. 2012);

2    *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016) ("An adequate showing of irreparable

3    harm is the single most important prerequisite for the issuance of a [TRO].") (internal citation

4    omitted).

5                    **1.    There Is No Imminent Harm to Enjoin**

6            A TRO cannot issue absent a showing of ***imminent*** irreparable harm.  *See Midgett v. Tri-*

7    *Cnty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850 (9th Cir. 2001) ("In order to be entitled to

8    an injunction, Plaintiff must make a showing that he faces a real or ***immediate*** threat of substantial

9    or irreparable injury.") (emphasis added).    Because Plaintiff's alleged harm here is neither

10   immediate, imminent, nor irreparable, a TRO is improper.

11                   **a.    An Injunction Cannot Issue For An Already Completed Act**

12           In order for an injunction to issue, the harm must be capable of being alleviated by injunctive

13   relief.  *See e.g.*, *Nelsen v. King Cnty.*, 895 F.2d 1248, 1254 (9th Cir. 1990) (holding plaintiffs "did

14   not possess the requisite standing to assert a claim of injunctive relief" because they did not show a

15   credible threat of immediate future harm but merely "a set of highly speculative contingencies");

16   *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself

17   show a present case or controversy regarding injunctive relief, however, if unaccompanied by any

18   continuing, present adverse effects.").

19           In other words, an injunction cannot issue to punish acts already completed.  *See Nat'l Rural*

20   *Telecommunications Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1051 (C.D. Cal. 2003)

21   ("[I]njunctions operate only with future effect; they are not granted to punish acts already

22   completed.").

23           Defendant's announcement occurred on May 21.  To the extent that announcement caused

24   harm to Plaintiff's fundraising—which, as discussed above, is factually speculative (*see* Section

25   II.C) and legally irrelevant to the issue of consumer confusion (*see id.*)—such harm has already

26   occurred.  *See* Catmull Dec. ¶ 10 ("All the time and effort IYO put into building its brand equity is

27   now gone").  It is therefore not capable of being alleviated by a TRO.

28

1

> **b.** <u>**There is No Imminent Threat of Infringement**</u>

2      The alleged infringement Plaintiff seeks to enjoin is not only highly speculative, but also far

3   from "imminent."  Plaintiff has not yet distributed its ONE product to consumers, and io has not

4   announced, produced, or advertised any product.  There thus can be no imminent irreparable harm

5   at this time (if ever).  *Guichard v. Universal City Studios, LLLP*, 2007 WL 1750216, at *8 (N.D.

6   Cal. June 15, 2007), *aff'd*, 261 F. App'x 15 (9th Cir. 2007) (finding no irreparable harm because

7   "[t]he irreparable injuries cited. . . are speculative because Plaintiff has not yet commenced

8   production of his film.").  As discussed above in Section I, the cases Plaintiff relies on here are

9   readily distinguishable and do not support Plaintiff's harm arguments.

10      In short, Plaintiff's claims of irreparable harm are nothing more than speculation.  A finding

11   of irreparable harm must be grounded in evidence, not "cursory and conclusory" assertions, which

12   are all Plaintiff offers.  *Herb Reed Enters.*, 736 F.3d at 1250.  No injunction should issue.  *See Planet*

13   *Coffee Roasters, Inc. v. Hung Dam*, 2010 WL 625343, at *7 (C.D. Cal. Feb. 18, 2010) (denying

14   injunction where plaintiff offered no factual evidence of harm "aside from unsubstantiated claims

15   made in declarations submitted by two of its employees").

16      Moreover, Plaintiff has not identified any irreparable, as opposed to economic, harm.  *See*

17   *e.g.*, *Nossk, Inc. Plaintiff, v. Fitness Anywhere LLC dba TRX, Defendant.*, 2021 WL 5991701, at *2

18   (N.D. Cal. Nov. 22, 2021) ("[A]ny damages resulting from lost profits, lost customers, and lost

19   business opportunities are purely financial and do not establish irreparable harm."); *compare* Mot.

20   21-22 (citing as "irreparable harm" lost "anticipated sales" and that Plaintiff's fundraising complain

21   has not received "further funds or pledges" since May 21, 2025).

22

> **2.** <u>**Plaintiff's Delay Precludes A Finding Of Imminent Harm**</u>

23      Plaintiff knew by at least March 4, 2025 that Defendants were working on "something

24   competitive" that would be "called io."  Rugolo Ex. C.  Plaintiff acknowledged that potential

25   competition, stating "ruh roh.  want to work together?  i don't want to go up against you man."  *Id.*

26   From there, Plaintiff and Defendants communicated frequently.  Tan Dec. ¶¶ 9-15; Tan Exs. B-E;

27   *see also* Rugolo Exs. E, F, H, I.  Plaintiff repeatedly recognized that io was working on "something

28   that could potentially be competitive."  Rugolo Ex. F.  Yet throughout these conversations, Plaintiff

1    never raised any concern with the name of io's potentially competitive product.  Indeed, it was not

2    until Plaintiff was unable to raise funding or persuade Defendants into investing in or buying its

3    company or intellectual property portfolio that it raised any issue with the io name and filed this

4    lawsuit.  Tan Dec. ¶ 17.

