1

2

3

4                                   UNITED STATES DISTRICT COURT

5                                 NORTHERN DISTRICT OF CALIFORNIA

6

7     IYO, INC.,                                        Case No.  25-cv-04861-TLT

8                          Plaintiff,

9            v.                                          **ORDER GRANTING MOTION FOR**
                                                         **TEMPORARY RESTRAINING ORDER**
10    IO PRODUCTS, INC., et al.,
                                                         Re: ECF 6
11                         Defendants.

12           The underlying dispute in this action is whether the use of the mark "IO" causes confusion,

13   mistake, and/or deception with Plaintiff IYO, Inc. ("Plaintiff" or "IYO")'s registered mark "IYO."

14   ECF 1, ¶¶ 129–30.  On June 9, 2025, Plaintiff filed a complaint alleging, among other claims,

15   trademark infringement against Defendants IO Products, Inc. ("IO Products"), OpenAI, Inc.,

16   OpenAI LLC, Sam Altman, and Jonathan Paul Ive (collectively, "Defendants").  *Id.* ¶¶ 128–76.

17   The parties in this action are well-acquainted.  *See id.* ¶¶ 66–92.

18           Before the Court is Plaintiff's motion for temporary restraining order ("TRO"),[1] seeking to

19   broadly enjoin Defendants from using Plaintiff's IYO mark, and any mark confusingly similar

20   thereto, including without limitation "IO."  ECF 6.  Because the motion did not seek ex parte

21   relief, the Court issued an order setting a briefing schedule and hearing date.  ECF 10.

22           After review and consideration of motion, briefings, attachments and exhibits thereto, the

23   Court **GRANTS** Plaintiff's motion for TRO.

24   //

25   //

26

27   _____

28   [1] Plaintiff also shoehorns a request for preliminary injunction in its TRO motion.  *See* ECF 6.  In
     light of the limited record and the broad relief requested, the Court sets further hearing and
     briefing schedule regarding motion for preliminary injunction.  *See infra* at 21.

United States District Court
Northern District of California

1    **I.    BACKGROUND**

2        **A.    Procedural History**

3        On June 9, 2025, Plaintiff filed a complaint against Defendants alleging: (1) trademark

4    infringement under 15 U.S.C. § 1114, (2) false design and unfair competition under 15 U.S.C. §

5    1125(a), (3) violation California Unfair Competition Law ("UCL"), (4) common law false

6    designation of origin and unfair competition, (5) contributory infringement, and (6) inducement of

7    infringement.  ECF 1, ¶¶ 128–76.

8        On the same day, Plaintiff filed a motion for TRO based on its trademark infringement

9    claim.  ECF 6.  The Court set a briefing schedule and hearing.  ECF 10.  Defendants timely filed

10   an opposition on June 12, 2025.  ECF 25; *but see* ECF 30 (supporting declaration filed four

11   minutes passed the deadline).  Plaintiff filed a reply on June 15, 2025.  ECF 35.  Defendants filed

12   objections on June 16, 2025.  ECF 39.  The Court heard the matter on June 17, 2025.

13       **B.    Factual History**

14           **1.    IYO's use of the mark**

15       IYO, Inc. was founded in 2021.  ECF 1, ¶ 46.  IYO filed to register the mark IYO on

16   September 17, 2021.  *Id.* ¶ 50.  On June 4, 2024, the application matured into Registration No.

17   7,409,119.  *Id.*; *see* ECF 1-1, Exhibit ("Ex.") A.  IYO has used the IYO mark continuously in

18   commerce in the United States since at least as early as February 2, 2024, in connection with its

19   audio-centric hardware and software.  ECF 1, ¶ 47.  IYO's first product, the VAD PRO and the

20   soon-to-launch IYO ONE both bear the IYO mark.  *Id.*  In addition, IYO promotes the IYO Mark

21   and its products through a number of channels.  *Id.* ¶ 55.

22       IYO's most recent product—the IYO ONE—is a specialized ear-worn device that allows

23   users to interact with their smartphones, computers, artificial intelligence ("AI"), and the internet

24   without the use of screens, keyboards, mice, or other similar physical interfaces.  *Id.* ¶¶ 34, 36–39.

25   IYO ONE is marketed for sale through IYO's website iyo.audio, and is available for presale to the

26   general public, with shipping expected in September or October 2025.  *Id.* ¶ 44.

27

28

United States District Court
Northern District of California

2

United States District Court
Northern District of California

### 2.  OpenAI's Acquisition of IO Products

On September 21, 2023, IO Products was formed as a Delaware corporation.  *Id.* ¶ 66.  Plaintiff alleges that the existence of IO Products remained largely a secret as it did not register to do business in California until April 4, 2024.  *Id.*

Its goal was to develop new ways for people to use AI.  ECF 29, Declaration of Sam Altman ("Altman Decl.") ¶ 2.  To determine which product or form factor to pursue, IO Products purchased a wide range of earbuds, hearing aids, and at least 30 different headphone sets from a variety of different companies including IYO.  ECF 26, Declaration of Tang Yew Tan ("Tan Decl.") ¶ 4; ECF 27, Declaration of Marwan Rammah ("Rammah Decl.") ¶ 3.

On May 21, 2025, OpenAI Chief Executive Officer ("CEO") Sam Altman and Apple designer Jonathan Ives announced the existence of IO and OpenAI's $6.5 billion acquisition of IO.  ECF 1, ¶ 93.  OpenAI is an AI organization founded in December 2015, which among other things, aims to develop artificial general intelligence ("AGI").  *Id.* ¶ 57.  OpenAI is known for the GPT family of large language models, the DALL-E series of text-to-image models, and a text-to-video model named Sora.  *Id.* ¶ 59.  Altman and Ives also announced IO's decision to make a new category of computer devices that allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.  *Id.* ¶ 93.

