MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Andrew D. Skale (211096)
Micha Danzig (177923)
Laura Franco (186765)
Anthony J. Viola (*pro hac vice*)
Kara M. Cormier (*pro hac vice*)
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone: 415.432.6000

Attorneys for Plaintiff
IYO, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IYO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>IO PRODUCTS, INC., OPENAI, INC.,<br>OPENAI, LLC, OPENAI OPCO, LLC, SAM<br>ALTMAN, SIR JONATHAN PAUL IVE,<br>and TANG YEW TAN,<br><br>Defendants. | **Case No. 25-cv-04861-TLT**<br><br>**VERIFIED COMPLAINT FOR:**<br><br>1) **TRADEMARK INFRINGEMENT;**<br>2) **FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER THE LANHAM ACT;**<br>3) **UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200;**<br>4) **COMMON LAW FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION;**<br>5) **CONTRIBUTORY INFRINGEMENT;**<br>6) **INDUCEMENT OF INFRINGEMENT;**<br>7) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>8) **TRADE SECRET MISAPPROPRIATION UNDER CUTSA; and**<br>9) **TRADE SECRET MISAPPROPRIATION UNDER DTSA**<br><br>**JURY DEMANDED** |

Plaintiff IYO, Inc. ("IYO"), by its attorneys, for its Complaint against defendants IO Products, Inc. ("IO"), OpenAI, Inc., OpenAI, LLC, OpenAI OpCo, LLC (collectively, "OpenAI"), Sam Altman, Sir Jonathan Paul Ive ("Jony Ive"), and Tang Yew Tan (Altman, Ive, and Tan collectively the "Individual Defendants") alleges as follows, upon knowledge as to its own acts and otherwise upon information and belief:

### NATURE OF THE ACTION

1.    All claims asserted herein arise out of, and are based on: (i) Defendants' willful infringement of IYO's registered and common law rights in its IYO (pronounced "EYE-OH") trademark (the "IYO Mark") or contributing to or inducing such infringement; and (ii) Defendant Tang Yew Tan's and Defendant OpenAI OpCo, LLC's misappropriation of IYO's trade secrets (including confidential CAD files and proprietary design information), with the help of Dan Sargent, a former IYO engineer, to accelerate io Products' product development by nearly a decade.

2.    Beginning in or around March 2018, the team behind IYO began their mission to bring natural language computing to billions of people at Google X (n/k/a X: The Moonshot Factory). Google X is a research and development facility within Google that focuses on developing breakthrough technologies to solve the world's biggest problems. During that time, the team invested approximately $25 million on the project.

3.    IYO spun out from Google X as a venture funded startup in or about August 2021. Since then, an additional $37.2 million has been invested in developing the next generation of hardware (and related software) which allows users to interact with their smartphones, computers, artificial intelligence ("AI"), and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

4.    The culmination of IYO's time and investment is its latest product, the IYO ONE, an ear-worn device that uses specialized microphones and bone-conducted sound to control audio-based applications with nothing more than the user's voice. In short, the IYO ONE is a revolutionary new kind of computer without a screen. It can run apps just like a smartphone, with the user simply speaking to them in natural language. The apps also talk back to the user in natural language, through the world's best audio display.

1

5.      At the time of Defendants' conduct, IYO was in the process of manufacturing an initial batch of its IYO ONE products, while also continuing its fundraising and taking presale orders.

6.      In **June 2024**, io Products was in the early stages of ideation.

7.      At that time, they lacked even basic prototyping equipment such as a 3D printer.

8.      But after seeing IYO's TedTalk (in or around April 2024), the co-founder of IO, Tang Yew Tan, and another engineer (from either LoveFrom or IO) ordered IYO's initial product and pre-ordered the IYO ONE.

9.      Tan then reached out to one of IYO's design engineers, Dan Sargent, in mid-May 2024, through a mutual acquaintance, Patch Kessler, to schedule a meeting.

10.      Dan Sargent was IYO's Product Design and Manufacturing Lead while he worked at IYO.

11.      The parties scheduled the meeting for June 6, 2024.

12.      In the days leading up to that meeting, Sargent began a series of suspicious file access and downloads, renaming files with gibberish names to conceal their content and exporting CAD files to files readable on platforms that IYO did not use.

13.      Armed with this trove of proprietary information, Sargent met Tan and Kessler for dinner on June 6, 2024, at Cotogna restaurant in San Francisco, during which he shared physical samples of IYO products (which could be dismantled to show their inner workings), showed a PowerPoint the he called "an early version of my design portfolio," and disclosed confidential CAD drawings depicting IYO's products to Tan.

14.      Sargent then met up with Kessler again in July 2024.

15.      Approximately ten months later—**on May 21, 2025**— Defendant OpenAI announced that it had acquired a new company – called "IO" – formed with famed designer Jony Ive, for $6.5 billion. The purpose of IO? Same as IYO: To develop hardware (and related software) which allows users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

16.      In other words, Defendants had not only stolen IYO's trade secrets, they also coopted IYO's brand name and goodwill by choosing a homophone of the IYO Mark.

17.     An image from Defendants' May 21, 2025, announcement is shown below (at https://openai.com/sam-and-jony/):



18.     io Products' implausibly rapid progression from first stage development to prototype product was made possible only by its misappropriation of IYO's trade secrets, which provided io Products with an improper headstart over IYO and other competitors.

19.     Indeed, IYO spent approximately eight years and over $60 million developing its manufacturable, working audio computing products.

20.     Defendants have known about the existence of IYO, the IYO Mark, and the nature of IYO's technology since at least 2022. Indeed, the parties had a series of meetings with representatives of OpenAI's principal, Sam Altman, and designers from LoveFrom Inc. ("LoveFrom"), a design studio founded by Jony Ive (which was working with OpenAI), about the prospect of IYO and OpenAI working together.

21.     While OpenAI (via Sam Altman's investment fund, Apollo Projects) and LoveFrom declined to pursue a collaboration with IYO in 2022, they kept tabs on IYO's technology.

22.     Certain of those tabs – like Tan's contacts with Sargent - were unbeknownst to IYO until much later.

23.     But in the Spring of 2025, IYO, OpenAI and LoveFrom had additional meetings regarding Defendants' possible participation in IYO's capital raise. During those meetings, IYO's

3

vision, technology, and approach (including embodiments that are still in development) were shared with Defendants, and seven of Defendants' representatives were fitted with demo IYO ONE devices.

24. Based on these meetings, Defendants stated to IYO that they thought IYO ONE had promise, and outright asked IYO to share with them its intellectual property embodied in the IYO ONE.

25. Defendants' May 21, 2025, announcement was publicized internationally, including in the New York Times, NPR, Wall Street Journal, CNBC, and almost every major publication.[1]

26. Defendants' selection of the IO name blatantly and knowingly usurps IYO's goodwill and the goodwill and consumer recognition that IYO has built in its IYO Mark and its products, causing confusion in the marketplace and disrupting IYO's marketing plans, manufacturing plans, and capital raise.

27. Due to Defendants' actions, IYO is at imminent risk of losing its corporate identity, its product identity, control over its goodwill and reputation, the value of its trademarks, and the ability to move into new markets. In fact, the sheer scale of OpenAI and its investment in IO threaten to swamp IYO's reputation in the market and its very existence.

28. The inescapable conclusion here is that Defendants chose the name IO and the timing of their announcement with undeniable knowledge of and intent to harm IYO, swamping its marketing and manufacturing efforts, all in order to misappropriate for themselves the goodwill of the IYO Mark.

29. After OpenAI's May 21 announcement, IYO and its counsel notified Defendants of the harm IYO was suffering due to the IO name and requested that Defendants cease using the name and from causing any further infringement of IYO's rights.

30. Defendants declined to cease their infringement or otherwise attempt to reach a resolution with IYO. And it is noteworthy that Defendants did not even try to provide a legal justification for their infringing activity, despite IYO's specific and written request for such a justification.

---

[1] https://www.nytimes.com/2025/05/21/technology/openai-jony-ive-deal.html; https://www.npr.org/2025/05/22/nx-s1-5407548/openai-jony-ive-io-deal-ai-devices; https://www.wsj.com/tech/ai/former-apple-design-guru-jony-ive-to-take-expansive-role-at-openai-5787f7da?reflink=desktopwebshare_permalink; https://www.cnbc.com/2025/05/21/openai-buys-iphone-designer-jony-ive-device-startup-for-6point4-billion.html

4

31.    Accordingly, to protect its valuable IYO Mark and trade secrets, IYO has been forced to file this action for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*; contributory trademark infringement; inducement of trademark infringement; unfair competition under California Business & Prof. Code, § 17200 *et seq.*; false designation of origin and unfair competition under California common law; trade secret misappropriation under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.; and trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

32.    IYO seeks both equitable relief and damages.

## THE PARTIES

33.    Plaintiff IYO is a Delaware entity founded in 2021. Its principal place of business is in Redwood City, California. It is registered to do business in California.

34.    Defendant IO Products, Inc. is a Delaware corporation registered to do business in California and having its principal place of business at 535 Pacific Avenue, Suite 300, San Francisco, CA 94133.

35.    Defendant OpenAI, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

36.    Upon information and belief, Defendant OpenAI, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

37.    Upon information and belief, Defendant OpenAI, LLC is owned by Defendant OpenAI, Inc.

38.    Upon information and belief, Defendant OpenAI OpCo, LLC ("OpenAI OpCo") is a Delaware limited liability company with its principal place of business in San Francisco, California.

39.    OpenAI OpCo is currently operating the io Products, Inc. business following its acquisition by OpenAI for $6.5 billion, announced on May 21, 2025.

