QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Margret M. Caruso (Bar No. 243473)
margretcaruso@quinnemanuel.com
Sara L. Pollock (SBN 281076)
sarapollock@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

*Attorneys for Defendants io Products, Inc., OpenAI, Inc., OpenAI, LLC, and Sam Altman*

JONES DAY
David Kiernan (Bar No. 215335)
dkiernan@jonesday.com
555 California Street 26th Floor
San Francisco, California 94104
Telephone:    (415) 875-5745

Meredith Wilkes (*pro hac vice forthcoming*)
mwilkes@jonesday.com
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone    (216) 586-7231

*Attorneys for Defendant Sir Jonathan Paul Ive*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IYO, INC.<br><br>Plaintiff,<br><br>v.<br><br>IO PRODUCTS, INC., OPENAI, INC., OPENAI, LLC, SAM ALTMAN, and SIR JONATHAN PAUL IVE,<br><br>Defendants. | Case No. 3:25-cv-4861-TLT<br><br>**EXPERT REPORT OF DR. SCOTT D. SWAIN** |

## I.    ASSIGNMENT AND QUALIFICATIONS

1.    I have been retained by counsel for Defendants io Products, Inc., OpenAI, Inc., OpenAI, LLC, Sam Altman, and Sir Jonathan Paul Ive (collectively, "Defendants" or "io"), in the above-captioned action to evaluate the Expert Report of Mark Keegan ("Keegan Report"), and the survey described in that report ("Keegan Survey"),[1] which was prepared on behalf of the Plaintiff, IYO, Inc. ("Plaintiff" or "iyO").

2.    Below is a summary of my education and relevant experience. A copy of my curriculum vitae is attached as **Exhibit A**.

3.    Before joining the faculty of Clemson University (Powers College of Business), I served on the faculties of Boston University (Questrom School of Business) and Northeastern University (D'Amore-McKim School of Business). I also served as a visiting Professor of Marketing at the Tuck School of Business at Dartmouth College in 2021 and 2022 and at the Sloan School of Management at the Massachusetts Institute of Technology in 2024.

4.    I earned an MBA with a concentration in Finance and a Ph.D. in Marketing from the University of South Carolina in 1996 and 2002, respectively. I earned a Bachelor of Science in Electrical Engineering from Clemson University in 1991, and a Bachelor of Science in Physics from Francis Marion University in 1991.

5.    My fields of expertise include consumer behavior, branding, advertising strategy, retailing, promotions, pricing, sales, multivariate methodology, survey design, experimental design, conjoint analysis, marketing analytics, and marketing management.

6.    My peer-reviewed research has been published in the leading journals in the disciplines of marketing, management, information systems, and behavioral economics, including *Nature*, *Journal of Marketing*, *Journal of Marketing Research*, *Journal of Consumer Research*, *Journal of the Academy of Marketing Science*, *Journal of Retailing*, *Journal of Business Research*, *Marketing Letters*, *Decision Support Systems,* and *Journal of Behavioral and Experimental Economics*. I have also published numerous scholarly book chapters, trade articles, and peer-reviewed articles, abstracts, and posters in international conference proceedings.

---

[1] Declaration of Mark Keegan, February 20, 2026.

7.      I serve as an associate editor for the *Journal of Business Research* and the *European Journal of Marketing* and as a member of eight editorial review boards. I also frequently serve as an invited referee for research manuscripts at leading journals in marketing, consumer psychology, retailing, advertising, international marketing, management, organizational behavior, information science, operations research, and applied psychology. My roles as an editor and referee require me to maintain a high level of expertise in marketing and consumer behavior theory and in methodologies such as experimental design, survey design, analytics, multivariate analysis, choice modeling, and structural equation modeling. I have received numerous external grants and awards for my research.

8.      For more than 25 years, I have taught undergraduate and graduate courses in marketing principles, marketing management, product management, marketing strategy, marketing research, analytics, methodology, branding, advertising and promotions, innovation, and entrepreneurial marketing. I have also supervised and guided theses and dissertations on topics related to my areas of expertise, and I have won teaching awards at multiple institutions, including the University of South Carolina, Boston University, Northeastern University, and Clemson University.

9.      I have conducted, supervised, and assessed over 1,000 research studies that have marketing applications. Most of these studies use qualitative and quantitative methods to understand the perceptions, attitudes, decision-making, and behaviors of customers, managers, and frontline personnel with respect to marketing stimuli such as promotions, pricing, advertising, technology, public relations, packaging, product design, retail environments, services, and channels of distribution. In addition, I have worked as a research and marketing strategy consultant to companies and other organizations to provide data and insights related to their marketing activities and processes in contexts such as advertising-assessment systems, customer segmentation, product design, service design, retail design, technology experiences, customer journeys, and lifetime value. My work with companies and other organizations has frequently involved designing, conducting, and reporting the results of customer surveys.

10.     Based on my education, experience, and expertise in assessing consumer perceptions and marketing activities, I have been previously retained and qualified as an expert witness in Federal court proceedings as well as matters before the National Advertising Division, Trademark Trial and Appeal Board, and American Arbitration Association. **Exhibit B** lists all

cases in which, during the previous four years, I testified as an expert in a deposition or at trial. I am being compensated for my time in this matter at a rate of $650 per hour. This compensation is not in any way contingent on the content of my opinions or the outcomes of this matter or any other matter.

11.     My assessments in the present matter are based on the scientific literature, which contains widely accepted theories, methodologies, and data sources for studying individuals' perceptions, attitudes, and decision-making processes. I also draw upon general principles of marketing and consumer behavior. My experience as a marketing scholar, educator, and consultant; as well as my review of documents and other information related to the litigation. Materials considered in forming my opinions in this report are listed in **Exhibit C** and the footnotes of this report.

12.     My opinions are held to a reasonable degree of professional certainty, and the information on which I relied consists of the type of information that is typically relied upon in my fields of expertise. I reserve the right to revise my opinion if additional information, documents, or testimony becomes available that would cause me to amend or supplement my opinions in this matter.

## II.     BACKGROUND AND SUMMARY OF CONCLUSIONS

13.     Plaintiff alleges both forward and reverse confusion: "Defendants' conduct, in particular its use of the IO name, is intended to, has, and is likely to continue to confuse, mislead, and/or deceive consumers into believing that IO is affiliated with IYO and/or that IO's products originate from, or are associated with, sponsored by, or affiliated with IYO, when they are not (e.g., forward confusion), or conversely, that IYO's services originate from, or are associated with, sponsored by, or affiliated with IO, when they are not (e.g., reverse confusion)."[2]

14.     However, Mr. Keegan describes his assignment only in terms of the allegation of reverse confusion. Mr. Keegan states that he, "Determined that a consumer study would be informative regarding those allegations of confusion, specifically with regard to reverse confusion, considering the dominant market position of the Defendants"[3] and that he subsequently, "Designed and executed a reverse confusion study to determine the extent to which,

---

[2] Complaint, ¶ 108.
[3] Keegan Report. ¶ 6.

if at all, there is a likelihood of confusion among relevant consumers between the Defendants and the Plaintiff based on the Defendants' alleged infringement of the IYO Mark."[4]

15.     As a threshold matter, the Keegan Survey purports to measure confusion arising from Defendants' use of the term "io," yet Defendants have affirmatively decided not to use that name. On February 9, 2026, Peter Welinder, Vice President and General Manager of OpenAI, declared that, "Defendants have decided not to use the name 'io' (or 'IYO,' or any capitalization of either) in connection with the naming, advertising, marketing, or sale of any artificial intelligence-enabled hardware products."[5] Mr. Welinder further stated that Defendants' first hardware device is not expected to ship before the end of February 2027 and that Defendants have not yet created product packaging or marketing for it.[6] That is, there are no "io"-branded products in the marketplace and there will be no "io"-branded products in the marketplace. Thus, it is a meaningless exercise to entertain Mr. Keegan's likelihood of confusion survey since it is founded on simulating a marketplace scenario that does not and will not exist.

16.     Even setting aside the threshold problem that Defendants do not, and will not, use the "io" name to advertise or sell any products, the Keegan Survey is independently unreliable on methodological grounds. Based on my analyses, a review of available materials, and my professional experience as a researcher, educator, and business consultant, I find that the Keegan Survey violated multiple principles and requirements of scientific surveys. These violations render the Keegan Survey unreliable and uninformative as to any alleged likelihood of confusion among the relevant universe of consumers. Specifically, the Keegan Survey:

(a)     Presents a fabricated test stimulus that does not approximate any real-world encounter with the io brand;

(b)     Defines an overbroad universe that encompasses virtually the entire adult population rather than prospective customers in a niche and novel category;

(c)     Uses a Squirt design despite the absence of any io product proximate to an iyO product in the marketplace, generating demand effects;

---

[4] Keegan Report, ¶ 7.

[5] Declaration of Peter Welinder in Support of Defendants' Administrative Motion to Extend Time for Briefing and Hearing Any Motion for Preliminary Injunction, ¶ 2.

[6] Declaration of Peter Welinder in Support of Defendants' Administrative Motion to Extend Time for Briefing and Hearing Any Motion for Preliminary Injunction, ¶ 3.

(d)     Includes a defunct decoy brand (Humane AI Pin);

(e)     Uses category-relevant distractor questions that function as primes rather than cognitive breaks; and

(f)     Places its attention check after all screening and confusion questions.

## III.    OVERVIEW OF THE KEEGAN SURVEY

17.    Mr. Keegan states that, "Typically, in a reverse confusion study, the appropriate population from which to sample is likely purchasers of products or services bearing the senior user's mark" but then opines that, "[B]ecause both Parties in the current matter operate within the same larger market (i.e., AI consumer electronics products) and serve the same customers, the appropriate survey universe is the Parties' common target of likely purchasers of AI consumer electronics products."[7]

18.    The Keegan Survey commenced with a welcome page (question Q1) that also featured a CAPTCHA challenge.[8] The next page (Q2) provided respondents with instructions to use a device with image capabilities, to wear eyeglasses if needed, and to avoid guessing or consulting outside sources. Below the instructions, respondents were asked to affirm whether they understood and agreed with the instructions. Respondents who selected "I understand and agree" were allowed to continue. Those who selected "I do not understand and/or do not agree" or "Don't know" were screened out.

19.    The next two questions asked respondents to indicate their age range (Q3) and their US state or territory of residence (Q4). Respondents who selected "Under 18" in Q3, or who selected "Other," "None of these," or "I do not live in the U.S." in Q4 were screened out. It is unclear from the Keegan Report whether responses to these basic demographics were validated against the panel provider's enrollment records, as is standard practice in survey methodology. The same concern applies to demographic questions appearing later in the survey; specifically, questions measuring education level (Q34), gender (Q35), and income (Q36).

---

[7] Keegan Report, ¶ 23.

[8] CAPTCHA stands for "Completely Automated Public Turing test to tell Computers and Humans Apart." It is a challenge-response test used on websites to differentiate between human users and bots. The goal is to ensure that only humans are granted access to perform specific actions, preventing automated spam, bot abuse, and other malicious activities. Google's revised CAPTCHA system is called reCAPTCHA (https://cloud.google.com/security/products/recaptcha).

20.     The next several questions (Q5 to Q8) were used to qualify respondents based on recent device usage and their involvement in purchase decisions for one or more of those devices. This series of questions, along with the age screener (Q3), comprised the sampling frame for the Keegan Survey.[9]

21.     Q5 asked respondents, "Which of the following types of products, if any, have you personally used in the last year?" The response options were "Laptop computer," "Bluetooth speaker / headphones," "Desktop computer," "Tablet," "Smartphone," "Smart watch / fitness tracker," "Gaming console," and "None of these." No screening criterion was used with Q5.

22.     Q6 piped all selected responses from Q5 and instructed respondents as follows: "The product(s) that you have personally used in the last year appear below. Thinking of the last product you used in each category, please indicate your level of involvement in purchasing the product(s) that you used." The response options for each listed product were, "Purchased by myself," "Purchased in coordination with others," "Influenced purchase," "No involvement in purchase," "Don't know / Don't recall."

23.     Question Q7 asked respondents, "Which of the following types of products, if any, do you expect to personally use in the next three months?" The response options were the same as for Q5 ("Laptop computer," "Bluetooth speaker / headphones," "Desktop computer," "Tablet," "Smartphone," "Smart watch / fitness tracker," "Gaming console," and "None of these"). Question Q8 piped all selected responses from Q7 and provided instructions similar to those in Q6: "The product(s) that you expect to personally use in the next three months appear below. Thinking of the product you are most likely to use in each category, please indicate your level of involvement in purchasing those products." The response options were the same as for Q6 ("Purchased by myself," "Purchased in coordination with others," "Influenced purchase," "No involvement in purchase," "Don't know / Don't recall").

24.     Only those respondents who indicated expectations to use a laptop computer, desktop computer, tablet, and/or smartphone in the next three months (in Q7) and to purchase (by themselves or in coordination with others) or influence the purchase of one or more of those products remained qualified for the survey. These respondents proceeded to Q9 where they were reminded not to guess or consult outside sources while completing the survey.

---

[9] Keegan Report, ¶¶ 24-25.

25.     The next section of the Keegan Survey sought to deploy a "Squirt" format[10] to measure the extent to which the use of the term "io" is likely or unlikely to cause relevant consumers to mistakenly believe that products bearing Plaintiff's iyO mark are put out or reflective of a business connection with Defendants.

26.     Briefly, a standard Squirt format for reverse confusion begins by randomly assigning respondents to a Test Group or a Control Group. In the Test Group, respondents are first exposed to the junior user's mark. The mark is removed and respondents are then exposed to a "lineup" comprised of senior user's mark plus a set of third-party "decoy" marks. The Control Group uses the same procedure and marks as the Test Group with the exception that the junior user's mark is replaced by a similar but non-infringing mark. The purpose of the Control Group is to measure the effects of factors other than the allegedly infringing junior mark on the measured likelihood of reverse confusion. The observed level of confusion in the Control Group is interpreted as the level of "noise" in the measurement process, thus providing a baseline for interpreting the level of confusion observed in the Test Group.

27.     Q10 in the Keegan Survey provided preliminary instructions for the reverse confusion sequence: "On the next page we will introduce you to a product. Please consider the product information as you would if you encountered it while shopping and are considering purchasing it. Please take as much time as you would like to consider the product information; you will be asked your opinions when you are finished."

28.     Next, Q11 asked respondents to, "Imagine you encounter a product while shopping. The manufacturer describes this product as follows: '*A family of electronic devices that will allow you to use AI (artificial intelligence) in new ways, from the way you express your requests to how responses to those requests are received by you*.'" Respondents were further informed that, "For the remainder of this survey, this product will be referred to as 'PRODUCT A.' The product will be offered under the name shown below:"

29.     The stimulus displayed to respondents depended on whether they were in the Test Group or the Control Group. Test Group respondents were shown the term "io," while Control Group respondents were exposed to the term "ue":

| *Test Group Stimulus* | *Control Group Stimulus* |
|---|---|

---

[10] Keegan Report, ¶¶ 30-31.



30. It should be noted that although the Keegan Survey asks respondents to "Imagine you encounter a product…" and that "For the remainder of this survey, this product will be referred to as '**PRODUCT A**,'" no product is ever shown to respondents.

31. Q12 asked respondents, "Were you able to see **PRODUCT A** clearly, or not?" Those who selected, "I was able to see PRODUCT A clearly" were allowed to continue with the survey while those selecting "I was not able to see PRODUCT A clearly" or "Don't know" were screened out.

32. Respondents were then asked a "distractor" question (Q13), "If you know, approximately how often do you shop for personal electronics?" The response options were, "Less than once per year," "1 - 2 times per year," "3 - 4 times per year," "5 or more times per year," and "Don't know / Don't recall." Respondents were allowed to continue regardless of their selected response option, including "Less than once per year" and "Don't know / Don't recall."

