# EXHIBIT B

Docusign Envelope ID: CAC35199-3781-48A4-9BBD-E5DD164C7460

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Margret M. Caruso (Bar No. 243473)
margretcaruso@quinnemanuel.com
Sara L. Pollock (SBN 281076)
sarapollock@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

*Attorneys for Defendants io Products, Inc., OpenAI,
Inc., OpenAI, LLC, and Sam Altman*

JONES DAY
David Kiernan (Bar No. 215335)
dkiernan@jonesday.com
555 California Street 26th Floor
San Francisco, California 94104
Telephone:    (415) 875-5745

Meredith Wilkes (*pro hac vice forthcoming*)
mwilkes@jonesday.com
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone    (216) 586-7231

*Attorneys for Defendant Sir Jonathan Paul Ive*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IYO, INC.,<br><br>              Plaintiff,<br><br>       vs.<br><br>IO PRODUCTS, INC., OPENAI, INC., OPENAI, LLC, SAM ALTMAN and SIR JONATHAN PAUL IVE,<br><br>              Defendants. | Case No. 3:25-cv-04861<br><br>**DECLARATION OF TANG YEW TAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF IYO, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Judge:  Hon. Trina L. Thompson<br>Hearing:  June 17, 2025 at 10 am |

Docusign Envelope ID: CAG35199-3781-48A4-9BBD-E5DD164C7460

**DECLARATION OF TANG YEW TAN**

I, Tang Yew Tan, declare:

1. I am a co-founder and the Chief Hardware Officer of Defendant io Products, Inc. ("io"). I make this declaration in support of Defendants' Opposition to Plaintiff IYO, Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction. The facts stated in this declaration are true and correct based on my personal knowledge, and if called and sworn in as a witness, I could and would testify competently to those facts.

2. Prior to co-founding io, I worked at Apple for over 24 years. While at Apple, I was the Vice President of Product Design for Apple's iPhone and Apple Watch product lines. I also oversaw some accessory design and ran Apple's Material and Acoustic teams. I have been named as an inventor on more than 400 patents and patent applications from technology I developed, including multiple patents for personal media devices with audio features.

3. I left Apple in February 2024 and joined io the following month to begin working with Jony Ive, Scott Cannon, and Evans Hankey, all former colleagues from Apple. At the time, io had not decided upon a particular product or form factor. Our goal was, and is, to create a family of products that would revolutionize the way people interact with AI technology.

4. For six to eight months, io surveyed the existing commercial offerings and engaged in prototyping exercises as we explored a wide variety of different form factors. As part of io's industry exploration, we considered a broad range of form factors, including objects that were desktop-based and mobile, wireless and wired, wearable and portable. As part of these early development exercises, my team and I began buying many different types of earbuds, headphones, and even hearing aids, and I instructed one of the engineers on my team, Marwan Rammah, to purchase iyO's VAD PRO wired headphones, among dozens of others.

5. In May 2024, I placed a pre-order for iyO's ONE earbuds with Wifi+LTE from iyO's website. The website listed the price as $1199, and the preorder downpayment as $69. A true and correct copy of my invoice is attached hereto as **Exhibit A**. At the time of my purchase, iyO represented that the product would ship in "winter 2024." However, on January 13, 2025, I received an email from iYO, stating that the ship date for the Wi-Fi version had been delayed until August

2025, with the LTE version "delayed further." A true and correct copy of this email is attached hereto as **Exhibit B**. I still have not received the iyO ONE earbuds I pre-ordered.

6. In approximately March 2025, I learned that Jason Rugolo of iyO had approached Sam Altman to try to raise Series B funding. At the time, I was strongly disinclined to meet with anyone from iyO. The ONE earbuds I had pre-ordered from iyO 10 months earlier had not arrived, and there was no suggestion they would be arriving soon. I had also spoken to a (now former) iyO engineer, who told me he was seeking a new job because he was frustrated with iyO's slow pace, unscalable product plans, and continued acceptance of preorders without a sellable product. I also learned that the TED talk Mr. Rugolo gave about iyO ONE used a mock-up that was very far from a finished product. Based on this conversation and my own experience, I concluded that iyO was basically offering "vaporware"—advertising for a product that does not actually exist or function as advertised, and my instinct was to avoid meeting with iyO myself and to discourage others from doing so.

7. However, around this time, Steve Zadesky, my former hardware design mentor from Apple, reached out to me, told me that Mr. Rugolo wanted to meet with me, and encouraged me to meet Mr. Rugolo, saying he was "the real deal" and to approach the meeting with "an open heart." As a courtesy to Steve, I agreed to take the meeting with Mr. Rugolo.

8. When I agreed to the meeting with iyO, I made clear that I would not sign any NDA with iyO because I did not want io to receive any iyO confidential information. I understand that this was communicated to Mr. Rugolo, and he agreed to those terms.

9. Peter Welinder, VP of Products at OpenAI, introduced me to Mr. Rugolo via email on April 16, 2025, stating that Mr. Rugolo wanted to show me "some of the cool audio/earbud tech" his team had been working on. Mr. Rugolo responded by email a few minutes later, suggesting that we "start with a fitting" for the earbuds. We exchanged pleasantries, and, in response to Mr. Rugolo's compliments regarding my reputation, I wrote that I had heard "good things from our common friends," referring to Steve. Since the audiologist would be coming to io's office for the fitting, I asked if other io employees whom I thought may be interested could join, and Mr. Rugolo agreed. A true and correct copy of this email chain is included in **Exhibit C**. I invited them because

Docusign Envelope ID: CAC35199-3781-48A4-9BDD-E5DD164C7460

I thought it would be good for them to go through the experience of having custom earmolds made from the consumer perspective, including the discomfort of the molding process.

