# EXHIBIT D

BUCHALTER
A Professional Corporation
DYLAN W. WISEMAN (SBN: 173669)
DAVID M. LIU (SBN: 216311)
NINA MORENO (SBN: 312748)
425 Market Street, Suite 2900
San Francisco, CA 94105-2491
Telephone: (415) 227-0900
Fax: (415) 227-0770
Emails: *dwiseman@buchalter.com*
 *dliu@buchalter.com*
 *nmoreno@buchalter.com*

Attorneys for Plaintiff
iyO Inc.

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**07/09/2025**
**Clerk of the Court**
BY: WILMA CORRALES
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

**CGC-25-627029**

| | |
|---|---|
| IYO INC., a Delaware corporation, | Case No.: |
| Plaintiff, | **VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| v. | **(1) BREACH OF CONTRACT; AND** |
| DAN SARGENT, an individual; and DOES 1 through 10, | **(2) MISAPPROPRIATION OF TRADE SECRETS** |
| Defendants. | **JURY TRIAL DEMANDED** |

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 91015059v8

1

**VERIFIED COMPLAINT**

Plaintiff iyO Inc. ("iyO") complains and alleges as follows:

**THE PARTIES**

1.     At all relevant times iyO was, and is, a Delaware corporation that is authorized to conduct business in California.  iyO's principal executive office is located in Redwood City, San Mateo County, California.

2.     Upon information and belief, Defendant DAN SARGENT ("Sargent") is, and at all relevant times was, an individual residing in San Francisco, California, and was employed by iyO from June 6, 2023, to December 18, 2024.

3.     iyO does not know the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive.  Such fictitious Defendants are sued pursuant to the provisions of section 474 of the California Code of Civil Procedure.  iyO is informed and believes and thereupon alleges that each fictitious Defendant was in some way responsible for, participated in or contributed to the matters and things of which iyO herein complains, and in some fashion has legal responsibility therefore.  When the exact nature and identity of the fictitious Defendants who are responsible for participating and contributing to the matters and things herein alleged are ascertained by iyO it will seek leave to amend this Complaint to set forth the same.

4.     iyO is informed and believes and thereupon alleges that at all times mentioned in this Complaint, in committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan or scheme and/or acted as co-conspirators.  iyO is informed that, at all times mentioned in this Complaint, in addition to the wrongful conduct alleged herein as giving rise to primary liability, Defendants also aided and abetted each other in committing the wrongful acts alleged herein.

5.     iyO is informed that, at all times mentioned in this Complaint, Defendants, and each of them, were the principals or agents, joint venturers, servants and employees, alter egos and representatives of each other in doing the things herein alleged and, in doing so, were acting within the scope of their respective authorities as agents, employees and representatives, and are jointly

and severally liable to iyO.

6.    Sargent and Defendants DOES 1 through 10 are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over this entire action because this is a civil action wherein the matter in controversy, exclusive of interest, exceeds $35,000.00 and because iyO seeks equitable relief.

8.    Venue is proper in the Superior Court, for the City and County of San Francisco ("San Francisco County") because, upon information and belief, the alleged wrongdoing took place in San Francisco County, iyO's injuries and damages were sustained in San Francisco County, and it is where the contracts at issue in this Complaint were entered into.

## FACTUAL ALLEGATIONS

9.    Beginning in or around March 2018, iyO began its mission to bring natural language computing to billions of people at Google X (n/k/a X: The Moonshot Factory). Google X is a research and development facility within Google that focuses on developing breakthrough technologies to solve the world's biggest problems.  During that time, the team invested approximately $25 million on the project.

10.    iyO spun out from Google X as a venture funded startup in or about August 2021. Since then, an additional $37.2 million has been invested in developing the next generation of hardware (and related software) which allows users to interact with their smartphones, computers, artificial intelligence ("AI"), and the internet without the use of screens, keyboards, mice, or other similar physical interfaces.

11.    The culmination of iyO's time and investment is its latest product, the iyO ONE, an ear-worn device that uses specialized microphones and bone-conducted sound to control audio-based applications with nothing more than the user's voice.  In short, the iyO ONE is a revolutionary new kind of computer without a screen.  It can run apps just like a smartphone, with the user simply speaking to them in natural language.  The apps also talk back to the user in natural language, through the world's best audio display.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

**VERIFIED COMPLAINT**



*PICTURE 1.*

*PICTURE 2.*

12.    Pictures 1 and 2 are representations of the iyO ONE and its intended use.

## THE TRADEMARK ACTION

13.    Concurrent with this action, on June 9, 2025, iyO filed a complaint for willful trademark infringement and unfair competition, along with other claims, against io Products, Inc., and others, in the United States District Court, Northern District of California, entitled *iyO, Inc. v.*

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

*io Products, et al.*, case number 3:25-cv-04861-TLT (the "Trademark Action"). In the Trademark Action, iyO sought a motion for a temporary restraining order and for a preliminary injunction (the "Injunction Request") against defendants io Products, Inc., OpenAI, Inc., OpenAI, LLC, Sam Altman and Sir Jonathan Paul Ive (the "io Products Defendants").

14. In opposing the Injunction Request, the io Products Defendants submitted a declaration of Tang Yew Tan ("Tan Decl."), a co-founder and Chief Hardware Officer of io Products, Inc. A true and correct copy of Mr. Tan's declaration, filed in the Trademark Action, is attached hereto as **Exhibit 1**.

15. Under penalty of perjury, on June 12, 2025, Mr. Tan admitted in his declaration that he spoke with an unnamed "(now former) iyO engineer," who was later identified as Defendant Sargent, and claimed that this engineer disclosed confidential internal information regarding iyO's product development timeline, business strategy, and pre-order status. Mr. Tan also admits he learned that the TED talk Mr. Rugolo gave about iyO ONE allegedly used a mock-up that was very far from a finished product.[1] (Tan Decl., ¶ 6.)

### IYO'S INVESTIGATION INTO TAN'S CLAIMS

16. Following receipt of the Tan Declaration in June 2025, iyO conducted a thorough investigation which established that Sargent was the unnamed "former employee" referenced therein.

17. When he was working for iyO, Sargent was its Design and Manufacturing Lead. As the Design and Manufacturing Lead, he was responsible for shaping the user experience and charged with collaborating with iyO's industrial design team regarding the physical shape and form of iyO's products, including the performance, manufacturing, and assembly of the products. As a team member for design and development, Sargent worked with iyO's hardware engineers, electrical engineers, and acoustic engineers. Sargent also oversaw and supervised the product design architecture of the employees working under him.

---

[1] Jason Rugolo is the CEO and Founder of iyO who gave a TED Talk in April 2024 entitled "Welcome to the World of Audio Computers."

18.    As a condition of his employment, on June 26, 2023, Sargent entered into the Employee Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement").  Attached hereto as **Exhibit 2** is a true and correct copy of the Confidentiality Agreement (redacted to remove Sargent's personal financial information).

19.    Given the importance of his role, Sargent had access to iyO's confidential and trade secret information regarding its product design, development, manufacturing, assembly, and sales of iyO's products.

20.    Through independent investigation and witness testimony, iyO learned that Sargent deliberately met with Mr. Tan and knowingly disclosed iyO's highly confidential and proprietary information about iyO's products, in direct violation of his contractual and legal obligations. iyO also learned that, during that meeting, Sargent showed Mr. Tan confidential CAD drawings of iyO's products.

21.    iyO's outside General Counsel, Jeff Hyman of LWD Advisors, Inc., conducted the Sargent investigation. As part of that investigation, Mr. Hyman contacted Sargent seeking to conduct an in-person interview.  Sargent first insisted that the interview be over a video conference, and then shifted his position and asked to speak by telephone.

22.    On June 24, 2025, Mr. Hyman spoke with Sargent by phone.  Mr. Hyman told Sargent that iyO knew that, while working for iyO, Sargent met with Mr. Tan, and that Sargent disclosed to CAD drawings depicting iyO's products to Mr. Tan.  Sargent's silence in response to these specific allegations constituted a tacit admission of his misconduct.

23.    Mr. Hyman also told Sargent about the existence and general contents of Mr. Tan's sworn declaration.  Again, Sargent did not deny or refute anything in Mr. Tan's declaration.

24.    During the June 24 call, Mr. Hyman told Sargent that iyO would forbear litigating against him if he provided a declaration attesting to what had occurred.  Sargent said he wanted to think it over, and the call ended.

25.    Later that evening, on June 24, 2025, Sargent emailed Mr. Hyman.  In the email, Sargent asked Mr. Hyman to provide additional details about what Sargent was alleged to have done.  Sargent claimed that this would help him draft his declaration.  Sargent then asked if iyO

could draft the declaration for Sargent.  In addition, Sargent requested further clarity about the terms iyO was offering, specifically what protections or guarantees iyO was offering.  Finally, Sargent asked if he would be "summoned" to testify in the Trademark Action if he provided the requested declaration.

26.    Mr. Hyman and Sargent spoke again by phone on June 26, 2025.  Mr. Hyman said that iyO would not draft the declaration for Sargent.  He explained that iyO's proposal was being made because it wanted *Sargent*, in his own words, to tell the full and complete truth about what he had done, and since only Sargent knew those details, he needed to write the declaration himself.  Sargent said he did not think he could present a declaration to iyO for another 4 weeks since he was travelling for business in July, and he wanted time to consult with counsel.  Mr. Hyman said he would provide a draft agreement outlining the terms of iyO's forbearance, but that it was unlikely iyO would proceed unless the declaration could be provided sooner.