5        Plaintiff's months-long delay in seeking relief here "implies a lack of urgency and

6    irreparable harm."  *Oakland Tribune*, 762 F.2d at 1377; *see also Alatus Aerosystems v. Velazquez*,

7    2019 WL 7166987, at *2 (C.D. Cal. Oct. 2, 2019) (denying plaintiff's motion for a TRO in trade

8    secret suit when "at least a month [passed] between Plaintiff's discovery of Defendant's conduct

9    and [plaintiff's TRO request]"); *Dahl v. Swift Distrib., Inc.*, 2010 WL 1458957, at *4 (C.D. Cal.

10    Apr. 1, 2010) (noting that eighteen-day delay in filing TRO application "implies a lack of urgency

11    and irreparable harm," especially when the plaintiff "fails to explain why he was unable to seek

12    relief 'earlier by a motion for [injunction], avoiding the necessity for a last-minute [temporary

13    restraining order]'"); *UnifySCC*, 2022 WL 686310 at *1 (noting "some courts deny temporary relief

14    based on delays of as little as ten days"); *Pedego, LLC v. Alliance Wholesalers, Inc.*, 2012 WL

15    12892900, at *3 (C.D. Cal. 2012) ("Where there is a delay in seeking a preliminary injunction,

16    courts have consistently found no irreparable harm at stake.").  TRO Plaintiffs' delay weighs heavily

17    against a finding of irreparable harm.  *See* Rutter Group Prac. Guide Fed. Civ. Proc. Before Trial

18    (Nat Ed.) Ch. 13-D, § 13:95 ("Delay in seeking relief may be evidence of laches or negate the

19    alleged threat of 'immediate' irreparable injury. The court has discretion to deny the application on

20    either ground.") (citations omitted).

21        Plaintiff has failed to demonstrate any, let alone "imminent," irreparable harm.  *See Pom*

22    *Wonderful*, 2015 WL 10433693 at *5.  The mere "possibility" of irreparable harm or of a

23    "speculative injury" is not enough to justify injunctive relief.  *See Winter*, 555 U.S. at 22.

24        **D.**    **The Balance Of Hardships And Public Interest Weighs Heavily Against ivO's**

25            **Requested TRO**

26        "[D]istrict courts must give serious consideration to the balance of equities and the public

27    interest."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (quotations and citation

28    omitted).  "[T]he court must identify the harm that a preliminary injunction might cause the

defendant and weigh it against plaintiff's threatened injury." *Planet Coffee Roasters*, 2010 WL 625343, at *6. Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "Injunctive relief may be refused where it would adversely affect the rights of persons who are not parties to the litigation." *Planet Coffee Roasters*, 2010 WL 625343, at *7.

Here, there is no risk of consumer confusion, as neither party is currently selling products to consumers. There is thus no public interest in "not being confused[ed]" (Mot. 25) by the allegedly infringing name.

## III. IF THE COURT GRANTS AN INJUNCTION, IT SHOULD REQUIRE A SUBSTANTIAL BOND

Although Plaintiff has failed to meet the high burden required for injunctive relief, if the Court is inclined to issue a preliminary injunction, a significant bond should be required given the harm and expense that will result to OpenAI's business and Messrs. Altman and Ive's livelihoods. Fed. R. Civ. P. 65(c); *see also Apple Inc. v. Samsung Electronics Co.*, 877 F. Supp. 2d 838, 918 (N.D. Cal. 2012) ("Because the amount of the bond is an upper limit on an injured party's redress for a wrongful injunction, courts have held that 'district courts should err on the high side.'"). Defendants respectfully request leave to submit briefing on the proper amount of bond necessary to protect their substantial investments of time and resources, including the sums they spent on the merger announcement and video, brand development, io.com domain acquisition, and the proper scope of any injunction.

## IV. CONCLUSION

For the reasons stated above and in the supporting declarations filed herewith, the Court should dismiss this case for lack of jurisdiction or, in the alterative, deny iyO's application in its entirety.

Case No. 3:25-cv-04861
DEFENDANTS' OPPOSITION TO MOTION FOR TRO

1

Dated:  June 12, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

2

3

4

By: ___*/s/ Margret M. Caruso*_____
    Margret M. Caruso

5

*Attorneys for Defendants io Products, Inc.,
OpenAI, Inc., OpenAI, LLC, and Sam Altman*

6

7

Dated:  June 12, 2025

JONES DAY

8

9

10

By: ___*/s/ David Kiernan*_____
    David Kiernan

11

*Attorneys for Defendant Sir Jonathan Paul Ive*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:25-cv-04861

DEFENDANTS' OPPOSITION TO MOTION FOR TRO

# FILER'S ATTESTATION

Pursuant to Civil LR 5.1(i)(3), the undersigned hereby attests that concurrence in the filing of **DEFENDANTS' OPPOSITION TO PLAINTIFF IYO INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** has been obtained from David Kiernan and is electronically signed with his express permission.


Dated:  June 12, 2025                          QUINN EMANUEL URQUHART &
                                               SULLIVAN, LLP


                                               By:    /s/ Margret M. Caruso
                                                   Margret M. Caruso

                                                   *Attorneys for Defendants io Products, Inc.,*
                                                   *OpenAI, Inc., OpenAI, LLC, and Sam Altman*