Through this announcement, Plaintiff contends that "OpenAI, IO, Sam Altman, and Jony Ive ha[d] just announced a significant collaboration in a new venture, IO, the name of which is a homophone of Plaintiff's IYO name, and the purpose of which is to launch a product whose purpose and function is eerily similar to and competitive with IYO's product."  *Id.* ¶ 14.

### 3.  Defendant's Knowledge of IYO prior to Announcement

Through a series of contacts, Plaintiff alleges that OpenAI knew of IYO prior to its acquisition and announcement of IO Products.  *Id.*  ¶ 70.  In February 2022, IYO attempted to recruit Evans Hankey, one of IO Products's co-founders, to work as Head of Design at IYO.  *Id.* ¶ 71.  In March 2022, representatives from Apollo Projects, Sam Altman's personal investment fund, met with IYO, obtained technical information from IYO, and discussed IYO's vision for the

1 future of human/computer interaction and the use of natural language. *Id.* ¶ 72. Ryan Cohen, a

2 representative of Apollo Projects, also visited IYO's headquarters where IYO shared its vision and

3 story with him and provided him demonstrations of its technology. *Id.* ¶ 73.

4      In April 2022, IYO was introduced to Ive's company LoveFrom to see if LoveFrom would

5 collaborate with it on natural language screenless computers. *Id.* ¶ 75. At the time, LoveFrom

6 declined to collaborate. *Id.* ¶ 76.

7      On March 4, 2025, IYO reached out to Altman again to request a meeting to pitch its latest

8 strategic financing round. *Id.* ¶ 77. Altman responded the same day, stating "thanks but im

9 working on something competitive so will respectfully pass!" *Id.* ¶ 78. He included that it was

10 "called io." *Id.* In follow-up, Altman stated that Ive is "the one driving this." *Id.*

11      On March 17, 2025, Marwan Rammah, a product design engineer for IO Products,

12 purchased IYO's VAD PRO product and pre-ordered an IYO ONE device. *Id.* ¶ 80. Tang Yew

13 Tan, the co-founder of IO Products, also preordered the IYO ONE. *Id.*

14      On March 26, 2025, IYO discussed with Altman the possibility of OpenAI acquiring IYO

15 and launching IYO ONE as a developer kit for a new kind of computer based on natural language

16 interaction. *Id.* ¶ 84. Plaintiff was connected with Tang Yew Tan, co-founders of IO Products.

17 *Id.* ¶ 87. On April 17, 2025, at Tan's request, Plaintiff fitted seven of IO Products's

18 representatives to demo IYO ONE devices. *Id.* ¶ 89. Tan indicated that Plaintiff's product had

19 potential and even requested review Plaintiff's intellectual property. *Id.* ¶ 92. Tan's request came

20 six days prior to the OpenAI's announcement acquiring IO Products. *Id.*

21     **4.  Alleged Harm Suffered by IYO**

22      On May 23, 2025, two days after the May 21 announcement, IYO's founder emailed

23 Altman to express concern that investors had contacted him about confusion between the parties'

24 company names. *Id.* ¶ 111. On May 29, 2025, IYO's founder again told Defendants that the

25 announcement of IO and the resulting confusion was causing problems for IYO and its investors,

26 network, and fund-raising efforts. *Id.* ¶ 112. IYO's founder asked that Defendants cease using the

27 IO name to stop the confusion, stating that the situation was "urgent." *Id.* In a call, Altman

28 declined to stop using IO. *Id.* ¶ 112.

United States District Court
Northern District of California

1    Since the May 21 announcement, IYO has not been able to secure any additional funding

2  or pledges for funding due to investors' expressed concerns over the infringement.  ECF 6-6,

3  Declaration of Jason Rugolo ("Rugolo Decl."), ¶¶ 30–32.

## II.    LEGAL STANDARD

A TRO enjoins conduct pending a hearing on a preliminary injunction.  Fed. R. Civ. P.

65(b).  The standard for issuing a TRO and issuing a preliminary injunction are substantially

identical.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir.

2001).  Either is an "extraordinary remedy" that the court should award only upon a clear showing

that the party is entitled to such relief.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008).

Plaintiff seeking preliminary relief must establish: (1) that they are likely to succeed on the

merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3)

that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.

*Id.*  A court must find that "a certain threshold showing" is made on each of the four required

elements.  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).  Under the Ninth Circuit's

sliding scale approach, a preliminary injunction may issue if there are "serious questions going to

the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the

[movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the

public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III.    EVIDENTIARY OBJECTIONS

On June 16, 2025, Defendants filed evidentiary objections to Plaintiff's reply evidence.

ECF 39.  Defendants' primary objection is Plaintiff's unauthorized filing of reply, declarations and

exhibits attached thereto.  *Id.* at 1.  The Court set a briefing schedule and hearing date for the

instant motion.  ECF 10.  The Court's order was silent as to whether Plaintiff could file a reply.

*Id.*  Nevertheless, on June 15, 2025, Plaintiff filed a reply.  ECF 35.  Because the Court's order

was silent and civil local rules provide for reply briefing, *see* L.R. 7-3(c), the Court will consider

Plaintiff's reply over Defendants' objection.

1    Defendants also object to the Reply Declaration of Jason Rugolo and accompanying

2    exhibits.  ECF 39, at 2–5.  Defendants request that the Court sustain Defendant's objections to

3    Rugolo Declaration Exhibit K and Paragraphs 3, 5, and 12.  *Id.* at 5.

4    The Ninth Circuit has established that the "district court need not consider arguments

5    raised for the first time in a reply brief."  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

6    Here, Plaintiff did not raise its notes in Exhibit K and Paragraph 3, nor its statements in

7    Paragraphs 5 and 12 until the reply briefing.  At this time, the Court sustains Defendants'

8    objections solely on the ground that they are improper reply evidence.