40.    Defendant Sam Altman (OpenAI's CEO) is an individual residing in San Francisco, California.

41.    Defendant Jony Ive is an individual residing in San Francisco, California.

42.    Defendant Tang Yew Tan is an individual who, upon information and belief, resides in

5

San Francisco, California.

43. Tan was a co-founder and Chief Hardware Officer of io Products, Inc., which subsequently merged with OpenAI.

44. Prior to co-founding io Products, Inc., Tan worked at Apple for over 24 years, where he served as Vice President of Product Design for Apple's iPhone and Apple Watch product lines.

45. Tan is named as an inventor on more than 400 patents and patent applications.

46. Given Tan's extensive experience with proprietary hardware design, Tan understood the sensitive and proprietary nature of CAD drawings and other design documentation.

47. Tan also knew or should have known that IYO's design engineer, Dan Sargent, was prohibited from disclosing IYO's confidential information.

48. As discussed further below, Altman and Ive personally participated in, directed, and controlled the infringing activity of OpenAI and IO Products, Inc.

49. Tan personally orchestrated the extraction of IYO's trade secrets by arranging a meeting with Dan Sargent, IYO's Design and Manufacturing Lead, in June 2024, during which Tan received confidential and proprietary information that accelerated io Products' product development by years.

## JURISDICTION AND VENUE

50. This Court has original jurisdiction over Plaintiff's federal claims pursuant to Section 39(a) of the Lanham Act, 15 U.S.C. § 1121(a), the Defend Trade Secrets Act, 18 U.S.C. § 1836, and 28 U.S.C. §§ 1331 and 1338(a). This Court has supplemental jurisdiction over Plaintiff's claims arising under the laws of the State of California pursuant to 28 U.S.C. §§ 1338(b) and 1367.

51. This Court has personal jurisdiction over the Individual Defendants because they reside in this District and engaged in the tortious conduct described herein in this District.

52. This Court has personal jurisdiction over each of the corporate Defendants because each Defendant has its principal place of business in California. Each Defendant also has continuous and systematic operations in and contact with California.

53. Moreover, the Defendants have purposely directed their infringing content at citizens of this forum via their public announcement of their gigantic collaboration in this State. They have

6

also purposefully availed themselves of the privilege of conducting activities in this forum, thereby invoking the benefits and protections of its laws. As a result, the exercise of jurisdiction over these Defendants is reasonable and comports with fair play and substantial justice.

54.    Venue is proper under 28 U.S.C. § 1391 because each Defendant, and Plaintiff, reside in this judicial district, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**IYO AND ITS PRODUCTS**

55.    IYO's most recent product – the IYO ONE – allows users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

56.    Images of the IYO ONE are shown below:






57.    The IYO ONE is an ear-worn device. The device uses 16 beamforming microphones to create an "audio display," or an immersive audio environment for both speaking and listening.

58.    Eight (8) external microphones on each earpiece arranged in a circular array pattern

7

perform a spatial capture of the surrounding environment, enabling the IYO ONE to pass sound through to the ears in a way that feels immersive and natural, as if the user were not wearing any device.

59.    Layering in an audio computing interface in "virtual auditory space" yields a form of mixed audio reality, where the user can hear what is happening around him/her and also engage effortlessly with audio apps. The IYO ONE achieves this through the use of natural language; the user does not have to learn, know, or memorize special commands, words, or gestures to cause the device to do what is asked of it. Instead, all the user needs to do is speak to the device naturally, as though the user were conversing with a person.

60.    In short, the IYO ONE is a revolutionary new kind of wearable, screenless, "audio computer."

61.    Other embodiments of IYO's product that have been conceptualized and/or brought to late-phase production development include the IYO WAND and the IYO YO.

62.    Images of the IYO WAND are shown below.



63.    Images of the IYO YO are shown below.



64.    The IYO ONE can run apps just like a smartphone, with the user simply speaking to them in natural language. The apps talk back to the user in natural language, through the world's best audio display.

65.    The apps can do any number of useful things for the user. These include:

- BABL, real time translation. Using advanced real-time large language models, the BABL app takes a directional audio input from the 16 beamforming microphones on the IYO ONE, sends the target foreign voice to the cloud for a high-quality translation, and in real time streams the voice back in the user's preferred listening language.

- OWL, telescopic hearing in noisy environments. Using 16 external beamforming microphones on the IYO ONE, OWL helps the user to focus on what matters by minimizing distracting noise in the periphery and augmenting voices and sounds in front of the user.

- SHERLOCK, search for anything with just your voice. Current events, the weather, world history, or the price of tea in China...anything you want to know. No more pulling out and unlocking your phone; just say what you want to know, and SHERLOCK will find it for you.

- DEEJ, music exploration with a savant a.i. disc jockey who gets to know you. DEEJ uses a natural language a.i. interface to control your Spotify account. DEEJ can play tracks, spin up playlists, and generally control the music for you just through conversation.

66.    IYO ONE's proprietary auditory user interface control employs a natural language agent called SHELL. SHELL helps make the computing experience seamless by allowing users to open and close apps and find the apps that will be most helpful for the user in any given moment, all through voice commands.

67.    IYO ONE also ensures privacy via voice pickup of the bone-conducted voice inside the user's ear canal. This allows the apps to "hear" only the user, preventing it from being interrupted by others' voices.

68.    IYO ONE can be used with, or without, the user's phone.

69.    The IYO ONE, WAND, and YO are marketed for sale through IYO's website iyo.ai, and are available for pre-sale to the general public.

70.    The IYO ONE, WAND, and YO have always been marketed to the mass market (unlike

9

the VAD PRO, which was marketed to a more niche market).

71.    The pricing for the IYO ONE is $999 for the WiFi version, $1,199 for the WiFi + LTE version, which is in the range of pricing for other mass market electronics such as smartphones and tablets. As of the time of the May 21 announcement, IYO was in the process of manufacturing 20,000 units.

72.    The pricing for the IYO WAND is $499.

73.    The pricing for the IYO YO is $599.

74.    Because of Defendants' conduct, IYO has not been able to fund its manufacturing efforts. This in turn has impacted IYO's anticipated sales so severely that IYO is not only at risk of losing significant market share, but also at risk of losing investors and manufacturing partners, with virtually no ability to replace them.

## IYO'S TRADEMARKS

75.    IYO was founded in 2021. Since then, it had grown to a company with 15 employees and has invested substantial time and resources to the tune of over 8 years and more than $60 million on developing a cutting edge, audio computing technology, launching products under the IYO brand.

76.    IYO has used the IYO Mark continuously in commerce in the United States since at least as early as February 2, 2024, in connection with its audio-centric hardware and software.

77.    IYO's first product, the VAD PRO and the IYO ONE both bear the IYO Mark (the VAD PRO is shown below):



78.    Through this use, IYO has established strong common law rights in the IYO Mark for,

10

among other things, wearable devices and related software for interacting with smartphones, computers, artificial intelligence, and the internet, without the use of screens, keyboards, mice, or other similar physical interfaces.

79.     In addition, IYO owns federal trademark Registration No. 7,409,119 issued by the United States Patent and Trademark Office ("USPTO") for its IYO Mark covering the following goods:

> "Audio headphones; Earphones; Computers; Micro-computers; Computer hardware and recorded and downloadable software sold as a unit for the integration of data and information into an interactive audio delivery mechanism for multimedia applications; Downloadable operating system programs; Downloadable mobile operating system software; Computer hardware in the form of an earpiece and audio/visual display with preinstalled operating system software; Computer hardware and recorded and downloadable software system containing an auditory user interface in the form of a molded earpiece for use in listening to, accessing, transmitting and sharing information, applications and data in an audio format, amplifying and reducing sounds and noise, natural language processing, and allowing communication between users, electronic devices and wireless devices"

in Class 9 (the "IYO Mark").

80.     The application that matured into Registration No. 7,409,119 on June 4, 2024, was filed on September 17, 2021, and the registration bears a first use in interstate commerce date of no later than February 2, 2024. A true and correct copy of the certificate of registration for IYO's Registration No. 7,409,119 is annexed hereto as **Exhibit A**.

81.     IYO's registration is valid, subsisting, and in full effect.

82.     IYO also owns pending U.S. Trademark Application Serial No. 98/088,268 for the mark IYO. This application was filed July 17, 2023, and covers the following services:

> "Online retail store services in the field of software programs, operating systems, computer games, audio recordings, visual works, consumer electronics, computer peripherals and accessories; Subscription-based online retail store services in the field of software programs, operating systems, computer games, audio recordings, visual works, consumer electronics, computer peripherals and accessories; Online retail store services in the field of downloadable mobile applications; Online retail store services featuring a wide variety of software programs, operating systems, computer games, audio recordings, visual works, consumer electronics, computer peripherals and accessories of others; Retail store services featuring software programs, operating systems, computer games, audio recordings, visual works, consumer electronics, computer peripherals and accessories of others; Retail store services featuring a wide variety of consumer goods of others; Retail store services featuring virtual goods for

11

use in online virtual worlds; Online retail store services featuring headphones, earbuds, and ear tips; Online retail store services featuring software programs for headphones, earbuds, and ear tips"

in Class 35;

"Fitting of entertainment audio equipment to the individual user, not for medical purposes, namely, headphone, earbud, and ear tip fitting services, fitting services for non-medical hearing and audio devices, fitting services for non-medical hearing and audio assistance devices, and ear mold custom fitting services"

in Class 41; and

"headphone, earbud, and ear tip fitting services, namely, custom design, engineering, and programming for headphones, earbuds, and ear tips; fitting services for hearing and audio devices, namely, custom design, engineering, and programming for hearing and audio devices; fitting services for hearing and audio assistance devices, namely, custom design, engineering, and programming for hearing and audio assistance devices; custom ear mold fitting services, namely, custom design, engineering, and programming for ear molds"

in Class 42.