33. Q14 commenced the Room 2 portion of the Squirt format and exposed respondents, with the following instructions: "Shown below, in random order, are additional products. Please consider the products as you would if you encountered them while shopping and are considering purchasing them. Take as much time as you would like to look at the products. You may click on the images for an enlarged view." Respondents were then shown a lineup comprised of screenshots of the Plaintiff's webpage for its iyO One product, along with screenshots of two decoy product webpages: Meta's AI Glasses and Humane's AI Pin.

34. Q15 was displayed on the same page as Q14 (below the webpage screenshots), and simply instructed respondents to, "Click the 'Next' button below to continue."

35. Q16 was a distractor question that asked, "When you shop for electronics, who do you typically shop for?" The response options were, "Yourself," "Your child or children,"

9

"Another family member," "Employee(s) or other business use," "Other," and "Don't know / Don't recall." As with the prior distractor question (Q13), respondents were allowed to continue regardless of their selected response option, including "Don't know / Don't recall."

36.    Q17 exposed respondents for a second time to either the term "io" (Test Group) or "ue" (Control Group). The instructions for the exposure stated, "Please consider again **PRODUCT A**, the product you saw earlier in this survey, which the manufacturer describes as: 'A family of electronic devices that will allow you to use AI (artificial intelligence) in new ways, from the way you express your requests to how responses to those requests are received by you.'" No response was required of respondents.

37.    Q18 served to transition respondents to the likelihood of confusion question set: "We are now going to ask you some questions about the products you reviewed earlier in the survey."

38.    Q19 sought to measure "source confusion" by randomly displaying one of the webpages previously displayed in Room 2 (iyO One, Meta Glasses, or Humane AI Pin) and asking respondents, "Please consider this product and answer the questions below the image: Thinking of the first product that you saw earlier in this survey, **PRODUCT A**, do you believe:"

39.    The response options were, "The product shown above is put out by the same company as **PRODUCT A**, the first product you saw," "The product shown above is not put out by the same company as **PRODUCT A**, the first product you saw," and "Don't know / No opinion."

40.    Q23 was only displayed to respondents who indicated in Q19 that the product was put out by the same company as PRODUCT A. Respondents were provided with a link to view the "product" again (Q20: "Click here to view **PRODUCT A**") and asked an open-ended follow-up question, "If you know, what makes you say that the product shown above is put out by the same company as **PRODUCT A**? Please be as specific as possible." Respondents could also indicate, "Don't know / No opinion" rather than providing an open-ended response (Q24). Respondents who indicated that "PRODUCT A" was not put out by the same company or who indicated they did not know or had no opinion were not shown a product webpage link or Q23 or Q24.

41.    Webpages for the remaining two marks from Room 2 were displayed and queried in the same manner as the first mark, with Q19 displayed for each mark. Q21 and Q22

corresponded to webpage image links for the two marks ("Click here to view **PRODUCT A**"). Q23 and Q24 were displayed only if respondents indicated the products were put out by the same company as PRODUCT A.

42.     Q25 sought to measure "affiliation confusion" by randomly displaying one of the webpages previously displayed in Room 2 (iyO One, Meta Glasses, or Humane AI Pin) and asking, "Do you believe that the product shown above:" and providing three response options: "Is affiliated, connected, or associated with the company that puts out **PRODUCT A**, the first product you saw," "Is not affiliated, connected, or associated with the company that puts out **PRODUCT A**, the first product you saw," and "Don't know / No opinion."

43.     Q26 was only displayed to respondents who indicated in Q25 that the product was affiliated, connected, or associated with the company that puts out PRODUCT A. In Q26, respondents were provided with a link to view the product again, "Click here to view **PRODUCT A**" (Q20, Q21, or Q22, depending on which mark was randomly selected from Room 2) and asked an open-ended follow-up question, "If you know, what makes you say that the product shown above is affiliated, connected, or associated with the company that puts out **PRODUCT A**? Please be as specific as possible." Respondents could also indicate, "Don't know / No opinion" rather than providing an open-ended response (Q27). Respondents who indicated in Q25 that the product was not affiliated, connected, or associated with the company that puts out PRODUCT A, or who indicated they did not know or had no opinion, were not shown a product webpage link or Q26 or Q27.

44.     Webpages for the remaining two marks from Room 2 were displayed and queried in the same manner as the first mark, with Q25 being displayed for each mark, and Q26 and Q27 being displayed only if respondents indicated the products were affiliated, connected, or associated with the company that puts out PRODUCT A.

45.     Q28 sought to measure "sponsorship confusion" by randomly displaying one of the webpages previously displayed in Room 2 (iyO One, Meta Glasses, or Humane AI Pin) and asking respondents, "Do you believe that the product shown above:" and providing three response options: "Is sponsored or approved by the company that puts out **PRODUCT A**, the first product you saw," "Is not sponsored or approved by the company that puts out **PRODUCT A**, the first product you saw," and "Don't know / No opinion."

46. Q29 was only displayed to respondents who indicated in Q28 that the product was sponsored or approved by the company that puts out PRODUCT A. In Q29, respondents were provided with a link to view the product again, "Click here to view **PRODUCT A**" (Q20, Q21, or Q22, depending on which mark was randomly selected from Room 2) and asked an open-ended follow-up question, "If you know, what makes you say that the product shown above is sponsored or approved by the company that puts out **PRODUCT A**? Please be as specific as possible." Respondents could also indicate, "Don't know / No opinion" rather than providing an open-ended response (Q30). Respondents who indicated the product was not sponsored or approved by the company that puts out PRODUCT A, or who indicated they did not know or had no opinion, were not shown a product webpage link or Q29 or Q30.

47. Webpages for the remaining two marks from Room 2 were displayed and queried in the same manner as the first mark, with Q28 being displayed for each mark, and Q29 and Q30 being displayed only if respondents indicated the products were sponsored or approved by the company that puts out PRODUCT A.

48. Q31 attempted to measure respondents' prior usage of various technologies and devices by asking "Which, if any, of the following types of technology have you used in the last three months? Please select all that apply." The response options were, "AI (artificial intelligence) app, website, or device," "Smart appliance (e.g., TV, washer, refrigerator)," "Internet search engine (e.g., Google, Bing)," "Internet chat bot / automated customer service," "Cloud computing / storage software," "Wearable fitness tracker," "Smartphone / tablet," "Music streaming service (e.g., Apple Music, Spotify)," "None of these," and "Don't know / No opinion."

49. Q32 attempted to measure respondents' prior usage of AI by asking, "In which of the following ways have you used AI (artificial intelligence) in the last three months? Please select all that apply." The response options were, "Smartphone / tablet app and/or website (e.g., ChatGPT, Google Gemini)," "Search engines with AI summaries (e.g., Google AI Overview, Bing Copilot Search)," "Voice-controlled home assistant (e.g., Google Alexa),"[11] "Meeting transcriptions / summaries," "Predictive text / writing assistant," "Chat bot / virtual customer

---

[11] The Keegan Survey provides "Google Alexa" as an example of a "Voice-controlled home assistant." However, there is no such product. Alexa is owned by Amazon.com, Inc. Surprisingly, the Keegan Report indicates that 42.8% of respondents claimed to have used a voice-controlled home assistant that was exemplified by a nonexistent product.

assistance," "Photo / video editing," "On-device voice assistant (e.g., Apple Siri)," "None of these," "Don't know / No opinion."

50.     Q33 was an open-ended question that checked whether respondents were paying attention by instructing them to, "Please type the word 'green' in the box below." Respondents who failed the attention check were screened out.[12]

51.     The final three questions in the Keegan Survey measured education level (Q34: "Which of the following best describes your educational background?"), gender (Q35: "What is your gender?"), and income (Q36: "Which of the following includes your household's approximate annual income in 2025?").

## IV.     CRITIQUE OF THE KEEGAN SURVEY

52.     While reviewing the Keegan Survey, I noted several fundamental errors that, individually and collectively, render it unreliable for drawing conclusions about the potential for reverse confusion in this matter.

### A.  __The Test Stimulus Is Fabricated__

53.     Even setting aside the threshold problem that Defendants have no product in the marketplace, the specific stimulus that Mr. Keegan constructed to represent the io "mark" fails to approximate any real-world condition under which a consumer might encounter Defendants' hardware product(s). It is a foundational requirement of confusion surveys that stimuli approximate the conditions under which consumers encounter the marks at issue. As McCarthy observes, "the closer the survey methods [and stimuli] mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[13] Swann (2023) likewise emphasizes that while few surveys are rejected for choice of format, "many are rejected for the abstract presentation of stimuli."[14]

---

[12] An instructional manipulation check is a built-in attention test that helps researchers identify participants who aren't reading or engaging with survey questions properly. See, for example, Oppenheimer, Daniel M., Tom Meyvis, and Nicolas Davidenko (2009), "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45 (4), 867-872.

[13] McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition.

[14] Swann, Jerre (2023), "A History of the Evolution of Likelihood of Confusion Methodologies," *Trademark Reporter*, 113 (5), 723-771.

54.     In Room 1 of the Keegan Survey, respondents were shown two lowercase letters ("io" in the Test Group or "ue" in the Control Group) displayed in a black box. This was the entirety of the visual stimulus for the Defendants' purported product(s). No product was shown. No product image, packaging, interface, website, advertisement, or any other marketplace context was provided. The stimulus was accompanied only by a written product category description. No consumer has ever encountered the io brand in this manner. As detailed below, Defendants' real-world announcements always paired the term with the established OpenAI, Altman, Ive, and LoveFrom brands and ChatGPT technology, context that Plaintiff's own Complaint relies upon. Two lowercase letters in a black box is not a marketplace experience; it is an abstraction that bears no resemblance to how consumers encounter brands in any commercial setting.

55.     The impoverished nature of this stimulus is compounded by the omission of all source-identifying information that has accompanied every real-world encounter with Defendants' use of the io term. Defendants' collaboration announcement leveraged the established brands and names of OpenAI, Jony Ive, Sam Altman, and LoveFrom to gain public attention.[15] The May 2025 announcement was titled "Sam & Jony introduce io," was hosted on openai.com, prominently featured the OpenAI name and visual identity, and described the ChatGPT AI technology with which the device would interact. Plaintiff's reaction to the io name stems from precisely this branded context. Plaintiff's own Complaint confirms as much. The Complaint alleges that "IYO's momentum was stopped dead" not by the letters "io" in isolation but by the announcement that OpenAI had acquired a company "formed with famed designer Jony Ive, for $6.5 billion"[16] and that "the sheer scale of OpenAI and its investment in IO threaten to swamp IYO's reputation in the market and its very existence."[17] Plaintiff's theory of harm thus depends on the association between "io" and the OpenAI, Altman, and Ive brands. A survey that tests "io" by stripping any such associations does not test the commercial impression that Plaintiff alleges is causing confusion.

56.     Yet Mr. Keegan's stimulus omitted all this context. There was no OpenAI name or logo, no reference to Jony Ive or LoveFrom, and no mention of ChatGPT or any other OpenAI technology. By scrubbing the brand context that defined every real-world encounter with

---

[15] https://openai.com/sam-and-jony/
[16] Complaint, ¶ 6.
[17] Complaint, ¶ 15.

Defendants' reference to the term "io," Mr. Keegan reduced the stimulus to the abstract two letters most likely to trigger a superficial name-matching comparison with "iyO," while removing the very information that would allow respondents to distinguish between the sources of the "marks". A confusion survey that tests "io" in isolation does not simulate its commercial impression and thus does not measure the likelihood of confusion due to that impression.

57.    The written description that accompanied the "io" (and "ue") stimuli compounds the problem. Respondents were told to, "Imagine you encounter a product while shopping" and that, "The manufacturer describes this product as follows: 'A family of electronic devices that will allow you to use AI (artificial intelligence) in new ways, from the way you express your requests to how responses to those requests are received by you.'" Mr. Keegan characterizes this as, "a description of the anticipated category of goods" but does not identify its source or explain how it is a justified representation of Defendants' product(s). The description does not appear in Defendants' May 21, 2025 announcement, which described the collaboration only in general terms and without specifying how those products would function. Nor have I located the Keegan Survey stimulus language in any public statement by Defendants. Yet the survey's framing of the description is, "the manufacturer describes," which conveys to respondents that this is how Defendants themselves characterize their product, lending it an air of marketplace authenticity and correspondence with reality that it does not possess.

58.    By pairing an unsourced, plaintiff-aligned product description with a bare two-letter name, Mr. Keegan ensured that the only substantive information respondents had about Product A was a category description that functionally mirrored the products they would encounter in Room 2, further compounding the tendency for respondents to match on the category rather than the mark.

59.    A further consequence of the extreme asymmetry between the Room 1 and Room 2 stimuli is that it systematically biases the confusion measurement. In Room 1, respondents received a stimulus containing almost no information: two letters and a category description. In Room 2, respondents were shown richly detailed product webpage screenshots for iyO One, Meta Glasses, and Humane AI Pin, each containing product imagery, brand logos, product descriptions, specifications, pricing, design elements, and company identification. When respondents are then asked to determine whether the Room 2 products are "put out by the same company" as the Room 1 stimulus, they must bridge a vast information gap.

60.     The Room 1 stimulus provides only two comparison dimensions: (a) the two-letter name and (b) the category description. Respondents who attempt to perform the task the survey demands of them can therefore only compare on those two dimensions, either by matching the letters (which favors iyO, since "io" appears within "iyO") or by matching the category description (which favors all three brands, since all are AI electronic devices).

61.     The problem with using a fabricated test stimulus is compounded by the re-exposure in Q17, where respondents were shown the bare Room 1 stimulus again ("io" or "ue") immediately before the confusion questions. This re-exposure freshly primes the two-letter name in respondents' working memory, which artificially heightens the salience of the two-letter name for comparison against the Room 2 brands at precisely the moment when respondents are about to make their confusion judgments.

### B. The Survey Universe Is Overbroad and Unrepresentative of Likely Purchasers

62.     Mr. Keegan defined his survey universe as persons aged 18 or older who reside in the United States and who (a) have used a laptop computer, desktop computer, tablet, or smartphone in the last year, and (b) have purchased or influenced the purchase of such a device, or expect to do so in the next three months. This universe encompasses virtually the entire adult population of the United States. The screening criteria function as little more than a threshold confirmation that a respondent is an adult who uses common electronic devices and has participated in a purchase decision for such a device, a description that fits the overwhelming majority of American adults.

63.     A properly defined universe for a trademark confusion survey should be limited to "prospective purchasers" of the products at issue.[18] The products at issue in this case are not ordinary consumer electronics. Plaintiff's iyO One is a specialized ear-worn audio computing device priced at $999 for the WiFi version and $1,199 for the WiFi+LTE version. It requires specialized fitting and is marketed as a cutting-edge device for interacting with AI, computers, and the internet without traditional physical interfaces. Indeed, prior to filing this action,

---

[18] Barber, William G. and Giulio E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann; Diamond, Shari S., (2011), "Reference Guide on Survey Research," *Reference Manual on Scientific* Evidence, 3rd ed., National Academies Press, 368-418.

Plaintiff's own website described its target audience as "professional musicians, audio engineers, audiophiles, auditory neuroscientists, psychoacousticians."[19]

64.   Jason Rugolo, founder of iyO, clearly articulated and affirmed the narrow universe targeted by Plaintiff in an appearance on The Moonshot Podcast (posted to YouTube on November 25, 2025). Mr. Rugolo explains that, "This is a first of a kind uh you know this is for tech early adopters for audiophiles for AI enthusiasts. It's expensive. You know we're not trying to make a mass market device yet…this is a very sophisticated audio device. You know, it's like definitely the most sophisticated audio device that's ever been made."[20]

65.   While Plaintiff contended during the TRO proceedings that its iyO One product is intended for a broader audience than its earlier VAD PRO product, even by Plaintiff's own account iyO One is a $999 to $1,199 device, which is a price point that, by itself, substantially narrows the universe of prospective purchasers relative to the universe Mr. Keegan defined. These are niche technology products aimed at technologically sophisticated consumers with meaningful disposable income, not mass-market consumer electronics. Defendants' eventual product(s), while not yet defined, are also described in novel, "futuristic" terms.