10. In late April, the audiologist came to io's office to take my ear impression. Mr. Rugolo was not present. This took approximately 15 minutes each and was physically uncomfortable. Mr. Rugolo emailed after to say he was "lookin[g] forward to meeting sometime next week and getting everyone's ears on some sound." I responded with my availability, noting that I "[l]earned a lot from the fitting." While at Apple, I had worked on designing wearable devices for many years, so I found the process for creating custom-molded earbuds interesting. My comment to Mr. Rugolo was not referring to iyO's technology or design, which the audiologist and I did not discuss. A true and correct copy of this email exchange is contained in **Exhibit C**.

11. Once it was decided that Mr. Rugolo would come to io's offices on May 1, 2025, he sent a calendar invitation stating, "iyo visits io." A true and correct copy of this calendar invitation is attached hereto as **Exhibit D**.

12. On May 1, 2025, Mr. Rugolo and an iyO audio engineer met with me and some other io employees to demonstrate the iyO ONE. The iyO ONE demonstration included three planned applications: (1) search, which allowed the user to give voice commands to search the internet (much like Siri on an iPhone with AirPods); (2) "Deej," which allowed the user to listen to music (much like Apple Music on an iPhone with AirPods); and (3) live translation. The demonstration did not go as planned, and various applications failed repeatedly, particularly the live translation. Although I had tried to approach the demonstration with an open mind, it confirmed what I expected: this was not a product that was ready for sale—or close to ready.

13. Only one io employee could hear the demonstration at a time. My demonstration was the last one, so when it concluded, I was the only io employee left. Mr. Rugolo explained that he was trying to fundraise for iyO. When I did not express interest, Mr. Rugolo pivoted, telling me that he would sell the entire iyO company for $200 million, which I understood to be the amount he had raised to date. When I again demurred, noting that I did not believe iyO's platform would be complementary to ours, Mr. Rugolo pivoted again, stating that, separately from the audio technology that he had just demonstrated, he had intellectual property that covered other AI. He asked me to

review this other intellectual property to see if it was "interesting" enough for us to consider purchasing.  Mr. Rugolo seemed desperate for cash.  In order to avoid being "contaminated" by another company's intellectual property, or charges that I learned something I otherwise knew from someone pitching it to me, it has long been my practice since my time at Apple to have technically savvy attorneys review outside content behind a "wall" or "curtain," so that I only review something if the attorneys deem it worthwhile and obtain the necessary safeguards.  Accordingly, I responded that I would need to speak with io's attorneys before reviewing any iyO intellectual property.

14. Four days after the meeting, Mr. Rugolo emailed me, calling the failed demonstration "embarrassing" and explaining they were continuing to work on some of the reasons for the failures. He reiterated that he would "love to find a way to partner up."  He suggested "launching together what we've built as an early 'developer kit.'"  I responded a little over a week later, explaining again that iyO's product was "very different" from our product vision and that we did not believe the designs or hardware would be complementary; therefore, we did not see the value in a "developer kit."  Trying to find some possible way to help Mr. Rugolo, I asked Mr. Rugolo if he still would like to have our IP lawyer create an air-curtain to review his IP portfolio, which he had previously told me "could be interesting"—those were his words, not mine.  A true and correct copy of this email exchange is attached hereto as **Exhibit E**.

15. Mr. Rugolo responded on May 15, 2025, asking that we reconsider the developer kit concept, as well as having "subject matter experts" rather than attorneys review iyO's intellectual property portfolio.  A true and correct copy of this email is also contained in **Exhibit E**.  I did not want any io engineers to look at a third party's intellectual property portfolio, and I did not respond.

16. On May 21, 2025, io was announced through a blog post and video.  The video does not advertise any specific product because io currently has no products for sale.  The prototype Sam Altman referenced in the video is at least a year away from being offered for sale.  Its design is not yet finalized, but it is not an in-ear device, nor a wearable device.  io has not sold any products, offered any products for sale or distribution, distributed any products, or advertised any goods or services.  It has no plans to do so for at least a year.

Case No. 3:25-cv-04861
TAN DECLARATION ISO OPPOSITION TO TRO

17. On May 25, 2025, Mr. Rugolo emailed me again, congratulating us on the launch. He also stated that he was "looking forward to continuing the conversation" and pressed again for us to consider the "developer kit" idea. I was surprised to receive this email, as I believed I had already made clear, as politely as I could, that io is not interested in pursuing this idea. I responded the next day, thanking Mr. Rugolo for his well wishes and confirming that we "have a dev platform already so not sure if this will be complimentary." In response, Mr. Rugolo asked for another meeting and raised, for the first time, an issue with our use of the "io" name, asking us to "stop using the name" while "we are continuing our conversations." A true and correct copy of these emails are also contained in **Exhibit E**. I was surprised to receive this email, too. There was no "continuing conversation," and Mr. Rugolo had never mentioned any issues with the io name in any of our prior communications over the past several weeks. It appeared to me that Mr. Rugolo was raising the issue of our name in bad faith to try to force us to do a deal with his company.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of June, 2025 at San Francisco, CA.

By:

Tang Yew Tan