27.    On June 27, 2025, Mr. Hyman emailed the draft forbearance agreement to Sargent.

28.    On June 29, 2025, Sargent emailed to Mr. Hyman that he was meeting with his lawyer on June 30, 2025, and would respond following that meeting.

29.    On June 30, 2025, Mr. Hyman had a short call with Sargent's lawyer.  During that call, Sargent's counsel proposed that a draft declaration would be provided by July 1 and a final, signed declaration by July 2.

### SARGENT'S DRAFT DECLARATION

30.    On Tuesday, July 2, 2025, Sargent's counsel shared the draft declaration.  Attached hereto as **Exhibit 3** is a true and correct copy of Sargent's draft declaration.[2]

31.    While admitting to having met with Mr. Tan on June 6, 2024, Sargent's draft declaration strayed considerably from the facts known to iyO and stated in Mr. Tan's declaration.

32.    Sargent's draft declaration noted that he met with ***both*** Mr. Tan ***and*** Patch Kessler, a mechanical and design engineer from LoveFrom, a San Francisco-based design and engineering collective.  Notably, LoveFrom was founded and operated by Sir Jonathan Paul Ive, who is one of

---

[2] The draft Sargent declaration received by iyO contained no exhibits.

the io Products Defendants in the Trademark Action.

33.     When interviewed by Mr. Hyman, Sargent did not refute or deny that he had shared iyO's CAD files with Mr. Tan.  However, the draft declaration states, "I shared information on my capabilities and experience as an engineer and leader."  (Exhibit 3, ¶ 4,)  Sargent claimed to have shared "a few physical samples of products I had helped develop," which he claimed were "non-functional, final form factors" that were not "non-public or confidential."  (Exhibit 3, ¶ 5.)  During the interview by Mr. Hyman, Sargent did not reveal that he had shared any physical samples with Mr. Tan.

34.     Having failed to refute that he had shared confidential CAD drawings with Mr. Tan during the call with Mr. Hyman, the draft declaration balked, claiming "I also showed an early version of my design portfolio to Tan and Kessler."  Indeed, the draft declaration goes so far as to claim, "I did not disclose to anyone information or materials in violation of my confidentiality obligations to IYO or applicable state or federal law."  (Exhibit 3, ¶9.)

35.     Sargent's draft declaration demonstrated a calculated attempt to conceal and misrepresent his unauthorized disclosures of iyO's trade secrets and confidential information. His deliberate omission of material facts regarding his communications with Mr. Tan, coupled with his attempt to minimize his misconduct, evidences consciousness of guilt and further demonstrates the willful and malicious nature of his actions.

36.     iyO's forensic investigation of Sargent's company-issued laptop, which he returned upon his departure on December 18, 2024, revealed that Sargent had deliberately *wiped* all data from the computer in violation of company policy and his contractual obligations, indicating a consciousness of guilt and an intent to conceal his misappropriation of trade secrets.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract – Against Sargent)

37.     iyO hereby re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein, with the same force and effect as if repeated at length.

38.     Sargent has willfully and materially breached, and continues to breach, the confidentiality provisions of the Agreement through his unauthorized disclosure of iyO's trade

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 91015059v8

8

**VERIFIED COMPLAINT**

secrets and confidential information to competitors, including, but not limited to, sharing CAD files and product designs with Mr. Tan.

39. iyO has fully and faithfully performed all conditions, covenants, and obligations required under the Agreement, and any non-performance, if any, has been excused or waived.

40. As a direct and proximate result of Sargent's willful and material breaches, iyO has suffered and will continue to suffer substantial monetary damages, including, but not limited to, lost profits, business opportunities, and goodwill, in an amount exceeding the jurisdictional minimum of this Court, to be proven with specificity at trial.

41. The conduct and breaches described above have caused and will continue to cause immediate and irreparable injury to iyO's business unless enjoined by this Court. iyO has no adequate remedy at law because monetary damages cannot fully compensate for the permanent loss of its competitive technological and business advantages. The Court should therefore issue preliminary and permanent injunctive relief compelling Sargent's specific performance of his contractual obligations and preventing further breaches.

WHEREFORE, iyO prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Misappropriation of Trade Secrets – Against All Defendants)

42. iyO hereby re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, with the same force and effect as if repeated at length.

43. Sargent willfully and maliciously misappropriated iyO's trade secrets by wrongfully acquiring, using, and disclosing iyO's confidential and proprietary trade secret information to competitors without iyO's consent or approval, in direct violation of both his contractual obligations and California's Uniform Trade Secrets Act.

44. iyO implemented comprehensive and reasonable measures to maintain the secrecy of its trade secrets, including, but not limited to: (1) restricting access to trade secrets on a strict need-to-know basis; (2) implementing robust electronic security measures and monitoring systems; (3) requiring all employees, including Sargent, to sign detailed confidentiality agreements; (4)

maintaining physical security measures; and (5) conducting regular security training and compliance reviews.

45.    iyO's trade secrets consist of confidential and proprietary information about its products and specifications, including, but not limited to: (1) CAD drawings; (2) unreleased design features; (3) manufacturing scaling strategies; and (4) proprietary product development schedules; (5) iyO's efforts to scale its products; and (6) the records and physical models that Sargent wrongfully retained and disclosed to Messrs. Tan and Kessler without authorization.[3]  iyO's information has economic value to iyO in that iyO expended substantial time, money, and effort in developing said information, which is used in connection with iyO's highly competitive business. The trade secret information described above has economic value to iyO in that such information is not generally known to iyO's competitors.

46.    On information and belief, Sargent willfully and maliciously misappropriated iyO's trade secrets by: (1) improperly retaining them after his employment ended; (2) wrongfully disclosing them without authorization; and (3) using them for his own economic benefit, all in violation of California Civil Code § 3426 et seq.

47.    DOES 1-10, with knowledge of or reason to know of the trade secrets' confidential nature, have wrongfully received, used, and/or further disclosed iyO's trade secrets without iyO's consent, thereby participating in and benefiting from Sargent's misappropriation.

48.    As a direct, foreseeable and proximate result of Defendants' willful and malicious misappropriation, iyO has suffered and continues to suffer substantial business losses, lost profits, reputational harm, and other compensable damages in an amount to be proven at trial.  Pursuant to Civil Code section 3426.3, iyO is further entitled to an award of the value of any unjust enrichment of Defendants because of their misappropriation and/or diversion of iyO's trade secrets, or any other form of relief under the Uniform Trade Secrets Act, including a reasonable royalty.

49.    Sargent and DOES 1-10 committed the acts alleged herein willfully, maliciously, and in conscious disregard of iyO's legal rights and interests, with the specific intent to harm iyO's

---

[3]  Once a stipulated protective order is in place, iyO will comply fully with Code of Civil Procedure section 2019.210 to identify with reasonable particularity its claimed trade secrets.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

competitive position and business operations. Accordingly, pursuant to Civil Code section 3426.3(c), iyO is entitled to recover exemplary damages in an amount not exceeding twice the award of damages alleged above.

50.     As a direct result of the Defendants' willful and malicious misappropriation of trade secrets, iyO has been forced to retain legal counsel and has incurred, and will continue to incur, substantial attorneys' fees and costs in prosecuting this action to protect its valuable intellectual property rights and business interests. Pursuant to Civil Code section 3426.4, iyO is entitled to an award of reasonable attorneys' fees in this action.

51.     Defendants' wrongful conduct in misappropriating iyO's trade secrets will, unless and until enjoined and restrained by order of this Court, cause great and irreparable injury to iyO's business in that it will enable Defendants to unfairly compete with iyO and hamper the competitive advantage that iyO has from its research and development efforts. iyO has no adequate remedy at law for these injuries because monetary damages alone cannot fully compensate for the irreparable harm to iyO's competitive position, goodwill, and market advantage. Unless enjoined by this Court, Defendants will continue to engage in acts of misappropriation of these trade secrets and continue to benefit from the use or disclosure of iyO's trade secrets. As a result, iyO is entitled to an injunction prohibiting said conduct pursuant to Civil Code section 3426.2.

WHEREFORE, iyO prays for relief as hereinafter set forth.

## PRAYER

WHEREFORE, iyO respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

(1)     For immediate preliminary and permanent injunctive relief prohibiting Defendants from using, disclosing, or benefiting from iyO's trade secrets, requiring the return of all misappropriated materials, and mandating preservation of all relevant evidence;

(2)     For an award of compensatory damages, including, but not limited to, actual losses and economic damages caused by Defendants' misappropriation, in an amount to be proven at trial;

(3)     For disgorgement of all profits, benefits, and other unjust enrichment

obtained by Defendants through their misappropriation of iyO's trade secrets;

(4)    For an award of consequential damages, including lost profits, business opportunities, and damage to goodwill, in an amount to be proven at trial;

(5)    For an award of punitive and exemplary damages up to twice the amount of actual damages pursuant to California Civil Code § 3426.3(c), due to Defendants' willful and malicious misappropriation;

(6)    For an award of reasonable royalties pursuant to California Civil Code section 3426.3(b) for each Defendant's unauthorized use of iyO's trade secrets;

(7)    For reasonable attorneys' fees and costs pursuant to California Civil Code section 3426.4, based on Defendants' willful and malicious misappropriation;

(8)    For prejudgment interest at the maximum legal rate on all amounts claimed from the date of misappropriation;

(9)    For all costs of suit, including expert witness fees, investigation costs, and litigation expenses incurred herein; and

(10)   For such other and further relief, including all available statutory remedies under California Civil Code § 3426 et seq. and other applicable laws, as the Court deems just and proper.