9    **IV.    DISCUSSION**

10    The Court will first determine whether the action is ripe.  The Court will then apply the

11    four *Winter* factors to determine whether to grant the TRO based on the trademark infringement

12    claim.  If necessary, the Court will determine whether bond is appropriate.

13    **A.    Plaintiff has alleged an imminent injury for the purpose of ripeness.**

14    As an initial matter, Defendants argue that the Court lacks jurisdiction over the instant

15    action because Defendants have not launched a product with the io mark yet.  ECF 25, at 15–17.

16    The parties do not dispute that IO Products currently has no existing product that uses the io mark.

17    ECF 26, Tan Decl. ¶ 16.  But IO Products concedes that it plans to release a product with the io

18    mark in at least a year.  *Id.*  In response, Plaintiff argues that Defendants have announced a

19    working prototype, ECF 1, ¶ 102, and their May 21 announcement was in fact a product

20    announcement: "Sam & Jony introduce io," *see* ECF 6-16, Ex. J.

21    "Along with standing and mootness, ripeness is one of three justiciability requirements."

22    *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022).  "Ripeness is drawn both from Article

23    III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."

24    *Id.* (citing *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021)) (internal

25    quotations omitted).  "The basic rationale of the ripeness requirement is to prevent the courts,

26    through avoidance of premature adjudication, from entangling themselves in abstract

27    disagreements."  *Id.* (citing *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993))

28    (internal quotations omitted).

United States District Court
Northern District of California

6

1    "The constitutional component of ripeness is synonymous with the injury-in-fact prong of

2    the standing inquiry." *Id.* (citing *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2

3    (9th Cir. 2003)).  "Whether framed as an issue of standing or ripeness, an injury must involve an

4    invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or

5    imminent, not conjectural or hypothetical." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

6    560 (1992)).

7    "A question is fit for decision when it can be decided without considering contingent

8    future events that may or may not occur as anticipated, or indeed may not occur at all."

9    *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, F.3d 1124, 1132 (9th Cir.

10    2015) (citing *Addington v. U.S. Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010))

11    (internal quotations omitted).  In *Name.Space*, the Ninth Circuit applied the ripeness inquiry in the

12    trademark infringement context.  *Id.*  The court dismissed the trademark infringement claim,

13    finding that "the complaint as it stands does not allege actual or imminent infringement." *Id.*

14    (citing *Sweedlow, Inc. v. Rohm & Haas Co.*, 455 F.2d 884, 886 (9th Cir. 2009)) (internal

15    quotations omitted).

16    Defendants focus on the "actual and imminent" inquiry.  ECF 25, at 15–17.  Defendants

17    argue that their announcement that OpenAI and IO Products would be merging and would develop

18    in the future a new family of products is insufficient to establish an actual or imminent injury.  *Id.*

19    at 15.

20    In response, Plaintiff argue that Defendants admit that their product will compete with

21    IYO; their products are called "io"; their product will be released next year; their company is

22    called IO Products; they have a functioning prototype; they invested $6.5 billion in the products;

23    they own the domain io.com; they plan to mass market their products on io.com to everyone; their

24    announcement was titled "Sam and Jony introduce io;" and they have declined to cease using the

25    io mark.  ECF 35, at 4.  Plaintiff contends that these facts indicate that injury is imminent.  *Id.*

26    The Court finds two cases to be instructive.  In *LegalForce RAPC Worldwide, P.C. v.*

27    *LegalForce, Inc.*, this district court determined whether the trademark infringement dispute was

28    ripe.  No. 22-CV-03724-TLT, 2023 WL 6930330, at *7 (N.D. Cal. Oct. 19, 2023), *aff'd sub nom.*

United States District Court
Northern District of California

7

1   *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122 (9th Cir. 2024).  The court

2   first concluded that defendant did not advertise or sell products and services in the U.S. using the

3   contested marks.  *Id.* at *6.  With no actual infringement, the court turned to whether the

4   infringement was imminent.  *Id.*  Defendant had filed a U.S. trademark application and had made

5   statement in June 2022 that it was planning to expand into the U.S. by March 2023.  *Id.*  However,

6   the articles stating defendant's intent to expand did not reflect that defendant intended to use the

7   contested marks.  *Id.*  The court held that these facts by themselves were not sufficient to establish

8   an imminent injury as to products sales in the U.S. and plan to launch products in the U.S.  *Id.* at

9   *8.

10          In *JGX, Inc. v. Handlery*, the court also determined whether the trademark infringement

11  dispute was ripe.  No. 17-CV-00287-BLF, 2018 WL 984856, at *3 (N.D. Cal. Feb. 20, 2018).

12  Plaintiff's lease had expired for its lounge and restaurant called "Lefty O'Doul's."  *Id.* at *4.

13  Defendants took over the restaurant and publicly announced the restaurant "isn't moving

14  anywhere" and "will remain" "at the same location" under the same name.  *Id.*  The court found

15  that because the restaurant had not reopened yet, plaintiffs could not allege actual infringement of

16  the "Lefty O'Doul's" mark.  *Id.*  However, the court found that defendants' "public statements,

17  combined with [p]laintiffs' allegations that [d]efendants left up signage and menus after the lease

18  expired, and the extensive loss of revenues resulting from these statements, [was] sufficient to

19  allege imminent and impending use of the mark."  *Id.*

20          Like in *LegalForce* and *JGX*, because Defendants have not yet released a product with the

21  disputed mark, IYO cannot allege actual infringement.  However, Defendants have working

22  prototype, ECF 1, ¶ 102, the product will compete with Plaintiff's product, *id.* ¶ 78, the product

23  will be called by the disputed mark, *id.*, and the product will be released in at least a year, ECF 26,

24  Tan Decl. ¶ 16.  The Court finds these allegations are sufficient to establish an imminent injury for

25  the purposes of ripeness.  *See, e.g.*, *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp.