83.     The USPTO issued a Notice of Allowance for this application on March 4, 2025.

84.     In April 2024, IYO's founder gave a TED talk about the IYO ONE and demonstrated some of its features. A clip of that TED talk garnered approximately 25 million views on Instagram, an additional 5 million views on TikTok, nearly 200,000 views on YouTube, and nearly 700,000 views on TED's website.

85.     IYO promotes the IYO Mark and its products through a number of channels. For example, IYO has an active presence on the LinkedIn, Instagram, and X (formerly Twitter) platforms, all of which prominently display and promote the IYO Mark. Additionally, IYO operates a robust website at [www.iyo.ai](www.iyo.ai) that also prominently displays the IYO Mark and where the public has access to, and views, the content, videos, and product specifications (among other things) of IYO's products.

86.     To consumers, the IYO Mark identifies IYO as the single source of products that allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

## OPENAI'S COMMANDING MARKET PRESENCE

87.     OpenAI, Inc. is an AI organization founded in December 2015 and headquartered in San Francisco, California. OpenAI's primary goal is to develop artificial general intelligence ("AGI").

88.     Wikipedia defines AGI—sometimes called human-level intelligence AI—as a type of artificial intelligence that would match or surpass human capabilities across virtually all cognitive tasks.

89.     As a leading organization in the ongoing AI boom, OpenAI is known for the GPT family of large language models, the DALL-E series of text-to-image models, and a text-to-video model named Sora.

90.     OpenAI's release of ChatGPT in November 2022 is credited with catalyzing widespread interest in generative AI and igniting the AI boom. By January 2023, ChatGPT was the fastest-growing consumer software application in history, gaining over 100 million users in two months.

91.     In June 2024, OpenAI joined forces with Apple Inc. to integrate ChatGPT features into Apple Intelligence and the iPhone.

92.     In October 2024, OpenAI secured $6.6 billion in funding—valuing it at $157 billion—with major investors including Microsoft, Nvidia, and SoftBank.

93.     Microsoft alone has invested $13 billion in OpenAI. Microsoft also provides computing resources to OpenAI through its cloud platform, Microsoft Azure.

94.     On January 21, 2025, it was announced that OpenAI, Oracle, SoftBank, and MGX would launch The Stargate Project, a joint venture to build an AI infrastructure system in conjunction with the US government. The project takes its name from OpenAI's existing "Stargate" supercomputer project and is estimated to cost $500 billion.

95.     On February 27, 2026, OpenAI announced it raised $110 billion at a $730 billion pre-money valuation, for a post-money valuation of $840 billion, marking the largest private technology deal on record, and making it one of the world's most valuable private companies.

**TAN'S EXTRACTION OF IYO'S TRADE SECRETS THROUGH DAN SARGENT**

96.     Dan Sargent was employed by IYO as its Design and Manufacturing Lead from June 2023 until December 2024. As Design and Manufacturing Lead, Sargent was responsible for mechanical enclosures and was charged with collaborating with IYO's industrial design team regarding the physical shape and form of IYO's products.

97. As a condition of his employment, on June 26, 2023, Sargent signed an Employee Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement"), which obligated him to maintain the confidentiality of IYO's trade secret and proprietary information.

98. Given the importance of his role, Sargent had broad access to IYO's confidential and trade secret information regarding its product design, development, manufacturing, assembly, and sales.

99. In or around April 2024, Sargent connected with Patch Kessler, a mechanical engineer at LoveFrom (Jony Ive's design firm), about potential employment opportunities. As discussed further below, that is also the same time that io Products, Inc. registered to do business in California.

100. On May 15, 2024, Kessler contacted Sargent about an opportunity at LoveFrom.

101. Sargent created a contact entry for "Patch Kessler" at 10:30 AM that morning.

102. On May 17, 2024, Sargent texted a friend: "Just talked to Patch, he said he's already spoken with Tang and that he's going to reach out to me. Sounds like an awesome time to get in there, very early fun days."

103. On May 28, 2024, only nine days after Tan pre-ordered the IYO ONE, Tan directly emailed IYO's Design and Manufacturing Lead, Dan Sargent, to arrange a meeting.

104. On May 30, 2024, Sargent texted a friend: "Tang is taking me to Cotogna on Monday. I gotta get my speeches on lock."

105. As Sargent geared up for this meeting, he began to engage in suspicious file accessing, renaming, and downloading.

106. From June 3 to June 6, 2024, Sargent downloaded 33 files totaling 79.6 MB from IYO's Google Drive systems.

107. This was a deviation from his prior activity.

108. On June 3, 2024, at 23:03 UTC, Sargent accessed dormant intellectual property folders for the first time ever in his entire work history at IYO—folders that had been created in 2022 but never previously accessed by Sargent, including "16-Juggernaut Proto" and "Universal Fit soft ears." Downloads began exactly 12 minutes after Sargent browsed these dormant folders.

109. Given Sargent's level and responsibilities within the overall design team, as well as his

common law and contractual duties of confidentiality, Sargent had access to review design files that fell outside his day to day responsibilities.

110.    Notably, although Sargent's job responsibilities at IYO were limited to mechanical enclosures, the files he downloaded included circuitry files and other materials outside his job responsibilities that he had no legitimate business reason to download.

111.    In addition to Sargent's unusual downloading activity, him accessing and downloading documents with schematics and other details having nothing to do with his specific job responsibilities, the timing of this activity by Sargent occurring almost immediately before his planned meeting with Tan (after Tan had recently made clear his great interest in IYO's products), Sargent gave certain of these downloaded files extremely unusual and misleading names—gibberish character strings such as "ergetght.x_t," "wrbb5r.x_t," "grege.x_t," and "grgrgege.x_t"—in a clear and deliberate effort to disguise the nature of the files and avoid detection of his misconduct.

112.    Sargent also exported 17 CAD files to the Parasolid format (.x_t), a cross-platform CAD exchange format that can be opened by different CAD programs.

113.    This is significant because IYO used specific CAD software, and the export to a cross-platform format shows Sargent intended to share these files with a recipient who used different CAD software—such as io Products.

114.    All 17 obfuscated CAD exports occurred outside of core business hours, further evidencing consciousness of guilt.

115.    On June 6, 2024, Sargent met with Tan and Kessler for dinner at Cotogna restaurant in San Francisco.

116.    The dinner lasted approximately two hours from approximately 6:30 pm to approximately 8:30 pm.

117.    At the time of this meeting, Sargent was still employed by IYO.

118.    During the meeting (and possibly at other times), Sargent disclosed IYO's confidential trade secret information to Tan and Kessler.

119.    Sargent also admitted that he "shared physical samples of products [he] helped develop."

15

120.    Tan admitted that the product he saw was the IYO ONE, though he claimed the product was a mere "mock up" -- a term intended to reflect plastic, non-functional renderings.

121.    However, at the time of this meeting, IYO did not have any non-functional, cosmetic "mock ups" of the IYO ONE devices.

122.    Due to IYO's rapid development cycle and lean startup budget, there were no separate manufacturing runs or tooling for display shells that served zero engineering purpose.

123.    Every single device IYO produced was either a live, functional prototype (running firmware and capable of audio debugging) or an un-assembled engineering parts kit containing proprietary electronic and acoustic components.

124.     The engineering parts kit Sargent brought provided Tan with a complete, fully exposed roadmap detailing exactly how the device's internal architecture was designed, fabricated, and assembled for mass production.

125.    Sargent also claimed that the devices he shared were approved to be worn and used publicly. However, Sargent knew this to be false with respect to the IYO ONE, which he was not permitted to wear or use publicly.

126.    Sargent also asserted that he "showed an early version of [his] design portfolio in PowerPoint form."

127.    Yet, Sargent later changed his story, claiming that he "did not bring any physical documents or drawings…and [] did not bring any computer, laptop, or tablet …to the dinner interview."

128.    Upon information and belief, Sargent also had a program on his phone that allowed him to display the CAD files he had transferred and renamed.

129.    The dinner lasted approximately two hours and Tan asked questions nearly the entire time.

130.    Immediately following the dinner, at 8:29 PM, Sargent texted Kessler: "Great to see you too Patch! Fun to share things and meet Tang, he seems like a great guy."

131.    At 8:31 PM, two minutes later, Sargent texted Tan: "Tang, thanks again for making the time to meet and share my experiences!"

16

132. At 8:46 PM, Sargent texted a friend: "Just had dinner with Tang and Patch, sounds like **they are still in the early stages of ideation** but will be hiring in earnest soon." Emphasis added.

133. On June 20, 2024, Sargent texted a friend: "I'm also working a slow deal with Jony Ive's company but won't know more till July - can keep you posted."

134. On July 22, 2024, Sargent texted Kessler: "Wanted to see if you're still up for a city walk sometime soon if you're back in town yet." Kessler responded: "Sure thing- it'd be great to meet up. Perhaps this coming weekend?"

135. On July 25, 2024, at 4:53 PM, just two days before the scheduled walk, Sargent exported another obfuscated CAD file (which he named "ndjkfnjknsajnkf.x_t") to his Google Drive.

136. On July 27, 2024, Sargent and Kessler met for a walk at Kite Hill Park in San Francisco.

137. After the walk, at 5:26 PM, Sargent texted Kessler: "The phones are always listening, didn't search for this at all." At 5:28 PM, Kessler responded: "Thanks for hanging out! I checked out the bambu printer you recommended- definitely getting one."

138. That Sargent was recommending 3D printers for io Products demonstrates that io Products did not have even fundamental hardware prototyping capabilities at that time.