66.   The over-inclusiveness of Mr. Keegan's universe is confirmed by the demographic and behavioral characteristics of the resulting sample, which I verified through my independent analysis of the native data printed in Exhibit 6 to the Keegan Report.

67.   First, a significant proportion of respondents have no experience with AI products – the category at issue. Question Q31 asked respondents which types of technology they had used in the last three months. Only 51.7% of all respondents (416 of 805) reported having used "An AI (artificial intelligence) app, website, or device." That is, nearly half of Mr. Keegan's sample had not used an AI product of any kind in the past three months. Question Q32, which asked respondents to specify how they had used AI, reveals that only 42.0% of all respondents (338 of 805) had used ChatGPT, Gemini, or a similar AI application via a smartphone, tablet, or website.

68.   Despite these figures, Mr. Keegan reports in Table 6 that "nearly the entire study sample—95.0 percent of respondents—indicated that they had used AI or had used technology

---

[19] Order Granting Motion for Temporary Restraining Order, p. 14.
[20] https://www.youtube.com/watch?v=punwqj6lOGs.

that incorporates AI."[21] Mr. Keegan achieves the 95% figure by counting respondents in Q31 who merely reported using an internet search engine (91.7% of respondents). While it is technically true that modern search engines incorporate AI components, this framing creates a grossly misleading impression of the sample's familiarity with, and interest in, AI products. Using Google to search the internet is a qualitatively different activity from using ChatGPT, purchasing an AI-powered wearable device, or evaluating competing AI hardware products. By inflating the apparent AI sophistication of his sample to 95%, Mr. Keegan obscures the fact that nearly half of his respondents have not recently used an AI app, website, or device, and are therefore not members of the relevant purchasing population for the products at issue.

69.     The Keegan Report is also misleading with regard to the prevalence of AI technologies used by respondents in the last three months. Table 7 suggests that 81.3% of respondents have used a Smartphone / tablet app and/or website such as ChatGPT or Google Gemini and that 77.9% of respondents have used search engines with AI summaries, such as Google AI Overview and Bing Copilot Search. However, unlike Table 6, the base for these figures is not the full sample of 805 but instead a subsample of 416 respondents who indicated they had used an AI app, website, or device in the last three months. My analysis of Q32 across the full sample reveals that only 42.0% of all respondents reported using a Smartphone / tablet app and/or website such as ChatGPT or Google Gemini and only 40.2% of respondents reported using search engines with AI summaries, such as Google AI Overview and Bing Copilot Search. By reporting these figures on a restricted base, Mr. Keegan creates the false impression that his sample consists overwhelmingly of AI-engaged consumers.

70.     Second, a substantial proportion of respondents are infrequent shoppers of personal electronics. Question Q13 asked respondents how often they shop for personal electronics. In the Test Group, 133 of 416 respondents (32.0%) reported shopping "less than once per year," and an additional 4 respondents (1.0%) selected "Don't know / Don't recall." In the Control Group, 113 of 389 (29.0%) respondents reported shopping less than once per year, with 9 (2.3%) selecting "Don't know." These respondents are not likely prospective purchasers of specialized AI electronic devices.

---

[21] Keegan Report, ¶ 81.

71.    Third, a substantial proportion of respondents reported household incomes that are inconsistent with iyO's high price points for its expensive, specialized products. In the Test Group, 19.5% of respondents (81 of 416) reported household income under $35,000, and an additional 16.1% (67 of 416) reported income between $35,000 and $49,999. Combined, 35.6% of Test Group respondents (148 of 416) had household income below $50,000. The pattern was similar in the Control Group, where 30.8% (120 of 389) fell below the $50,000 threshold. Across the full sample, one-third of all respondents (268 of 805, or 33.3%) had household income under $50,000. For a household earning $50,000, the $999 entry-level price of the iyO One exceeds one full week of gross income. For a household earning under $35,000, it exceeds two weeks. These are not likely prospective purchasers of a specialized device that Plaintiff's own founder describes as "expensive" and "not a mass market device" and that Plaintiff's own website marketed to "professional musicians, audio engineers, audiophiles, auditory neuroscientists, [and] psychoacousticians." Including these respondents in the sample dilutes it with individuals who would not likely shop the iyO One in the marketplace.

72.    The consequence of the Keegan Survey's overbroad universe is not conjectural. Respondents who are unlikely to encounter the iyO One in the marketplace, whether because they cannot afford it, do not shop for personal electronics, or have no engagement with AI devices or products, will generally lack the familiarity necessary to differentiate between brands in this emerging product space. As documented in more detail in the section that follows, the dominant driver of confusion in the Keegan Survey is category matching. Respondents who are unfamiliar with the AI product landscape are especially susceptible to this artifact. Including these respondents in the sample inflates the confusion rates and renders the survey unrepresentative of the consumers who would actually encounter the parties' products in the marketplace.

73.    Reanalysis of the Keegan Survey data confirms that the over-inclusiveness of the universe materially inflates the reported confusion figures. When the sample is restricted to respondents who more closely resemble prospective purchasers of $999+ AI electronic devices, the net confusion drops substantially. Among respondents who shop for personal electronics at least one to two times per year (*i.e.*, excluding those who shop less than once per year or do not know how often they shop), the total iyO confusion rate is 63.1% in the Test Group and 44.2% in the Control Group, yielding a net of 18.9% (compared to the 24.0% net in the Keegan Report). When the sample is further restricted to respondents with household income of $50,000 or more

who also shop for electronics at least one to two times per year, the net drops to 14.4% (61.3% Test versus 46.9% Control). This narrowing of the universe reduces the reported net figure, but it does not cure the survey's underlying design problem, because the control condition remains implausibly high and in some instances becomes even higher.

74.    Indeed, the control rate of confusion among these more qualified respondents does not decrease; it increases. Among respondents with household income of $50,000 or more who shop for electronics at least one to two times per year, the control confusion rate is 46.9%, which is higher than the 38.3% control confusion rate in the full sample. This finding reinforces my earlier critique of the survey's design. Even among the most relevant respondents, nearly half report "confusion" with iyO after seeing a stimulus ("ue") that shares no letters with "iyO." The category-matching artifact I identified in my first critique is not an artifact of including unqualified respondents; it is endemic to the survey instrument itself. The net confusion figure drops among more qualified respondents not because the test rate declines, but because the control rate rises, indicating that respondents who are more engaged with the AI product category are, if anything, more susceptible to the category-matching demand effect.

75.    The same pattern holds when the sample is restricted to respondents who have actually used AI applications; that is, the consumers most likely to be in the market for AI electronic devices. Among respondents who have used AI applications, shop for personal electronics at least once or twice per year, and have household income of $50,000 or more, the net confusion is 11.1% (58.7% Test versus 47.6% Control). This figure is not evidence of residual trademark confusion. The test rate has barely moved from the full-sample figure (58.7% versus 62.3%), while the control rate has climbed from 38.3% to 47.6%. In other words, among the respondents *most qualified* to evaluate AI products, nearly half report "confusion" with iyO after seeing a control stimulus that shares no letters with the iyO mark. This is further confirmation that the survey instrument generates category-matching confusion that cannot be removed by restricting the sample to more relevant respondents.

C.    **The Squirt Design Is Inappropriate: Defendants Have No Products in the Marketplace**

76.    As explained earlier, the Keegan Survey uses a sequential, two-room Squirt design. However, Squirt designs are inappropriate when the parties' goods or services are not competitively proximate in the marketplace. The rationale for the Squirt format rests on the

premise that consumers encounter the senior and junior marks in sufficiently close temporal or spatial proximity that both marks are simultaneously in working memory for a similarity comparison. Where this premise is not satisfied, the Squirt format artificially creates the proximity it purports to measure.[22]

77.     A survey that is designed to measure likelihood of confusion should strive for a sufficiently realistic simulation of the marketplace conditions that are relevant to the marks at issue so that respondents' mental states in the survey are representative of the mental states among the relevant universe of consumers when they encounter the allegedly infringing mark.[23] A key consideration in simulating the marketplace is determining whether typical consumers are likely to encounter the marks in proximity, such as in the same grocery store or shopping mall. As noted by Jerre B. Swann, former director of the International Trademark Association and editor-in-chief of the Trademark Reporter, "[a] likelihood of appreciable trademark confusion cannot arise absent appreciable opportunities for consumers contextually to compare the marks at issue."[24]

78.     The artificiality of the Squirt design is an acute problem here because Defendants have no challenged device or hardware product in the marketplace. As of the date of Mr. Keegan's data collection in January 2026, Defendants had not launched any product, had no product webpage, had no advertising, had no product specifications, had no pricing, and had no distribution channel.[25] The Complaint filed in this action confirms that the May 21, 2025 announcement disclosed only the existence of io and OpenAI's $6.5 billion acquisition; it did not unveil a product.[26] The Court's Order Granting Plaintiff's Motion for Temporary Restraining

---

[22] Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann; Swann, Jerre (2023), "A History of the Evolution of Likelihood of Confusion Methodologies," *Trademark Reporter*, 113 (5), 723-771.

[23] McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition.

[24] Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

[25] Declaration of Peter Welinder in Support of Defendants' Administrative Motion to Extend Time for Briefing and Hearing Any Motion for Preliminary Injunction, ¶ 2-3.

[26] Complaint, ¶¶ 93-102.

Order likewise acknowledges that "the parties do not dispute that IO Products currently has no existing product that uses the io mark."[27]

79.     Mr. Keegan appears to recognize this problem, stating in his report that, "Because the Defendants have not yet brought a product to market, the test stimulus shows only the Defendants' brand name—i.e., IO—and a description of the anticipated category of goods."[28] Even setting aside Mr. Keegan's incorrect assertion that Defendants' brand name is "IO," this admission is critical. The Squirt format requires that the survey accurately reflect the circumstances in which consumers encounter the parties' marks in the marketplace. If surveys of products that exist in the marketplace but are not competitively proximate fail the Squirt proximity requirement, then clearly, a survey for a product that does not exist at all cannot satisfy it.

80.     This is a fatal flaw. Squirt designs that do not replicate marketplace conditions are likely to generate "demand effects" (a.k.a. "demand biases").[29] Demand effects occur when survey respondents use cues provided by the survey to discern the purpose or intention of the survey and to provide responses they believe are expected or desired by the researcher. In the Keegan Survey, the demand effects arise from a specific mechanism: the substitution of a generic product category description for an actual product.

81.     In Room 1, the Keegan Survey tells respondents to imagine encountering a product while shopping and informs them that the manufacturer describes the product as, "A family of electronic devices that will allow you to use AI (artificial intelligence) in new ways, from the way you express your requests to how responses to those requests are received by you." Respondents were further told that "For the remainder of this survey, this product will be referred to as 'PRODUCT A.' The product will be offered under the name shown below:" at which point respondents were shown only the letters "io" (Test Group) or "ue" (Control Group) in a black box. No actual product was shown. No product imagery, specifications, pricing, design, or company information was displayed. The only information respondents received about Product A

---

[27] Order Granting Motion for Temporary Restraining Order, p. 6.

[28] Keegan Report, ¶ 40.

[29] Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* Diamond, Shari S. and Jerre B. Swann (eds.), American Bar Association.

was a novel and vague category description ("a family of AI electronic devices that will allow you to use AI (artificial intelligence) in new ways") and a two-letter name.

82. In Room 2, respondents were then shown richly detailed product webpage screenshots for three brands: iyO One, Meta AI Glasses, and Humane AI Pin. Each of these is (or was) a specific AI-related electronic device. Each fits the category description that was provided for "Product A." Respondents were then asked whether each of these products is "put out by the same company" as Product A, is "affiliated, connected, or associated with" the company that puts out Product A, or is "sponsored or approved by" that company.

83. This sequence creates a predictable demand effect. When the only substantive information respondents possess about Product A is a novel and vague category description ("a family of AI electronic devices that will allow you to use AI (artificial intelligence) in new ways") and they are then shown products that match that description, many respondents will infer that at least one product in the same category must come from the same company, be affiliated with one another, or have a sponsorship relationship. But a judgment that two products are in the same category of goods is not confusion as to source, affiliation, or sponsorship. A proper reverse confusion inquiry asks whether consumers are likely to believe that the plaintiff's goods originate from, or are associated with, sponsored by, or affiliated with the defendant. The fact that iyO, Meta Glasses, and Humane AI Pin are all AI electronic devices does not mean consumers would believe they come from the same company, are affiliated, or operate under a sponsorship arrangement. Recognizing category membership is not trademark confusion. The affiliation question is especially susceptible to this category-matching artifact, because products in the same category are "associated" or "connected" in a general sense by virtue of competing in the same product space. A respondent who reports that iyO is "associated with" the maker of a "family of electronic devices" may simply be expressing a product-category judgment, not a belief about corporate affiliation.

84. The magnitude of this category-matching artifact is revealed by the Keegan Survey's own control data. In the Control Group, respondents were shown the stimulus "ue," which is comprised of two lowercase vowels that share zero letters with "iyO." Yet, when responses are aggregated across the three types of confusion (source, affiliation, and sponsorship), 38.3% of control respondents (149 of 389) reported confusion with iyO. The category description for Product A was identical in both the Test and Control Groups. Both groups then saw iyO,

which is an electronic device that uses AI. The category match is perfect in both conditions. The total control rate for iyO is 38.3% not because respondents confused "ue" with "iyO," but because they recognized that iyO fits the novel and vague category description they were given for Product A.[30] The breakdown of this 38.3% figure is itself informative: 28.0% reported source confusion (that iyO is "put out by the same company" as "ue"), 8.0% reported affiliation confusion, and 2.3% reported sponsorship confusion. Even the most specific form of confusion ("same company"), was expressed by more than one in four Control Group respondents, despite the absence of any similarity between the marks.

85.    The decoy brands confirm the pervasiveness of this category-matching artifact. In the Control Group, the total confusion rates for Humane AI Pin and Meta Glasses were 38.3% and 35.2%, respectively, rates that are virtually indistinguishable from the iyO control rate of 38.3%. In the Test Group, the total confusion rates for Humane and Meta were 42.8% and 37.7%, respectively, yielding net increments of only +4.5 and +2.5%. Every product in the lineup matched the category framing provided to respondents, and approximately 35% to 40% of respondents in both groups treated mere category membership as evidence of common source, affiliation, or sponsorship.

86.    To be clear, there is a larger increment for iyO specifically: 62.3% total confusion in the Test Group versus 38.3% in the Control Group, a difference or net of 24.0%. This increment is concentrated in source confusion answers (+18.6%) with smaller increments for affiliation (+4.5%) and sponsorship (+0.8%). The question is whether this increment can be reliably attributed to genuine trademark confusion between "io" and "iyO," or whether the same design flaws that produced a 38.3% total control rate render the net figure unreliable. There are strong reasons to conclude the latter.

87.    First, the 38.3% total control rate for iyO suggests that the survey instrument is generating such pervasive noise that the control has failed in its fundamental purpose: to establish a reliable baseline against which the incremental effect of the challenged mark can be isolated. When the baseline is this unstable, the net figure derived by subtracting it is inherently unreliable, because both the test rate and the control rate are contaminated by the same category-matching

---

[30] Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

bias. Subtracting one inflated number from another does not produce a trustworthy estimate of the confusion attributable to the mark.