DATED:  July 7, 2025                                    BUCHALTER
                                                        A Professional Corporation


_____
                                                        Dylan W. Wiseman

                                                        Attorneys for Plaintiff
                                                        iyO Inc.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN FRANCISCO

BN 91015059v8                              12

**VERIFIED COMPLAINT**

## DEMAND FOR JURY TRIAL

iyO, Inc. requests a jury trial on all issues so triable.


DATED:  July 7, 2025

BUCHALTER
A Professional Corporation


Dylan W. Wiseman

Attorneys for Plaintiff
iyO Inc.

**VERIFICATION**

I, JASON RUGOLO, am the Chief Executive Officer for iyO Inc., the Plaintiff in this action, and make this verification. I have read the VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF. Based on personal knowledge and/or my review of documents, the matters stated within this verified complaint is true and correct to the best of my knowledge as of the date of this Verification.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on July 8, 2025, at _____Taipei_____, _____Taiwan_____.

Signed by:

JASON RUGOLO

A5E91C3C0F7B4A0...

JASON RUGOLO

# EXHIBIT 1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Margret M. Caruso (Bar No. 243473)
margretcaruso@quinnemanuel.com
Sara L. Pollock (SBN 281076)
sarapollock@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

*Attorneys for Defendants io Products, Inc., OpenAI,*
*Inc., OpenAI, LLC, and Sam Altman*

JONES DAY
David Kiernan (Bar No. 215335)
dkiernan@jonesday.com
555 California Street 26th Floor
San Francisco, California 94104
Telephone:    (415) 875-5745

Meredith Wilkes (*pro hac vice forthcoming*)
mwilkes@jonesday.com
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone    (216) 586-7231

*Attorneys for Defendant Sir Jonathan Paul Ive*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IYO, INC., | Case No. 3:25-cv-04861 |
| Plaintiff, | **DECLARATION OF TANG YEW TAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF IYO, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | |
| IO PRODUCTS, INC., OPENAI, INC., OPENAI, LLC, SAM ALTMAN and SIR JONATHAN PAUL IVE, | |
| Defendants. | Judge: Hon. Trina L. Thompson |
| | Hearing: June 17, 2025 at 10 am |

**DECLARATION OF TANG YEW TAN**

I, Tang Yew Tan, declare:

1.  I am a co-founder and the Chief Hardware Officer of Defendant io Products, Inc. ("io"). I make this declaration in support of Defendants' Opposition to Plaintiff IYO, Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction. The facts stated in this declaration are true and correct based on my personal knowledge, and if called and sworn in as a witness, I could and would testify competently to those facts.

2.  Prior to co-founding io, I worked at Apple for over 24 years. While at Apple, I was the Vice President of Product Design for Apple's iPhone and Apple Watch product lines. I also oversaw some accessory design and ran Apple's Material and Acoustic teams. I have been named as an inventor on more than 400 patents and patent applications from technology I developed, including multiple patents for personal media devices with audio features.

3.  I left Apple in February 2024 and joined io the following month to begin working with Jony Ive, Scott Cannon, and Evans Hankey, all former colleagues from Apple. At the time, io had not decided upon a particular product or form factor. Our goal was, and is, to create a family of products that would revolutionize the way people interact with AI technology.

4.  For six to eight months, io surveyed the existing commercial offerings and engaged in prototyping exercises as we explored a wide variety of different form factors. As part of io's industry exploration, we considered a broad range of form factors, including objects that were desktop-based and mobile, wireless and wired, wearable and portable. As part of these early development exercises, my team and I began buying many different types of earbuds, headphones, and even hearing aids, and I instructed one of the engineers on my team, Marwan Rammah, to purchase iyO's VAD PRO wired headphones, among dozens of others.

5.  In May 2024, I placed a pre-order for iyO's ONE earbuds with Wifi+LTE from iyO's website. The website listed the price as $1199, and the preorder downpayment as $69. A true and correct copy of my invoice is attached hereto as **Exhibit A**. At the time of my purchase, iyO represented that the product would ship in "winter 2024." However, on January 13, 2025, I received an email from iYO, stating that the ship date for the Wi-Fi version had been delayed until August

2

Case No. 3:25-cv-04861

2025, with the LTE version "delayed further." A true and correct copy of this email is attached hereto as **Exhibit B**. I still have not received the iyO ONE earbuds I pre-ordered.

6. In approximately March 2025, I learned that Jason Rugolo of iyO had approached Sam Altman to try to raise Series B funding. At the time, I was strongly disinclined to meet with anyone from iyO. The ONE earbuds I had pre-ordered from iyO 10 months earlier had not arrived, and there was no suggestion they would be arriving soon. I had also spoken to a (now former) iyO engineer, who told me he was seeking a new job because he was frustrated with iyO's slow pace, unscalable product plans, and continued acceptance of preorders without a sellable product. I also learned that the TED talk Mr. Rugolo gave about iyO ONE used a mock-up that was very far from a finished product. Based on this conversation and my own experience, I concluded that iyO was basically offering "vaporware"—advertising for a product that does not actually exist or function as advertised, and my instinct was to avoid meeting with iyO myself and to discourage others from doing so.

7. However, around this time, Steve Zadesky, my former hardware design mentor from Apple, reached out to me, told me that Mr. Rugolo wanted to meet with me, and encouraged me to meet Mr. Rugolo, saying he was "the real deal" and to approach the meeting with "an open heart." As a courtesy to Steve, I agreed to take the meeting with Mr. Rugolo.

8. When I agreed to the meeting with iyO, I made clear that I would not sign any NDA with iyO because I did not want io to receive any iyO confidential information. I understand that this was communicated to Mr. Rugolo, and he agreed to those terms.

9. Peter Welinder, VP of Products at OpenAI, introduced me to Mr. Rugolo via email on April 16, 2025, stating that Mr. Rugolo wanted to show me "some of the cool audio/earbud tech" his team had been working on. Mr. Rugolo responded by email a few minutes later, suggesting that we "start with a fitting" for the earbuds. We exchanged pleasantries, and, in response to Mr. Rugolo's compliments regarding my reputation, I wrote that I had heard "good things from our common friends," referring to Steve. Since the audiologist would be coming to io's office for the fitting, I asked if other io employees whom I thought may be interested could join, and Mr. Rugolo agreed. A true and correct copy of this email chain is included in **Exhibit C**. I invited them because

I thought it would be good for them to go through the experience of having custom earmolds made from the consumer perspective, including the discomfort of the molding process.

10. In late April, the audiologist came to io's office to take my ear impression. Mr. Rugolo was not present. This took approximately 15 minutes each and was physically uncomfortable. Mr. Rugolo emailed after to say he was "lookin[g] forward to meeting sometime next week and getting everyone's ears on some sound." I responded with my availability, noting that I "[l]earned a lot from the fitting." While at Apple, I had worked on designing wearable devices for many years, so I found the process for creating custom-molded earbuds interesting. My comment to Mr. Rugolo was not referring to iyO's technology or design, which the audiologist and I did not discuss. A true and correct copy of this email exchange is contained in **Exhibit C**.

11. Once it was decided that Mr. Rugolo would come to io's offices on May 1, 2025, he sent a calendar invitation stating, "iyo visits io." A true and correct copy of this calendar invitation is attached hereto as **Exhibit D**.

12. On May 1, 2025, Mr. Rugolo and an iyO audio engineer met with me and some other io employees to demonstrate the iyO ONE. The iyO ONE demonstration included three planned applications: (1) search, which allowed the user to give voice commands to search the internet (much like Siri on an iPhone with AirPods); (2) "Deej," which allowed the user to listen to music (much like Apple Music on an iPhone with AirPods); and (3) live translation. The demonstration did not go as planned, and various applications failed repeatedly, particularly the live translation. Although I had tried to approach the demonstration with an open mind, it confirmed what I expected: this was not a product that was ready for sale—or close to ready.

13. Only one io employee could hear the demonstration at a time. My demonstration was the last one, so when it concluded, I was the only io employee left. Mr. Rugolo explained that he was trying to fundraise for iyO. When I did not express interest, Mr. Rugolo pivoted, telling me that he would sell the entire iyO company for $200 million, which I understood to be the amount he had raised to date. When I again demurred, noting that I did not believe iyO's platform would be complementary to ours, Mr. Rugolo pivoted again, stating that, separately from the audio technology that he had just demonstrated, he had intellectual property that covered other AI. He asked me to

review this other intellectual property to see if it was "interesting" enough for us to consider purchasing. Mr. Rugolo seemed desperate for cash. In order to avoid being "contaminated" by another company's intellectual property, or charges that I learned something I otherwise knew from someone pitching it to me, it has long been my practice since my time at Apple to have technically savvy attorneys review outside content behind a "wall" or "curtain," so that I only review something if the attorneys deem it worthwhile and obtain the necessary safeguards. Accordingly, I responded that I would need to speak with io's attorneys before reviewing any iyO intellectual property.

14. Four days after the meeting, Mr. Rugolo emailed me, calling the failed demonstration "embarrassing" and explaining they were continuing to work on some of the reasons for the failures. He reiterated that he would "love to find a way to partner up." He suggested "launching together what we've built as an early 'developer kit.'" I responded a little over a week later, explaining again that iyO's product was "very different" from our product vision and that we did not believe the designs or hardware would be complementary; therefore, we did not see the value in a "developer kit." Trying to find some possible way to help Mr. Rugolo, I asked Mr. Rugolo if he still would like to have our IP lawyer create an air-curtain to review his IP portfolio, which he had previously told me "could be interesting"—those were his words, not mine. A true and correct copy of this email exchange is attached hereto as **Exhibit E**.