26  2d 890, 902 (C.D. Cal. 2014) (finding ripeness where neither party had "commercially available

27  products or services"); *JGX*, 2018 WL 984856, at *4 ("The law does not require the [c]ourt to wait

28  until [d]efendants physically re-open their doors.").

United States District Court
Northern District of California

8

United States District Court
Northern District of California

### B.    Likelihood of Success on the Merits

"In order to state a claim for trademark infringement under the Lanham Act, the plaintiff must show that (1) the plaintiff has a protectible ownership interest in the mark, or for some claims, a registered mark; (2) the defendant used the mark 'in connection with' goods or services; and (3) that use is likely to cause confusion." *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1125 (9th Cir. 2024) (citing  15 U.S.C. §§ 1114(1)(a), 1125(a)).  "More precisely . . . at the preliminary injunction [or TRO] stage, [the plaintiff] must establish this it is likely to be able to show such a likelihood of confusion." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053 n.15 (9th Cir. 1999) (citation omitted).

### 1.  Plaintiff has a protectable ownership interest in the mark.

As an initial matter, Plaintiff has a valid federal registration for its IYO trademark (Reg. No. 7,409,119).  *See* ECF 1-1, Ex. A.  "Registration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)).  Where the proof of registration for the federally registered trademark is uncontested, the element requiring proof of a valid, protectable trademark is met.  *Id.*  Plaintiff has established the "protectible ownership interest in the mark" requirement.

### 2.  Defendants used the disputed mark in connection with the sale of goods or services.

Next, Defendants argue that the io mark has not been used in commerce in connection with the sale, distribution, or advertising of any actual good or service.  ECF 25, at 19.  Defendants contend that Plaintiff's allegations limited to Defendants issuing a press release and publishing a video are insufficient to establish "use in commerce."  *Id.*

The Ninth Circuit has made clear that "use in commerce" language in the Lanham Act "is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005).  Rather, to prevail on its trademark infringement claims, Plaintiff must show that Defendants used the disputed trademark

1 "in connection with a sale of goods or services." *Id.* "[T]he 'use in connection with the sale of

2 goods and services' requirement of the Lanham Act does not require any actual sale of goods and

3 services." *Id.* at 679. But the appropriate inquiry is whether Defendants offer "competing [goods

4 or] services to the public." *Id.*

5      Here, Defendants have working prototype, ECF 1, ¶ 102, the product will compete with

6 Plaintiff's product, *id.* ¶ 78, and the product will be called by the disputed mark, *id.* Plaintiff has

7 sufficiently alleged the "in connection with a sale of goods or services" requirement.

8              **3. The *Sleekcraft* factors weigh in favor of infringement.**

9      The Court next turns to the "consumer confusion" requirement. Consumer confusion may

10 be shown as either forward or reverse confusion. *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th

11 1150, 1159 (9th Cir. 2021). "Forward confusion occurs when consumers believe that goods

12 bearing the junior mark came from, or were sponsored by, the senior mark holder. By contrast,

13 reverse confusion occurs when consumers dealing with the senior mark holder believe that they

14 are doing business with the junior one." *Id.* at 1159–60 (citations and internal quotation marks

15 omitted).

16     The likelihood of confusion element is governed by the eight *Sleekcraft* factors: "(1)

17 strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and

18 the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing

19 mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7)

20 defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product

21 expansion." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014) (citing *AMF*

22 *Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated on other grounds by*

23 *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)). "[T]his multi-

24 factor approach must be applied in flexible fashion" and the facts are "not a rote checklist"; "[a]

25 determination may rest on only those factors that are most pertinent to the particular case . . . and

26 other variables besides the enumerated factors should also be taken into account based on the

27 particular circumstances." *Rearden*, 683 F.3d at 1209 (citations omitted). "[A] plaintiff need not

28 satisfy every factor, provided that strong showings are made with respect to some of them." *Pom*

United States District Court
Northern District of California

10

1   *Wonderful*, 775 F.3d at 1125 (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631

2   (9th Cir. 2005)).

3        Courts "must be acutely aware of excessing rigidity when applying the [*Sleekcraft* factors]

4   in the Internet context; emerging technologies require a flexible approach." *Brookfield*, 174 F.3d

5   at 1054 (emphasis added).

6        Plaintiff argues that the *Sleekcraft* factors demonstrate that it has a likelihood of success for

7   its trademark infringement claim based on reverse confusion. ECF 6, at 15–21. Defendants argue

8   that the *Sleekcraft* factors do not indicate a likelihood of success. ECF 25, at 18–25. The Court

9   will address each *Sleekcraft* factor in turn.

10                    **a.  Strength of the Mark**

11        "The stronger a mark—meaning the more likely it is to be remembered and associated in

12   the public mind with the mark's owner—the greater the protection it is accorded by the trademark

13   laws." *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield*, 174 F.3d at 1058). "A mark's

14   strength is 'evaluated in terms of its conceptual strength and commercial strength.' " *JL Beverage*

15   *Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citation omitted).