139. On July 29, 2024, two days after the walk, Sargent exported two more obfuscated CAD files (which he named "dbbwwbw.x_t" at 8:21 PM and "bbwbwbbww.x_t" at 11:04 PM).

140. These were the last obfuscated CAD exports Sargent ever made.

141. After July 29, 2024, Sargent's export behavior changed completely. The gibberish naming convention ceased entirely. Subsequent exports used date-organized folders and meaningful filenames. This behavioral change—from obfuscated filenames to normal naming conventions—strongly suggests that Sargent's "mission" of extracting and transferring IYO's trade secrets to io Products was complete.

142. Sargent left IYO on December 18, 2024. Upon returning his company-issued laptop, Sargent told IYO that he had attempted to delete all information from his laptop.

143. Sargent's unsuccessful effort to wipe all data from his computer was an apparent attempt to obfuscate his illegal behavior.

144. As discussed further below, on May 21, 2025, approximately ten months after the July

27, 2024 walk—and less than one year after Sargent disclosed IYO's trade secrets to Tan—io Products/OpenAI announced the prototype to the world.

145. They also announced OpenAI's acquisition of io Products for $6.5 billion.

146. In the accompanying announcement, Sam Altman referenced a fully functioning prototype that io Products had developed.

147. By contrast, while it appears that io products spent at best 10 to 11 months on development before announcing a working prototype, IYO spent approximately eight years and over $60 million developing its manufacturable, working audio computing products.

148. IYO's team invested approximately $25 million developing the technology while at Google X beginning in or around March 2018. After spinning out as a venture-funded startup in August 2021, IYO invested an additional $37.2 million and another five years of research and development activity before getting to its working prototypes.

149. It is not only implausible, it appears impossible that io Products, which in June 2024 was in the "early stages of ideation," did not even have a 3D printer as of July 2024, and had not yet decided upon a particular product or form factor, could have developed a working prototype in approximately ten months without access to IYO's trade secret information.

150. io Products' rapid product development was made possible only by the approximately seven to eight year headstart it obtained through the misappropriation of IYO's trade secrets.

151. Tan and io Products used information from IYO's CAD drawings, design specifications, manufacturing strategies, and other trade secret information to leapfrog years of painstaking and necessarily very time consuming independent research and development.

152. The headstart Defendants obtained by accessing IYO's trade secret information gave them at least a seven-year jump on what it would otherwise have taken to develop similar products through independent effort.

153. IYO's trade secrets represent the accumulated product of approximately eight years of intensive research and development—beginning at Google X in or around March 2018 and continuing through IYO's operations as a venture-funded startup—and more than $60 million in investment.

154. That body of work includes not only the positive design and engineering solutions

18

embodied in IYO's products, but also the extensive negative know-how that IYO developed through years of trial and error: the blind alleys explored and abandoned, the design choices tested and rejected, the manufacturing approaches attempted and discarded, and the hard-won understanding of what does not work in audio computing hardware.

155. By coopting IYO's trade secrets—including, at a minimum, this negative know-how and the results of years of iterative experimentation—Defendants bypassed all that time and effort.

156. They did not need to conduct their own years of experimentation, make their own costly mistakes, or independently discover which approaches would fail, because IYO had already done that work for them.

157. This improper headstart enabled io Products to leap from the "early stages of ideation" in June 2024 to announcing a working prototype in May 2025, compressing what took IYO approximately eight years into roughly 10-11 months.

158. Despite not being a named defendant in IYO's litigation against Sargent for breach of contract and trade secret misappropriation in California Superior Court, one or more of the Defendants are funding his defense.

159. This strongly suggests that Sargent's relationship with Defendants goes far beyond that of a mere job interviewee who Tan and Kessler only had dinner with for 2 hours as the Defendants have attempted to claim.

### **DEFENDANTS' KNOWING CONDUCT**

160. Unbeknownst to IYO, IO Products, Inc. was formed as a Delaware corporation on September 21, 2023.

161. It did not register to do business in California until April 4, 2024, after which it continued to operate largely in secret.

162. Indeed, the May 21, 2025, press release is titled "Sam & Jony **Introduce** io."

163. Until shortly before that announcement, IYO had no idea that the Defendants had formed a company to work together on hardware products intended to allow users to interact with smartphones, computers, artificial intelligence, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

19

164. IYO also did not know that Tan had reached out to Sargent until much later.

165. But the Defendants knew about IYO and its technology and brand prior to adopting the IO name.

166. In February 2022, IYO attempted to recruit Evans Hankey, the former Apple Design Chief, to work as Head of Design at IYO. IYO shared with Ms. Hankey its story, vision, current technology, and plans for future development. Ms. Hankey declined to join IYO, citing her disbelief in voice interfaces. (As discussed below, IYO later learned that Ms. Hankey co-founded IO.)

167. In March 2022, representatives from Sam Altman's personal investment fund, Apollo Projects, met with IYO to discuss a potential investment in IYO. They obtained technical information from IYO and discussed IYO's vision for the future of human/computer interaction and the use of natural language.

168. Then, in April 2022, Ryan Cohen – a representative of Apollo Projects – visited IYO's headquarters in Redwood City, California. IYO shared its vision and story with him and provided him demonstrations of its technology.

169. Later that month, Mr. Cohen informed IYO that it had decided not to invest in IYO.

170. In an email on April 25, 2022, Mr. Cohen stated: "[I t]hink you're on the path to build something incredible with the hardware you've developed, but we unfortunately don't do significant work with consumer hardware, and don't feel we can make high-conviction investments based on this aspect alone."

171. Separately, in April 2022, IYO was introduced to Jony Ive's company LoveFrom and met with Evan Sharp (the former co-founder of Pinterest) to share the IYO vision and story and to see if LoveFrom would collaborate on the future of natural language screenless computers.

172. After that meeting, Mr. Sharp stated that LoveFrom did not want to pursue a collaboration with IYO at that time.

173. On March 4, 2025, IYO reached out to Mr. Altman again to request a meeting to pitch its latest strategic financing round.

174. Mr. Altman responded the same day, stating "thanks but im working on something competitive so will respectfully pass!" He then added "(called io…)." Mr. Altman, in a follow-up

20

email, then quickly pointed the finger by stating that "jony ive" is "the one driving this."

175.    At the time, IYO did not appreciate that Defendants were actually working to brand a company and competing products with an infringing name.

176.    And, at the time, IYO did not know that Tan had met with Sargent and obtained IYO's trade secret CAD files and design information from an actual prototype.

177.    On March 17, 2025, a product design engineer named Marwan who – unbeknownst to IYO – worked for IO purchased IYO's VAD PRO product and pre-ordered an IYO ONE device.

178.    On May 19, 2024, eleven days after Rugolo's May 8, 2024 TED talk was published online, "IO" co-founder Tang Yew Tan pre-ordered the IYO ONE device from IYO's website.

179.    When placing those orders, Marwan Rammah used an email address at "presidiotech.com," apparently to hide his association with Defendants.

180.    When Mr. Rammah was fitted for his VAD PRO on March 19, 2025, he asked IYO's fit specialist questions for over an hour about the IYO device and its specifications.  Mr. Rammah even asked for IYO's design files.

181.    Marwan Rammah now works on the design team with Jony Ive, Tang Yew Tan, and Evans Hankey, the same people the May 21, 2025, press release announced were the founders (along with Scott Cannon) of IO.

182.    On March 26, 2025, IYO discussed with Mr. Altman the possibility of OpenAI acquiring IYO and launching IYO ONE as a developer kit for a new kind of computer based on natural language interaction.  Mr. Altman stated that an acquisition would come down to whether his team agreed, and that he wanted to introduce IYO to Peter Welinder, OpenAI's Vice President of Product.

183.    On March 30, 2025, Mr. Altman introduced Mr. Welinder to IYO via email and stated that we "should talk and see if it makes sense to team up!"

184.    On April 4, 2025, 47 days prior to Defendants announcing their "IO" business to the public, representatives of IYO met with Peter Welinder to discuss IYO's vision for screenless natural language human-computer interaction.

185.    There was another such meeting the next week, at which Peter Welinder stated that IYO should meet with Tang Yew Tan, who at the time was working on one of Mr. Ive's projects.

21

186.    On April 15, 2025, 41 days prior to Defendants announcing their "IO" business to the public, IYO learned that Tang Yew Tan had pre-ordered an IYO ONE in May 2024, almost a year earlier.

187.    On April 17, 2025, 39 days prior to Defendants announcing their "IO" business to the public, Mr. Tan requested that IYO fit members of his team for the IYO device. IYO ended up fitting seven of Defendants' representatives to demo IYO ONE devices.

188.    On May 1, 2025, 20 days prior to Defendants announcing their "IO" business to the public, IYO met with several of Defendants' representatives, including Welinder, Mr. Tan, Ms. Hankey, and Mr. Rammah. IYO presented its products and visions for the future of human interaction.

189.    IYO did not show them any of its proprietary CAD or design files and it did not show them the inner workings of the IYO ONE product.

190.    On May 5, 2025, 16 days prior to Defendants announcing their "IO" business to the public, Tan told IYO that its product had potential. Indeed, after meeting with IYO and experiencing the IYO ONE in person, the Defendants were sufficiently interested to request that they be allowed an opportunity to review IYO's intellectual property portfolio.

191.    On May 15, 2025, 6 days prior to Defendants announcing their "IO" business to the public, Mr. Tan emailed IYO requesting to review IYO's intellectual property through an "IP air curtain" because "it could be interesting."  Mr. Tan added: "ps. is it possible to get our ear plugs?"