88.     Second, the open-ended responses to the "why" question (Q23) for source confusion confirm that category matching, and not name similarity, is the dominant driver of reported confusion in both groups. Analysis of the 147 open-ended responses from test-group respondents who identified iyO as being put out by the same company as "io" reveals the following distribution of reasons: while approximately 32% cited letter or name similarity (e.g., "it has the same IO in its name," "the names are too similar," "same two letters"); approximately 19% cited category or product-level similarity (e.g., "both use AI," "same technology," "hands-free device"), approximately 12% cited visual elements (e.g., "same logo," "same colors"); and the remaining approximately 37% gave vague or non-substantive responses (e.g., "I think they all are by the same company," "seems similar," "I'm not really sure"). That is, roughly two-thirds of the confused test-group respondents offered reasons unrelated to the similarity between the names "io" and "iyO."

89.     In the Control Group, where the stimulus was "ue," the picture is even more telling. Among the 79 Control Group respondents who reported source confusion with iyO, only approximately 15% cited anything related to name or letters. Further, several of these responses referenced letters appearing on the iyO product page screenshot itself (e.g., "The name IYO was in both"), not the similarity between "ue" and "iyO." The majority cited category-level reasoning (e.g., "it's an AI product," "same type of technology"), vague impressions (e.g., "they seem similar," "I don't know to be honest"), or visual similarity between the product page screenshots. It is implausible that these respondents were "confused" by the names having been shown a stimulus that bears no resemblance to iyO. Rather, their responses are attributable to the category description that was common to both the Test and Control conditions, and not to similarity of the marks.

90.     The total control rate for iyO (38.3%) is, by itself, higher than the net confusion levels that courts have found to constitute significant evidence of likely confusion. Mr. Keegan himself cites the literature for the proposition that a threshold of approximately 15% net confusion is the minimum for a finding of likelihood of confusion.[31] A control rate that exceeds

---

[31] Keegan Report, ¶ 76, fn 71; Jacoby, Jacob (2013), *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, Chicago: American Bar Association. See also: Ezell,

this threshold by a factor of two-and-a-half is a tell-tale sign that the instrument is generating confusion rather than measuring it.

### D. One of the Decoy Brands Did Not Exist in the Marketplace

91.     Room 2 in the Keegan Survey included product webpage screenshots for three brands: iyO One, Meta AI Glasses, and Humane AI Pin. The Meta AI Glasses and Humane AI Pin served as decoy brands in the lineup (also functioning as in-treatment controls). However, the Humane AI Pin did not exist as a product at the time of Mr. Keegan's data collection in January 2026.

92.     Humane launched the AI Pin in late 2023 as a wearable AI device intended as a smartphone alternative. The product was widely criticized and commercially unsuccessful. On February 18, 2025, HP Inc. announced it was acquiring Humane's assets, not including the AI Pin device business, for $116 million. Humane immediately discontinued sales of the AI Pin and announced that all existing devices would cease functioning on February 28, 2025. After that date, the AI Pin could no longer make calls, send messages, process AI queries, or access the cloud. Humane dissolved its customer support team on the same date and instructed remaining customers to transfer their data before the devices were permanently disabled. By the time Mr. Keegan fielded his survey in January 2026, the Humane AI Pin had been defunct for approximately eleven months: the product could not be purchased, existing devices had been rendered inoperable, and Humane's product website was no longer live.

93.     Mr. Keegan acknowledges this problem. In footnote 35 of his report, he discloses that the Humane AI Pin webpage stimulus was sourced from the Wayback Machine.[32] The Squirt format requires replication of the consumer experience of encountering competing products in the marketplace. A product that no longer exists in the marketplace cannot serve this function. No consumer browsing for AI electronic devices in January 2026 would have encountered the Humane AI Pin, because it was not available for purchase, its website was offline, and its devices had been bricked months earlier.

---

Matthew G., and AnnaBelle Sartore (2022), "Survey Percentages in Lanham Act Matters," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

[32] https://web.archive.org/web/20250327122741/https://humane.com

26

94.    The inclusion of a defunct product as a decoy has practical consequences for the reliability of the survey. In a properly designed Room 2 Squirt lineup, the decoy brands serve a dual purpose: they reduce demand effects by preventing respondents from identifying the marks at issue, and they function as in-treatment controls that provide a benchmark for the level of confusion attributable to the survey instrument itself (as opposed to the challenged mark). For both of these purposes, decoy brands should be real products that a consumer might plausibly encounter in the relevant marketplace, so that the lineup approximates a realistic shopping or browsing experience.

95.    Moreover, inclusion of the Humane AI Pin may have exacerbated the category-matching artifact I identified in my first critique. Respondents who were unfamiliar with the Humane AI Pin (a likely majority, given its commercial failure and discontinuation), would have no basis for evaluating it other than the category description visible on the archived product page (an AI-powered wearable device). This is the same category-level information that drives the inflated confusion rates throughout the Keegan Survey. The total confusion rate for the Humane AI Pin was 42.8% in the Test Group and 38.3% in the Control Group. Both rates are consistent with the pervasive category-matching noise rather than any meaningful marketplace signal.

### E.    The Distractor Questions Reinforce Rather Than Reduce Category-Level Processing

96.    A properly designed distractor question should be unrelated to the subject matter of the survey, so that it diverts respondents' attention away from the comparison task and disrupts any demand-driven processing that may have been activated by the stimulus exposure. Standard examples include questions about the weather, recent entertainment, or other topics entirely unconnected to the products at issue. The purpose is to introduce a genuine cognitive break from the survey's subject matter.

97.    The distractor questions in the Keegan Survey (Q13 and Q16) do not fulfill this function. Both are explicitly about shopping for personal electronics, the very category of products at the center of the survey. Q13 asks how often the respondent shops for personal electronics. Q16 asks who the respondent typically shops for when buying electronics. Rather than diverting respondents' attention away from the product category, these questions reinforce it. They remind respondents, at precisely the critical junctures between stimulus exposures and confusion measurements, that they are evaluating personal electronics.

98.     Specifically, Mr. Keegan inserted Q13 ("If you know, approximately how often do you shop for personal electronics?") between Room 1 and Room 2 and then inserted Q16 ("When you shop for electronics, who do you typically shop for?") between Room 2 and the re-exposure of the Room 1 stimulus in Q17.

99.     The placement of these questions is particularly problematic in light of the category-matching artifact I identified earlier. As I have documented, the dominant driver of confusion in the Keegan Survey is respondents treating membership in the broad category of "AI electronic devices" as evidence of common source, affiliation, or sponsorship. Q13 activates and reinforces the "personal electronics" category frame in respondents' working memory immediately before they encounter Room 2, while Q16 performs the same function between Room 2 and the re-exposure to the Room 1 stimulus in Q17. This reinforces the electronics shopping frame at the moment respondents are transitioning to the confusion questions.

100.    In effect, Mr. Keegan's "distractors" are not distractors at all. They are category primes. By asking respondents to think about their electronics shopping habits between stimulus exposures, these questions encourage the very category-level processing that inflates the confusion rates throughout the survey. A respondent who has just been asked how often she shops for personal electronics, and is then shown product webpages for three AI electronic devices, is more (not less) likely to view those products through a category lens and to infer that products in the same category come from the same source. The distractor questions thus compound, rather than ameliorate, the demand effects generated by the survey's design.

### F. **The Survey Attention Check Was Placed After the Screening and Confusion Questions**

101.    Q33 in the Keegan Survey was an attention check that instructed respondents to "Please type the word 'green' in the box below." Respondents who failed this check were excluded, but only after all key screening and confusion responses had already been recorded. The purpose of an attention check is to identify inattentive or acquiescent (a.k.a. yea-saying) respondents who are not paying attention to or processing the survey and whose data should therefore be excluded.[33]

---

[33] Yea-saying refers to the general tendency among some individuals to provide affirmative responses regardless of the content of the question and regardless of whether an affirmative response is accurate with respect to their true opinion (e.g., always answering "yes" / "true" or

102.    However, Q33 was placed *after* all screening questions (Q3 through Q8) and all confusion questions (Q19 through Q30) had been completed. By the time a respondent reached Q33, both the qualification decision and every confusion judgment in the survey had already been recorded.

103.    Standard practice in survey methodology places attention checks early in the survey, before the critical dependent measures and, ideally, before or within the screening sequence, so that inattentive or acquiescent respondents can be identified and excluded before their data contaminates the key results. By placing the attention check after both the screener and the confusion questions, Mr. Keegan's design fails to address two distinct problems.

104.    First, inattentive or acquiescent respondents may have qualified for the survey through random clicking or uncritical agreement during the screening sequence. The screener questions (Q3 through Q8) ask respondents to confirm their age, residence, device usage, and purchase involvement. Inattentive or acquiescent respondents could select response options that satisfy the screening criteria, thereby gaining entry to the survey despite not actually meeting the universe definition.

105.    Second, inattentive or acquiescent respondents who did qualify (whether legitimately or through random or uncritical clicking) may have provided meaningless confusion data. A respondent who clicked through the stimulus exposures and confusion questions without processing the information would be screened out only if they also failed to type "green" at the end of the survey in Q33. An inattentive respondent can easily type a single word while having been completely disengaged during the portions of the survey that actually matter. Because the "same company" and "affiliated" options are among three choices for each confusion question, random responding would generate a substantial baseline of apparent "confusion" that has

---

selecting all items offered in a list). For reviews, *see* Baumgartner, Hans and Jan-Benedict E. M. Steenkamp (2001), "Response Styles in Marketing Research: A Cross-National Investigation," *Journal of Marketing Research*, 38 (May), 143-156; Feldman, Jack M. and John G. Lynch (1988), "Self-Generated Validity and Other Effects of Measurement on Belief, Attitude, Intention, and Behavior," *Journal of Applied Psychology*, 73 (3), 421-435; Piedmont, Ralph L., Robert R. McCrae, Rainer Rieman, and Alois Angleitner (2000), "On the Invalidity of Validity Scales: Evidence from Self-Reports and Observer Ratings in Volunteer Samples," *Journal of Personality and Social Psychology*, 78, 582-593; Winkler, John D., David E. Kanouse, and John E. Ware Jr. (1982), "Controlling for Acquiescence Response Set in Scale Development," *Journal of Applied Psychology*, 67 (October), 555-561.

nothing to do with trademark similarity or even category matching but rather is noise from respondents who are not performing the task. A properly placed attention check would have identified and excluded these respondents before their random responses contaminated both the qualification decision and the confusion data.

## V.   CONCLUSIONS

106.   Based on the foregoing analysis, a review of available materials, and my professional experience, I conclude that the Keegan Survey is unreliable and uninformative as to the likelihood of reverse confusion. As a threshold matter, the survey tests consumer reactions to a name that Defendants have decided not to use in connection with any products, rendering the entire exercise meaningless and devoid of predictive value regarding actual marketplace confusion. Even if Defendants were going to use the "io" term, the Keegan Survey does not demonstrate that confusion is likely, because the survey:

    (a)    Presents a fabricated test stimulus that does not approximate any real-world encounter with the io brand;

    (b)    Defines an overbroad universe that encompasses virtually the entire adult population rather than prospective customers in a niche and novel category;

    (c)    Uses a Squirt design despite the absence of any io product proximate to an iyO product in the marketplace, generating demand effects;

    (d)    Includes a defunct decoy brand (Humane AI Pin);

    (e)    Uses category-relevant distractor questions that function as primes rather than cognitive breaks; and

    (f)    Places its attention check after all screening and confusion questions.

107.   Each of these errors biases the survey toward finding confusion where none exists. Taken together, they render the Keegan Survey unreliable and entitled to no weight in assessing the likelihood of reverse confusion in this matter.

108.   I reserve the right to amend or revise this expert report in response to additional information, documents, or testimony provided by the parties, as such items may be brought to my attention after the date of my signature on this report.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2026 in Clemson, South Carolina

_____

Scott D. Swain, Ph.D.

# Exhibit A

# Curriculum Vitae

32

# CURRICULUM VITAE

Scott D. Swain, Ph.D.

Clemson University
Wilbur O. and Ann Powers College of Business
326E Wilbur O. and Ann Powers Hall
225 Walter T. Cox Blvd.
Clemson, SC 29634-1325

## ACADEMIC APPOINTMENTS

*Clemson University*, Wilbur O. and Ann Powers College of Business

| | |
|---|---|
| Professor of Marketing | 2021-present |
| Powers Distinguished Fellow | 2021-present |
| Director, M.S. Marketing Program | 2023-2025 |
| Associate Professor of Marketing | 2016-2021 |
| Assistant Professor of Marketing | 2013-2016 |

*Massachusetts Institute of Technology*, Sloan School of Management

| | |
|---|---|
| Professor of Marketing (Visiting) | 2024 |

*Dartmouth College*, Tuck School of Business

| | |
|---|---|
| Professor of Marketing (Visiting) | 2022 |
| Associate Professor of Marketing (Visiting) | 2021 |

*Northeastern University*, D'Amore-McKim School of Business

| | |
|---|---|
| Assistant Professor of Marketing | 2009-2013 |

*Boston University*, Questrom School of Business

| | |
|---|---|
| Assistant Professor of Marketing | 2002-2008 |

*University of South Carolina*, Darla Moore School of Business

| | |
|---|---|
| Research Assistant, Instructor | 1998-2002 |

## EDITORIAL APPOINTMENTS

| | |
|---|---|
| Associate Editor, *Journal of Business Research* | 2021-present |
| Associate Editor, *European Journal of Marketing* | 2017-present |

## EDUCATION

| | | |
|---|---|---|
| Ph.D. | Marketing, *University of South Carolina* | 2002 |
| MBA | Finance, *University of South Carolina* | 1996 |
| B.S. | Electrical Engineering, *Clemson University* | 1991 |
| B.S. | Physics, *Francis Marion University* | 1991 |

RESEARCH

Peer reviewed research

Aczel, Balazs, Barnabas Szaszi, Harry T. Clelland, Marton Kovacs, ...Scott D. Swain, ...Brian A. Nosek (forthcoming), "Investigating the Analytical Robustness of the Social and Behavioural Sciences," *Nature*.

Brodeur, Abel et al. (2025), "Comparing Human-Only, AI-Assisted, and AI-Led Teams on Assessing Research Reproducibility in Quantitative Social Science," I4R Discussion Paper Series, No. 195, *Institute for Replication* (I4R).

Sonnenberg, Christian, B. Andrew Cudmore, and Scott D. Swain (2025) "An Approach for Dynamic Testing of Augmented Reality in Retail Contexts," *International Journal of Technology Marketing*, 19 (2), 243-268.

Weathers, Danny and Scott D. Swain (2024), "A Scaffolded Learning Approach to Increasing Student Comfort with Microsoft Excel," *Journal of Marketing Analytics,* 12 (2), 198-208.

Mullins, Ryan, Scott D. Swain, and Scott B. Friend (2023), "How and Should Firms Motivate Salesperson Effort Across a Multi-Brand Portfolio?," *Journal of Business Research*, 158 (March), 113677.

Swain, Scott D. (2023), "Unhelpful and Unaware of It: A Dyadic Analysis of Online Product Reviews," *Journal of Management and Engineering Integration*, 16 (1), 48-56.

Swain, Scott D. (2022), "An Exploratory Study of The Effect of In-Store Recommendation Technology on Wine Shoppers' Search Behaviors," *International Journal of Business Research*, 22 (2), 124-137.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2018), "Property Lines in the Mind: Consumers' Perceptions of Infringement and Their Territorial Responses," *Journal of Consumer Research*, 45 (1), 148-168.

Swain, Scott D. and B. Andrew Cudmore (2018), "The Human Hand and Technology Adoption," *Journal of Management and Engineering Integration*, 11 (1), 46-53.

Swain, Scott D. and Colleen Kirk (2018), "Consumer Psychological Ownership of Digital Technologies," in *Psychological Ownership and Consumer Behavior*, eds. Joann Peck and Suzanne Shu, New York: Springer, 69-90.

Carlson, Jay P., Danny Weathers, and Scott D. Swain (2016), "Consumer Responses to Bonus Pack and Product Enlargement Claims," *Journal of Marketing Theory and Practice*, 24 (1), 59-71.