15. Mr. Rugolo responded on May 15, 2025, asking that we reconsider the developer kit concept, as well as having "subject matter experts" rather than attorneys review iyO's intellectual property portfolio. A true and correct copy of this email is also contained in **Exhibit E**. I did not want any io engineers to look at a third party's intellectual property portfolio, and I did not respond.

16. On May 21, 2025, io was announced through a blog post and video. The video does not advertise any specific product because io currently has no products for sale. The prototype Sam Altman referenced in the video is at least a year away from being offered for sale. Its design is not yet finalized, but it is not an in-ear device, nor a wearable device. io has not sold any products, offered any products for sale or distribution, distributed any products, or advertised any goods or services. It has no plans to do so for at least a year.

17. On May 25, 2025, Mr. Rugolo emailed me again, congratulating us on the launch. He also stated that he was "looking forward to continuing the conversation" and pressed again for us to consider the "developer kit" idea. I was surprised to receive this email, as I believed I had already made clear, as politely as I could, that io is not interested in pursuing this idea. I responded the next day, thanking Mr. Rugolo for his well wishes and confirming that we "have a dev platform already so not sure if this will be complimentary." In response, Mr. Rugolo asked for another meeting and raised, for the first time, an issue with our use of the "io" name, asking us to "stop using the name" while "we are continuing our conversations." A true and correct copy of these emails are also contained in **Exhibit E**. I was surprised to receive this email, too. There was no "continuing conversation," and Mr. Rugolo had never mentioned any issues with the io name in any of our prior communications over the past several weeks. It appeared to me that Mr. Rugolo was raising the issue of our name in bad faith to try to force us to do a deal with his company.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12th day of June, 2025 at San Francisco, CA.

By: Tang Tan
Tang Yew Tan

# EXHIBIT A

 Gmail

Tang Yew Tan ███████████

## IYO: Order Confirmed #1465

**IYO** <support@iyo.audio>
Reply-To: support@iyo.audio
To: Tang Yew Tan ███████████

Sun, May 19, 2024 at 11:36 PM


SHOP

## Order #1465 Confirmed

Your order from IYO is confirmed.

**Thank you for placing an order deposit for IYO ONE.**

We expect to release IYO ONE this winter. As the release date gets closer, you'll receive more product details as well as have an opportunity to finalize all options for your purchase.

In the meantime, if you have any questions, please email us at support@IYO.audio or call us at 1-480-818-0356. We're typically available 10am-4pm PT, but will call you back as soon as we can.

Thank you,

The IYO team

## Order Summary

**Order #1465**

**Confirmation Code avQMUIo64YLQZphZ4dASdw**

Placed on May 19, 2024 at 11:36 PM PDT



**IYO ONE pre-order deposit**        **$69.00**

SQ8076286

Connectivity: WIFI + LTE 32GB

Qty: 1

$69.00 / Item

---

| Subtotal | $69.00 |
|---|---|
| Sales Tax | $0.00 |
| **Total** | **$69.00** |

---

Paid with CARD — ▮▮▮▮        **$69.00**

---

## Please confirm

Do you agree to receive text messages related to your order?

I do not agree to opt in

D you accept the Terms of Service (iyo.audio/terms) and Privacy (iyo.audio/privacy)

I accept

---

## Customer Information

**Billing Address**

Tang Yew Tan

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

US

▮▮▮▮▮

**Payment Method**

CARD —

VIEW YOUR ORDER



# EXHIBIT B

 Gmail

## iyO ONE update :D

**jason rugolo** <jason@iyo.audio>
To: "support@iyo.dev" <support@iyo.audio>
Bcc: ████████████████

Mon, Jan 13, 2025 at 10:39 PM

hey everybody :)

if you're receiving this email, you're one of the many early backers who have supported us by pre-ordering the iyO ONE.

we're really excited to update everyone.  we have been grindin' very hard for y'all.  birthing a new computer paradigm is not for the faint of heart.

we're makin a ton of progress on building the iyO ONE and getting it out to you.  we have entered the first phases of  manufacturing, and things are going well.

we are confident that the iyO ONE is the most sophisticated, most featureful, and all around simply the best audio device ever created.

we're really proud of how it's coming together! :D

*tl;dr:*
1. we have a ton of updates on the product; manufacturing, hardware specifications + features, color options, and more below.
2. iyO ONE Wi-Fi version is somewhat late, now shipping target is august.  the LTE version is more late, we will have precise date soon and update everyone.
3. we have decided to push aggressively on software features.  we intend to ship the iyO ONE with the following natural language apps out of the box: translation, superhearing, ask anything, and a music dj.  each app will have its own details and description (think just like a smartphone app).  we will open up to third party app development shortly after we get the iyO ONE to our early adopters, as you are our first priority.

---

because we have so many updates for everyone, we are trying to keep it all brief and informative.  if you want to know more about any of the below, please email us at support@iyo.audio.  for fair warning, we are overloaded on the amount of inbound we get as a small company, and so we appreciate your patience as we try to answer everyone's questions.

1. **we have a ton of updates on the product; hardware features, software features, and color options!**
   a. *upgrade! :)*  we have decided to upgrade the Wi-Fi version's specifications by adding more memory.  the Wi-Fi version now has 2GB of RAM, and 32GB of flash memory.
   b. *price increase.*  we have discovered we need to increase the price of the iyO ONE.  (don't worry, we will honor the pre-order pricing!)  for all new orders from today, the price will be

higher.  unfortunately we are not like the big tech companies that can afford to lose money on high-end hardware.

   c. *3 colors*.  you will have three color choices.  we'll put out a video soon so you can see the three colorways.  they are all very dope!  we will reach out shortly to ask you all which color you prefer.

   d. *caps.*  we have developed an accessory we call "caps".  these are thin shells that go over your device, much like a smartphone case, but much thinner.  they offer some protection, and also allow you to stylize the device on a daily basis.  keep an ear out for updates on caps and their availability for purchase.

   e. *fitting.*  we now have two fitting options in partnership with earproject.org.  there is a $99 fitting and a $199 fitting.  in the $99 fitting, the customer will travel to the fitting specialist, and in the $199 fitting, earproject.org will arrange to have the specialist come to you.  if you're receiving this email, your fitting has already been included in your price, though for future orders we will break this option out during checkout so customers can choose their desired level of service.

   f. *battery life.*  battery life is looking pretty incredible.  the runtime will depend a lot on usage, just like your smartwatch or your smartphone.  but we are seeing all day wear numbers (16+ hours) with what we'd consider "normal usage", which was our objective.

on to production updates…we're starting a new meme, we are calling it, "production heaven". :D  cause, you know what they say, "hardware is easy".  really though, it has required everything we got to get these devices to a really highly reliable, mass manufacturable state.

a lot of you have been asking, when will we ship?  we are lucky to have partnered with one of the best manufacturers in the world...the same people who make the iPhone Pro and Pro Max.

we have, in our hands already, fully integrated and working devices, which were designed for manufacture, and we couldn't be more excited about them.  we still have a way to go to get the manufacturing line set up and working flawlessly, however.  this takes time to do it right.

   2. **we had intended to ship iyO ONE before the end of winter, and it looks like we're not going to hit that mark given there's only 2 months left of winter.  our new deadline we're working hard to hit is august.  the LTE model is delayed further, and we expect to have the detail production schedule soon and will update further.  i am in taiwan now personally trying to move things as fast as i can.**

part of our obsession is building these devices to the level of finish and quality that we stand for here and would want for ourselves.  we are very happy about how the devices are turning out.  these things are really incredible!

we are disappointed about the delay, but trust us we are moving mountains to breathe life into these things.

finally, we wanted to update quickly on software features.

the device itself is running a modified version of android AOSP 14, and will function in two modes: "companion mode", where the device is connected to your phone and works with the iyO app installed on your android or iOS device; and "phone-free" mode, where the device is connected directly to the internet either via WiFi or LTE.

in our opinion, the iyO ONE stands on its own as a headphone, and is worth the money simply for being such an incredible feat of audio engineering.  it is less expensive than other high-end audio devices out there that do far less and frankly don't bring the same sound quality or build quality.

but we didn't want to stop there, and so have decided to really push hard to include novel software features consistent with our big vision of natural language computing when we ship the devices.