16   "Conceptual strength involves classification of a mark 'along a spectrum of generally increasing

17   inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.' " *Network*

18   *Automation*, 638 F.3d at 1149 (quoting *Brookfield*, 174 F.3d at 1058). "Arbitrary or fanciful

19   marks deserve wide protection because the trademark holder can properly expect to run into very

20   little confusion from honest competitors . . . [and because] the trademark holder must work hard to

21   make consumers associate the trademark with the product." *Dreamwerks Prod. Grp., Inc. v. SKG*

22   *Studio*, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998). "Commercial strength is based on 'actual

23   marketplace recognition,' and thus 'advertising expenditures can transform a suggestive mark into

24   a strong mark.' " *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield*, 174 F.3d at 1058).

25        In cases of reverse confusion, the Court assesses "whether consumers doing business with

26   the senior user might mistakenly believe that they are dealing with the junior user," which requires

27   "evaluat[ing] the conceptual strength of [the plaintiff's] mark and compar[ing] it to the

28   commercial strength of [the defendant's] mark." *Ironhawk*, 2 F.4th at 1162 (quoting *JL Beverage*,

*United States District Court*
*Northern District of California*

828 F.3d at 1107). "[I]n a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Id.* at 1163 (quoting *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) (per curiam)). Indeed, the central question is whether the junior mark is so commercially strong as to overtake or "swamp the reputation" of the senior mark. *Id.* at 1162–63 (first citing *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000); and then citing *Dreamwerks*, 142 F.3d at 1130 n.5).

Here, IYO is a conceptually strong mark because it is arbitrary or fanciful and the USPTO issued a registration without requiring proof of secondary meaning. *See* ECF 6-2, at 16; *see also Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010) ("[T]he federal officials who register a mark are perceived to have some expertise in assessing if it is entitled to registration, and absent a presentation of secondary meaning, their registration is entitled to a presumptive validity, a presumptive conclusion that the mark was distinctive else they would not have registered it."). In response, Defendants simply argue that it is unclear what IYO means. ECF 25, at 20.

The Court next turns to the commercial strength of the marks. Plaintiff contends that Defendants' IO mark is already so commercially strong that it has overtaken Plaintiff's senior mark and caused actual confusion among investors. ECF 6-2, at 16. Prominent publications nationwide picked up OpenAI's acquisition of IO Products. ECF 1, ¶ 13 n.1. The Court agrees with Plaintiff that Defendants have a commercially strong mark.

Here, the Court finds that Plaintiff may show that Defendants' use of the IO mark may "swamp the reputation" of the IYO mark, and Plaintiff's reputation and business could be affected. Based on this record, the Court finds that this factor favors finding infringement.

### b. Proximity and Relatedness of Goods

"Goods and services are related when they are complementary, sold to the same class of purchasers, or similar in use and function." *Ironhawk*, 2 F.4th at 1163 (citing *Sleekcraft*, 599 F.2d at 350). A plaintiff suing for trademark infringement "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor." *Rearden*, 683 F.3d at 1212. Rather,

United States District Court
Northern District of California

1   "[r]elated goods (or services) are those 'which would be reasonably thought by the buying public

2   to come from the same source if sold under the same mark.' " *Ironhawk*, 2 F.4th at 1163 (quoting

3   *Sleekcraft*, 599 F.2d at 348 n.10). Within the Ninth Circuit, courts "adopt[ ] a rather flexible

4   approach to the whole notion of competition." *Rearden*, 683 F.3d at 1212 (collecting cases).

5   Even where "the parties are not direct competitors," "[t]heir businesses may be sufficiently

6   'complementary' or 'related' that the public is likely to be confused as to the source of the

7   services." *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (citations

8   omitted).

9        In an email, Altman stated that Defendants were working on "something competitive . . .

10   called io." ECF 1, ¶ 78. Plaintiff argues that both companies are working on products that are

11   intended to allow users to interact with their smartphones, computers, AI and the internet without

12   legacy hardware. ECF 6-2, at 17. Plaintiff contends even if Defendant's product is not an in-ear

13   device like Plaintiff's, the products need not be identical to be competing or related. ECF 35, at 8;

14   *see Dreamwerks*, 142 F.3d at 1131 (finding movies and sci-fi merchandise to be related).

15        In response, Defendants argue that Plaintiff's ear-device is a legacy hardware itself. ECF

16   25, at 20–21. Defendants contend that their product will not rely on legacy hardware like

17   Plaintiff's. *Id.*

18        At this stage, considering the intended goals of the products, Plaintiff is likely to success in

19   showing that the products are related and proximate in the market. The Court finds that this factor

20   favors finding infringement.

21        **c.  Types of Goods and Degree of Consumer Care**

22        This factor considers "the sophistication of the customers," including whether a "

23   'reasonably prudent consumer' would take the time to distinguish between the two product lines."

24   *Ironhawk*, 2 F.4th at 1167 (citation omitted). " 'When the buyer has expertise in the field,' or 'the

25   goods are expensive, the buyer can be expected to exercise greater care in his purchases.' " *Id.*

26   (citation omitted).

27        Plaintiff argues that the intended buyers for both products are members of the general

28   public. ECF 6-2, at 23. Both devices are intended to lessen reliance of their users on computer

United States District Court
Northern District of California

1  literacy by allowing users to interact with natural language. *Id.* Plaintiff's IYO ONE is $999 for

2  the WiFi version, $1,199 for the WiFi + LTE version, which is in the range of pricing for other

3  mass market electronics such as smartphones and tablets. *Id.*

4        Defendants counter Plaintiff's consumers are in fact a highly specialized audience. ECF

5  25, at 24. Before filing this action, Plaintiff's website described its target audience as professional

6  musicians, audio engineers, audiophiles, auditory neuroscientists, psychoacousticians. ECF 30,

7  Declaration of Margret M. Caruso ("Caruso Decl.") ¶ 2. Not only does Plaintiff's product cost

8  $1,000, but it also requires an in-person appointment with an audiologist to create custom ear

9  molds. ECF 26, Tan Decl. ¶ 5; ECF 27, Rammah Decl. ¶ 4.