### THE MAY 21, 2025 ANNOUNCEMENT

192.    On May 21, 2025, a mere 10-11 months after Tan's meeting with Sargent when io was purportedly in the early stages of development, Sam Altman and Apple designer Jony Ive (LoveFrom) announced the existence of IO, its $6.5 billion acquisition of IO by OpenAI, and its decision to make this new category of computer devices that allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

193.    The deal was reported to be OpenAI's largest acquisition to date.

194.    According to Defendants' press release, the two companies would merge to "work more intimately with the research, engineering, and product teams in San Francisco," and "Jony will assume deep design and creative responsibilities across OpenAI" as the company develops new

22

hardware products powered by AI technology.

195.    The announcement, on OpenAI's website, further states (among other things) that: "This is an extraordinary moment. Computers are now seeing, thinking and understanding. Despite this unprecedented capability, our experience remains shaped by traditional products and interfaces. . . . . It became clear that our ambition [was] to develop, engineer and manufacture a new family of products" (emphasis added).

196.    In a video accompanying the press release, Sam Altman (CEO of OpenAI) opens by stating that IO "has the opportunity to completely re-imagine what it means to use a computer."

197.    The video also makes clear that IO is formed around a nucleus of employees from the LoveFrom design collective, and that IO and OpenAI are merging for the "mission" of developing a new class of products for the way people use computers and AI.

198.    The video mentions that the existing devices people use to access technology are "decades old," and that it is "common sense" to move beyond them.

199.    In the video, Altman specifically described the current method of accessing the internet or ChatGPT through the process of opening a computer and physically interacting with it through keyboard and screen as obsolete, as they are "at the limit of what that tool can do." Incredibly, these are the same talking points that IYO had pitched to Altman not long before.

200.    The press release and video make clear that the purpose of IO is precisely the purpose that IYO made public years earlier: to develop a family of products which will allow users to interact with their smartphones, computers, AI, and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

201.    The video also made clear that Sam Altman had used a functioning prototype.

202.    At the end of the video, the following messages were displayed:

23

**THE ANNOUNCEMENT IMMEDIATELY BEGINS TO IRREPARABLY HARM IYO**

203.    Immediately upon the May 21 announcement, IYO's founder began receiving an avalanche of communications to the point that IYO's founder's phone was so swamped with messages that IYO's founder reported to Defendants that "it's been a while since [I]'ve been blown up this hard by pretty much everyone, iyO investors, professional network, etc."

204.    Other technology professionals also reported to IYO the confusion they were hearing and expected based on Defendants' use of IO.

205.    This harm is ongoing as discussed below.

**DEFENDANTS' CONDUCT PLAINLY INFRINGES IYO'S RIGHTS, BUT THEY REPEATEDLY REFUSE TO CEASE IT DESPITE EVIDENCE OF CONFUSION**

206.    Defendants are not associated or affiliated with IYO and have never been authorized or otherwise licensed to use the IYO Mark in connection with any products or services.

207.    Defendants adopted the IO name with full knowledge of Plaintiff, its product and its IYO trademark.

208.    Defendants' conduct, in particular its use of the IO name, is intended to, has, and is likely to continue to confuse, mislead, and/or deceive consumers into believing that IO is affiliated with IYO and/or that IO's products originate from, or are associated with, sponsored by, or affiliated

24

with IYO, when they are not (*e.g.*, forward confusion), or conversely, that IYO's services originate from, or are associated with, sponsored by, or affiliated with IO, when they are not (*e.g.*, reverse confusion).

209. Defendants' conduct also contributes to, and induces infringement of the IYO Mark, in that (with full knowledge of Plaintiff, its product and its IYO trademark) they have joined with, facilitated, encouraged, financed, and made possible, the aforesaid infringement.

210. Nevertheless, and despite the repeated outreach discussed below, Defendants refused to reverse course.

211. On May 23, 2025, two days after the May 21 announcement, IYO's founder emailed Mr. Altman to express concern that investors had contacted him about confusion between the parties' company names.

212. At the time, IYO did not know about Tan's and OpenAI's misappropriation of IYO's trade secret information and so it did not raise that issue then.

213. On May 29, 2025, IYO's founder again told Defendants that the announcement of IO and the resulting confusion was causing problems for IYO and its investors, network, and fund-raising efforts. IYO's founder asked that Defendants cease using the IO name to stop the confusion, stating that the situation was "urgent."

214. On May 30, 2025, Mr. Altman responded and asked IYO's founder to call him, which he did that same day. On the call, IYO's founder reiterated the confusion IO was causing and expressed the concern that IO had "stolen" IYO's name. He also asked Mr. Altman whether Defendants would agree to stop using IO. Mr. Altman not only refused, he incredibly stated that *IO* would sue *IYO* to force IYO to stop using its own name.

215. On June 2, 2025, IYO's general counsel sent an email to Defendants outlining IYO's trademark rights and the damage their announcement was causing and again asking them to cease using the IO name.

216. On June 3, 2025, IYO's general counsel had a phone call with OpenAI's Deputy General Counsel, Renny Hwang. IYO's general counsel reiterated the history of the parties' relationship and stressed that the announcement of IO was already causing confusing and harm to

IYO.

217. Mr. Hwang responded that he would investigate, but he did not engage in any further communication thereafter.

218. On June 6, 2025, IYO's general counsel had a phone call with OpenAI's outside trademark counsel, Margaret Caruso. She confirmed that OpenAI would not change the name of its IO venture and took the implausible position – despite the evidence to the contrary and its highly publicized marketing – that OpenAI was not using the infringing mark in commerce.

219. Although Defendants later claimed that they no longer planned to use the IO brand going forward – they did so *after* the Court had already issued a TRO and the Ninth Circuit had fully affirmed that decision.

220. But absent a Court order, nothing prevents Defendants from changing its mind and using the IO brand again.

### ONGOING INJURY TO IYO

221. Defendants' May 21 Announcement and video constitute an infringing advertisement under the Lanham Act.

222. That advertisement has already damaged IYO. Defendants have marketed their IO products to potential customers, announced the acquisition of IO products for $6.5 billion dollars, and caused significant confusion in the marketplace, such that the market is presently confused as to who owns the rights to the mark.

223. The goodwill that IYO has amassed in the IYO Mark has been put at risk by Defendants' appropriation and use of the IYO Mark. Defendants' unauthorized acts unfairly and unlawfully wrest from IYO control of its IYO Mark and its reputation, particularly as IYO has no control over the quality of Defendants' services offered under the infringing IO mark. As a result, IYO's valuable reputation has been and will continue to be irreparably damaged.

224. If Defendants' conduct is not enjoined, it will continue to injure the value of IYO's IYO Mark and the ability of that mark to indicate goods and services emanating from a single source, namely, IYO.

225. Investors have stated the concern that the public will believe that IYO is the one stealing

26

Defendants' brand, when it is the exact opposite that is the case.

226. And even if investors understand that Defendants are the ones in the wrong, they will still be hesitant to invest in a company that is facing inevitable confusion in the marketplace from the largest market player.

227. IYO's capital raise had been going well before OpenAI made the May 21, 2025, announcement. But since that time, IYO has not been able to secure any additional funding or pledges for funding due to investors' expressed concerns over the infringement.

228. Without the raise, IYO has been unable to fund its manufacturing efforts or the advertising needed to market its products. This in turn has impacted IYO's anticipated sales. Moreover, as discussed above, IYO is not only at risk of losing significant market share, but also at risk of losing investors, with virtually no ability to replace them.

229. IYO is also faced with the momentous task of correcting the confusion resulting from Defendants' conduct.

230. In addition, IYO has been damaged by Defendants' past infringement and/or contributory infringement and/or inducement of infringement.

231. IYO is being, and will continue to be, irreparably harmed by Defendants' willful and unlawful conduct.

232. IYO has no adequate remedy at law to Defendants' infringing conduct.

### FIRST CLAIM FOR RELIEF
### TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

**(AGAINST ALTMAN, IVE, OPENAI, AND IO PRODUCTS INC.)**

233. IYO hereby repeats and realleges each of the allegations set forth in this Complaint.

234. Defendants have used the term IO in commerce in connection with the sale, offering for sale, distribution, and advertising of Defendants' goods and services.

235. Defendants' actions are likely to cause, and have already caused, confusion, mistake, and deception as to the origin, sponsorship, or approval of the Defendants' products or commercial activities, and thus constitute infringement of the registered IYO Mark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

236. Defendants had actual knowledge of IYO prior to their first use of the term IO.

27

237.    By virtue of IYO's federal registration, Defendants were on constructive notice of IYO's ownership of the IYO Mark pursuant to Section 22 of the Lanham Act, 15 U.S.C. § 1072.

238.    Moreover, Defendants knew or should have known about the registered IYO Mark because even a cursory search of US trademark filings would have shown that IYO already had rights in it.

239.    Nevertheless, Defendants have persisted in their forward and reverse infringing conduct, rendering such conduct knowing and willful.

240.    This case is exceptional, and Plaintiff is entitled to its attorneys' fees under 15 U.S.C. § 1117.

241.    As a direct and proximate result of Defendants' willful actions, Defendants have enjoyed or will enjoy resulting profits from the confusion.

242.    IYO is entitled to damages and further entitled to an accounting of infringing profits as unjust enrichment, for willfulness or for deterrence in an amount to be established upon proof at trial.

243.    Defendants' conduct is also causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff irreparable harm that cannot fully be compensated or measured in money.

244.    As a direct and proximate result of Defendants' willful actions, conduct, and practices, IYO has been damaged and will continue to suffer irreparable harm.

245.    As such, Plaintiff has no adequate remedy at law and is entitled to injunctive relief prohibiting Defendant from further infringing Plaintiff's rights.