Hanna, Richard C., Scott D. Swain, and Paul D. Berger (2016), "Optimizing Time-Limited Price Promotions," *Journal of Marketing Analytics*, 4 (2), 77-92.

Swain, Scott D. and B. Andrew Cudmore (2016), "How Players Respond to Monetary Incentives in Online Poker Promotions," *Journal of Management and Engineering Integration*, 9 (1), 93-100.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2016), "CSR and the Frontline Context: How Social Programs Improve Customer Service," *GfK Marketing Intelligence Review*, 8 (1), 24-29.

Hanna, Richard C., Scott D. Swain, and Jason Smith (2016), *Email Marketing in a Digital World: The Basics and Beyond*, Business Expert Press, New York, NY.

Kirk, Colleen, Bernard McSherry, and Scott D. Swain (2015), "Investing the Self: The Effect of Nonconscious Goals on Investor Psychological Ownership," *Journal of Behavioral and Experimental Economics*, 58 (October), 186-194.  Winner, *Bright Idea Award* (best journal

34

article in business in 2015), awarded by Seton Hall and the NJ Policy Research Organization Foundation.

Weathers, Danny, Scott D. Swain, and Varun Grover (2015), "Can Online Product Reviews be More Helpful? Examining Characteristics of Information Content by Product Type," *Decision Support Systems*, 79 (November), 12-23.

Kirk, Colleen, Scott D. Swain, and James E. Gaskin (2015), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," *Journal of Marketing Theory and Practice*, 23 (2), 166-184.

Weathers, Danny, Scott D. Swain, and Igor Makienko (2015), "When and How Should Retailers Rationalize the Size and Duration of Price Discounts?," *Journal of Business Research*, 68 (12), 2610-2618.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2014), "Corporate Social Responsibility, Customer Orientation, and the Job Performance of Frontline Employees," *Journal of Marketing*, 78 (3), 20-37.

Swain, Scott D., Paul D. Berger, and Bruce D. Weinberg (2014), "The Customer Equity Implications of Using Incentives in Acquisition Channels: A Nonprofit Application," *Journal of Marketing Analytics*, 2 (1), 1-17.

Swain, Scott D., B. Andrew Cudmore, and Danny Weathers (2012), "Communicating Innovations in Product Safety: When Labels Signal Greater Manufacturer Responsibility," *Journal of Management and Engineering Integration*, 5 (Winter), 58-65.

Isaacson, Bruce, Jonathan D. Hibbard, and Scott D. Swain (2012), "Three Critical Questions to Evaluate Intellectual Property Surveys," *Intellectual Property Today*, September 12, 1-5. [authors contributed equally]

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2012), "Why Consumers Respond Differently to Absolute versus Percentage Descriptions of Quantities," *Marketing Letters*, 23 (4), 947-953.

Swain, Scott D. and B. Andrew Cudmore (2011), "Conditional Indirect Effects of Corporate Social Responsibility Cues on Purchase Intentions," *Journal of Management and Engineering Integration*, 4 (Winter), 92-100.

Kim, Stephen K., Jonathan D. Hibbard, and Scott D. Swain (2011), "Commitment in Marketing Channels: Mitigator or Aggravator of the Effects of Destructive Acts?," *Journal of Retailing*, 87 (4), 521-539.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2011), "When and How Does Corporate Social Responsibility Encourage Customer Orientation?," European School of Management and Technology, *ESMT Technical Series* #11-05

Swain, Scott D. (2011), "Prize Indemnification," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. LA: Sage, 1187-1188.

Swain, Scott D. (2011), "Probability Sales Promotions," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. LA: Sage, 1190-1191.

Swain, Scott D. (2011), "Promotional Risk Management," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. LA: Sage, 1220-1221.

Onyemah, Vincent, Scott D. Swain, and Richard C. Hanna (2010), "A Social Learning Perspective on Sales Technology Adoption and Sales Performance: Preliminary Evidence

from an Emerging Economy," *Journal of Personal Selling & Sales Management*, 30 (2), 131-142.

Berger, Paul D., Richard C. Hanna, Scott D. Swain, and Bruce D. Weinberg (2010), "Configurators/Choiceboards: Uses, Benefits, and Analysis of Data," in *Encyclopedia of E-Business Development and Management in the Global Economy*, In Lee, ed. IGI Publishing, 428-435.

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2008), "Assessing Three Sources of Misresponse to Reversed Likert Items," *Journal of Marketing Research*, 45 (February), 116-131.

Niedrich, Ronald W. and Scott D. Swain (2008) "The Effects of Exposure-Order and Market Entry-Information on Brand Preference: A Dual Process Model," *Journal of the Academy of Marketing Science*, 36 (September), 309-321.

Isaacson, Bruce, Jonathan D. Hibbard, and Scott D. Swain (2008), "Why Online Surveys Can Be a Smart Choice in Intellectual Property Cases," American Bar Association, *Intellectual Property Law Newsletter*, 26 (Spring), 1-15. [authors contributed equally]

Swain, Scott D., Tim Silk, and Laura Smarandescu (2007), "Playing the Cards: The Impact of Monetary Format on Consumer Spending," *Builders and Leaders*, Spring, 22-28.

Berger, Paul D., Richard C. Hanna, Scott D. Swain, and Bruce D. Weinberg (2007), "The Great Potential Benefits of Vertical Cooperative Advertising," *Advertising Express*, 7 (February), 7-11. [cover article].

Dong, Weimin, Scott D. Swain, and Paul D. Berger (2007), "The Role of Channel Quality in Optimal Allocation of Acquisition and Retention Spending," *Journal of Business Research*, 60 (December), 1243-1252.

Niedrich, Ronald W. and Scott D. Swain (2007), "The Effects of Exposure-Order and Market Entry-Information on Brand Preference: A Dual Process Model," *Boston University, SMG Technical Series* #2007-16.

Swain, Scott D. and Weimin Dong (2007), "Incorporating Managerial Judgment in an Extended Model of Customer Equity," Boston University, SMG Technical Series #2007-13.

Swain, Scott D., Weimin Dong, and Paul D. Berger (2006), "The Role of Channel Quality in Optimal Allocation of Acquisition and Retention Spending," *Boston University, SMG Technical Series* #2006-11.

Berger, Paul D., Richard C. Hanna, and Scott D. Swain (2007), "Collaborative Filtering: Advertising Efficiency," in *Media and Advertising Management - New Trends*, Sabyasachi Chatterjeem, ed. Hyderabad: ICFAI University Press, 105-111.

Brunel, Frédéric F. and Scott D. Swain (2006), "A Two-Route Model of Product Aesthetic Evaluation," *Boston University, SMG Technical Series* #2006-09.

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2006), "Misresponse to Reversed Likert Items: Acquiescence, Inattention, or Item Difficulty?," *Boston University, SMG Technical Series* #2006-12.

Berger, Paul D., Richard C. Hanna, and Scott D. Swain (2006), "Collaborative Filtering: The Potential to Increase Advertising Efficiency," *Advertising Express*, 6 (May), 11-14.

Swain, Scott D., Richard C. Hanna, and Lisa J. Abendroth (2004), "Buying Time: The Consumer Psychology of Time Limits," *Builders and Leaders*, Fall, 26-27.

Niedrich, Ronald W. and Scott D. Swain (2003) "The Influence of Pioneer Status and Experience Order on Consumer Brand Preference: A Mediated-Effects Model," *Journal of the Academy of Marketing Science*, 31 (Fall), 468-480.

Conference and symposia publications and presentations

Swain, Scott D. and Billy Mastrone (2026), "Pandora's Panel: Synthetic Respondents and the Illusion of Measurement," *32nd International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, Association for Industry, Engineering, and Management Systems, scheduled for April 6.

Danny Weathers and Scott D. Swain (2026), "Suspicious Minds: Predicting Replicability from Published Study Features," *32nd International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, Association for Industry, Engineering, and Management Systems, scheduled for April 6.

Mullins, Ryan and Scott D. Swain (2025), "Sales Compensation Shrouding: The Impact of Pay Outcome Communication on New Hire Pay Preferences," *Thought Leadership on the Sales Profession Conference*, UCLA, Los Angeles, CA, June 18.

Voltaire, Peter, B. Andrew Cudmore, and Scott D. Swain (2025), "Online Shopping Cart Abandonment: Retargeting and Conversion Methods," *31st International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, Association for Industry, Engineering, and Management Systems, April 7.

Woodbine, Kyle, B. Andrew Cudmore, Christian Sonnenberg, and Scott D. Swain (2025), "Artificial Intelligence Usage and Effects on Critical Thinking in Higher Education," *31st International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, Association for Industry, Engineering, and Management Systems, April 7.

Patel, Maitri, B. Andrew Cudmore, and Scott D. Swain (2025), "Digital Detox and Nature Immersion as Drivers of Consumer Well-Being and Brand Loyalty in Hospitality Settings," *31st International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, Association for Industry, Engineering, and Management Systems, April 7.

Swain, Scott D. and Danny Weathers (2025), "Automation Technology and Consumer Perceptions of Animal Welfare: A Longitudinal Analysis," Academy of Business Research Conference, New Orleans, LA, Academy of Business Research, 117, March 21.

Krishnaraju, Vidhya, Manish Kacker, Scott D. Swain and Jonathan D. Hibbard (2024), "What Drives the Nature and Magnitude of Negative B2B Relationship Outcomes in the Aftermath of Strategic Actions by Firms?," *13th Annual Conference*, Emerging Markets Conference Board, Noida, Uttar Pradesh, India, December 18.

Mullins, Ryan and Scott D. Swain (2024), "Compensation Shrouding: What's Hiding in Your Comp Plan?," Sales Comp '24, *WorldatWork*, San Francisco, CA, August 19.

Nath, Pravin, Scott D. Swain, Danny Weathers, Michael Giebelhausen, Eric Hair, Austin Minkowksi, Matt Gorstein, Graham Gaines (2024), "Producer and Consumer Preferences for Direct Marketing of Seafood Products in South Carolina," *S.C. Sea Grant Consortium Research Symposium*, Conway, SC, May 16.

Mullins, Ryan and Scott D. Swain (2024), "Compensation Shrouding: What's Hiding in Your Compensation Plan," *Sales Force Productivity Conference*, Emory University, Goizueta Business School, Atlanta, GA, March 12.

Swain, Scott D., Ananya Bakre, and B. Andrew Cudmore (2024), *"Product Durability as a Sustainability Alibi for Luxury Purchases," 30th International Conference on Industry, Engineering, and Management Systems*, Disney Springs Area, FL, Association for Industry, Engineering, and Management Systems, March 5.

Cudmore, B. Andrew and Scott D. Swain (2024), "How Movie Trailer Length and Plot Revelation Impact Consumer Anticipation: The Mediating Roles of Arousal and Pleasure," *30th International Conference on Industry, Engineering, and Management Systems*, Disney Springs Area, FL, Association for Industry, Engineering, and Management Systems, March 5.

Cudmore, B. Andrew, Scott D. Swain, and Stephan Dansky (2024), *"Process or Purity? The Impact of Analogous Reasoning on Consumers' Choices among Foods Labeled as NonGMO, Organic, and Natural,"* 30th International Conference on Industry, Engineering, and Management Systems*, Disney Springs Area, FL, Association for Industry, Engineering, and Management Systems, March 5.

Weathers, Danny, Scott D. Swain, and Kate Barger (2023), "Understanding Consumer Perceptions of Animal Welfare," Annual Meeting, *American Association of Avian Pathologists* (AAAP), Jacksonville, FL, June 11.

Swain, Scott D., Christian Sonnenberg, and B. Andrew Cudmore (2023), "A Scalable Framework for Dynamic Interface Testing of Augmented Reality in Retail Contexts," *8th Annual Research Symposium*, Clemson University, May 10.

Swain, Scott D. and B. Andrew Cudmore (2023), "Higher Levels of Compensation Induce Consumer Guilt When Firms are Close but Future Transactions are Distant," *8th Annual Research Symposium*, Clemson University, May 10.

Swain, Scott D. (2023), "An Exploratory Study of the Effect of In-store Recommendation Technology on Shoppers' Search Behaviors," *Proceedings of the International Academy of Business and Economics Conference*, Orlando, FL, International Academy of Business and Economics, 23 (1), 48, March 18.

Swain, Scott D. and B. Andrew Cudmore (2023), "Service Recovery: When Playing It Safe is a Dangerous Strategy," *29th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL, Association for Industry, Engineering, and Management Systems, March 5-7.

Swain, Scott D. and B. Andrew Cudmore (2023), "When Reviewers Overestimate the Helpfulness of their Reviews" *29th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL, Association for Industry, Engineering, and Management Systems, March 5-7.

Mullins, Ryan, Scott D. Swain, and Scott B. Friend (2023), "Unraveling the Complexities of Salesperson Brand Identifications and Motivations within a Solution Selling Portfolio," *Proceedings of the American Marketing Association Winter Educators' Conference*, eds. Monika Lisjak and Nita Umashankar, Nashville, TN: American Marketing Association, February 10, 2023, C94-C95.

Swain, Scott D. and B. Andrew Cudmore (2023), "Higher Levels of Compensation Induce Consumer Guilt When Firms are Close but Future Transactions are Distant," *Proceedings of the American Marketing Association Winter Educators' Conference*, eds. Monika Lisjak and Nita Umashankar, Nashville, TN: American Marketing Association, February 10, 410-416.

Nath, Pravin, Scott D. Swain, Danny Weathers, Michael Giebelhausen, Eric Hair, Austin Minkowksi, Matt Gorstein, Graham Gaines (2022), "Addressing Supply Chain Vulnerabilities for South Carolina's Mariculture Industry: An Assessment of Preferences for Direct-to-Consumer Marketing of Shellfish Using Conjoint Analysis," *8th Annual Research Symposium*, Clemson University, Clemson, SC, May 6.

Swain, Scott D. and B. Andrew Cudmore (2022), "The Risks of Overcompensation in Service Recovery Strategies," *28th International Conference on Industry, Engineering, and*

*Management Systems*, Clearwater Beach, FL, Association for Industry, Engineering, and Management Systems, March 13-15.

Swain, Scott D. and Danny Weathers (2022), "The Impact of Automation Technology on Consumers' Animal Welfare Perceptions," *28th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL, Association for Industry, Engineering, and Management Systems, March 13-15.

Swain, Scott D. and Danny Weathers (2021), "Spatial Expressions and Consumer Perceptions of Quantity," *27th Association of Marketing Theory and Practice Proceedings*, Virtual: Association for Marketing Theory and Practice, March 18-20.

Swain, Scott D. and Danny Weathers (2021), "Re-envisioning a Masters of Science in Marketing Degree," *27th Association of Marketing Theory and Practice Proceedings*, Clearwater Beach, FL: Association for Marketing Theory and Practice, March 18-20.

Swain, Scott D. (2021), "Consumer Responses to Serendipity Narratives," *27th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 15-17.

Swain, Scott D. and Danny Weathers (2021), "Reframing Extreme Magnitudes," *27th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 15-17.

Swain, Scott D., Oswald Harris King, IV, Ally Ault, Lucas Ball, Jack Enright, and Aleksandra K. Shtompil (2020), "Measuring the Perceived Intensity of Rivalries," *26th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 15-18.

Korschun, Daniel, Hoori Rafieian, Anubhav Aggarwal, and Scott D. Swain (2019). "Taking a Stand: Consumer Responses When Companies Get (Or Don't Get) Political," *Proceedings of the 41st ISMS Marketing Science Conference* (*INFORMS*), eds. Tülin Erdem, Russ Winer, Alberto Pezzi, and Luca Petruzzellis, University of Roma Tre, Rome, Italy: Institute for Operations Research and the Management Sciences (ISBM), June 20-22.