3. **we have decided to do a hard push on software features.  we intend to ship the iyO ONE with the following natural language apps out of the box: translation, superhearing, ask anything, and a music dj.  each app will have its own details and description (think just like a smartphone app).  we will open up to third party app development shortly after we get the iyO ONE to our early adopters, as you are our first priority.**

   a. *translation.*  the translation app, which we call "babl", will be able to translate almost any language pair.  we will focus on developing high quality experiences for translations TO ENGLISH from most of the popular world languages.  the app uses the microphone array to capture a beamformed signal which enhances the target voice before going into the translator.  this helps to reduce the confusion when there is a complex noise environment.  the app works really well, and there are also some places for improvement.  we will be continuing to develop the experience before launch.  breaking down language barriers with an app like this is a mission we're all very passionate about.

   b. *superhearing.*  the hearing enhancement app, which we call "owl", will help you hear things that are right in front of you, especially in noisy environments like a restaurant or a bar.  it uses the 8 microphone array on each ear and some complicated math to make your hearing very directional.  cutting noise out of our lives is going to make everything more pleasant!

   c. *ask anything.*  the ask anything app, which we call "sherlock", is basically the smarty pants you wish you had to answer all those random questions that come up during your day.  what's the capital of tajikistan?  how many galaxies are there in the universe?  you know, the important stuff :).  it feels so natural and just so easy to just ask out loud these questions in a conversation with sherlock, rather than having to pull out your phone, unlocking it, finding the search bar, and then searching google for the answer.  sherlock is just faster and much more convenient.

   d. *music dj.*  the music dj app we have in development, we call it "deej", is pretty awesome.  we have currently designed an agent to control your spotify account through their API.  talking to deej is a pretty incredible experience.  you can have a casual conversation about music genres or even specific songs, and, when you ask, deej can spin up tracks according to your conversation.  we have found it's a pretty great way to listen to music.  (in the future, we may use other music services too, but for now you will need a spotify account for it to work.)

okay, that's all the updates for now.  apologies that this email is so long!  we really have so much more to say.

please remember if for any reason you'd like to cancel your pre-order, no worries at all.  just send us an email at support@iyo.audio and we'll take care of you.

we are likely to switch format here to making some update videos, as it will be hard for us to get all the updates in words, given how much work there is to do on getting these devices built and shipped out to you!

thank you again for all of your support.

❤️,

--



**jason rugolo**
founder + ceo
650.515.5285
iyo.audio

# EXHIBIT C

**From:** **jason rugolo** jason@iyo.audio
**Subject:** Re: jason <> tang
**Date:** April 24, 2025 at 12:11 AM
**To:** Tang Tan tang@presidiotech.com
**Cc:** Evans Hankey evans@presidiotech.com, Peter Welinder pw@openai.com

JR

hi tang! :)

thursday would work great!

shall we come to 535 Pacific Ave then at 11am on the 1st?

best,
--

 **jason rugolo**
founder + ceo
650.515.5285
iyo.audio

On Wed, Apr 23, 2025 at 11:03 PM Tang Tan <tang@presidiotech.com> wrote:
Jason,

Anga did an amazing job taking the ear impressions. Learned a lot from the fitting.

Curious to listen to some sounds next week. Marwan mentioned that the demo was impressive.

How does Tuesday 4/29 late morning/early afternoon work? or Thursday 5/1 late morning?

Thanks,
Tang

> On Apr 17, 2025, at 5:06 PM, jason rugolo <jason@iyo.audio> wrote:
>
> hi all!  :)
>
> @evans no worries!  i won't be at the fitting this evening...hopefully we'll be able to finally meet in person soon.
>
> @tang no problem on fitting those additional folks.  lookin forward to meeting sometime next week and getting everyone's ears on some sound.
>
> best,
> --
>
>  **jason rugolo**
> founder + ceo
> 650.515.5285
> iyo.audio
>
> On Thu, Apr 17, 2025 at 11:48 AM Evans Hankey <evans@presidiotech.com> wrote:
> Hello Jason! I have been looking forward to meeting since our phone call a few years ago.
>
> Unfortunately I have a conflict at 5pm so I likely won't be able to meet you. Hopefully another time soon.
>
> Best,
> Evans

On Apr 17, 2025, at 11:10 AM, Anga Lao <anga@iyo.dev> wrote:

Hi Tang,

Yes, I'd be happy to complete all the ear impressions today for you and your team. Would you mind sharing everyone's names with me? That way, I can ensure everything is organized and ready to go.

Thank you,
Anga

On Thu, Apr 17, 2025 at 10:45 AM Tang Tan <tang@presidiotech.com> wrote:

Angi

Looking forward to the fit session this afternoon.
Is it possible to get 5 people fitted? Some folks are curious about the fit.

Thanks
Tang Tan

> On Apr 16, 2025, at 6:51 PM, Anga Lao <anga@iyo.dev> wrote:
>
> Thank you so much for your response. 5:30 p.m. will work out perfectly. I look forward to meeting you and will be happy to fit in any additional colleagues while I'm there.
>
> My phone number is 206-818-9391.
>
> Best,
> Anga Lao, AuD
> Audiologist

On Wed, Apr 16, 2025, 6:22 PM Tang Tan <tang@presidiotech.com> wrote:

+ Evans

Come by 535 Pacific Ave. How about making it 5:30pm?
Unfortunately Jony is traveling this week, and Scott might be tied up. Checking if Evans is available for a fitting as well at 5:30pm tomorrow.

Thanks
Tang

> On Apr 16, 2025, at 6:08 PM, jason rugolo <jason@iyo.audio> wrote:
>
> awesome tang!
>
> anga (cc'ed here) is our best. :)
>
> she'll come to you at 5pm tomorrow.
>
> should she come to:
>
> 535 pacific ave
> sf 94133
>
> she'd be happy to fit jony and scott too, if they're interested.
>
> looking forward to meeting!
>
> best,
> --
> **jason rugolo**



founder + ceo
650.515.5285
iyo.audio

On Wed, Apr 16, 2025 at 4:21 PM Tang Tan <tang@presidiotech.com> wrote:
(Thanks Peter!)

Jason,

Great to e-meet you. I've also heard many good things from our common friends.

Happy to chat and listen to some sounds.  Let me know when I can get a fitting? I can make time tomorrow Thurs 4/17, between 12-3pm or after 5pm. Or next Monday 12-3pm.

Looking forward.

Thanks,
Tang

On Apr 16, 2025, at 12:35 PM, jason rugolo <jason@iyo.audio> wrote:

hi tang!

i know you well by your all star reputation among the apple folks. :)

would love to chat the future of audio x ai with you, and share some sound with you.

looking forward to meeting you!  i would suggest we start with a fitting if that sounds good to you.

best,
--



**jason rugolo**
founder + ceo
650.515.5285
iyo.audio

On Wed, Apr 16, 2025 at 12:27 PM Peter Welinder <pw@openai.com> wrote:
Hi Jason and Tang,

You both have context. Jason wants to show some of the cool audio/earbud tech the iyo team has been working on. I'll let you take it from here.

# EXHIBIT D

tang@presidiotech.com



# iyo visits io

Created by: jason@iyo.dev · Your response: ✔Yes, I'm going

**Time**

11am - 12:20pm (Pacific Time - Los Angeles)

**Date**

Thu May 1, 2025

**Where**

535 Pacific Ave, San Francisco, CA 94133, USA

**My Notes**

**Guests**

👤 ✔ jason@iyo.dev
👤 ✔ Tang Yew Tan
👤 ✔ pw@openai.com

# EXHIBIT E

**From:** **jason rugolo** jason@iyo.audio
**Subject:** Re: thanks for having us! next steps?
**Date:** May 29, 2025 at 9:32 PM
**To:** Tang Tan tang@presidiotech.com
**Cc:** Peter Welinder pw@openai.com, Sam Altman sam.hg.altman@gmail.com

hi tang and peter!

(cc sam)

i'm definitely happy to help think through together! :)

there's a lot of perspective here to unpack about all the different modes to run an agent-first computer like iyO ONE, and their respective value to the user in different use scenarios.

in terms of next steps, perhaps we can meet friday (tomorrow) afternoon to discuss?  i am at TPE airport right now and will land around 11:30am PST in SF, so i can be available any time in the afternoon.  i can also meet saturday or sunday.

i let sam know that the name issue is causing me problems (it's been a while since i've been blown up this hard by pretty much everyone, iyO investors, professional network, etc).  it is a rather urgent issue for us, given we are approaching availability of our product and currently fundraising.

while we are continuing our conversations, could you agree in writing to stop using the name?  if you could do this friday or over the weekend, this would help give me confidence our conversations are continuing in good faith.

best,

--



**jason rugolo**

founder + ceo

650.515.5285

iyo.audio


On Tue, May 27, 2025 at 7:56 AM Tang Tan <tang@presidiotech.com> wrote:
Jason,

Thanks for the well wishes. It really is an interesting moment for AI devices, as you're already well aware.

Thanks for the list of developer kit configurations, and we'll need to think about this. We have a dev platform already so not sure if this will be complimentary.

Also, I spoke to our IP lawyers and they suggested to give the air-curtain idea a pause for now.

We have a lot of work ahead of us, and we'll definitely give this a think.

Hope your Rel work is going ok.


Thanks,
Tang


> On May 23, 2025, at 6:55 PM, jason rugolo <jason@iyo.audio> wrote:
>
> hey guys! :)
>
> congrats on the launch! and the acquisition!
>
> it's a really big deal!  (said as congratulations, and also, quite literally )

i'm looking forward to continuing the conversation.

i haven't had more time to write about the "developer kit" idea in detail given REL is so intense right now.

in short, there are a lot of ways to "run" these little screenless compute discs we've made.

you can think of them as just a general purpose source of connectivity to cloud with some local processing and memory.

they could be configured in:

1. **mixed audio reality mode** - with the custom virtual auditory display "accessory" attached, two discs can go directly into your ears to display a mixed audio reality agentic UI (where iyO has focused to date)
2. **pendant mode** - the magnetic connector allows the computer to easily be hung around the neck as an observant AI companion with audio superpowers (8 mic array)
3. **pocket mode** - as a screenless computer, you can carry it around with you, talk to it, have it observe your life passively and share with other devices for UI.
4. **vision mode** - the disc can have a USB camera module attached to the back connector to enable vision (can send renders)
5. **console mode** - the disc can be attached to a USB display or other input device, where disc holds data, credentials, connectivity, and console accessory gives more UI surface, like a laptop or phone physical UI where the disc is the brains. (will struggle to drive a large display, can send renders)

i can show you guys the way we've rendered all these use scenarios out in the past.

we have had to focus on the mixed audio reality development because we believe that's the "roadster" experience of agentic UI, where you have perfect voice pickup and ability to hear the agent output.  this is also why we built the VAD technology first.

but these other use scenarios and their applications may be super exciting to explore for openAI developers.