10       Plaintiff counters that while its first product, the VAD PRO was targeted to a limited

11  audience and required a custom fitting, its IYO ONE product is marketed to the general public and

12  will not require general fitting. ECF 35, at 12. Based on the filings, there is no indication that

13  IYO ONE product was not intended for broader audiences. *See* ECF 30-1, Ex. A (website does

14  not advertise limited audience for IYO ONE); ECF 35-5, Ex. N (website advertises to a limited

15  audience only for the VAD PRO).

16       Based on the limited record, the Court finds that this factor weighs in favor of

17  infringement. At this stage, this factor favors TRO.

18                      **d. Similarity of the Marks**

19       "The following axioms define and delimit the similarity analysis: (1) similarity is best

20  evaluated by appearance, sound, and meaning; (2) marks should be considered in their entirety and

21  as they appear in the marketplace; and (3) similarities weigh more heavily than differences." *Pom

22  Wonderful*, 775 F.3d at 1127 (citation and footnote omitted); *see also Network Automation*, 638

23  F.3d at 1151 (emphasizing the importance of addressing how consumers would encounter the

24  mark in the marketplace). "[T]he more similar the marks in terms of appearance, sound, and

25  meaning, the greater the likelihood of confusion." *Brookfield*, 174 F.3d at 1055 (holding

26  "MovieBuff" and "MovieBuff.com" were "essentially identical"). "[A]s the similarities between

27  two marks increase, so too does the likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1127

28

1    (citation omitted).  "Non-visual similarities are particularly important where . . . there is no

2    evidence that consumers encounter the marks side-by-side in the marketplace."  *Id.* at 1129 n.9.

3          Plaintiff argues that there are many similarities between IYO and IO.  ECF 6-2, at 17.  The

4    marks are similar in appearance with only one letter separating them.  *Id.*  In sound, the marks are

5    identical such that, when spoken, they are indistinguishable.  *Id.*

6          Defendants counter that there are no similarities between the marks.  ECF 25, at 21–23.

7    First, Defendants point to Plaintiff's website.  *Id.* at 22.  In the prelawsuit version, IYO is in all-

8    caps, blocky yellow-green fonts against a black screen.  *See* Caruso Dec. ¶ 2, Exs. A & B.  In the

9    post-lawsuit version, IYO is now "IyO" with a more uniform stroke weight and more rounded

10   conventional letters in black and white.  *Id.*  Here, there is no marketing of IO's products for

11   comparison.  ECF 25, at 22.  But IO will market its products with lowercase "io."  *Id.*  Thus, there

12   will be difference in capitalization and the missing "y."  *Id.*  Defendants also argue that the

13   similarity in sound does not matter because Plaintiff's only sales channel is its website where

14   consumers will not rely on the sound of the mark in their purchasing decisions.  *Id.*

15         Plaintiff argues that its online marketing occurs via its TED Talk.  ECF 35, at 9.  Likewise,

16   Defendants' marketing also relies on video which is embedded in the May 21 announcement.  *Id.*

17   Thus, the sound of the marks does play a role in the analysis.  *Id.*

18         In *Synoptek, LLC v. Synaptek Corp.*, the court determined the similarity of marks for

19   "Synoptek" and "Synaptek."  309 F. Supp. 3d 825, 836 (C.D. Cal. 2018).  The court found that

20   because the two marks were phonetic equivalents and had only a one or two letter difference, there

21   was a strong similarity weighing in favor of likelihood of confusion.  *Id.* at 387.  The court also

22   held that "[t]he striking similarity of appearance and sound in the parties' marks here outweighs

23   differences in how the marks may be presented in the parties' advertising."  *Id.* at 383.

24         Like in *Synoptek*, the Court finds that, at this stage, the appearance and sound in the

25   parties' marks weighs in favor of infringement.

26                    **e.  Marketing Channel Convergence**

27         "In assessing marketing channel convergence, courts consider whether the parties'

28   customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful*,

United States District Court
Northern District of California

775 F.3d at 1130 (citing *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987)). "Marketing channels can converge even when different submarkets are involved so long as 'the general class of . . . purchasers exposed to the products overlap.' " *Id.* (citing *Sleekcraft*, 599 F.2d at 353).

The parties devote very little briefing to this factor. Plaintiff argues that both parties market to the general public through the internet. ECF 6-2, at 19. Defendants counter that no IO product exists, so none has been advertised. ECF 25, at 23–24. Plaintiff contends that overlap in advertising, distribution, and customer demographics favors Plaintiff. ECF 35, at 11.

Based on the limited record, the Court finds that marketing channel convergence weighs slightly in favor of infringement because of the overlap in customer bases and internet marketing of products.

### f. Evidence of Actual Confusion

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding." *Reardon*, 683 F.3d at 1210 (citing *Playboy Enters., Inc. v. Netscape Comm'cs Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004)). "[C]onfusion on the part of potential consumers may be relevant" and "non-consumer confusion can serve as a proxy for consumer confusion." *Id.* at 1215 (citations omitted). "Because of the difficulty in garnering such evidence . . . the failure to prove instances of actual confusion is not dispositive." *Ironhawk*, 2. F.4th at 1165 (quoting *Sleekcraft*, 599 F.2d at 353). "Therefore, 'this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available.' " *Id.* (quoting *Sleekcraft*, 599 F.2d at 353).