**SECOND CLAIM FOR RELIEF**
**FALSE DESIGNATION OF ORIGIN**
**AND UNFAIR COMPETITION (15 U.S.C. § 1125(A))**
**(AGAINST ALTMAN, IVE, OPENAI, AND IO PRODUCTS INC.)**

246.    IYO repeats and realleges each of the allegations set forth in this Complaint.

247.    Defendants' actions are likely to cause, and have already caused, confusion, mistake, and deception as to the affiliation, connection or association of Defendants and Plaintiff, and as to the origin, sponsorship or approval of Defendants' products, services, or commercial activities, and thus constitute false designation of origin, passing off, and unfair competition with respect to the IYO

28

Mark, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

248.    Defendants' use of the term IO and other actions alleged herein, constitute proscribed acts of unfair competition.

249.    The harm of such unfair competition outweighs its utility, has the effect of confusing and deceiving consumers, and trades off the goodwill of IYO.

250.    On information and belief, such unfair competition was designed specifically to, and willfully does, harm Plaintiff and its commercial prospects, and to maximize the likelihood of confusion.

251.    As a direct and proximate result of Defendants' willful actions, IYO has been damaged and will continue to suffer irreparable harm.

252.    As a direct and proximate result of Defendants' willful actions, Defendants have enjoyed or will enjoy resulting profits from the confusion.

253.    IYO is entitled to damages and further entitled to an accounting of infringing profits as unjust enrichment, for willfulness or for deterrence in an amount to be established upon proof at trial.

254.    Defendants' conduct is also causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff irreparable harm that cannot fully be compensated or measured in money.

255.    As a direct and proximate result of Defendants' willful actions, conduct, and practices, IYO has been damaged and will continue to suffer irreparable harm.

256.    As such, Plaintiff has no adequate remedy at law and is entitled to injunctive relief prohibiting Defendant from further infringing Plaintiff's rights.

### THIRD CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE (§ 17200 ET SEQ.)
#### (AGAINST ALTMAN, IVE, OPENAI, AND IO PRODUCTS INC.)

257.    IYO repeats and realleges each of the allegations set forth in this Complaint.

258.    Defendants' trademark infringement harms Plaintiff and constitutes unlawful and unfair business acts or practices within the meaning of Section 17200 *et seq*. of the California Business and Professions Code.

29

259.    Defendants have engaged in unfair competition by the trademark infringement alleged herein.

260.    Defendants' trademark infringement constitutes unfair business practices because the harm of these business practices outweighs the utility, if any, of these business practices, and are unscrupulous and injurious to consumers.

261.    Defendants' trademark infringement constitutes unlawful business practices because Defendants' conduct is forbidden by multiple laws, including but not limited to 15 U.S.C. §§ 1114 and 1125(a).

262.    Defendants have engaged in these activities willfully and consciously.

263.    Defendants' activities have caused and will continue to cause damage to IYO, and IYO is entitled to recovery of such damages in an amount to be determined at trial.

264.    As a direct and proximate consequence of the unfair and unlawful business practices complained of herein, Plaintiff has been irreparably harmed to an extent not yet determined and will continue to be irreparably harmed by such acts in the future unless the Court enjoins Defendants from committing further acts of unfair competition.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW FALSE DESIGNATION**
**OF ORIGIN AND UNFAIR COMPETITION**

**(AGAINST ALTMAN, IVE, OPENAI, AND IO PRODUCTS INC.)**

265.    IYO repeats and realleges each of the allegations set forth in this Complaint.

266.    Defendants are promoting, advertising, and providing products under the term IO, which is virtually identical to the IYO Mark in appearance, sound, and meaning, in violation of California's common law of false designation of origin and unfair competition.

267.    Defendants' unauthorized use of the term IO for products identical and/or closely related in type to those provided by IYO under the IYO Mark is likely to cause confusion or to cause mistake or to deceive the parties' customers or potential consumers and the public as to the source or sponsorship of parties' respective goods and services, or of the parties' relationship to one another. Consumers are likely to be misled into believing that Defendants' services are licensed, sponsored, approved or endorsed by, or otherwise associated with IYO, or that IYO's services are licensed,

30

sponsored, approved or endorsed by, or otherwise associated with Defendants.

268.   Defendants' activities in misappropriating IYO's brand are intentional, malicious, and calculated.

269.   Defendants' activities have caused and will continue to cause damage to IYO, entitling IYO to recover damages in an amount to be determined at trial.

270.   As a direct and proximate consequence of the false designation of origin and unfair competition herein, IYO has been irreparably harmed to an extent not yet determined and will continue to be irreparably harmed by such acts in the future unless the Court enjoins Defendants from committing such further acts.

### FIFTH CLAIM FOR RELIEF
### CONTRIBUTORY INFRINGEMENT

**(AGAINST ALTMAN, IVE, AND OPENAI)**

271.   IYO repeats and realleges each of the allegations set forth in this Complaint.

272.   At least Defendant IO Products, Inc. has committed direct trademark infringement.

273.   The remaining Defendants had actual or constructive knowledge of IO's directly infringing activity.

274.   The remaining Defendants' conduct also contributes to such infringement in that (with full knowledge of Plaintiff, its product and its trademark) they have joined with, facilitated, encouraged, directed, financed, and made possible IO's direct infringement, with knowledge that use of the term IO would infringe on Plaintiff's rights.

275.   The remaining Defendants' activities have caused and will continue to cause damage to IYO, in an amount to be determined at trial.

276.   As a direct and proximate consequence of the remaining Defendants' conduct, IYO has been irreparably harmed to an extent not yet determined and will continue to be irreparably harmed by such acts in the future unless the Court enjoins Defendants from committing such further acts.

31

**SIXTH CLAIM FOR RELIEF**
**INDUCEMENT OF INFRINGEMENT**

**(AGAINST ALTMAN, IVE, AND OPENAI)**

277.    IYO repeats and realleges each of the allegations set forth in this Complaint.

278.    At least Defendant IO Products, Inc. has committed direct trademark infringement.

279.    The remaining Defendants had actual or constructive knowledge of IO's directly infringing activity.

280.    The remaining Defendants' conduct also induces such infringement in that (with full knowledge of Plaintiff, its product and its trademark) they have joined with, facilitated, encouraged, directed, financed, and made possible IO's direct infringement, with knowledge that use of the term IO would infringe on Plaintiff's rights.

281.    The remaining Defendants' activities have caused and will continue to cause damage to IYO, in an amount to be determined at trial.

282.    As a direct and proximate consequence of the remaining Defendants' conduct, IYO has been irreparably harmed to an extent not yet determined and will continue to be irreparably harmed by such acts in the future unless the Court enjoins Defendants from committing such further acts.

**SEVENTH CLAIM FOR RELIEF**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

283.    IYO repeats and realleges each of the allegations set forth in this Complaint.

284.    At the time of Defendants' conduct, IYO had existing and prospective economic relationships with third parties, including but not limited to: (a) investors who were actively participating in, or considering participation in, IYO's capital raise; (b) manufacturing partners who were engaged or in discussions with IYO regarding the production of IYO ONE devices; and (c) potential customers who had placed or were considering placing pre-sale orders for IYO's products. These relationships carried a probability of future economic benefit to IYO.

285.    IYO's capital raise had been going well prior to Defendants' May 21, 2025, announcement. IYO was actively engaged in fundraising discussions with multiple investors and had reasonable expectations of securing additional funding and pledges sufficient to support its

32

manufacturing and marketing operations.

286.    Defendants knew of IYO's economic relationships with investors, manufacturing partners, and customers. Through meetings in Spring 2025, Defendants had direct knowledge of IYO's ongoing capital raise, its manufacturing plans for an initial batch of 20,000 IYO ONE units, and IYO's pre-sale activities. Indeed, the very purpose of several of these meetings was to discuss Defendants' possible participation in IYO's capital raise.

287.    Defendants also knew of IYO's business relationships through their earlier interactions with IYO dating back to 2022, including meetings with representatives of Sam Altman's investment fund, Apollo Projects, and Jony Ive's design firm, LoveFrom.

288.    Defendants engaged in intentional acts designed to disrupt IYO's economic relationships. Specifically, Defendants, at least: (a) chose the name IO—a homophone of the IYO Mark—with full knowledge of IYO and its trademark rights, in order to misappropriate IYO's goodwill and swamp its brand in the marketplace; (b) timed the May 21, 2025, announcement to coincide with and disrupt IYO's ongoing capital raise, marketing plans, and manufacturing efforts; and (c) refused to cease using the infringing IO name despite repeated demands from IYO and evidence of marketplace confusion.

289.    Defendants' conduct was independently wrongful apart from the interference itself. Defendants' acts constituted, among other things: (a) trademark infringement in violation of 15 U.S.C. § 1114; (b) false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a); (c) unfair competition in violation of California Business and Professions Code § 17200 et seq.; and (d) intentional and malicious conduct designed to harm IYO and destroy its business.

290.    Defendants' conduct was also independently wrongful by virtue of Defendant Tan's fraud and deceit directed at IYO. In the weeks immediately preceding the May 21, 2025 announcement, Tan engaged in a deliberate course of deceptive conduct designed to lull IYO into a false sense of security while concealing the imminent threat to its business.

291.    On April 17, 2025—just 34 days before Defendants publicly announced IO—Tan requested that IYO fit members of his team for IYO ONE demo devices, and IYO obliged by fitting seven of Defendants' representatives.

33

292. On May 1, 2025, a mere 20 days before the announcement, Tan attended a meeting at which IYO presented its products and vision for the future of human-computer interaction—all while Tan concealed that he had co-founded a directly competing company under a confusingly similar name, that his company had already developed a working prototype, and that the public announcement of that company was imminent.