Swain, Scott D., Oswald Harris King IV, Lucas Ball, Bailey Bottini, Tanner Dieterich, Connor Enright, Olivia Pescatore, James Ruddy, Brad Uscilla, Bailey Whetter, and Cameron Zavaski (2019), "Rivalries as Relational Schemas," *Focus on Creative Inquiry*, Clemson University, April 1-2.

Swain, Scott D. (2019), "Misresponse and its Consequences," *25th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Swain, Scott D. and Matthew Kosniewski (2019), "Consumer Responses to Companies' Political Stances," *25th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Cudmore, B. Andrew and Scott D. Swain (2019), "The Influence of CSR-focus and CSR-innovativeness on Perceived Brand Image of Innovative Firms," *25th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Swain, Scott D., Richard C. Hanna, and B. Andrew Cudmore (2018), "Managing Digital Promotions to Account for the Dual Effects of Time Limits on Customer Response," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Cudmore, B. Andrew, Scott D. Swain, Alexei Rakowitsch, and Titas Vainauskas (2018), "The Influence of Coach Gender and Athletic Skill on the Athlete Attitude and Motivation," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Cudmore, B. Andrew, Scott D. Swain, and Samantha Porter (2018), "The Role of Length and Ambiguity of Movie Trailers on Customer Attitudes and Intentions to Attend the Movie," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2017), "When and How Consumers Defend Their Psychological Possessions," in *Advances in Consumer Research*, Vol. 45, eds. Ayelet Gneezy, Vlad Griskevicius, and Patti Williams, San Diego, CA: Association for Consumer Research, October 26-29.

Swain, Scott D., Richard C. Hanna, and B. Andrew Cudmore (2017), "Using Clickstream Analysis to Examine In-store Technology Appropriation Among Wine Shoppers," *23rd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Swain, Scott D. and Richard C. Hanna (2017), "Optimal Time Limits for Online Promotions: Balancing Customer Awareness and Urgency" *Proceedings of the American Marketing Association Winter Educator's Conference*, eds. Chandy, Rajesh, Jeffrey Inman, and Christine Moorman, Orlando, FL: American Marketing Association, February 17-19.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "When is an Incursion an Infringement? Consumers' Contingent Territorial Responses for Psychologically Owned Targets," *Workshop on The Future of Ownership Research*, eds. Bernadette Kamleitner, Monika Koller, Joann Peck, and Stephan Dickert, WU Vienna University of Economics and Business, 98-102, July 7-8.

Cudmore, B. Andrew, Jim Sparks, Scott D. Swain, and Enrique Perez (2017), "The Influence of a Firm's CSR Innovativeness and CSR Focus on Customer Attitudes," *23rd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "Property Lines in the Mind: Consumers' Perceptions of Infringement and their Territorial Responses," *SCP-JACS Collaborative Conference*, eds. Akira Shimizu, Kaichi Saito, Satoko Suzuki, and Jeffrey Inman, Society for Consumer Psychology and Japan Association for Consumer Studies, Tokyo, Japan. May 18-19.

Cudmore, B. Andrew, Jim Sparks, and Scott D. Swain (2017), "The Moderating Role of CSR Focus on Consumer Responses to the CSR Initiatives of Low and High Ability Firms," *23rd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "Consumers' Emotional and Territorial Responses to Perceived Infringements of Psychologically Owned Targets," *SCP Boutique Conference on Motivation, Emotion, and How They Interact*, eds. Juliano Laran, Oscar Moreno, Keith Wilcox, New York, NY: Society for Consumer Psychology, June 7-8.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2017), "Hey, That's Mine! The Effect of Others' Psychological Ownership Signals on Consumers' Territorial Responses," in *Proceedings of the Society for Consumer Psychology*, eds. Katherine White and On Amir, San Francisco, CA: Society for Consumer Psychology, Feb 16-18.

Swain, Scott D., B. Andrew Cudmore, and Jonathan D. Hibbard (2016), "Impact of Mixed Retail Experiences on Consumer Impressions of Salespersons," *22nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Kirk, Colleen and Scott D. Swain (2016), "The Value in Lurking: The Effect of a Mere Communication Opportunity on Consumers' Psychological Ownership and Valuation of Digital Content," *Proceedings of the American Marketing Association Winter Educators' Conference*, eds. Charles F. Hofacker and Thorsten Hennig-Thurau, Las Vegas, NV: American Marketing Association, C94-C95, February 26-28. Winner, AMA Best Paper in Consumer Behavior Track

Hibbard, Jonathan D., Scott D. Swain, and Richard C. Hanna (2016), "Impact of Cross-Functional Team Projects on Student Performance in Functional Courses," *Marketing Management Association Fall Educator's Conference Proceedings*, eds. Lisa Lindgren and Brent Smith, Providence, RI: Marketing Management Association, 120-121, September 14-16.

Swain, Scott D. and B. Andrew Cudmore (2016), "The Challenges of Being Different at Making a Difference," *22nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Noyes, Jamie, Colleen P. Kirk, Joann Peck, Scott D. Swain, and Yasmine Kalkstein (2016), "Yours, Mine, or Ours? The Effect of Psychological Ownership Signals on Consumers' Territorial Responses," *70th Annual Eastern Colleges Science Conference* (ECSC), Springfield, MA, No. 54, April 2.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2016), "You Stepped on My Toes: When Does Psychological Ownership Lead to Territorial Responses?," in *Advances in Consumer Research*, Vol. 44, eds. Page Moreau and Stefano Puntoni, Berlin, Germany: Association for Consumer Research, 743-743, October 27-30.

Cudmore, B. Andrew, Scott D. Swain, and Chris Sonnenberg (2016), "Online Poker: Motivations for Online versus Casino Poker Gambling," *22nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Noyes, Jamie, Colleen P. Kirk, Joann Peck, Scott D. Swain, and Yasmine Kalkstein (2016), "Hands Off, It's Mine! Psychological Ownership Signals and Consumers' Retaliatory Behaviors," *Proceedings of the 43rd Annual Northeast Business and Economics Association Conference*, ed. Ramon Vasconcellos, West Point, NY: Northeast Business and Economics Association, November 10-12.

Colleen P. Kirk, Scott D. Swain, and Joann Peck (2016), "When Good Fences Make Good Customers: Consumer Responses to Psychological Ownership Signals," *Proceedings of the 43rd Annual Northeast Business and Economics Association Conference*, ed. Ramon Vasconcellos, West Point, NY: Northeast Business and Economics Association, November 10-12.

Swain, Scott D., Daniel Korschun, and C.B. Bhattacharya (2015), "When and How Organizational Identification Mediates the Effect of Corporate Social Responsibility on Customer Orientation," in *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Tom Brown and Vanitha Swaminathan, San Antonio, TX: American Marketing Association.

Hanna, Richard C., Gary Ottley, Scott D. Swain, and Daniel Qualls (2015), "There's an App for That! An Exploratory Study of How Consumers Search for Wine with the Assistance of Technology," *Bi-Annual Wine Marketing Conference: Innovations and Best Practices*, Vittoriale Degli Italiani, 2015.

Bennett, Delancy and Scott D. Swain (2015), "Sports Immersion Tour: Scoring Big Outside the Classroom," *American Marketing Association's Winter Educators' Conference*, eds. Tom Brown and Vanitha Swaminathan, San Antonio, TX: American Marketing Association.

Swain, Scott D., B. Andrew Cudmore, and Danny Weathers (2015), "Unhelpful and Unaware of It: A Dyadic Analysis of Online Consumer Reviews," *21st International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Swain, Scott D. and Colleen P. Kirk (2015), "Getting Owned: Systematic and Situational Influences on Consumer Responses to Digital Content," in *Proceedings of the 42nd Annual Northeast Business and Economics Association Conference*, ed. Kang Bok Lee, Jamaica, NY: Northeast Business and Economics Association, 152-155.

Mullins, Ryan and Scott D. Swain (2015), "Brand Identity Multiplicity: How Merging Companies Overlook Competing Brand Identities and Hamper Cross-Selling Success," *5th Biennial Enhancing Sales Force Productivity Conference*, Georgia Tech, Scheller College of Business, eds. Goutam Challagalla, Brian Murtha, and Jeff Boichuk.

Swain, Scott D., Colleen P. Kirk, and James E. Gaskin (2014), "Putting the Fun in Functionality: Appropriation, Ownership, and Pride," in *Advances in Consumer Research*, Vol. 42, eds. June Cotte and Stacy Wood, Baltimore, MD: Association for Consumer Research, 791-791.

Kirk, Colleen P., Bernard McSherry, and Scott D. Swain (2014), "Resistance is Frugal: When Ignoring Nonconscious Goals Affect Psychological Ownership of Investment Decision," in *Advances in Consumer Research*, Vol. 42, eds. June Cotte and Stacy Wood, Baltimore, MD: Association for Consumer Research, 791-791.

Borden, Joseph, Colleen P. Kirk, and Scott D. Swain (2014), "I Just Want to Talk: When Website Interactivity Enhances Donor Psychological Ownership in Not-for-profit Organizations," in *Proceedings of the 41st Annual Northeast Business and Economics Association Conference*, ed. Della Lee Sue, West Long Branch, NJ: Northeast Business and Economics Association, 41-43.

Kirk, Colleen P., Scott D. Swain, James E. Gaskin (2014), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," in *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Michael W. Obal, Nina Krey, and Christian Bushardt, Indianapolis, IN: Academy of Marketing Science, 643-645.

Kirk, Colleen P. and Scott D. Swain (2014), "Not Now, I'm Busy: When Interactivity Undermines Psychological Ownership and Product Valuation," in special session titled "Psychological Ownership: A Concept of Value to the Marketing Field," (Marko Sarstedt and Colleen P. Kirk, co-chairs), *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Brad Carlson and Todd Donavan, Indianapolis, IN: Academy of Marketing Science, 219-224.

Kirk, Colleen P., Scott D. Swain, and Richard C. Hanna (2014), "Owning the Intangible: The Roles of Motivational Orientation and Two-Way Communication on Psychological Ownership and Willingness to Pay in New Media," *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Gary Hunter and Tom Steenburgh,

Orlando, FL: American Marketing Association, C5-C6.

Korschun, Daniel, Bhattacharya, C.B., and Scott D. Swain (2013), "Corporate Social Responsibility and the Customer Orientation of Frontline Employees," Proceedings of the *International Marketing Conference* (MARCON), eds. Organizing committee, Calcutta, India: Indian Institute of Management, Calcutta, Winner, Best Paper in Conference.

Kirk, Colleen P. and Scott D. Swain (2013), "Interactivity and Psychological Ownership in Consumer Value-Co-Creation," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Leyland Pitt and Constantine Katsikeas, Monterrey, CA: Academy of Marketing Science.

Hanna, Richard C. and Scott D. Swain (2013), "Social Media Game Design: Unintended Effects on Consumer Choice" *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Leyland Pitt and Constantine Katsikeas, Monterrey, CA: Academy of Marketing Science, 286.

Kirk, Colleen P. and Scott D. Swain (2013), "Touching the Intangible: Perceptions of Interactivity and Ownership in New Media," *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. James Burroughs and Aric Rindfleisch, Las Vegas, NV: American Marketing Association, 464-465.

Kirk, Colleen P. and Scott D. Swain (2013), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," *Vienna University of Economics and Business Workshop on Ownership and Decision Making*, Vienna, Austria.

Kirk, Colleen P. and Scott D. Swain (2012), "Empowering Digital Information Consumers: The Effects of Self-Efficacy, Optimum Stimulation Level, and Perceived Interactivity on Value in Use," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Barry J. Babin, Adilson Borges, and Eli Jones, New Orleans, LA: Academy of Marketing Science, 250-253.

Swain, Scott D., B. Andrew Cudmore, J. Daniel Wadden (2012), "When Companies Make Customers Feel Guilty," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Bhattacharya, C.B., Daniel Korschun, and Scott D. Swain (2012), "Corporate Responsibility Through the Stakeholder's Looking Glass," *Stakeholder Theory Conference*, Darden School of Business, University of Virginia, Olsson Center for Applied Ethics, Charlottesville, VA, 2012.

Cudmore, B. Andrew, Scott D. Swain, Jared Maynard, Semy Makonnen, and Michelle Condjella (2012), "Corporate Social Responsibility: A Package Safety Labeling Context," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2012), "Comparing Consumer Reactions to Percentage and Absolute Values: An Analogue Magnitude Encoding Perspective," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Barry J. Babin, Adilson Borges, and Eli Jones, New Orleans, LA: Academy of Marketing Science, 350-353.

Cudmore, B. Andrew, Anthony T. Fischetti, and Scott D. Swain (2012), "Evaluation of a Systematic Manipulation of Cigarette Warning Labels on Consumer Attitudes toward Smoking," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Dean, Christopher, Jasmine Tucker, B. Andrew Cudmore, and Scott D. Swain (2011),

"Corporate Image Benefits: The Role of Fair Trade and Charitable Donations in a Coffee Context," *17th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Swain, Scott D. (2011), "Investing in Methodology to Advance Theory," in a special session titled, "The Challenges and Rewards of Growing Theory as Junior Faculty" (S. Adam Brasel, chair), *Academy of Marketing Science Annual Conference,* ed. Mary Conway, Coral Gables, FL: Academy of Marketing Science.

Fombelle, Paul and Scott D. Swain (2011), "The VIP Phenomenon: The Role of Social Comparison in Status-Oriented Experiences," *Northeastern University Research & Scholarship Expo*, Boston, MA.

Hanna, Richard C., Scott D. Swain, and Jonathan D. Hibbard (2011), "Consumer Responses to Promotional Games in Social Media," *Academy of Marketing Science World Marketing Congress*, eds. Barry J. Babin and Adilson Borges, Reims, France: Academy of Marketing Science, 814.

Williams, Matthew L., Donald P. Wilson, B. Andrew Cudmore, Tinatin Kiguradze, and Scott D. Swain (2011), "Telecommuting: Impacts of Work Environment and Salary on Employee Attitude and Motivation," *17th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Kim, Stephen K., Jonathan D. Hibbard, and Scott D. Swain (2010), "A Study of Dual Effects of Dealer Commitment under Relational Distress," *Academy of World Business Marketing and Management Development Conference*, Oulu, Finland: Academy of World Business Marketing and Management Development.

Swain, Scott D., B. Andrew Cudmore, and Jonathan D. Hibbard (2009), "Order Effects in Retail Service Encounters," *15th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering and Management Systems.

Isaacson, Bruce, Scott D. Swain, and Jonathan D. Hibbard (2009), "The Use of Online Surveys in Intellectual Property Litigation," *National Advertising Division Annual Conference*, New York, NY: National Advertising Division.

Swain, Scott D., Jonathan D. Hibbard, Richard C. Hanna (2009), "Trademark Infringement: When is Similarity Confusing to Consumers?" in *Academy of Marketing Science World Marketing Congress*, eds. Victoria L. Crittenden, Linda Ferrell, and Göran Svensson: Academy of Marketing Science, 333.

Swain, Scott D., Tim Silk, and Laura Smarandescu (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," *Proceedings of the INFORMS Marketing Science Conference*, eds. Chuck Weinberg, Darren Dahl, and Dan Putler, Vancouver, British Columbia, Canada: Institute for Operations Research and the Management Sciences, 83.

Papavasileiou, Eleni Zoi, Scott D. Swain, C.B. Bhattacharya (2008), "Consumers' Reactions to Acquisitions of Socially Responsible Companies," in *Marketing and Public Policy Conference Proceedings*, Vol. 18, eds. Ronald P. Hill, John C. Kozup, Charles R. Taylor, Philadelphia, PA: American Marketing Association.

Swain, Scott D., Laura Smarandescu, and Tim Silk (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," *72nd Annual Midwest Economics Association Conference*, Chicago, IL: Midwest Economics Association.