(one side note, for the use scenarios that involve only one compute disc, we have not yet made a single-disc charge case.  that's easy, we just haven't prioritized it.  we could do it very quickly though as the two disc charger is much more complicated.)

happy to chat further; please let me know how you'd like to proceed.

best,
--



**jason rugolo**

founder + ceo

650.515.5285

iyo.audio


On Fri, May 16, 2025 at 10:28 AM jason rugolo <jason@iyo.audio> wrote:

hello guys from taipei...in REL heaven over here ;)

on IP, happy to discuss!

have y'all done this air-curtain before?

my gut says lawyers are not the best judges of relevance or value or potential, and that it would be beneficial to have some subject matter expert(s) in the loop who would understand the rapidly evolving technology space.

i'm not totally sure how to do that, any ideas?

we can have a briefing of the most relevant matters prepared in a day or so to share with whomever you find the most relevant to digest them.

(i hear you on the different product design vision, and the concern the dev kit approach may not be directly relevant to your products under development.  under separate cover i'd like to share some thoughts about the dev kit concept and the quality of AUI/AUX across all the conceivable hardware interfaces.)

best,

Best,
--

**jason rugolo**
founder + ceo
650.515.5285
iyo.audio

On Fri, May 16, 2025 at 7:45 AM Tang Yew Tan <tang@presidiotech.com> wrote:
Jason,

Apologies for the delay in response.
We think your device is delightful and has potential.

However, it's very different from our product vision and not sure how much of the design/HW can be ported over. Given the differences, I'm not sure how much value we get as a "developer kit" for future products.

You mentioned that you have a portfolio of IPs that could be interesting. I can set you up with our IP lawyer so we can create an IP air-curtain. Let me know if you're open to that.

Thanks,
Tang

ps. is it possible to get our ear plugs?

On May 6, 2025, at 4:58 PM, Peter Welinder <pw@openai.com> wrote:

Hi Jason,

Thanks for stopping by. And thanks so kindly for leaving me a pair of headphones too!

Hope you're feeling better. Me and Tang will huddle a bit over the next few days to figure out next steps.

Best,
Peter

On Mon, May 5, 2025 at 4:01 PM jason rugolo <jason@iyo.audio> wrote:
hey tang and peter!

apologies for the delayed followup; i got hit pretty hard with a cold.

thanks a lot for having us over to the little fox theatre.

it was really wonderful to meet the team!

btw, i'm SO SORRY we had demo fails.

how embarrassing. 😅

1. *peter's fail*:  we've root-caused the issue with peter's fail (we had recently increased the threshold on the local dsp voice activity detector to get better rejection of non-speech canal-borne sounds, but apparently we increased it too high for soft voices in quiet rooms...it was a total own goal there!)
2. *tang's fail*:  as for tang's fail with the babl app, it's still a mystery for us where that horrendous lag was coming from...as it wasn't there before, and now it is gone.  we're putting in some tooling so we can watch the latencies on the stack in real time in the future.

(all is working now if y'all are up for a re-demo anytime :)

tang, please let me know how you and the team are thinking after our meeting.

i'm very bullish on openAI and would love to find a way to partner up.

i think launching together what we've built as an early "developer kit" for screenless agentic interaction could

be an awesome opportunity.

not only would we learn a lot from it---we would---and we could feed those learnings into future products.

but we'd also energize the developer community, right now, and if we play it right we'd be able to ride that energy to winning a platform network effect as we follow with improved, more mass market products in '26.

that'd be a real moat.

best,

--

**jason rugolo**
founder + ceo
650.515.5285
iyo.audio

# EXHIBIT 2

## IYO INC.

### EMPLOYEE CONFIDENTIAL INFORMATION AND
### INVENTION ASSIGNMENT AGREEMENT

*Employee Name:* Daniel Burton Sargent

*Effective Date:* June 26, 2023

As a condition of my becoming employed (or my employment being continued) by Iyo Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, the receipt of Confidential Information (as defined below) while associated with the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby agree to the following:

1.    **Past and Future Activities**.  This Employee Confidential Information and Invention Assignment Agreement (this "Agreement") applies to my employment relationship with the Company.  For purposes of clarity, if (a) I performed work, activities, or services, or otherwise made efforts, on behalf of the Company or for its benefit, or in anticipation of my involvement with the Company that would have been within the scope of my employment relationship if performed during the term of this Agreement or (b) within one (1) year after my employment relationship with the Company ends I become reemployed by the Company, then, unless the Company and I otherwise agree in writing, this Agreement shall apply to all such past and future work, activities, services, and efforts.  The "Relationship" refers to my employment relationship with the Company, whether commenced before, on, or after the Effective Date.

2.    **Confidentiality**.

(a)    **Confidential Information Definition**.  "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable, and without regard to whether such information and physical manifestations thereof are marked or otherwise designated as "confidential", "proprietary", or something similar.  Confidential Information includes, without limitation:  (i) Company IP (as defined below); (ii) IP owned or licensed by the Company prior to or outside of this Agreement; (iii) Company Data (as defined below) that I receive, access or use in connection with the Relationship; (iv) access credentials, such as username, password, security key, security token, or PIN; (v) lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants); and (vi) lists of, agreements with, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship) and any other third parties, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or

other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation. Notwithstanding the foregoing, Confidential Information does <u>not</u> include information that is generally available to and known by the public through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b)    **Protection of Information**. I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information, without which I would not be able to perform my duties to or for the Company. At all times during the Relationship and thereafter, I shall hold any and all Confidential Information that I obtain, access, or create during the Relationship in strictest confidence, shall not use such Confidential Information except for the Company's benefit and to the extent necessary to perform my obligations to the Company in connection with the Relationship, and shall not disclose such Confidential Information to any third party without written authorization from the Company in each instance. I shall comply with the foregoing obligations whether or not during working hours, until the information at issue is no longer Confidential Information as described herein. I will not make copies of any Confidential Information (including any documents, records, files, media, or other resources containing any Confidential Information) except as authorized by the Company or in the ordinary course of my obligations to the Company in connection with the Relationship. I shall not use Confidential Information in violation of any applicable laws.

(c)    **Third Party Information**. During the Relationship and thereafter, I will not improperly use or disclose to the Company any confidential, proprietary or secret information of my former employer(s) or any other person, and I will not bring any such information onto the Company's property or place of business or upload or transfer any such information to the Company's property, devices, or cloud services accounts.

(d)    **Other Rights**. This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

(e)    **Permitted Disclosures**. Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. To the extent legally permissible, I shall promptly provide reasonable advance written notice of any such order to an authorized officer of the Company. Without limiting the generality of the foregoing:

(i)    Nothing in this Agreement prohibits or restricts me (or my attorney) from communicating with the Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any other applicable regulatory authority regarding a possible securities law violation.

(ii)    Nothing in this Agreement prohibits or restricts me from exercising protected rights, including without limitation those rights granted under Section 7 of

the National Labor Relations Act, or otherwise disclosing information as permitted by applicable law, regulation, or order.

          (iii)    The U.S. Defend Trade Secrets Act of 2016 ("DTSA") provides that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, DTSA provides that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (x) files any document containing the trade secret under seal; and (y) does not disclose the trade secret, except pursuant to court order.

       3.    **IP Matters**.

         (a)    **IP Definitions**.

          (i)    "IP" means any and all: (A) processes, machines, manufactures, compositions of matter, and other potentially patentable subject matter of any kind, as well as discoveries, ideas, inventions (whether or not reduced to practice), algorithms, calculations, methods, techniques, technology, equipment, tools, devices, apparatuses, systems, compounds, formulations, designs, and configurations; (B) written, photographic, audio, video, audiovisual, or other content of any kind (in whatever form embodied), including without limitation software (in whatever form embodied, including source and executable code), content, textual or artistic works, videos, graphics, sound recordings, mask works, manuals, documentation, communications, specifications, memoranda, communications, records, laboratory notebooks, flowcharts, presentations, notes, reports, lists, and other works of authorship and other potentially copyrightable subject matter of any kind; (C) trade names, trade dress, slogans, logos, trademarks, service marks, and other source identifiers and other trademarkable subject matter of any kind; (D) trade secrets (including those trade secrets defined under any applicable laws, including without limitation the Uniform Trade Secrets Act and DTSA), business, technical and know-how data and information, non-public information, and confidential information, including all know how, processes, customer, client, and personnel lists or data, business and marketing plans, and marketing information and rights to limit the use or disclosure thereof by any person; (E) data, databases, and data collections of any kind; and (F) any enhancements, improvements, derivatives, or modifications of any kind of any of the foregoing; in each case with respect to subsections (A) through (F) whether or not any of the foregoing is patentable, copyrightable, trademarkable, or otherwise legally protectable.