Plaintiff argues that the immediate reaction of Plaintiff's investors and professional network, upon learning of the May 21 "introduction" of IO, was that Plaintiff would be swamped by Defendants and that Defendants had stolen Plaintiff's name. ECF 6-2, at 18. One of Plaintiff's investors, David Rangel, indicated that several of his contacts have already asked him whether "IYO had anything to do with OpenAI's announcement of IO" and he believes this was because the confusion that Defendants are causing in the marketplace. ECF 6-4, Declaration of David

1    Rangel ("Rangel Decl.") ¶ 10; *see also* ECF 6-5, Declaration of Ed Catmull ("Catmull Decl.") ¶

2    13.

3          Defendants counter that there is no evidence of consumer confusion because IO Products

4    has no consumers yet.  ECF 25, at 23.  While Plaintiff's investors might be confused, that is not

5    relevant to the consumer confusion inquiry.  *Id.*

6          Here, there is no evidence of actual consumer confusion.  However, courts have found that

7    confusion of non-consumers may be relevant.  *Reardon*, 683 F.3d at 1216.  "[C]onfusion on the

8    part of at least certain non-consumers could either: (1) turn into actual consumer confusion (i.e.,

9    potential consumers); (2) serve as an adequate proxy or substitute for evidence of actual consumer

10   confusion (i.e., non-consumers whose confusion could create an inference of consumer

11   confusion); or (3) otherwise contribute to confusion on the part of the consumers themselves (i.e.,

12   non-consumers whose confusion could influence consumer perceptions and decision-making)."

13   *Id.*

14         The Court finds that Plaintiff's investors may serve as a proxy for actual consumer

15   confusion.  However, the Court notes that Plaintiff's investors' testimony may be self-serving and

16   reliant on hearsay.  At this stage, due to the limited record, these declarations are given slight

17   weight.  Evidence of actual consumer confusion weighs slightly in favor of infringement.

18                    **g.  Defendant's Intent in Selecting the Mark**

19         When assessing the defendant's intent to infringe, "[t]his factor favors the plaintiff where

20   the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's

21   trademark."  *Ironhawk*, 2. F.4th at 1167 (internal quotation marks omitted) (citing *JL Beverage*,

22   828 F.3d at 1111–12).  For reverse confusion cases, the court "ask[s] whether there is some

23   evidence that the junior user, when it knew of the senior user, was at fault for not adequately

24   respecting the rights of the senior user."  *Id.* at 1167–68 (quoting 4 McCarthy on Trademarks and

25   Unfair Competition § 23:10 (5th ed. 2020)).  "Intent can be shown through . . . 'evidence that, for

26   example, the [junior user] knew of the mark, should have known of the mark, . . . or otherwise

27   culpably disregarded the risk of reverse confusion.' "  *Id.* at 1168 (citation omitted).

28

17

1    Plaintiff contends that at the time of the May 21 announcement, Defendants were well

2    aware of the IYO mark. ECF 6-2, at 20. Defendants had encountered IYO well before the May

3    21 announcement through meetings and purchases of Plaintiff's products. *Id.* Altman believed

4    that IYO would be a competitor of IO Products. ECF 1, ¶ 78.

5    Defendants contend that they chose the IO name in mid-2023 before they knew IYO would

6    be using the IYO mark in commerce. ECF 25, at 25. However, Plaintiff points out that it

7    exchanged communications with Apollo Projects and Altman himself in March and April of 2022.

8    ECF 6-6, Rugolo Decl. ¶¶ 3–5; ECF 6-7, Ex. A. Further, Plaintiff's application for the IYO mark

9    was filed on September 17, 2021 and published on February 14, 2023, before Defendants would

10    have chosen the IO name. ECF 1, ¶¶ 50, 66.

11    The Court finds that, based on this limited record, Defendant's intent weighs in favor of

12    infringement.

13    **h. Likelihood of Product Expansion**

14    A " 'strong possibility' that either party may expand [its] business to compete with the

15    other will weigh in favor of finding that the present use is infringing." *Ironhawk*, 2 F.4th at 1168

16    (quoting *Sleekcraft*, 599 F.2d at 354).

17    Plaintiff argues that this factor is irrelevant and weighs neutrally. ECF 6-2, at 20–21.

18    Defendants provide no opposition to the assertion that the factor weighs neutrally. ECF 25, at 25.

19    The Court finds that the factor is neutral.

20    After review of each of the *Sleekcraft* factors, the Court finds that Plaintiff has established

21    a likelihood of success. In totality, at this stage, the factors weigh in favor of infringement. The

22    Court next turns to the remaining *Winter* factors.

23    **C. Irreparable Harm**

24    A plaintiff seeking a TRO or preliminary injunction for violation of 15 U.S.C. § 1125(a),

25    (c), (d) is "entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood

26    of success on the merits." 15 U.S.C. § 1116(a); *see also AK Futures LLC v. Boyd St. Distro, LLC*,

27    35 F.4th 682, 694 (9th Cir. 2022) (same). Because IYO has shown a likelihood of success on the

28    merits, it is entitled to a presumption of irreparable harm.

United States District Court
Northern District of California

United States District Court
Northern District of California

1       To rebut this presumption, Defendants argue that Plaintiff's injury is in the past because

2   the announcement occurred in May 21.  ECF 25, at 27.  Defendants contend that there is no

3   imminent irreparable harm and Plaintiff's loss of fundraising is purely financial.  *Id.*  Finally,

4   Defendants contend that on March 4, 2025, Altman told Plaintiff that he was working on

5   something competitive called io but Plaintiff waited until June 9, 2025 to file this action.  *Id.*

6       Plaintiff argues that its injury is ongoing as its fundraising campaign continues to falter

7   after Defendants' May 21 announcement.  ECF 35, at 13.  Plaintiff's harm is not purely financial

8   because if Plaintiff fails to secure funding, it will be unable to manufacture its IYO ONE and

9   fulfills its pre-orders.  *Id.* at 14.  This will result in a loss of credibility and reputation.  *Id.*  Further,

10  Plaintiff will be unable to recruit new talent which is required for the growth of a technology start-

11  up.  *Id.*  Finally, Plaintiff did not delay in filing this action because Plaintiff immediately

12  demanded Defendants cease infringement after the May 21 announcement.  *Id.*  Plaintiff did not

13  have a claim for infringement from Altman's March 4 email.  *Id.* at 15.