293. On May 5, 2025, Tan told IYO that its product "had potential," and on May 15, 2025—just six days before the announcement—Tan emailed IYO requesting to review IYO's intellectual property through an "IP air curtain" because "it could be interesting," and further requested additional custom ear interfaces for his team.

294. Throughout this period, Tan never disclosed that he was a co-founder and Chief Hardware Officer of IO Products, Inc., that IO Products had been incorporated as a Delaware corporation since September 21, 2023 and registered to do business in California since April 4, 2024, or that OpenAI's $6.5 billion acquisition and public launch of IO were days away. Tan's affirmative misrepresentations and deliberate omissions—expressing interest in IYO's technology and soliciting access to its intellectual property portfolio while secretly preparing to announce a competing venture—constitute independently wrongful acts of fraud and deceit, separate and apart from the trademark infringement alleged herein.

295. Defendants' wrongful conduct actually disrupted IYO's prospective economic relationships. Since the May 21, 2025, announcement, IYO has not been able to secure any additional funding or pledges for funding due to investors' expressed concerns over the infringement and marketplace confusion caused by Defendants' use of the IO name.

296. Investors have stated concerns that the public will believe IYO is the party infringing upon Defendants' brand, when the opposite is the case.

297. Even investors who understand that Defendants are in the wrong have expressed hesitancy to invest in a company facing inevitable marketplace confusion from one of the most well-resourced technology companies in the world.

298. After Defendants' interference, IYO's own manufacturing partner altered its investment in IYO.

34

299.    Without the capital raise, IYO has been unable to fund its manufacturing efforts or the advertising needed to market its products. This has severely impacted IYO's anticipated sales. IYO is not only at risk of losing significant market share, but also at risk of losing its existing investors and manufacturing partners, with virtually no ability to replace them.

300.    Defendants acted with knowledge and intent that their conduct would disrupt IYO's economic relationships. Defendants knew that announcing a $6.5 billion acquisition of a competing company under an infringing name—while simultaneously possessing detailed knowledge of IYO's ongoing capital raise, manufacturing plans, and business operations—would cause investors and business partners to lose confidence in IYO and withdraw from or decline to enter into economic relationships with IYO.

301.    As a direct and proximate result of Defendants' intentional and wrongful interference with IYO's prospective economic relationships, IYO has suffered and continues to suffer substantial economic harm, including but not limited to: (a) lost investment funding and the inability to close its capital raise; (b) the inability to fund manufacturing of IYO ONE devices; (c) lost and diminished sales due to the inability to manufacture and market its products; (d) the loss of existing and prospective manufacturing partners; (e) damage to IYO's goodwill and reputation in the investment and technology communities; and (f) the existential threat to IYO's business as a going concern.

302.    Defendants' interference was malicious and oppressive, conducted with a willful and conscious disregard of IYO's rights and the probable consequences of their actions. Defendants are among the most well-resourced and powerful entities in the technology industry, with a valuation of approximately $840 billion, and they used that power to overwhelm a 15-person startup whose technology and brand they had already misappropriated. IYO is therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

303.    IYO is entitled to compensatory damages in an amount to be proven at trial, including all economic losses flowing from Defendants' wrongful interference with IYO's prospective economic relationships.

**EIGHTH CLAIM FOR RELIEF**
**MISAPPROPRIATION OF TRADE SECRETS**
**California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.**
**(Against Tan, io Products, Inc., and OpenAI)**

304.    IYO repeats and re-alleges each of the allegations set forth in this Complaint.

305.    IYO owns valuable trade secrets consisting of confidential and proprietary information about its products and specifications, including but not limited to: (1) CAD drawings for IYO's proprietary audio computing devices; (2) unreleased design features; (3) manufacturing scaling strategies; (4) proprietary product development schedules; (5) custom-fit ear technology and manufacturing processes; (6) circuitry designs; and (7) other confidential design, engineering, and manufacturing information developed over approximately eight years of research and development.

306.    IYO's trade secrets derive independent economic value, both actual and potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. IYO has invested over $60 million (approximately $25 million at Google X and $37.2 million since 2021) in developing its audio computing technology, representing approximately eight years of substantial research and development efforts.

307.    The economic value of IYO's trade secrets is demonstrated by the competitive advantage they provide. It took IYO approximately eight years to develop manufacturable, working products. The trade secrets encompass the technical know-how, design choices, negative know-how and manufacturing processes that enabled IYO to create revolutionary audio computing devices that no competitor had previously achieved.

308.    IYO has taken reasonable measures under the circumstances to maintain the secrecy of its trade secrets, including but not limited to: (1) restricting access to trade secrets on a need-to-know basis; (2) implementing electronic security measures and monitoring systems requiring two-factor authentication and allowing for password lock-outs; (3) requiring all employees, including Sargent, to sign detailed confidentiality agreements; and (4) maintaining physical security measures (including key access and cameras on entrances and exits).

309.    As a condition of his employment, on June 26, 2023, Sargent entered into the Confidentiality Agreement, which obligated him to maintain the confidentiality of IYO's trade secret and proprietary information.

36

310. Defendant Tan misappropriated IYO's trade secrets within the meaning of California Civil Code § 3426.1(b) by:

a. Acquiring IYO's trade secrets from Sargent while knowing, or having reason to know, that the trade secrets were acquired by improper means or derived from a person who owed a duty to IYO to maintain their secrecy. Tan, as a former Apple Vice President of Product Design with over 24 years of experience, understood the sensitive and proprietary nature of CAD drawings and other design documentation, and knew or should have known that Sargent was prohibited from disclosing IYO's confidential information;

b. Using IYO's trade secrets to accelerate io Products' product development without IYO's express or implied consent, at a time when Tan knew or had reason to know that his knowledge of the trade secrets was derived from a person, Sargent, who owed a duty to IYO to maintain their secrecy.

311. Defendant OpenAI OpCo, as the entity operating the io Products, Inc. business following OpenAI's acquisition announced on May 21, 2025, is liable for the misappropriation of IYO's trade secrets.

312. Upon information and belief, OpenAI OpCo has continued to use and benefit from IYO's misappropriated trade secrets in its ongoing development efforts.

313. The misappropriation by Defendants was willful and malicious, as evidenced by the following:

a. After receiving Sargent's information from Kessler, Tan initiated contact with Sargent, arranged a meeting, and received IYO's trade secret information knowing that Sargent was still employed by IYO and likely bound by contractual confidentiality obligations and certainly bound by common law and statutory confidentiality obligations to IYO;

b. Given his experience in the industry, Tan knew that CAD files and other proprietary design information (including that garnered from the inspection of the inner workings of functional prototypes) were trade secret or confidential information that Sargent should not have been sharing with competitors, which should have alerted Tan that Sargent was acting improperly;

c. The files Sargent accessed, downloaded under very surreptitious and suspicious

37

circumstances, and provided information therefrom to Tan during their meeting and potentially subsequently via meetings with Kessler, had been exported to a cross-platform format (.x_t) so they could be opened by CAD programs that IYO did not use -- indicating the files were prepared specifically for transfer to a third party or to show on Sargent's phone; and

d.      OpenAI is funding Sargent's defense in a separate litigation IYO brought against him.

314.    As a direct and proximate result of Defendants' willful and malicious misappropriation, IYO has suffered and continues to suffer substantial damages.

315.    Defendants' misappropriation of IYO's trade secrets provided io Products with an improper "headstart" over IYO and other competitors. It took IYO approximately eight years and over $60 million to develop manufacturable, working audio computing products. Yet io Products—which in June 2024 was in the "early stages of ideation" and lacked even basic prototyping equipment such as a 3D printer—announced a prototype to the world approximately ten to eleven months later, in May 2025.

316.    The time differential is stark: IYO required eight years to accomplish what io Products accomplished in approximately ten to eleven months. This implausible acceleration was made possible only by Defendants' misappropriation of IYO's trade secrets.

317.    Pursuant to California Civil Code § 3426.3, IYO is entitled to recover damages for actual loss caused by the misappropriation of its trade secrets, including the headstart advantage Defendants obtained, the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss (including, for example, the proportion of the $6.5 billion acquisition that resulted from OpenAI's use of IYO's trade secrets), and/or a reasonable royalty for the unauthorized disclosure or use of the trade secrets.

318.    Because Defendants' misappropriation was willful and malicious, IYO is entitled to exemplary damages in an amount not exceeding twice the award of damages pursuant to California Civil Code § 3426.3(c).

319.    Pursuant to California Civil Code § 3426.4, IYO is entitled to recover its reasonable attorneys' fees because Defendants' misappropriation was willful and malicious.

320.    Unless enjoined by this Court, Defendants will continue to engage in acts of misappropriation of IYO's trade secrets and continue to benefit from the use or disclosure of IYO's trade secrets. IYO has no adequate remedy at law because monetary damages cannot fully compensate IYO for the irreparable harm to IYO's competitive position, goodwill, and market advantage. Accordingly, IYO is entitled to injunctive relief pursuant to California Civil Code § 3426.2 to prevent any actual or threatened misappropriation of its trade secrets.

**NINTH CLAIM FOR RELIEF**
**MISAPPROPRIATION OF TRADE SECRETS**
**Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.**
**(Against Tan, io Products, Inc., and OpenAI)**

321.    IYO repeats and realleges each of the allegations set forth in this Complaint.

322.    IYO owns trade secrets as defined by 18 U.S.C. § 1839(3), consisting of confidential and proprietary information about its products and specifications, including but not limited to: (1) CAD drawings for its products; (2) unreleased design features; (3) manufacturing scaling strategies; (4) proprietary product development schedules; (5) custom-fit ear technology and manufacturing processes; (6) circuitry designs; (7) negative know-how; and (8) other confidential design, engineering, and manufacturing information developed over approximately eight years of research and development.