Swain, Scott D. and Richard C. Hanna (2008), "Emulating Research Firms in the Classroom: Research Practicum Days," in a special session titled, "Creating Value in Marketing Courses," (Richard C. Hanna, chair) in *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Steven P. Brown and Peter A. Dacin, Vancouver, British Columbia, Canada: Academy of Marketing Science, 341.

Swain, Scott D., Tim Silk, and Laura Smarandescu (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," in *Proceedings of the Society for Consumer Psychology*, eds. Maria Cronley and Dhananjay Nayakankuppam, New Orleans, LA: Society for Consumer Psychology, 130-133.

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2008), "An Examination of Concreteness and Whole Number Dominance Effects on the Evaluation of Percentage Shipping Charges," in *Proceedings of the Society for Consumer Psychology*, eds. Maria Cronley and Dhananjay Nayakankuppam, New Orleans, LA: Society for Consumer Psychology, 367-368.

Swain, Scott D. and B. Andrew Cudmore (2008), "Promotional Response as Swarm Intelligence," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., Jonathan D. Hibbard, Richard C. Hanna, and B. Andrew Cudmore (2008), "A Signal Detection Approach for Assessing Response Biases in Consumer Confusion," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Miller, Brandon, Jonas Dewitte, B. Andrew Cudmore, and Scott D. Swain (2008), "Student Athlete Attitude toward Performance Enhancing Drugs," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Arnould Diehl, B. Andrew Cudmore, and Scott D. Swain (2008), "The Perceived Importance of an Internationally Diverse and Engaged Student Population," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., Danny Weathers, and Jay P. Carlson (2008), "Whole Number Dominance in Price Evaluations," in a special session titled "Retail Pricing Strategy: Current Perspectives and Research," (Kathleen Seiders, chair), *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Tom J. Brown and Zeynep Gurhan Canli, Austin, TX: American Marketing Association.

Bhattacharya, C.B., Daniel Korschun, and Scott D. Swain (2008), "Using Corporate Social Responsibility to Create a Stakeholder Oriented Firm," *Stakeholder Marketing Consortium: Beyond the 4 Ps and the Customer*, *Aspen Institute and the Marketing Science Institute*, Boston, MA.

Swain, Scott D. and Danny Weathers (2008), "Survey Data Equivalence: Assessment and Implications," *Eli Lilly Global Market Research Conference*, Indianapolis, IN.

Isaacson, Bruce, Scott D. Swain, and Jonathan D. Hibbard (2008), "Integrating Research Techniques for Deeper Customer Insights: Blurring Boundaries between Research Methods," *American Marketing Association – Marketing Research Conference*, Boston, MA: American Marketing Association.

Papavasileiou, Eleni Zoi, Scott D. Swain, C.B. Bhattacharya (2008), "Consumers' Reactions to Acquisitions of Socially Responsible Companies," in *Advances in Consumer Research*, Vol.

35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research, 1015-1017.

Brunel, Frédéric F. and Scott D. Swain (2008) "A Moderated Perceptual Model of Product Aesthetic Evaluations," in special session titled "Consumer Response to Aesthetic Aspects of Product Design: 1-, 2-, and 3-Dimensional Perspectives" (Xiaoyan Deng and Wes Hutchinson, co-chairs) in *Advances in Consumer Research*, Vol. 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research, 142-145.

Brunel, Frédéric F. and Scott D. Swain (2008), "A Moderated Perceptual Model of Product Aesthetic Evaluations," in *European Advances in Consumer Research*, Vol. 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Milan, Italy: Association for Consumer Research, 444-445.

Swain, Scott D. and Weimin Dong (2007), "Maximizing Customer Equity when Acquisition and Retention Rate are Negatively Related," in *Marketing Advances in Pedagogy, Process, and Philosophy*, ed. Tom Baker, San Antonio, TX: Society for Marketing Advances, 77-78.

Swain, Scott D., Danny Weathers, and Jay P. Carlson (2007), "Partitioning Prices and Whole Number Dominance," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D. (2007), "Consumer Responses to Product Mass," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., J. Daniel Wadden, and B. Andrew Cudmore (2007), "Compensation and Consumer Guilt," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., Richard C. Hanna, S. Adam Brasel (2006), "Lost in Translation: Consumers' Difficulty in Estimating Expiration Time with Redemption Caps," in *Advances in Consumer Research*, Vol. 34, eds. Gavan Fitzsimons and Vicki Morwitz, Orlando, FL: Association for Consumer Research, 470-472.

Swain, Scott D., Richard C. Hanna, and Lisa J. Abendroth (2006), "How Time Restrictions Work: The Roles of Urgency, Anticipated Regret, and Deal Evaluations," in *Advances in Consumer Research*, Vol. 33, eds. Cornelia Pechmann and Linda Price, San Antonio, TX: Association for Consumer Research, 523-525.

Brunel, Frédéric F. and Scott D. Swain (2005), "The Role of Product Form in Products' Evoked Sets, Recognition, and Evaluation," in *Proceedings of the American Marketing Association's Summer Educators' Conference*, eds. Beth A. Walker and Mark B. Houston, San Francisco, CA: American Marketing Association.

Abendroth, Lisa J., Richard C. Hanna, and Scott D. Swain (2005), "Does the Past Matter? Emotional and Behavioral Responses to Missing Part of a Promotion," in *Proceedings of the Society for Consumer Psychology*, eds. Anne M. Brumbaugh and Geraldine R. Henderson, St. Pete Beach, FL: Society for Consumer Psychology, 30-31.

Hanna, Richard C., Scott D. Swain, and Lisa J. Abendroth (2004) "The Roles of Anticipated Regret and Urgency in Explaining How Discount Level and Time Restriction Affect Purchase Intentions," in *Proceedings of the American Marketing Association's Summer Educators' Conference*, ed. Kenneth L. Bernhardt, James S. Boles, and Pam Scholder Ellen, Boston, MA: American Marketing Association, 78-79.

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2003), "Effects of Negatively Worded Items on Scale Reliability and Factor Structure," in special session summary titled

46

"Measure for (Valid) Measure: Critical Issues in Developing and Validating Multi-Item, Multi-Dimensional Consumer Psychology Measures" (Frédéric F. Brunel and Cristel A. Russell, co-chairs), in *Proceedings of the Society for Consumer Psychology*, ed. Steven S. Posavac, New Orleans, LA: Society for Consumer Psychology, 143-144.

Becker-Olsen, Karen, B. Andrew Cudmore, and Scott D. Swain (2003), "When Nice Guys Finish First: The Role of Celebrity Endorser Character and Fit on Brand Evaluations," in special session summary titled "Fitting It All Together: A Look at The Fit Construct Across Brand Extension, Sponsorship and Endorsement," (Karen Becker-Olsen, chair) in *European Advances in Consumer Research*, Vol. 6, eds. Stephen Brown and Darach Turley, Dublin, Ireland: Association for Consumer Research, 347-349.

Swain, Scott D. (2003), "Weighing Your Options: The Effect of Product Weight on Preference", in special session summary titled "Weight and Height and Shape and Size: When Do Peripheral Cues Drive Evaluation and Consumption?," (Brian Wansink and Koert van Ittersum, co-chairs), in *Advances in Consumer Research*, Vol. 30, eds. Punam Anand Keller and Dennis W. Rook, Atlanta, GA: Association for Consumer Research, 363-365.

Swain, Scott D., B. Andrew Cudmore, and Karen Becker-Olsen (2003), "The Effect of Celebrities' Personal Lives on the Brands They Endorse," in *Advances in Consumer Research*, Vol. 30, eds. Punam Anand Keller and Dennis W. Rook, Atlanta, GA, Association for Consumer Research, 346-347.

Cudmore, B. Andrew, Scott D. Swain, and Karen Becker-Olsen (2002), "The Effect of Endorser Behavior on Brand Attitudes: The Moderating Role of Knowledge," in *Marketing Advances in Pedagogy, Process, and Philosophy*, ed. Beverly T. Venable, St. Pete Beach, FL: Society for Marketing Advances, 83-84.

Swain, Scott D. and B. Andrew Cudmore (2001), "When Bad is Good: The Resilience of Consumer Brand Evaluations to Negative Information about Their Celebrity Endorsers," in *Proceedings of the Academy of Business Disciplines*, eds. Eldon Little and Dave Strupeck, Ft. Meyers, FL: Academy of Business Disciplines.

Wood, Stacy L., Scott D. Swain, and J. Daniel Wadden (2001), "Consumer Perceptions of Product Parity in E-Commerce Markets," in *Advances in Consumer Research*, Vol. 28, ed. J. Meyers-Levy, Salt Lake City, UT: Association for Consumer Research, 394.

**SERVICE TO THE DISCIPLINE**

Associate Editor
*Journal of Business Research*, 2021-present, *European Journal of Marketing*, 2017-present

Guest Editor
*Sage Open*, 2021, 2024

Editorial Review Boards
*Marketing Management Journal*, 2026-present, *Journal of International Marketing, 2020-present*, *Journal of Business Research, 2016-present*, *Journal of Marketing Analytics, 2015-present*, *International Journal of Business Research, 2017-present*, *Journal of Management and Engineering Integration, 2016-present, Journal of International & Interdisciplinary Business Research, 2016-present*, *Academy of Marketing Studies Journal*, 2017-present

Ad hoc Reviewer: Journals

47

*Journal of Marketing*, *Journal of Marketing Research*, *Journal of Consumer Research*, *Journal of the Academy of Marketing Science*, *Journal of Retailing*, *Journal of International Marketing*, *Journal of Service Research*, *Journal of Business Research*, *Marketing Letters*, *Psychology & Marketing*, *Journal of Public Policy & Marketing*, *Industrial Marketing Management*, *Journal of Interactive Marketing*, *Journal of Marketing Management*, *Journal of Marketing Analytics*, *Journal of Marketing Theory and Practice*, *Journal of Marketing Communications*, *Journal of Environmental Psychology*, *Journal of Retailing and Consumer Services*, *Academy of Marketing Science Review*, *Journal of Research in Interactive Marketing*, *Strategic Management Journal*, *Psychological Reports*, *Journal of Marketing Education*, *Frontiers in Communication*, *Eurasian Business Review*, *Ethics & Behavior*, *Sage Open*, *Operations Research*, *Journal of Health Organization and Management*, *Asian Journal of Business Ethics*, *Substance Use and Misuse*, *Environment, Development and Sustainability*, *Total Quality Management & Business Excellence*, *Business Horizons*, *Social Behavior and Personality*, *PLoS ONE*, *Asian Academy of Management Journal*, *Journal of Management & Engineering Integration*, *International Journal of Human Resource Management*, *Journal of International & Interdisciplinary Business Research*, *International Journal of Management Science and Engineering Management*

Ad hoc Reviewer: Conferences
*American Marketing Association*, *Association for Consumer Research*, *Academy of Marketing Science*, *Marketing Management Association*, *MIT World Conference on Mass Customization & Personalization*, *Society for Consumer Psychology*, *Society for Marketing Advances*, *Marketing and Public Policy*

External Reviewer for Tenure/Promotion
Full Professor (promotion), 2015, 2021 (3), 2024, 2025
Associate Professor (tenure and promotion), 2009, 2018 (2), 2023

Judge for Research Competitions and Awards
Clemson Student Research Forum (CSRF), 2018-2019, 2022-2025
Focus on Creative Inquiry (FoCI) Poster Forum, 2015-2025
Three Minute Thesis (3MT) Competition, 2014-2018, 2023
Summer CI + UR Showcase Poster Symposium, 2022-2023
Journal of International Marketing, S. Tamer Cavusgil Award, 2022
Fulbright U.S. Student Program, 2020-2021
Rutland Institute for Ethics, Case Competition, 2019-2020
Graduate Research and Discovery Symposium (GRADS) competition, 2015-2018
Society for Marketing Advances, Doctoral Dissertation Competition, 2017
D'Amore-McKim College of Business case competition, 2010-2013

Conference Chair, Session Chair, Invited Panels
Track Chair, "Marketing," *International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, 2019-2026
Track Chair, "AI, Big Data, and Marketing Analytics," *Academy of Marketing Science*, Annual Conference, Coral Gables, FL, 2024

48

Panelist, "Academia or Industry," Strom Thurmond Institute, Graduate Student Government Research Initiatives, Clemson University, November 9, 2023

Session Chair, "Invoking Ownership," *Workshop on The Future of Ownership Research*, Vienna University of Economics and Business, Vienna, Austria, 2017

Session Chair and Discussant, "Consumer Responses to Autonomous Vehicles," *BMW PhD Scholars* event, Clemson University, Clemson, SC, 2017

Discussant, "The Known and Unknown," *Workshop on The Future of Ownership Research*, Vienna University of Economics and Business, Vienna, Austria, 2017

Discussant, "Closing Forum," *Workshop on The Future of Ownership Research*, Vienna University of Economics and Business, Vienna, Austria, 2017

Panelist, "Teaching and Learning Creatively: Pedagogical Innovations to Stimulate Intellectual Curiosity," *American Marketing Association Winter Marketing Educators' Conference*, San Antonio, TX, 2015

Panelist, "The Challenges and Rewards of Growing Theory as Junior Faculty," *Academy of Marketing Science*, Coral Gables, FL, 2011

Session Chair, "Corporate Social Responsibility and Consumer Reactions," *American Marketing Association Winter Marketing Educators' Conference,* San Antonio, TX, 2011

Chair, *Boston Area Corporate Social Responsibility Colloquium*, Northeastern University, Boston, MA, 2011

Panelist, *Corporate Social Responsibility Colloquium*, Simmons College, Boston, MA, 2010

Panelist, "Doctoral Student Development," *Society for Consumer Psychology*, New Orleans, LA, 2008

Discussant, "Pricing and Price Discounts" *American Marketing Association Summer Marketing Educators' Conference*, Boston, MA, 2004

Panelist, "Doctoral Roundtable: Trends in Service Research," *American Marketing Association Summer Marketing Educators' Conference*, Boston, MA, 2004

Speaker, "Ethics in Marketing Research," *Research Colloquium*, Boston University, Boston, MA, 2002

Administrative Positions

Academic Board of Advisors, *Marketing Research Association* (MRA), 2013-2015

Fellow, *Direct Selling Education Foundation (DSEF)*, 2018-present

Panelist, Drexel University, *Expert Poll on Corporate Political Activism*, 2017-2020

Faculty Board of Advisors, *AMA Doctoral Special Interest Group* (DocSIG) 2002-2009

Secretary, *AMA Doctoral Special Interest Group* (DocSIG) 2000-2002

Owner/moderator, *MRKT-PHD listserv*, 1500+ subscribed, 60+ countries, 1999-2008

## UNIVERSITY, COLLEGE, AND DEPARTMENT SERVICE

Clemson University (2013-present)

*University*

Intellectually Property Committee, 2025-present

Graduate Academic Grievance Committee, 2023-present

Academic Technology Council, 2022-present

Artificial Intelligence Research Institute for Science and Engineering (AIRISE), 2020-present

Clemson Corps, Board of Directors 2018-2025

Bookstore Advisory Committee, 2021-2023
Council on Graduate Studies, 2019-2022
Council on Undergraduate Studies, 2016-2022
Financial Aid Advisory Committee, 2019-2022
Undergraduate Academic Grievance Board, 2016-2022
University Grievance Board, member 2020-2022
Faculty Senator
   Lead Senator, College of Business, 2019-2020
   Faculty Senate Advisory Committee (steering for Senate), 2019-2020
   Sub-committee: Research, 2018-2020
   Sub-committee: Finance and Infrastructure, 2017-2018
NSF Engineering Research Center (ERC) Planning Workshop for CAN-RESIST (Computer and
Network Resiliency and Security for Transportation), invited panel 2020
Military Appreciation Days, Planning Committees:
   Soccer: Men 2018-2023, Women, 2022-2023; Men's Basketball, 2018-2019; Football, 2019
Cross-Disciplinary INNO Curriculum Committee, 2018-2020
Parking Advisory Committee, elected by Faculty Senate, 2018-2020
Brooks Sport Science Institute (BSSI) Scholarship Committee, chair, 2017-2019
Summer School Committee, member 2018-2020
BMW German PhD Scholars event, Faculty host and speaker, 2017
International Center for Academic Integrity, advisor, 2015-2016
Library Advisory Committee, 2013-2016