         (ii)    "IP Rights" means any and all intellectual property, industrial, or other proprietary rights of any kind, throughout the world, in IP, including without limitation any and all: (A) patent rights and any equivalent or similar rights in or relating to patentable subject matter, such as utility models and industrial rights; (B) copyrights and all other rights corresponding thereto, and any equivalent or similar rights in copyrightable works of authorship, semiconductor masks, layouts, architectures or topology, moral and economic rights of authors

-3-

and inventors, however denominated and any similar or equivalent rights in or relating to any of the foregoing; (C) rights in or relating to trademarks of any kind and character and goodwill associated with and symbolized by such trademarks; (D) rights in or relating to trade secrets, confidential and proprietary information and know-how, and industrial designs; (E) rights in or relating to data or databases; and (F) rights in or relating to applications and registrations for, all related rights of priority with respect to, and renewals, combinations, divisions, reissues, continuations, or extensions of, any of the rights referred to in subsections (A) through (E) above.

(iii)    "Company IP" means, other than Excluded IP:  (A) IP that I solely or jointly author, discover, develop, conceive, or reduce to practice during the period of, or otherwise in connection with, the Relationship or that includes, incorporates, or otherwise relies upon the use of or results from access to, Confidential Information; (B) any other work product, deliverables, materials, compilations, analyses or information that I solely or jointly author, discover, develop, conceive, or reduce to practice in connection with, or otherwise during the period of, or otherwise in connection with, the Relationship, including without limitation Company Data (as defined below); and (C) all IP Rights in any of the foregoing.

(iv)    "Employee Background IP" means IP that, as of the Effective Date:  (A) has been created by me or on my behalf; (B) (x) is owned exclusively by me or jointly by me with others or (y) in which I otherwise have an ownership interest; (C) relates in any way to any of the Company's actual or proposed businesses, products, services, or research and development; and (D) which is not intended to be assigned to the Company hereunder.

(v)    "Excluded IP" means IP that I solely or jointly author, discover, develop, conceive, or reduce to practice in connection with, or otherwise during the period of the Relationship that qualifies fully for exclusion under the provisions of applicable state law, if any, attached hereto as Exhibit B.

(vi)    "Moral Rights" means all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like.

(b)    **Employee Background IP Disclosure**.  I have attached hereto, as Exhibit A, a complete list describing with particularity all of my Employee Background IP.  I understand that my listing of any IP on Exhibit A does not constitute an acknowledgement by the Company of the existence or extent of such IP, nor of my ownership of such IP.

(c)    **Use or Incorporation of Employee Background IP and Excluded IP**. If in the course of the Relationship I use or incorporate into any of the Company's products, services, processes, or machines, or create in any Company IP any dependency on, any Employee Background IP or Excluded IP, I will promptly so inform the Company in writing. Whether or not I give such notice, I hereby grant to the Company a perpetual, irrevocable, fully paid-up, royalty-free, worldwide, fully transferable and sublicensable (through multiple tiers), nonexclusive right and license to practice and exploit such Employee Background IP and Excluded IP and to make, have made, copy, modify, prepare derivative works of, use, sell, import, and otherwise distribute and commercialize the product, service, process, machine, or

-4-

Company IP in which it was used or incorporated, or with respect to which the Company has a dependency on such Employee Background IP or Excluded IP.

        (d)     **Company IP and Excluded IP**.

        (i)     **Records and Disclosure**.  I shall keep and maintain adequate and current written records of all IP made or conceived by me (solely or jointly with others) during the Relationship, which such records shall be considered Company IP.  The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format.  I will make the records available to the Company on request.  I will not remove such records from the Company's place of business or systems except as expressly permitted by the Company's policy which may, from time to time, be revised at the Company's sole election.  Without limiting the generality of the foregoing, during the Relationship and for a period of twelve (12) months thereafter, I will promptly make full written disclosure to the Company of all IP that I solely or jointly author, discover, develop, conceive, or reduce to practice during the period of, or otherwise in connection with, the Relationship for, among other things, the Company to determine which IP is Company IP and which is Excluded IP.

        (ii)     **Ownership of Company IP**.  The Company and I intend for all Company IP to be owned solely and exclusively by the Company.  I acknowledge that, to the extent permitted by law, all Company IP consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. §101), are fully compensated by my salary, and such copyrights are therefore owned by the Company.  With respect to all other Company IP, or to the extent not otherwise vested in the Company by operation of law, I will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, for no additional consideration, all of my right, title and interest (including Moral Rights) in and to any and all Company IP.  I further hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any Company IP.  If I have any rights to Company IP that cannot be assigned to the Company, I hereby grant to the Company a perpetual, irrevocable, fully paid-up, royalty-free, worldwide, fully transferable and sublicensable (through multiple tiers), exclusive right and license to practice and exploit such rights and to make, have made, copy, modify, prepare derivative works of, use, sell, import, and otherwise distribute and commercialize any Company products or services that may practice such rights.  Without limiting the generality of the foregoing, to the extent I have any Moral Rights in Company IP that cannot be assigned or exclusively licensed under applicable law, I hereby waive and agree not to enforce any such Moral Rights, including without limitation any limitation on subsequent modification, to the extent permitted under applicable law.

        (iii)     **Further Assurances; Power of Attorney**.  During and after the Relationship, I agree to reasonably cooperate with the Company, at the Company's expense and within the Company's timeframe, to:  (i) apply for, obtain, perfect, and transfer to the Company all Company IP; and (ii) maintain, protect, and enforce the same, including without limitation by participating in litigation and regulatory proceedings, as well as executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments requested by the Company.  I hereby irrevocably grant the

-5-

Company a power of attorney to execute and deliver any such documents on my behalf in my name and to do all other lawfully permitted acts to transfer the Company IP to the Company and further the transfer, issuance, prosecution, and maintenance of all IP Rights therein, to the fullest extent permitted by law, if I do not promptly cooperate with the Company's requests (and without limiting any other rights or remedies the Company may have in such circumstances). The foregoing power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

(e)      **Publicity**.  I hereby consent to any and all uses and displays by the Company and its agents of my name, voice, likeness, image, appearance, and biographical information in any media, at any time during or after the Relationship, for all legitimate business purposes of the Company.  I hereby forever release the Company and its directors, officers, employees, and agents from and against any and all claims, actions, damages, losses, costs, expenses, and liabilities of any kind, arising under any legal or equitable theory whatsoever, relating to any such permitted use of any of the foregoing.

4.      **Privacy.**

(a)      **Personal Information Definition**.  "Personal Information" means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular individual or household.

(b)      **Privacy Notice**.  I acknowledge that:

(i)      the Company collects certain Personal Information about me, which may include contact information, identification materials, demographic information, professional information, education and training information, financial information, benefits information, security credentials, information about my activity on and use of the Company's facilities and its telecommunications, networking and information processing systems, as well as other work related information.  The Company may collect such information directly from me as well as from supervisors, colleagues, customers, vendors, publicly available sources and other third parties I may interact with as an employee of the Company.  In addition, the Company may also collect this information through service providers and other third parties that collect it on the Company's behalf, such as communications providers, payroll providers and benefits providers; and

(ii)      the Company uses my Personal Information in the ordinary course of business for purposes such as:  recruiting, onboarding, staffing, leave, personnel evaluations, promotions, performance management, training, discipline; supporting and managing personnel; managing access to or use of company systems, facilities, records, property and infrastructure; monitoring employee conduct and compliance with the Company's policies and practices; improving efficiency; compensation, payroll, and benefit planning and administration; managing business travel; communicating with and between personnel, as well as with designated emergency contacts; investigating, documenting and reporting work-related injuries, illnesses, or grievances; conducting other internal investigations, audits, and risk assessments; fulfilling contractual obligations to personnel and third parties; and complying with applicable laws.

-6-

5.    **Company Property.**

(a)    **Company Equipment; Returning Company Documents.  I** acknowledge that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, files, email messages, and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice.  I further acknowledge that any property situated on the Company's premises or systems and owned by the Company, including storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice.  At the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

(b)    **Company Data**.  I acknowledge that in the course of the Relationship I may collect, receive, access, or use Personal Information and/or other Confidential Information relating to the Company's customers, potential customers, end-users, suppliers, potential suppliers, employees, independent contractors, and other personnel, or others (collectively, "Company Data"), and that such Company Data may be subject to protection by federal, state or international privacy laws or contractual restrictions on use.  I agree to treat Company Data as confidential and in compliance with all applicable laws, and I shall not collect, use, retain or disclose Company Data for any purpose other than as necessary for the purpose of performing legitimate business activities within the scope of the Relationship.  I acknowledge that failure to adhere to the policies, procedures, contractual restrictions and instructions that the Company has implemented to protect the privacy and security of Company Data is a violation of the terms of my employment and may result in termination.

6.    **Non-Solicit**.

(a)    **Generally**.  As described above, I acknowledge that the Company's Confidential Information includes information relating to the Company's customers, potential customers, end-users, suppliers, potential suppliers, employees, independent contractors, and other personnel, and others, and I will not use or disclose such Confidential Information except as authorized by the Company in advance in writing.  I further agree as follows:

(i)    **Employees and Independent Contractors**.  During the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason (the "Restriction Period"), whether with or without cause, I shall not, directly or indirectly, solicit any of the Company's employees or independent contractors to terminate their relationship with the Company, either for myself or for any other person or entity.

(ii)    **Other Parties**.  During the Relationship, I will not influence any of the Company's actual or potential customers from purchasing the Company's products or services or solicit or influence or attempt to influence any actual or potential customer, either

-7-

directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

(b) **Notice to Third Parties**.  During the Restriction Period, I shall inform any entity or person with whom I may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of my contractual obligations under this Agreement.  I acknowledge that the Company may, with or without prior notice to me and whether during or after the Relationship, notify third parties of my agreements and obligations under this Agreement.  To the fullest extent permissible under applicable law, upon written request by the Company, I will respond to the Company in writing regarding the status of my employment or proposed employment with any party during the Restriction Period.