14      Based on the limited record, Defendants have not rebutted Plaintiff's presumption of

15  irreparable harm.  The Court does not find that Plaintiff delayed in filing this action.  This *Winter*

16  factor weighs in favor of a TRO.

17      **D.    Balance of Equities**

18      "[W]here the only hardship that the defendant will suffer is lost profits from an activity

19  which has been shown likely to be infringing, such an argument in defense merits little equitable

20  consideration."  *Restoration Hardware, Inc. v. Alimia Light*, No. 23-CV-00948, 2023 WL

21  3639360, at *2 (N.D. Cal. May 24, 2023) (cleaned up).

22      Plaintiff argues that any harm resulting from a TRO should be discounted because

23  Defendants knew of the infringing mark.  ECF 6-2, at 24.  Further, Plaintiff only seeks an order

24  enjoining Defendants' use of the name "IO" in connection with their new company/products, not

25  to prevent Defendants from pursuit of a competitive product under a different name.  *Id.*

26  Defendants could alter their brand and company name to comply with the TRO resulting in very

27  little harm.  *Id.*

28

1    Defendants argue that because there is no risk of customer confusion, the balance of

2    equities weighs against a TRO.  ECF 25, at 29–30.

3    Based on the limited record, it is difficult to discern whether Defendants would suffer from

4    more than mere loss profits.  If the injunction is granted, Defendants may ultimately need to alter

5    their brand and company name.  Here, there are no infringing products already in the marketplace.

6    Given Plaintiff's showing of likelihood of success on the merits, the Court finds that the balance

7    of the equities on the record weighs in favor of enjoining Defendants' infringing conduct.

8        **E.    Public Interest**

9    Finally, "[a]n injunction that prevents consumer confusion in trademark cases . . . serves

10    the public interest."  *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir.

11    2013) (citing *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993

12    (9th Cir. 2009)).  The Court finds that all four *Winter* factors weigh in favor of TRO.

13        **F.    Rule 65(c) Bond**

14    Under Rule 65(c), "[t]he court may issue a . . . [TRO] only if the movant gives security in

15    an amount that the court considers proper to pay the costs and damages sustained by any party

16    found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  District courts have

17    considerable discretion in setting the amount of the bond, "and the bond amount may be zero if

18    there is no evidence the party will suffer damages from the injunction."  *Connecticut Gen. Life Ins.*

19    *Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted).

20    "In particular, the district court may dispense with the filing of a bond when it concludes there is

21    no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Johnson v.*

22    *Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotations omitted).

23    Here, Plaintiff argues there should be no bond because it has demonstrated strong evidence

24    of infringement and Defendants do not have an infringing product in the market.  ECF 6-2, at 25.

25    Plaintiff does not seek to enjoin Defendants from development, production, or sale of products—

26    only an injunction for use of the infringing mark.  ECF 35, at 15.  Defendants argue a substantial

27    bond should be required.  ECF 25, at 30.  Defendants request leave to submit briefing on the

28    proper amount of bond necessary to protect their substantial investments of time and resources,

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    including the sums they spent on the merger announcement and video, brand development, io.com

2    domain acquisition, and the proper scope of any injunction.  *Id.*

3         At oral argument, the Court provided Defendants with leave to provide an accounting of

4    the proper amount of bond.  *See* ECF 41.  Defendants submitted under seal a single sum rivaling

5    the cost of a Super Bowl commercial.  ECF 46-1, ¶ 2.  Defendants do not provide accounting of

6    the single sum due to "mutual non-disclosure agreements."  *Id.*  Plaintiff submitted objections.

7    ECF 48.

8         Given Defendant's limited support for proper bond amount, and Plaintiff's likelihood of

9    success on the merits, the Court will not require Rule 65(c) bond.

10   **V.   CONCLUSION**

11        For the reasons stated above, the Court **GRANTS** the motion for TRO.  Considering the

12   limited record, the Court will require the parties to further brief a motion for preliminary

13   injunction.

14        Defendants IO Products, Inc., OpenAI, Inc., OpenAI LLC, Sam Altman, and Jonathan Paul

15   Ive, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active

16   concert or participation with Defendants having notice of this Order are hereby temporarily

17   restrained:

18        1.   From using the IYO mark, and any mark confusingly similar thereto, including the IO

19             mark in connection with the marketing or sale of related products.

20        This Order shall restrain Defendants until an order on motion for a preliminary injunction.

21   Plaintiff's motion for preliminary injunction is due on August 1, 2025.  Opposition is due on

22   August 22, 2025.  Reply is due on September 5, 2025.  Hearing on preliminary injunction is

23   schedule for October 7, 2025, at 2:00 p.m.  Failure to timely file motion for preliminary injunction

24   will result in immediate lift of the TRO.

25        Joint case management statement is due on July 3, 2025, with initial case management

26   conference on July 17, 2025, at 2:00 p.m.

27   //

28   //

21

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This Order resolves ECF 6.

**IT IS SO ORDERED.**

Dated: June 20, 2025

TRINA L. THOMPSON
United States District Judge