323.    This information constitutes trade secrets because it derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from its disclosure or use, and IYO has taken reasonable measures to keep such information secret.

324.    IYO's trade secrets relate to products and services used in, and intended for use in, interstate and foreign commerce. IYO Markets its products across state lines through its website to customers nationwide, and its products incorporate technology developed through interstate commercial relationships, including its origins at Google X and subsequent venture-funded operations.

325.    Defendant Tan misappropriated IYO's trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring IYO's trade secrets from Sargent while knowing, or having reason to know, that

39

the trade secrets were acquired by improper means.

326.    It would not have been possible for OpenAI to have announced a product and functioning prototype less than 10-11 months after being in very early stages and not even having a 3D printer unless Tan had misappropriated IYO's trade secrets.

327.    Tan, as a former Apple Vice President of Product Design with over 24 years of experience in proprietary hardware design, understood the sensitive and proprietary nature of CAD drawings and other design documentation, and knew or should have known that Sargent was prohibited from disclosing IYO's confidential information through either contractual confidentiality obligations or common law and statutory obligations.

328.    Tan initiated contact with Sargent, arranged a meeting under the guise of a dinner interview, and during that nearly two-hour meeting on June 6, 2024 (and potentially at other times as well), received confidential and proprietary information—including IYO's trade secret CAD drawings, design specifications, and physical prototypes—that Sargent was obligated to keep confidential.

329.    Tan used that information without IYO's express or implied consent, to accelerate io Products' product development. Tan knew or had reason to know that his knowledge of IYO's trade secrets was derived from a person who owed a duty to IYO to maintain their secrecy.

330.    Defendant OpenAI OpCo, LLC, as the entity operating io Products, Inc. business following OpenAI's $6.5 billion acquisition announced on May 21, 2025, is liable for the misappropriation of IYO's trade secrets. Upon information and belief, OpenAI OpCo has continued to use and benefit from IYO's misappropriated trade secrets in its ongoing hardware development efforts.

331.    The misappropriation by Defendants was willful and malicious, as evidenced by: (a) Tan initiating contact with Sargent and arranging a meeting with him, while Sargent was still employed by IYO and bound by confidentiality obligations; (b) Tan receiving confidential CAD files and design information that were far outside Sargent's job responsibilities, which should have alerted them that Sargent was acting improperly; (c) the files having been downloaded under very surreptitious and suspicious circumstances and then exported to a cross-platform CAD format (.x_t) indicating they

40

were prepared specifically for transfer to a third party; (d) Sargent's deliberate obfuscation of filenames using gibberish character strings; and (e) OpenAI's funding of Sargent's defense.

332.    As a direct and proximate result of Defendants' willful and malicious misappropriation, IYO has suffered and continues to suffer substantial damages, including but not limited to the competitive headstart advantage Defendants obtained, lost business opportunities, diminished value of IYO's trade secrets, and harm to IYO's competitive position.

333.    Pursuant to 18 U.S.C. § 1836(b)(3)(B), IYO is entitled to recover damages for actual loss caused by the misappropriation, any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss (including, for example, the proportion of the $6.5 billion acquisition that resulted from OpenAI's use of IYO's trade secrets), and, in lieu of damages measured by any other methods, imposition of liability for a reasonable royalty for the unauthorized disclosure or use of the trade secret.

334.    Because Defendants' misappropriation was willful and malicious, IYO is entitled to exemplary damages in an amount not more than two times the amount of damages awarded pursuant to 18 U.S.C. § 1836(b)(3)(C).

335.    Pursuant to 18 U.S.C. § 1836(b)(3)(D), IYO is entitled to recover its reasonable attorneys' fees because Defendants' misappropriation was willful and malicious.

336.    Unless enjoined by this Court, Defendants will continue to engage in acts of misappropriation of IYO's trade secrets. IYO has no adequate remedy at law because monetary damages cannot fully compensate for the irreparable harm to IYO's competitive position, goodwill, and market advantage. Accordingly, IYO is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent any actual or threatened misappropriation of its trade secrets.

## **PRAYER FOR RELIEF**

WHEREFORE, IYO requests that this Court enter judgment in its favor on each and every claim for relief set forth above, and award it relief including, but not limited to, the following:

A.    Judgment in favor of IYO and against Defendants;

B.    An Order temporarily, preliminarily, and permanently enjoining Defendants and their officers, agents, employees, directors, shareholders, subsidiaries, related companies, affiliates, and all

41

persons in active concert or participation with any of them from using the term IO or any designation or design so similar as to be likely to cause confusion, mistake, or deception in connection with Defendants' goods and services;

C.    An Order temporarily, preliminarily, and permanently enjoining Defendants and their officers, agents, employees, directors, shareholders, subsidiaries, related companies, affiliates, and all persons in active concert or participation with any of them from directly or indirectly using, disclosing, disseminating, exploiting, or otherwise benefiting from IYO's misappropriated trade secrets — including but not limited to IYO's CAD drawings, design specifications, manufacturing strategies, circuitry designs, custom-fit ear technology and manufacturing processes, negative know-how, and any other confidential design, engineering, and manufacturing information — in the development, production, marketing, or sale of any products or services;

D.    An Order requiring Defendants to identify, return, destroy, or sequester all documents, materials, prototypes, files, and other items in their possession, custody, or control that contain, embody, reflect, or are derived from IYO's trade secrets, and to certify such return or destruction under oath;

E.    An Order requiring Defendants to account for, and pay to, IYO any and all of Defendants' profits arising from the foregoing acts, and trebling such profits for payment to the Plaintiff in accordance with 15 U.S.C. § 1117;

F.    An Order requiring Defendants to pay IYO compensatory and/or actual damages in an amount to be determined, and trebling such damages in accordance with 15 U.S.C. § 1117;

G.    An Order requiring Defendants to pay corrective advertising in an amount to be determined caused by the foregoing acts, and trebling such damages in accordance with 15 U.S.C. § 1117;

H.    An Order requiring Defendants to pay compensatory damages arising from Defendants' intentional interference with IYO's prospective economic relationships, including but not limited to: (i) lost investment funding and the inability to close its capital raise; (ii) the inability to fund manufacturing of IYO ONE devices; (iii) lost and diminished sales due to the inability to manufacture and market its products; (iv) the loss of existing and prospective manufacturing partners;

42

(v) damage to IYO's goodwill and reputation in the investment and technology communities; and (vi) the existential threat to IYO's business as a going concern, in an amount to be proven at trial;

I.    An Order, where appropriate, requiring Defendants to pay an appropriate amount as punitive damages to deter future unlawful misconduct;

J.    Pre-judgment interest and post-judgment interest at the legally allowable rate on all amounts allowed;

K.    Restitution;

L.    Statutory damages as allowed by law;

M.    An Order requiring Defendants to pay IYO its costs and attorneys' fees in this action pursuant to 15 U.S.C. § 1117;

N.    For an award of damages for actual loss caused by the misappropriation of IYO's trade secrets pursuant to California Civil Code § 3426.3;

O.    For disgorgement of all unjust enrichment obtained by Defendants through their misappropriation of IYO's trade secrets;

P.    For the imposition of a constructive trust over any and all profits, proceeds, or other benefits obtained by Defendants through their misappropriation of IYO's trade secrets, including but not limited to any portion of the $6.5 billion acquisition value attributable to the use of IYO's misappropriated trade secrets;

Q.    For exemplary damages not exceeding twice the award of actual damages pursuant to California Civil Code § 3426.3(c);

R.    For an award of reasonable attorneys' fees pursuant to California Civil Code § 3426.4;

S.    For injunctive relief pursuant to California Civil Code § 3426.2 to prevent any actual or threatened misappropriation of IYO's trade secrets;

T.    For an award of damages for actual loss, unjust enrichment, and/or a reasonable royalty caused by the misappropriation of IYO's trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B);

U.    For exemplary damages not exceeding twice the award of actual damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

V.    For an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

W.     For an order authorizing the seizure of property necessary to prevent the propagation or dissemination of IYO's trade secrets pursuant to 18 U.S.C. § 1836(b)(2), to the extent warranted by the circumstances;

X.     For injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A) to prevent any actual or threatened misappropriation of IYO's trade secrets; and

Y.     Such other relief as the Court may deem appropriate.

Dated:  March 13, 2026                          Respectfully submitted,

                                                MINTZ LEVIN COHN FERRIS
                                                GLOVSKY AND POPEO, P.C.

                                                By: */s/ Andrew D. Skale*_____
                                                Andrew D. Skale (211096)
                                                Laura Franco (186765)
                                                Micha Danzig (177923)
                                                Anthony J. Viola (*pro hac vice*)
                                                Kara M. Cormier (*pro hac vice*)

                                                Attorneys for Plaintiff

                                                IYO, INC.

44

**DEMAND FOR JURY TRIAL**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues triable of right by a jury.

Dated:  March 13, 2026

Respectfully submitted,

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: */s/ Andrew D. Skale*_____
Andrew D. Skale (211096)
Micha Danzig (177923)
Laura Franco (186765)
Anthony J. Viola (*pro hac vice*)
Kara M. Cormier (*pro hac vice*)
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone: 415.432.6000

Attorneys for Plaintiff

IYO, INC.

45

**VERIFICATION**

I, Jason Rugolo, declare as follows:

1.      I am the founder and Chief Executive Officer of plaintiff IYO, Inc. I am authorized to make this verification on behalf of IYO, Inc.

2.      I have read the foregoing First Amended Complaint. I have personal knowledge of the facts stated therein, except as to those matters stated upon information and belief, and as to those matters, I believe them to be true. The facts stated in this First Amended Complaint are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2026 in San Francisco, California.

*/s/ Jason Rugolo*
Jason Rugolo

46