*College of Business*
Garrison Family Professorship in Sales Innovation, Search Committee (chair), 2026
Powers Emerging Fellows, Nomination Committee, 2024
Promotion and Tenure Advisory Committee, 2021-2023
AACSB, Continuous Improvement Review Committee, 2023-2025
Intellectual Contributions Working Group, 2024
Faculty Retention Working Group, 2023
Associate Dean of Research, Search Committee, 2020
Garrison Endowed Professorship in Sales Innovation, Search Committee (chair), 2020
Honors and Awards ceremony, speaker 2017-2018

*Department of Marketing*
Tenure, Promotion, and Reappointment (TPR) Committee, 2019-present
Faculty Advisory Committee, 2021-present
M.S. Marketing GS2 Committee, 2022-present
TPR By-Laws Revision, Ad hoc Committee, 2025-2026
Director, M.S. Marketing Program, 2023-2025
Department Chair Search Committee, Chair, 2024
Honors Committee, 2023-2024
Department Chair Review Committee, 2019-2020, 2022-2023
Interim Department Chair Search Committee, Chair, 2023
Faculty Recruiting Committee, 2017, 2018 (chair), 2019 (chair), 2023
Clemson Marketing Research Symposium, co-chair, 2023
Marketing Research Industry Panel, organizer, 2023

M.S. Marketing Program Redesign, Ad hoc Committee, 2020-2023
Research Committee, Chair, 2020-2023
Digital Measures Task Force, Lead Faculty, 2020
Honors and Awards Committee, co-chair, 2013-2019
Director, Honors Program, 2015-2016
Clemson 360 Sports Immersion Tour, faculty guide, 2014-2015
PhD Program Exploratory Committee, 2015
Curriculum Assessment Committee, 2013
AACSB AQ Criteria Committee, 2013

Northeastern University (2009-2013)
Global Corporate Citizenship Collaborative, 2012-2013
Business Sustainability Institute, 2012-2013
MBA Marketing Career Track Advisory Board, 2011
Northeastern University Research & Scholarship Expo, 2011
College of Business Case Competition, Judge, 2010-2013
Freshman Business Living and Learning Community, Faculty Host, 2011
Marketing Research Corporate Roundtable, Organizer, 2010-2013
U.S. Department of Education, Center for Emerging Markets BIE Grant Review, 2010
Marketing Group Welcome Day for Students and Parents, Organizer and Host, 2010-2011
Journal Task Force Committee, 2010-2011
Northeastern University American Marketing Association (NUMA), Faculty Advisor, 2009-2013
Faculty Search Committee, 2009, 2011-2013
D'Amore-McKim College of Business Website, Faculty Auditor, 2009-2013
Early Action Admitted Student Phone-a-thon, 2009-2013
Faculty Marshal, Graduation Ceremonies, 2009

Boston University (2002-2008)
Academic Conduct Committee 2007-2008
Chair, Distinguished Speaker Series, 2004-2008
Faculty Search Committee, 2002-2008
Research Computing and Databases Support Committee, 2006-2008
Doctoral Comprehensives, Examiner 2002-2008
Doctoral Program Curriculum Committee 2002-2008
Advisor, MBA Marketing Concentration 2004-2008
Faculty Host, School of Management Spring Open House, 2003-2007
Undergraduate Marketing Program, Faculty Liaison, 2003-2007
Undergraduate Concentration Orientation, Coordinator, 2006-2007
Sakai (SMGTools) Learning Management System, Faculty Pilot, 2006-2007
School of Management Subject Pool Coordinator, 2004-2007
MBA Concentration Orientation, Marketing, Coordinator, 2004-2005

**ACADEMIC HONORS AND AWARDS**

Powers Distinguished Fellow (Inaugural), College of Business, Clemson University, 2021-present
University Senior Scholar Research Award, finalist, Clemson University, 2025-2026

College of Business Senior Scholar Research Award, Clemson University, 2025-2026
Department of Marketing Senior Scholar Research Award, Clemson University, 2025-2026
Harold & Muriel Berkman Charitable Foundation, Marketing Research Award, 2025
Department of Marketing Senior Scholar Teaching Award, Clemson University, 2024-2025
Open Educational Resources (OER) Faculty Award, Clemson University, 2023-2024
College of Business Senior Scholar Research Award, Clemson University, 2022-2023
University Senior Scholar Research Award, finalist, Clemson University, 2022-2023
Best Reviewer Award, *Journal of International Marketing*, 2021
Watt Faculty Fellow, Clemson University, Artificial Intelligence, 2019-2020
AMA-EBSCO Annual Award for Responsible Research in Marketing, nominee 2019
Best Reviewer Award, *Journal of Business Research*, 2018
Top Researcher Recognition, Board of Trustees, Clemson University, 2017-2018
Best Paper Award (CB Track), American Marketing Association Winter Conference, 2016
Delta Sigma Pi (professional business fraternity), Faculty initiate, 2016
Bright Idea Award, Seton Hall and N.J. Policy Research Organization Foundation, 2015
Best Overall Paper Award, International Marketing Conference, IIM-Calcutta, 2013
Best Teacher Award, College of Business, finalist, Northeastern University, 2013
Research Grant Award (competitive), College of Business, Northeastern University, 2013
Favorite Professor Award, selection by Northeastern University seniors, 2012
New Student Organization Advisor of the Year, finalist, Northeastern University, 2011
Excellence in Teaching Award, Northeastern University finalist, 2011
Alumni Legacy Gift Teaching Recognition, Boston University, 2005, 2007
Teaching Excellence Recognition, Honors College, University of South Carolina, 2002
Beta Gamma Sigma (Business honor society), 2001
Chi Delta Chi (US Veterans honor society), 2001
AMA Fellow, Sheth-Foundation Doctoral Consortium, 1999
Top MBA Student Award, University of South Carolina, 1996
Francis M. Hipp Merit Fellowship (MBA), University of South Carolina, 1994-1996
Outstanding Senior Award (Electrical Engineering), Clemson University, 1991
Eta Kappa Nu (Electrical Engineering honor society), Clemson University, 1990
Phi Kappa Phi (Interdisciplinary honor society), Francis Marion College, 1989
Student Marshall (top 5% of juniors), Francis Marion College, 1988
Patriot Scholar (varsity soccer scholarship), Francis Marion College, 1986-1989
William Douglas Dargan Merit Scholarship, Francis Marion College, 1986-1989

### TEACHING

Courses

*Clemson University*, Wilbur O. and Ann Powers College of Business (2013-present)
    M.S.  Marketing Analytics
    M.S.  Marketing Research
    M.S.  Multivariate Statistics for Marketing
    MBA Entrepreneurial Marketing and Digital Strategies
    UG    Promotional Strategy
    UG    Advertising Strategy
    UG    Marketing Research
    UG    Creative Inquiries (Rivalry Lab; Open Innovation, Athletics and Academics)

*Massachusetts Institute of Technology*, Sloan School of Management (2024)
  MBA: Marketing Innovation
  UG: Marketing Innovation

*Dartmouth College*, Tuck School of Business (2021, 2022)
  MBA Marketing Research

*Northeastern University*, D'Amore-McKim School of Business (2009-2013)
  MBA: Brand and Advertising Management
  MBA: Marketing Research
  UG: Marketing Principles
  UG: Advertising and Brand Promotion
  UG: Marketing Research

*Boston University*, Questrom School of Business (2002-2008)
  PhD: Marketing Management and the Customer-Focused Firm
  PhD: Mathematical Modeling in Marketing
  MBA: Brand and Advertising Management
  MBA: Marketing Research
  UG: Advertising and Brand Promotion
  UG: Marketing Research

*University of South Carolina*, Moore School of Business (1998-2002)
  UG: Integrated Marketing Communications
  UG: Product Management
  UG: Marketing Research
  UG: Marketing Strategy and Planning


Teaching Recognition
Department of Marketing Senior Scholar Teaching Award, Clemson University, 2024-2025
Open Educational Resources (OER) Faculty Award, Clemson University, 2023-2024
Best Teacher Award, D'Amore-McKim College of Business, Northeastern University finalist, 2013
Favorite Professor Award, Northeastern University, 2012
Excellence in Teaching Award, Northeastern University finalist, 2011
Alumni Legacy Gift Teaching Recognition, Boston University, 2005, 2007
Teaching Excellence Award, Honors College, University of South Carolina, 2002


Advising
McNair Scholars Mentor, U.S. Department of Education TRIO Program, 2021-present
Advisor, Spark Challenge finalists, College of Engineering, Computing and Applied Sciences, 2021
Advisor, 15 students who won/placed in national innovation competitions, 2017, 2018, 2019
Advisor, winner of *Harvey Levenson* competition (Technical Association of the Graphic Arts), 2017
Advisor, 17 team awards at the annual AMA National Collegiate Conference, 2009-2013


Dissertations, Theses, Honors Contracts, and Directed Studies
Supervisor, B.S. honors contracts, theses, and directed studies (31), 2002-2025
Chair, M.S. theses and PhD dissertations (10), 2005-2019

Published Instructional Materials
Instructor's Manual, McDaniel and Gates, *Marketing Research*, 8th ed., Wiley: Hoboken
Excel Manual, McDaniel and Gates, *Marketing Research*, 8th ed., Wiley: Hoboken
Internet Exercises, Shimp, *Advertising, Promotion, and Supplemental Aspects of Integrated Marketing Communications*, 6th ed., The Dryden Press: Fort Worth
Boston University Guidebooks: *Review of Descriptive Statistics & Probability*, *Review of Inferential Statistics & Hypothesis Testing*, *Using SPSS for Marketing Research*

## OTHER WORK EXPERIENCE

*Expert Witness*, research and testimony (FTC, TTAB, NAD, AAA), 2007-present
*Officer*, United States Navy (Submarines), 1992-2000
*Manager*, Downwind Trading, Myrtle Beach, SC, 1989
*Server,* TCBY, Myrtle Beach, 1988
*Ocean Lifeguard*, City of Myrtle Beach, Myrtle Beach, SC, 1986, 1987

54

# Exhibit B

# Testimony at Deposition or Trial in Prior Four Years

**Note: <u>underlining</u> indicates retaining party**

EasyGroup, Ltd. v. <u>ER Travell, LLC, Paul Hanley, and Timothy Koehler</u>
    US District Court for the Southern District of Florida
<u>GOLO, LLC</u> v. Amazon.com and Amazon.com Services
    US District Court for the District of Delaware
Nicky Laatz v. <u>Zazzle Inc. and Mohamed Alkhatib</u>
    US District Court for the Northern District of California, San Jose Division
<u>Microtech Knives, Inc.</u> v. Outdoors Online, LLC and Jon Janecek
    US District Court for the Northern District of Georgia, Atlanta Division
Keeper Security, Inc. v. <u>Keeper Tax Inc.</u>
    US District Court for the Northern District of Illinois, Eastern Division
<u>OpenAI, Inc.</u> v. Open Artificial Intelligence, Inc.
    US District Court for the Northern District of California, Oakland Division
<u>Jose Santiago</u> v. New Huntingdon Construction Company, Inc. and Terex Corporation
    Philadelphia County, Court of Common Pleas, Trial Division
<u>I-Meta Holdings, Inc.</u> v. Meta Platforms, Inc.
    District Court, District of Nevada
<u>La Potencia, LLC and YC52, LLC d/b/a Chandler Bats</u> v. David Chandler et al.
    US District Court for the Southern District of Florida
<u>NetEase, Inc., NetEase Information Technology Corporation, and Hong Kong NetEase Interactive Entertainment Limited</u> v. Krafton, Inc. and PUBG Santa Monica, Inc.
    Superior Court of the State of California for the County of San Mateo

57

# Exhibit C

# Materials Reviewed

**Materials Reviewed**

**Filed Documents**

Complaint, June 9, 2025

May 21, 2025 Merger Announcement, filed June 9, 2025, and accompanying video

Declaration of Mark Keegan, February 20, 2026

Order Granting Motion for Temporary Restraining Order, June 20, 2025

Declaration of Peter Welinder in Support of Defendants' Administrative Motion to Extend Time for Briefing and Hearing Any Motion for Preliminary Injunction, February 9, 2026

**Academic Research and Documents in Public Domain**

Baumgartner, Hans and Jan-Benedict E. M. Steenkamp (2001), "Response Styles in Marketing Research: A Cross-National Investigation," *Journal of Marketing Research*, 38 (May), 143-156.

Barber, William G. and Giulio E. Yaquinto (2022), "The Universe," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Diamond, Shari S., (2011), "Reference Guide on Survey Research," *Reference Manual on Scientific* Evidence, 3rd ed., National Academies Press, 368-418.

Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Ezell, Matthew G., and AnnaBelle Sartore (2022), "Survey Percentages in Lanham Act Matters," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Feldman, Jack M. and John G. Lynch (1988), "Self-Generated Validity and Other Effects of Measurement on Belief, Attitude, Intention, and Behavior," *Journal of Applied Psychology*, 73 (3), 421-435.

Isaacson, Bruce and Keith A. Botner (2021), "When to Conduct an Eveready Survey: The Importance of Aided Awareness," *Trademark Reporter*, 111 (3), 693-711.

Jacoby, Jacob (2013), *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, Chicago: American Bar Association.

McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition.

Oppenheimer, Daniel M., Tom Meyvis, and Nicolas Davidenko (2009), "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, 45 (4), 867-872.

Piedmont, Ralph L., Robert R. McCrae, Rainer Rieman, and Alois Angleitner (2000), "On the Invalidity of Validity Scales: Evidence from Self-Reports and Observer Ratings in Volunteer Samples," *Journal of Personality and Social Psychology*, 78, 582-593.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* Diamond, Shari S. and Jerre B. Swann (eds.), American Bar Association.

Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Swann, Jerre (2023), "A History of the Evolution of Likelihood of Confusion Methodologies," *Trademark Reporter*, 113 (5), 723-771.

USPTO Trademark registration certificate for Registration Number 7409119 (IYO)

USPTO Trademark registration Application Number 98088268 (IYO)

Winkler, John D., David E. Kanouse, and John E. Ware Jr. (1982), "Controlling for Acquiescence Response Set in Scale Development," *Journal of Applied Psychology*, 67 (October), 555-561.


**Websites and linked documents (last visited March 2026)**

https://www.ama.org/the-definition-of-marketing-what-is-marketing

https://www.iyo.ai/

https://x.com/iyo_audio

https://www.instagram.com/iyo.audio/

https://apps.apple.com/us/app/iyo-ai/id6467432095

https://www.linkedin.com/company/iyo

https://www.youtube.com/@we_are_iyo

https://www.tiktok.com/@iyo.audio

https://web.archive.org/web/20250327122741/https://humane.com/

https://openai.com/sam-and-jony/

https://openai.com

https://x.com/OpenAI

https://www.youtube.com/OpenAI

https://www.linkedin.com/company/openai

https://github.com/openai

https://www.instagram.com/openai/

https://www.tiktok.com/@openai

https://discord.gg/openai

https://www.youtube.com/watch?v=punwqj6lOGs

https://www.nytimes.com/2025/05/21/technology/openai-jony-ive-deal.html

https://www.npr.org/2025/05/22/nx-s1-5407548/openai-jony-ive-io-deal-ai-devices

https://www.wsj.com/tech/ai/former-apple-design-guru-jony-ive-to-take-expansive-role-at-openai-5787f7da?reflink=desktopwebshare_permalink

https://www.cnbc.com/2025/05/21/openai-buys-iphone-designer-jony-ive-device-startup-for-6point4-billion.html