7. **Representations and Covenants**.

(a) **Facilitation of Agreement**.  I shall execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

(b) **No Conflicts**.  I represent and warrant that my performance of my duties for the Company and all the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party (including without limitation any former employer), including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship.  I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party.  I represent and warrant that I have listed on Exhibit A all agreements *(e.g.*, non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company.  I shall not enter into any written or oral agreement that conflicts with the provisions of this Agreement without the Company's prior written consent.

(c) **Voluntary Execution**.  I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

8. **Acknowledgment.**  I acknowledge that the duties to be performed by me for the Company are of a special and unique character, that I will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing strategies by virtue of my employment, and I agree that the terms of this Agreement are reasonable under such circumstances.  I further acknowledge that the amount of my compensation reflects, in part, my obligations and the Company's rights under this Agreement and I have no expectation of any additional compensation, royalties, or other payment of any kind in connection with my performance of this Agreement, that I will not be subject to undue hardship by reason of my full

compliance with this Agreement or the Company's enforcement thereof, and that this Agreement in itself is not a contract of employment for any particular time period and shall not be construed as a commitment by the Company or me to continue an employment relationship for any particular time period.

9.    **Miscellaneous**.

(a)    **Governing Law**.  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law.

(b)    **Entire Agreement**.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges and supersedes all prior discussions between us.  No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement.  The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors.  Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

(c)    **Successors and Assigns**.  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

(d)    **Notices**.  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)    **Severability**.  If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected.  The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition.  Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 6 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

(f)     **Remedies**.  I acknowledge that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

(g)     **Advice of Counsel**.  I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(h)     **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution via an electronic signature system, facsimile copy or scanned image will have the same force and effect as execution of an original, and an electronic signature, facsimile or scanned image signature will be deemed an original and valid signature.

[<em>Signature Page Follows</em>]

The parties have executed this Employee Confidential Information and Invention Assignment Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**THE COMPANY:**

IYO INC.

By: _Jason Rugolo_
    (Signature)

Name: Jason Rugolo
Title: CEO

Address:
2606 Spring Street

Redwood City, CA 94063
United States

Date: 6/23/2023

**EMPLOYEE:**

Daniel Burton Sargent

(PRINT NAME)

_Daniel Burton Sargent_
(Signature)

Address:
1506 Lombard St Apt A
San Francisco, CA 94123
Email: dan@iyo.dev

Date: 6/23/2023

CONFIDENTIAL INFORMATION AND INVENTION
ASSIGNMENT AGREEMENT OF IYO INC.

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP
### EXCLUDED UNDER SECTION 3(B)
### AND
### CONFLICTING AGREEMENTS DISCLOSED UNDER SECTION 7(B)

The following is a list of (a) my Employee Background IP (if any); and (b) all agreements, if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company:

### Employee Background IP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

### Conflicting Agreements

| Title | Date | Brief Description |
|---|---|---|
| | | |

Except as indicated above on this Exhibit, I have no inventions, improvements or original works to disclose pursuant to Section 3(b) of this Agreement and no agreements to disclose pursuant to Section 7(b) of this Agreement.

_____ Additional sheets attached

Signature of Employee: _Daniel Burton Sargent_
431C53B7F54E4D6...

Print Name of Employee: Daniel Burton Sargent
_____

Date: 6/23/2023
_____

## EXHIBIT B

**Section 2870 of the California Labor Code is as follows:**

(a)      Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)      Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)      Result from any work performed by the employee for the employer.

(b)      To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Chapter 765, Section 1060/2 of the Illinois Compiled Statutes is as follows:**

(1)      A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of this State and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.

(2)      An employer shall not require a provision made void and unenforceable by subsection (1) of this Section as a condition of employment or continuing employment. This Act shall not preempt existing common law applicable to any shop rights of employers with respect to employees who have not signed an employment agreement.

(3)      If an employment agreement entered into after January 1, 1984, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

**Sections 44-130 of the Kansas Labor and Industries Code is as follows:**

(a)     Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facilities or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)     The invention relates to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)     the invention results from any work performed by the employee for the employer.

(b)     Any provision in an employment agreement which purports to apply to an invention which it is prohibited from applying to under subsection (a), is to that extent against the public policy of this state and is to that extent void and unenforceable.  No employer shall require a provision made void and unenforceable by this section as a condition of employment or continuing employment.

(c)     If an employment agreement contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer shall provide, at the time the agreement is made, a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless:

(1)     The invention relates directly to the business of the employer or to the employer's actual or demonstrably anticipated research or development; or

(2)     The invention results from any work performed by the employee for the employer.

(d)     Even though the employee meets the burden of proving the conditions specified in this section, the employee shall disclose, at the time of employment or thereafter, all inventions being developed by the employee, for the purpose of determining employer and employee rights in an invention.

**Section 181.78 of the Minnesota Labor, Industry Code is as follows:**

Subdivision 1.  Invention not related to employment.  Any provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer shall not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.  Any provision which purports to apply to such an invention is to that extent against the public policy of this state and is to that extent void and unenforceable.

Subd. 2.  Effect of subdivision 1.  No employer shall require a provision made void and

unenforceable by subdivision 1 as a condition of employment or continuing employment.

Subd. 3. Notice to employee. If an employment agreement entered into after August 1, 1977 contains a provision requiring the employee to assign or offer to assign any of the employee's rights in any invention to an employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility or trade secret information of the employer was used and which was developed entirely on the employee's own time, and (1) which does not relate (a) directly to the business of the employer or (b) to the employer's actual or demonstrably anticipated research or development, or (2) which does not result from any work performed by the employee for the employer.

**RCW 49.44.140 of the Revised Code of Washington is as follows:**

(1)     A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that exten t against the public policy of this state and is to that extent void and unenforceable.

(2)     An employer shall not require a provision made void and unenforceable by subsection (1) of this section as a condition of employment or continuing employment.

(3)     If an employment agreement entered into after September 1, 1979, contains a provision requiring the employee to assign any of the employee's rights in any invention to the employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (i) directly to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

DocuSign Envelope ID: 54E81B49-1051-406B-A203-4509EA13CAA4

# EXHIBIT 3

## <u>DECLARATION OF DANIEL SARGENT</u>

I, Daniel Sargent, declare:

1. I am a mechanical engineer and currently employed as a product design engineer at Apple, Inc.  I make this Declaration at the request of my former employer IYO Inc. where I was a Design and Manufacturing Lead, Manager from June, 2023 until December, 2024.  This Declaration is based on my own personal knowledge and if called to testify in court, I could and would testify truthfully to the following facts.

2. In 2024, I considered seeking employment outside of IYO.  Through a connection with a mutual friend and former colleague Patch Kessler (LoveFrom), I was put in touch with Tang Tan (then employed by LoveFrom) by email. We arranged to meet for dinner and I have attached a true and correct complete copy of our correspondence as **Exhibit A** to this Declaration.

3. My intent in setting up this meeting and having dinner with Tan was to seek employment with LoveFrom.

4. On June 6, 2024 I met with Tan and Kessler for dinner at Cotogna restaurant in San Francisco. While at dinner, we discussed my previous work as an engineer and my then-current work at IYO in the context of an interview.  I shared information on my capabilities and experience as an engineer and leader.

5. At dinner, I share a few physical samples of products I had helped develop in the past with Tan and Kessler. All of these devices were shown in non-functional, final form factor and were intended only to highlight my skills in building high quality physical goods as a mechanical engineer. None of the devices shown were non-public or confidential.  To the contrary, all of the devices shared were announced publicly by IYO and approved to be worn and used publicly by IYO.  Indeed, IYO encouraged myself and others to wear and use the products in public.  No demonstration of technology or function was conducted in our meeting.

6. I also showed an early version of my design portfolio to Tan and Kessler.  I cannot locate an exact copy of the design portfolio that I shared, but the oldest saved version of the design portfolio, which I believe to be virtually the same as the portfolio shared, is attached hereto as **Exhibit B**. I have not and did not give a copy to Tan or Kessler.

7. After the dinner, I sent two follow-up emails to Tan expressing my continued interest in working at LoveFrom. Tan responded stating that there were not any available roles at the time and so I continued my job search.

8. In November 2024, I applied for a role with Open AI through LinkedIn and provided a then-current copy of my resume.  A true and correct copy of that resume is attached as **Exhibit C** to this Declaration. I received a generic rejection email on November 8, 2024 a true and correct copy of which is attached hereto as **Exhibit D**.

9. This is a complete and true record of all interactions I have had with employees of LoveFrom, io products, and OpenAI.  In the course of these interactions, I did not disclose to anyone information or materials in violation of my confidentiality obligations to IYO or applicable state or federal law.  I acted in good faith toward IYO and have never intended to cause any harm to the Company in any way.

10. I had similar interviews with other companies in 2024. I interviewed with Sesame AI in May 2024, Nudge in September 2024, Oura in November 2024 and again in June 2025, and Apple in November 2024. Content covered in these conversations was similar to that which is stated above along with normal engineering interview topics.

11. As with IYO, I did not disclose any information or materials in violation of my confidentiality obligations to IYO or applicable state or federal law in the course of such interviews.

12. I voluntarily terminated my employment at IYO in December 2024 and began my new role at Apple in January 2025.

I declare under penalty of perjury of the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: July 2, 2025                                              DRAFT
                                                                _____
                                                                By: Daniel Sargent

DECLARATION OF DANIEL SARGENT